**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EBONY TATE, for herself and on behalf of her minor children, E'MONIE BOOTH, LA'NIYA BOOTH, LEGEND BOOTH and LAKAI'YA BOOTH; and CYNTHIA EASON, | ) ) ) ) ) | |
| Plaintiffs, | ) | Case No. 18-cv-07439 |
| v. | ) ) | |
| THE CITY OF CHICAGO; Chicago police officers PATRICK BOYLE (star #975); JENNIFER BURMISTRZ (star #14060); MATTHEW EVANS (star 5815); MICHAEL FLEMING (star #15085); JOHN FOERTSCH (star #9195); MICHAEL HIGGINS (star #3766); PATRICK KENNEDY (star #14414); JEFFREY LAWSON (star #8353) LIEUTENANT JAMES D. CASCONE (star #560); S. ANTISUK (star #6607); BARDSLEY (star #13848); CUOMO (star #5853); SGT. HROMA (star #1729); JAMES (star #4308); KILPONEN (star #12854); LINKER (star #12858); LOPEZ (star #11987); MCCALLUM (star #16333); PANTANO (star #11886); ZENERE (star #17319); and unknown Chicago police officers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Charles P. Kocoras Magistrate Judge Jeffrey T. Gilbert Jury Demanded |
| Defendants. | ) ) | |

**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1.     Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld,

Jr., LLC, bring this action against the City of Chicago and 27 Chicago police officers pursuant to

42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.

S. 658 (1978), for Chicago police officers' use of excessive force against four young children,

ages 4, 8, 11 and 13, their mother and grandmother, which traumatized the family, and state as follows:

2. On August 9, 2018, before Chicago police officers executed a search warrant for the wrong apartment, a Chicago Police Department ("CPD") SWAT team of officers, each one masked and carrying an assault rifle but no bodycam, set off flashbangs outside plaintiffs' apartment, broke the front door and entered plaintiffs' apartment without knocking and announcing, and repeatedly pointed and held assault rifles at close range directly at E'Monie, La'Niya, Legend and LaKai'ya Booth, as well as at their mother and grandmother in the children's presence. Officers' guns were loaded, and their fingers were on the triggers. None of the children or adults posed any apparent, actual or possible threat whatsoever to the officers or refused to comply with instructions.

3. Officers also immediately ordered plaintiffs to leave the apartment, then took them across the street, where they were made to sit on the step or running board of the CPD SWAT truck for over an hour.

4. When officers entered the apartment, Cynthia Eason, the children's grandmother, was in her bedroom dressed in a T-shirt and underwear. When the officers ordered her outside, she asked if she could put on pants before going outside. In response, officers told her again to "Get out!" Once outside for several minutes, she asked two more officers if she could go inside and get something to cover herself or if one of the officers could go inside and get some clothing for her. One officer put her off, while another officer ignored her.

5. A fourth officer simply laughed at Ms. Eason while she stood and sat outside with her underwear fully exposed and visible for an hour and fifteen minutes.

6.     The Chicago police forced a 55-year-old grandmother to stand for an hour and fifteen minutes on the public street outside her home - in full view of her neighbors and the onlookers who had gathered to watch the dramatic events unfold - in nothing but a braless T-shirt and underwear.  Ms. Eason has never felt or been so humiliated in her life.

7.     Upon first entering the apartment, officers screamed and cursed loudly at Ebony Tate, the children's mother, and Ms. Eason in the children's presence, as well as at the children.  Officers were rude, nasty and sarcastic.

8.     Officers found nothing illegal.  They arrested and charged no one.  When they finished searching, they simply left.  Officers did not apologize or explain that they made a mistake, which could have mitigated the psychological harm they did to the children.

9.     On information and belief, officers never reported to the appropriate department of the City of Chicago the damage that they did to plaintiffs' apartment so that repairs could be made or paid for by the City.

10.     In fine, on August 9, 2018, Chicago police terrorized the innocent, Tate family in their home for no reason.  Their actions toward E'Monie, La'Niya, Legend and LaKai'ya, their mother and grandmother were not only premised on an easily avoidable mistake (i.e., executing a search warrant for which they knew they no longer had probable cause); they were totally unnecessary, excessive, unreasonable, and without any lawful justification.

11.     E'Monie, La'Niya, Legend and LaKai'ya now suffer severe, emotional and psychological distress and injury as the direct result of their exposure to defendants' unnecessary and terrifying conduct.  Their deep distress and related symptoms constitute scars on their young psyches, scars that, unlike many physical injuries, are long-lasting and may never fully heal.

3

12. The children's totally law-abiding mother and grandmother also suffered serious psychological harm from the incident.

## JURISDICTION AND VENUE

13. This action arises under 42 U. S. C. § 1983. This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction over plaintiffs' state law claims.

14. Venue is proper pursuant to 28 U. S. C. § 1391(b). The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

15. At the time of all relevant events, plaintiff LaKai'ya Booth was a four-year-old girl residing with her mother, grandmother and siblings at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609. The building at 5033 S. Hermitage is a two-story, three-unit apartment building. On August 9, 2018, LaKai'ya was about to begin her final year of preschool before kindergarten next year.

16. At the time of all relevant events, plaintiff Legend Booth was an eight-year-old boy residing with his mother, grandmother and siblings at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609. On August 9, 2018, Legend was about to enter third grade.

17. At the time of all relevant events, plaintiff La'Niya Booth was an eleven-year-old girl residing with her mother, grandmother and siblings at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609. On August 9, 2018, La'Niya was about to enter sixth grade.

18. At the time of all relevant events, plaintiff E'Monie Booth was a thirteen-year-old boy residing with his mother, grandmother and siblings at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609. On August 9, 2018, E'Monie was about to enter eighth grade.

19.     Plaintiff Ebony Tate (or "Ms. Tate") is LaKai'ya, Legend, La'Niya and E'Monie's natural mother.  At the time of all relevant events, Ms. Tate resided at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609.

20.     Plaintiff Cynthia Eason (or "Ms. Eason") is LaKai'ya, Legend, La'Niya and E'Monie's natural, maternal grandmother.  At the time of all relevant events, Ms. Eason resided at 5033 S. Hermitage Avenue, 1st floor, Chicago, Illinois, 60609.

21.     Neither Ms. Tate, nor Ms. Eason, nor any of the four children has ever been arrested; none have any criminal record of any kind.  None have ever been involved in any illegal activity.

22.     At the time of all relevant events, to support her family Ms. Tate worked full-time, six days per week as a cashier at a gas station in Chicago.  Ms. Eason, who is disabled, helps take care of the children.

23.     Plaintiffs are African-American.

24.     Plaintiffs are a close-knit family who live on a dangerous block. Consequently, they keep to themselves and keep their kids close.  They drop off and pick up their kids up from school in a car, even though the school is located just blocks from where they live.  Ms. Eason and Ms. Tate do not allow their kids to play outside unsupervised, even in summer time.  The children are only permitted to walk down the block to a community center where they regularly get homework help.  The family keeps their doors and windows closed and locked at all times.

25.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

26.     At the time of all relevant events, defendant Michael Higgins (star #3766) was a Chicago police officer assigned to Unit 312 Area South Gun Team. He, defendant Jennifer Burmistrz (star 14060) and unknown other Chicago police officers participated in obtaining a search warrant for a suspect target at the address of plaintiffs' apartment. On information and belief, defendant CPD Lieutenant James D. Cascone (star #560) approved the search warrant, both pre- and post-execution, as well as a second search warrant obtained by officer Burmistrz for the same target at the address of the building next to plaintiffs' building. Collectively, these officers are referred to below as "defendant warrant officers."

27.     Defendant officer Michael Higgins (star #3766) and the following other defendant officers participated in the execution of the search warrant at plaintiffs' address on August 9, 2018: Patrick Boyle (star #975); defendant Jennifer Burmistrz (star #14060); Matthew Evans (star #5815); Michael Fleming (star #15085); John Foertsch (star #9195); Patrick Kennedy (star #14414); and Jeffrey Lawson (star #8353). Officer Boyle was the search team supervisor.

28.     Officers of the CPD SWAT Alpha Team participated in the breach, entry and "clearing" or "securing" of the apartment, prior to the search, which on information and belief was conducted by the Area South Gun Team. SWAT officers also participated in the initial stage of the search.

29.     On information and belief, several of the following defendant officers of CPD's SWAT Alpha Team participated in the breach, entry and initial search of plaintiffs' apartment and/or had contact outside afterwards with plaintiffs: S. ANTISUK (star #6607); BARDSLEY (star #13848); CUOMO (star #5853); JAMES (star #4308); KILPONEN (star #12854); LINKER (star #12858); LOPEZ (star #11987); MCCALLUM (star #16333);

PANTANO (star #11886); and ZENERE (star #17319). The Alpha Team was supervised by defendant SGT. HROMA (star #1729).

30. Collectively, these officers are referred to below as "defendant SWAT officers."

31. Defendant officer Jennifer Burmistrz and unnamed officers also participated in obtaining a search warrant on August 8, 2018 for the same target and the same gun at the address of the building next door to plaintiffs. Officers executed this warrant on the same day, immediately after executing the warrant for plaintiffs' address.

32. When Chicago police officers obtained the search warrants and when they were present at plaintiffs' home on August 9, 2018, they were at all times acting under color of law and within the scope of their employment as officers of the CPD of the City of Chicago.

## FACTS RELATING TO ALL COUNTS

***Chicago Police Used Unnecessary and Excessive Force Against E'Monie, La'Niya, Legend and LaKai'ya and Against Their Mother and Grandmother in the Children's Presence***

**a. Officers point guns close-range at 4-year-old LaKai'ya and her mother**

33. A few minutes before 6:00PM on August 9, 2018, Ms. Tate was sitting quietly on the couch in the living room of her apartment while her youngest daughter, LaKai'ya, age 4, lay on the couch next to her, napping. Moments before, Ms. Tate had finished talking on the phone with her children's paternal grandmother.

34. Suddenly, Ms. Tate heard loud "popping" sounds coming from two sides of the outside of her apartment building. She did not know what they were; they sounded like fireworks going off. At that moment, her apartment's front security door was open, and the front screen door was shut and locked. The front door of Ms. Tate's apartment opens into the living room.

7

35.     When Ms. Tate looked up from the couch, she saw someone using a large bar of some kind to pry and break open the screen door, and she saw men with guns. Ms. Tate at first thought her home was being robbed.

36.     Officers did not knock or announce themselves or their purpose before breaching and entering Ms. Tate's apartment. They did not announce or present a search warrant. The search warrant they had was not a "no-knock" warrant.

37.     As Ms. Tate stood up from the couch to better see what was happening, CPD SWAT officers were already rushing in at her and pointing assault rifles at her and 4-year-old LaKai'ya.

38.     The approximately 10 officers who entered plaintiffs' home first and ordered them out at gunpoint were all members of CPD's SWAT Alpha Team. Their uniforms consisted of army fatigues that had "SWAT" printed on the front and back; black boots; helmets; face coverings that left only the eyes visible; at least one SWAT team member also had a riot shield; and all SWAT team members carried large machine guns or assault rifles, dark in color and approximately 3 – 3.5' in length.

39.     None of the SWAT team officers were wearing bodycams. None wore name plates or badges or badge numbers on their uniforms or helmuts. Plaintiffs could not see their faces in order to be able to describe or identify them later.

40.     The SWAT officers that entered plaintiffs' home had arrived in a large CPD SWAT truck, an armored military vehicle labeled "SWAT," which they parked in the middle of the street directly in front of plaintiffs' building. They were one of two, entire SWAT teams, Alpha and Beta, that were deployed to execute two search warrants for two apartments in adjacent buildings. The situation and circumstances did not satisfy accepted criteria for

8

deployment of SWAT, but, even they had, CPD SWAT chose incorrect, unreasonable, and unnecessarily dangerous tactics (to officers and citizens, including plaintiffs) for the operation.

41.     In plaintiffs' living room, SWAT officers pointed multiple assault rifles directly at Ms. Tate as she stood up and at LaKai'ya, who was directly behind and adjacent to Ms. Tate as Ms. Tate stood in front of the couch.

42.     One officer pointed his assault rifle directly at Ms. Tate's chest, and the tip of the barrel was approximately 2-4 inches away from her body.  Other officers pointed their assault rifles directly at her from a distance of approximately 3 feet away (tip to body).

43.     The assault rifles that officers pointed directly at Ms. Tate and LaKai'ya were at such close-range that Ms. Tate vividly remembers staring into the dark holes at the end of gun barrels.

44.     Officers immediately ordered Ms. Tate out of the apartment.  The first words they spoke to her that day were "GET OUT!" and "COME OUT WITH YOUR HANDS UP!"

45.     Ms. Tate asked officers if she could pick up her baby.  Officers did not respond.

46.     Ms. Tate then snatched the sleeping LaKai'ya up from the couch, clutched her to her chest, and carried her outside.  As she did this and as she was walking towards the front door and out of the apartment, officers continued to aim their assault rifles at them – at the front of Ms. Tate's body, at LaKai'ya as she was being held in the arms of her mother, and at Ms. Tate's back.

47.     In the same instant that some officers focused on Ms. Tate and LaKai'ya in the living room, other officers rushed pass them and into the dining room, kitchen, and hallway leading to the bedrooms.  The apartment has an open floor plan in these common areas.

**b.     Officers also point guns close-range at 8-year-old Legend, 11-year-old La'Niya, 13-year-old E'Monie and their grandmother**

48.     At the moment when SWAT officers entered the apartment, Ms. Eason was lying down in her bedroom, which is the bedroom closest to the kitchen, dining room and living room areas.  She had undressed and was waiting for the bathroom to become free so that she could take a bath.  She was wearing nothing but a T-shirt with no bra and her underwear.  In these clothes, when she sat or stood her T-shirt did not cover her underwear.

49.     At the moment when SWAT officers entered, La'Niya had just exited the bathroom and was walking in the hallway.  E'Monie was in his bedroom, and Legend was in Ms. Tate's bedroom, which he shared with his mom.  Both boys were playing video games.

50.     Ms. Eason heard at least two, loud sounds, "BOOM, BOOM!"  To her, it sounded like a car crashing through the front of the living room.  She leapt up, opened her bedroom door, entered and walked through the hallway and into the kitchen on her way to the dining and living rooms.

51.     Ms. Eason was the second family member to run through the hallway from the back of the house; La'Niya was the first and was directly ahead of her grandmother. E'Monie and Legend came out of their bedrooms and ran through the hallway, close behind their grandmother.

52.     When 11-year-old La'Niya heard two, big "boom" sounds, she immediately turned around and headed toward the front of the house and the living room.  When she first became visible to officers in the dining room, one pointed a gun at her face from

approximately two-to-three feet away and shouted at her, "GET OUT! GET OUT!" Officers near her in front of the deep freezer pointed guns and shouted at her.

53.     La'Niya then quickly walked through the living room towards the front door, trying to catch up with her mother and LaKai'ya, who at that moment were walking out of the front door while an officer pointed an assault rifle at her mother's back. Another officer pointed a gun at La'Niya's back as she walked out of the apartment. Walking out, La'Niya glanced back and saw officers pointing guns at her grandmother and her brothers.

54.     With La'Niya walking out, officers ran towards Ms. Eason and the two boys, who were immediately behind her, and pointed their assault rifles at all three of them while shouting at them to "GET OUT!"

55.     When Legend and E'Monie entered from the hallway into the kitchen and dining room, which are visible to the front of the house, approximately four or five officers pointed their assault rifles at them from various distances around the living room, dining room and kitchen.

56.     Ms. Eason and the boys halted their forward motion at the dining room/kitchen table as officers trained their guns on them and yelled for them to put their hands up.

57.     An officer standing in front of the deep freezer pointed the tip of his assault rifle barrel directly in the center of Ms. Eason's face, at the bridge of her nose. She looked into the black hole at the end of the barrel. Terrified, she backed up slightly and stepped on Legend's right foot.

58.     Simultaneously, this officer shouted at her, "WHO'S IN HERE?!" "WHO'S IN HERE?!" When she didn't respond immediately (because she had frozen up from

shock and confusion), the officer yelled louder, "WHO THE FUCK IS IN HERE?!!!"  "No one, just me, my daughter, and grandkids," replied Ms. Eason.

59.     When officers shouted for them to put their hands up, E'Monie and Legend put their hands up immediately.  Legend's arms shot straight up in the air.  Both boys were in shock.

60.     The same officer who had pointed his assault rifle at Ms. Eason then turned the gun and pointed it directly at the face of 8-year-old Legend, who was standing directly behind his grandmother.

61.     The same officer then shifted again and pointed his gun at the chest of E'Monie, who was standing directly behind Legend.

62.     Simultaneously, several other officers also pointed their guns at both Legend and E'Monie.  An officer standing in the kitchen aimed his gun at Legend first then pointed it at the left side of E'Monie's head, just inches from his head.  This officer fixated on E'Monie as though he were the 20-year-old target of the search warrant when E'Monie was obviously just a prepubescent boy.  Other officers who trained their guns on E'Monie aimed at points above his waist-level from a distance of less than a foot from his body.

63.     On information and belief, the SWAT officers, like members of the Area South Gun Team, viewed photos of the target of the search warrant before carrying out the raid on plaintiffs' home.  Neither Legend nor E'Monie looked anything like the target of the search warrant.  Both were much younger, shorter, and were mere boys

64.     Ms. Eason managed to ask officers why they were pointing guns at the children.  They responded by telling her and the boys "GET OUT!" "GET OUT!"

65.     Ms. Eason, still in her T-shirt and underwear, also asked, "Let me get some clothes."

66.     Two officers responded, "NO, GET OUT NOW!  GET OUT!"

67.     Following the officers' orders, Ms. Eason then ushered the boys in front of her and had them walk out first, with her following immediately behind them.

68.     As she and the boys walked through the apartment toward the front door, officers kept their assault rifles trained on Ms. Eason's back.  Ms. Eason walked slowly because her ankle was swollen from gout, and she had had knee surgery, prompting officers to keep yelling at her to "GET OUT!"  It took her approximately 30 seconds to make it out of the apartment.

69.     As Ms. Eason was walking out, SWAT officers started searching the apartment and tossing things.  An officer in the kitchen was pulling out pots and pans.  Two officers were looking at the couches and throwing couch pillows across the room.  Other officers went towards the hallway and into the bedrooms and other rooms.

70.     When officers entered the apartment, not one of them told plaintiffs they had a search warrant, said they were there because of a warrant or showed plaintiffs a warrant.  Not until the family had been outside for a long time did officers mention that they had a search warrant.

71.     Until all plaintiffs were outside, only SWAT team members had entered and were inside their apartment.  Once plaintiffs were all outside, plainclothes Chicago police officers, wearing faded jeans, black bullet proof vests with shirts underneath the vests – believed to be officers Michael Higgins, Jennifer Burmistrz and other members of the Area South Gun Team – rushed past plaintiffs and entered their apartment to join in the search.

### c. Chicago police officers also forced Ms. Eason, a grandmother, to stand in the public street in her underwear for over an hour

72.     When plaintiffs were led outside, SWAT team members were posted all over the street out front.  Officers had blocked off plaintiffs' street at either end of the block and were not letting anyone through.  They were ordering people to put their cell phones away and not to take video of the scene.

73.     Once plaintiffs were outside, SWAT officers led them across the street to the other side of the SWAT truck, where they directed them to sit on the running board or steps of the truck.  Plaintiffs were surrounded by SWAT team members at this time.  As plaintiffs sat, at least one SWAT team member was pointing an assault rifle at them.

74.     When they were led outside, Ms. Tate, Ms. Eason and the children were all barefoot, except for E'Monie.  LaKai'ya had a T-shirt and her nightgown on.

75.     Ms. Eason was not able to cover herself; both when she walked and when she sat, her underwear and bare legs were visible to all of her neighbors and the onlookers who continued to gather as the dramatic events unfolded on the block.

76.     Neighbors and onlookers stared at Ms. Eason and her family, wondering what crimes they had committed.

77.     Ms. Tate was crying.  La'Niya and LaKai'ya were crying.  LaKai'ya had been sleeping peacefully before Ms. Tate had to snatch her up and rush outside.  The boys were silenced by shock.

78.     Throughout the encounter – when officers first entered, as plaintiffs were led out, and while they were being held outside for over an hour – Ms. Tate and Ms. Eason continually asked officers, "What's going on?"  Officers would not give them any information.  An officer kept telling them, "someone will be here soon to tell you."  No one came.

79.     Almost immediately after the family was taken outside, Ms. Tate's heart began to pound palpably in her chest and she began to hyperventilate deeply and loudly.  She felt like she could not breathe.  Ms. Tate has asthma and at first thought she was having an asthma attack.  An officer told her, sarcastically, "You're not having an asthma attack.  It's panic.  Just breathe through your nose."

80.     The officer was not doing anything to help Ms. Tate so Ms. Eason demanded, "help her!"  An ambulance was called, and water was brought for her.

81.     An ambulance arrived at approximately 7:00 PM.  Once the ambulance arrived, Ms. Tate was placed inside the ambulance for assessment.  Ms. Tate asked the ambulance staff to assess La'Niya, too, because she has high blood pressure that is sensitive to stress.  Ms. Tate then asked the ambulance staff to give her mother a blanket.

82.     The ambulance staff gave Ms. Eason a blanket to wrap around herself.  This was the first time Ms. Eason was allowed or provided any clothing to put on to cover her underwear and legs.

83.     When the family was first taken outside, Ms. Eason had asked a female officer if she could either go get some clothes or if an officer could go inside for her and get some clothes for her to put on.  The officer said, "Someone will be with you in a minute."  No one ever got back to her.

84.     A little while later, Ms. Eason asked another officer, a male, who did not respond at all.

85.     And while Ms. Eason was stranded outside in her T-shirt and underwear waiting for clothing, another SWAT officer simply laughed at her and her humiliating predicament.

86.     Because officers both refused to allow her to retrieve clothes to cover herself and refused to retrieve clothes for her, Chicago police officers forced Ms. Eason, a 55-year-old grandmother, to stand outside in public in her underwear and a braless T-shirt for approximately an hour-and-fifteen-minutes.  During this time, her underwear and legs were fully visible; whether she stood or sat, her T-shirt cut off before it reached her underwear.

87.     Ms. Eason has never been more embarrassed and humiliated in her life.

88.     After the ambulance left, Ms. Tate asked if she could go inside to get some shoes to put on.  In response, an officer brought her into the apartment and gave her a copy of search warrant for a "Javale Bell" at her apartment address.  This was the first time that any officer mentioned a search warrant to any member of the Tate family or presented them with a copy of it.

**d.     *Officers Did Not Find the Target Nor a Gun Nor did They Arrest or Charge Anyone***

89.     Next, while she was still inside, officer Higgins approached Ms. Tate and showed her photos on his cell phone of the target of the warrant and questioned Ms. Tate, asking her if she knows who Mr. Bell is.  She had never seen him before and told officer Higgins so. Officer Higgins asked her if she was sure.

90.     Officer Higgins also said that Mr. Bell was selling drugs to an undercover cop under the stairs by Ms. Tate's front door.  The ground-level, front door to plaintiffs' home is underneath a wooden stairway leading to the building's second-floor apartments.  Higgins also said that Mr. Bell has "family members in this building or the building next door."  Officer Higgins said officers had been doing surveillance of her home.  He did not say officers saw Mr. Bell enter plaintiffs' building or plaintiffs' apartment.

91.     When Ms. Tate told officer Higgins she did not know who the man in the photos was, another officer sniped sarcastically, "I guess we got the wrong house."

92.     After speaking with Ms. Tate, officer Higgins and other officers then allowed she and her family to sit on the stairs by their front porch while officers finished searching their apartment.  Ms. Eason was still wrapped in a blanket.

93.     At approximately 7:15 PM, plaintiffs were permitted to go back into their apartment.

94.     Officers finished pulling out all of plaintiffs' things and searching plaintiffs' entire apartment and left.

95.     Officers did not find Javale Bell in plaintiffs' apartment, and they did not find the gun described in the search warrant or any gun in plaintiffs' home.

96.     Officers did not find anything illegal in plaintiffs' apartment, and they did not arrest or charge anyone in the Tate family with any crime.

97.     Before they left the apartment, officers did not make any apology for their conduct to the children, Ms. Tate or Ms. Eason.  They did not offer any explanation for pointing their assault rifles at young children or for ransacking their apartment and leaving it damaged and trashed.  Apology and/or explanation would likely have mitigated the family's – especially the children's - trauma.

98.     Before they left the apartment, none of the officers explained how plaintiffs could arrange for the damage to their apartment to be repaired.  The damage has still not been repaired.

    *e.*    ***Officers Recklessly Search and Trash Plaintiffs' Apartment***

17

99.     Officers aggressively searched plaintiffs' apartment, throwing things, damaging doors and a closet, carelessly dumping storage containers full of plaintiffs' belongings and breaking their personal property.  Officers were disrespectful and reckless with plaintiffs' property, in violation of CPD's Special Order governing the execution of search warrants, SO4-19, which requires officers to "mak[e] every effort to leave the premises in the same condition as originally found."

100.     Photos taken in the days after the search show that officers made a mess in all of the rooms.  Objects were strewn all over the surfaces and floors and sometimes left in large piles for plaintiffs' to clean up.  It literally took plaintiffs weeks to clean up and recover from the physical mess and disorganization that officers wreaked.

101.     Officers damaged the front screen door and door frame when they forced it open.  They damaged the wall in Ms. Eason's bedroom closet, making a hole.  They damaged a door off of the hallway that opens into the utility room.

102.     During the entry and search, officers caused damage to at least three places in the apartment.  However, on information and belief, defendant officers did not make any City Claims Notification, as required by CPD Special Order S04-19.

103.     Before they left, officers did not explain how plaintiffs could arrange to have the City repair the damage to their apartment.  They did not provide any name or phone number for plaintiffs or their landlord/property manager to contact the City of Chicago regarding damage or repairs.  No one from the City ever contacted Ms. Tate or Ms. Eason or, on information and belief, their landlord/property management company, Woodlawn Development Corporation (WDC), and no one from the City ever came to inspect or make repairs.  On

information and belief, WDC had to make and pay for all repairs of damage caused by the officers' breaches.

104.     Among the property officers destroyed were some of the children's favorite toys.  Each child had an iPad-type tablet.  They were stored in a plastic trunk or tote.  With this and other totes in plaintiffs' apartment, officers simply turned the tote upside down and dumped the contents to the floor; the glass face of all four tablets shattered or cracked.  The tablets no longer work.

105.     After officers left, Legend could not find his Xbox.  When he finally found it, the battery pack for it had been broken by officers and was no longer working.  His mother had to buy a substitute replacement.

106.      La'Niya had a favorite toy, a Hello Kitty Karaoke toy that she played with often.  Officers broke the volume button, leaving the toy with no sound, so it no longer works.

107.     Plaintiffs are low-income people and cannot easily afford to replace their damaged and broken property.

108.     On August 9, 2018, officers terrorized a totally innocent family and departed, leaving behind all of the damage, physical and psychological, for plaintiffs and others to cope with indefinitely.

### *Officers Discovered They Lacked Credible or Reliable Information that Bell Resided at Plaintiffs' Address; Nevertheless, They Executed the Warrant, Endangering an Innocent Family*

109.     When officers obtained and when they executed the search warrant for plaintiffs' apartment, they lacked "credible and reliable" information that Mr. Bell actually resided at plaintiffs' address, as they had claimed in the complaint for search warrant.

Consequently, their "investigation leading up to the need for a search warrant" for plaintiffs' address had not been "thoroughly conducted." (CPD SO4-19). Officers failed to adhere to these basic requirements of CPD's Special Order governing procedures for obtaining search warrants, S04-19.

110.     Alternatively, when officers executed the warrant for plaintiff's apartment, they were aware they no longer had probable cause for that warrant. The day before they executed it, they had received what they regarded as more accurate, precise and reliable information about Mr. Bell's location.

111.     At a minimum, before they executed the warrant for plaintiffs' apartment on August 9, officers possessed conflicting information about the address where the target, Mr. Bell, resided, and they did not bother to try to resolve the conflict through further investigation or surveillance before raiding the apartment of an innocent family with young children and endangering their health and safety. They took a known, foreseeable, unreasonable risk.

112.     One day after defendant officer Higgins obtained a search warrant for Mr. Bell at plaintiffs' address (5033 S. Hermitage), another officer, defendant Burmistrz, sought and obtained a second search warrant for the same Mr. Bell at the address of the building next door to the south (5039 S. Hermitage).

113.     Both officers Higgins and Burmistrz were members of the Area South Gun Team. On information and belief, both officers' complaints for search warrant rely on information provided by the same confidential informant. In both complaints, each officer swore that he or she talked to that informant on the same day, August 7, 2018.

114.     In the search warrant complaint for plaintiffs' address obtained on August 7, Higgins swears the informant told him on August 7 that Bell resides at 5033 and that the

informant observed Bell handling the gun inside the basement apartment at this address; in the complaint for the warrant obtained on August 8, Burmistrz swears the same informant told her on August 7 that Bell resides at 5039 and that the informant observed Bell handling the gun inside the basement apartment at *this* address. In each complaint, the informant identified Bell and Bell's residence from photos presented by the swearing officer.

115.    Bell could not have resided in both apartments or been observed with the gun in both apartments at the same time. The two swearing officers, part of the same gun team, were each aware of the conflicting information.

116.    Moreover, the two sworn complaints for search warrant contain nearly identical descriptions of Bell handling the same gun inside each basement apartment, based on the same August 7 conversation with the informant. The same event could not have occurred in two different apartments at the same time.

117.    The fact that the same informant had provided officers with two addresses for the same target meant that the "the facts alleged in the complaint" for the warrant for plaintiffs' home were not "credible and reliable" such that officers should not have applied for both warrants and/or should not have executed one of them without further investigation or surveillance. (S04-19, VI.B.a.).

118.    Not to undertake further investigation was to unreasonably risk making a mistake and traumatizing an innocent family.

119.    Officers could easily and quickly have checked public utility records, recorder of deeds records, public housing lease records and/or CPD's own information sources/databases, such as Accurint, which assists officers in identifying apartments and the

persons residing in them. In this manner, they could have determined where Mr. Bell most probably resided and who else lived there, including whether any children lived there.

120. Moreover, the surveillance that officers did do of plaintiffs' apartment on or about August 8 did not show Mr. Bell going inside plaintiffs' apartment.

121. Instead, to circumvent the problem of having conflicting information about where Bell could be found, officers of the same gun team approached different Assistant State's Attorneys one day apart in order to independently obtain two warrants for the same person, each with a different address. In neither complaint did the swearing officer disclose that he or she had been given another address where the target resided.

122. Once they obtained the August 8 search warrant, the fact that officers had conflicting addresses without any explanation meant that officers had not "thoroughly conducted" "the investigation leading up to the need for a search warrant." Additional investigation and surveillance were also called for once they had obtained both warrants.

123. Instead of conducting additional investigation and surveillance to determine where the target most likely lived so that they could ensure execution of the right warrant for the correct address, officers simply raided and searched *both* addresses.

124. Alternatively, officers regarded the location information in the second or August 8 warrant has more accurate and reliable, such that they no longer had probable cause for the warrant for plaintiffs' address; nevertheless, they proceeded to execute the warrant for plaintiffs' apartment as well.

125. Officers should never have executed the warrant for plaintiffs' address. After obtaining it but before executing it, officers became aware or reasonably should have been aware that it was defective in that the target and items to be seized were not located at the

address of plaintiffs' apartment. Officers knew that warrant when executed was no longer supported by probable cause.

126.    At about the same time or just after officers entered and searched plaintiffs' apartment, they entered and searched the apartment or house next door, 5039 S. Hermitage, first floor. There, they apprehended and arrested Mr. Bell. They also found the gun described in the warrant. They also found cannabis on his person and Ziploc bags.

127.    Under the circumstances, especially where officers knew before they executed the warrants on August 9 that Bell did not reside at 5033 S. Hermitage, CPD's decision to use a SWAT team to enter plaintiffs' apartment was unreasonable and constituted a deliberate choice in favor of excessive force.

128.    SWAT should never have been selected to execute a routine search warrant using extraordinary force and terror at the home of a law-abiding mother, grandmother and four young children, none of whom were suspects.

*Officers' Uses of Force against E'Monie, La'Niya, Legend and LaKai'ya and Against Their Mother and Grandmother in the Children's Presence Was Totally Unnecessary*

129.    E'Monie, La'Niya, Legend, and LaKai'ya presented absolutely no threat, real or apparent, to the police officers entering into their home in order to clear and secure it for the search team.

130.    Even though they presented no threat, officers repeatedly pointed their guns at all four children, and other officers did not ask the officers pointing guns at the children to cease doing it.

131.    Moreover, Ms. Tate presented absolutely no threat, real or apparent, to the police officers as they were entering into her home and she stood in front of her sleeping four-year-old or as she walked out of her home with LaKai'ya in her arms.

132.    Even though she presented no threat, officers repeatedly pointed guns at Ms. Tate and LaKai'ya, and other officers did not intervene to ask their fellow officers to stop pointing guns at them.

133.    Similarly, Ms. Eason presented absolutely no threat, real or apparent, to the officers who entered her home in order to clear and secure it for the search team.

134.    Even though she was a grandma in her underwear and presented no threat, officers repeatedly pointed guns at her, and other officers did not intervene to ask their fellow officers to stop pointing guns at her.

135.    Plaintiffs have all been harmed by the unnecessary pointing of guns, the unlawful detention, and the unlawful search of their homes.

*Officers' Unnecessary Uses of Force Traumatized E'Monie, La'Niya, Legend and LaKai'ya*

136.    Chicago police officers' terrorizing conduct toward E'Monie, La'Niya, Legend and LaKai'ya and toward their mother and grandmother in the children's presence caused the children immediate, severe, and lasting emotional and psychological distress and injury.

137.    When SWAT officers raided their home and pointed assault rifles at them and their mother and grandmother, the people dearest to them, the Booth children were utterly shocked and terrified, and they believed that something awful was going to happen to them and their family.

138.    In addition to having guns pointed at them at point blank range and being threatened with imminent violence against themselves and their mother and grandmother, E'Monie, La'Niya, Legend and LaKai'ya were also subject to officers' shouting and cursing commands and to their mother's visible, severe distress.  Many of the officers spoke to the

children, their mother and grandmother in rude, nasty and sarcastic tones. This made for one, big, fast, chaotic, unnecessary scene of disrespect and terror.

139.    Prior to August 9, 2018, E'Monie, La'Niya, Legend and LaKai'ya were happy, healthy children in a close, loving family whose members all respected police and did not fear or distrust them. Prior to this date, they had not been subject to police violence or the threat of police violence. That changed on August 9, 2018 with defendant's actions.

140.    Throughout their encounter with police, E'Monie, La'Niya, Legend and LaKai'ya were alternately in shock, terrified, confused, and/or crying. LaKai'ya kept repeating, "mommy, mommy, mommy, mommy...."

141.    In fact, they saw their mother have a panic attack. She looked, sounded, and felt like she couldn't breathe – she was hyperventilating loudly and deeply. Her heart was pounding.

142.    That night after the incident, Ms. Eason did not sleep at all. Nor did Legend. Legend lay with his grandma in her bed all night.

143.    Ever since the incident, E'Monie, La'Niya, Legend and LaKai'ya have continued to re-live, in various ways, how terrified they were that day.

144.    The children and their mother and grandmother are now all on edge and jumpy. If they hear any loud noise, they jump; LaKai'ya runs.

145.    Whenever Ms. Tate gets herself ready to go out somewhere, the kids follow her around the house and plead with her, "don't leave me, don't leave me...." Each day, they follow her around the house until she leaves for work.

146.    Now, Legend cannot stand to be by himself.  His grandmother has to sit in the bathroom with him when he takes a bath and stand by the door when he goes to the bathroom.

147.    Before the incident, if any of the children saw a police officer, they did not think anything of it.  Now, they freeze, get nervous, and/or cling to their mother or grandmother and ask, "what are you here for?"

148.    The children are now afraid of the police and feel afraid every time they see them.

149.    The children's behavior is now profoundly changed.

150.    None of the children have been sleeping well since the incident.

151.    Now, Legend wakes up in the middle of the night and just looks around and stares.  It takes him three or four hours to get back to sleep - sometimes he does not get back to sleep at all – and he is tired during school and exhausted when he gets home from school.

152.    Since the incident, La'Niya and E'Monie also often stay up much of the night.  When asked what they are doing, they say "I'm just watching."

153.    La'Niya is afraid the police are going to come back.  La'Niya used to watch TV in the living room frequently.  Since the incident, she has stopped watching TV.  She is scared that police officers are going to come through the living room again.

154.    The children exhibited none of these behaviors prior to August 9, 2018.

155.    All four children now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

156.    Since the incident, at school teachers are asking if the children have experienced trauma recently.

157.    On information and belief, the children either have or have many of the symptoms of severe Post-Traumatic Stress Disorder.

158.    In addition to threatening their lives and those of their mother and grandmother, officers destroyed some of the children's most precious toys. E'Monie, La'Niya, Legend and LaKai'ya each had a tablet or iPad-type device that they played games on. Officers shattered the face of all four tablets. After the raid, Legend could not find his remote or his game.

159.    La'Niya had another favorite toy, a Hello Kitty Karaoke. Officers broke it, and she could not turn the volume up or down.

160.    The kids were asking, in genuine puzzlement, "why did they do this to my stuff?" Four-year-old LaKai'ya asked, "Why did they throw my baby dolls all over the floor?" La'Niya recalls seeing her toys all over the floor.

161.    As a direct result of officers' conduct, the children now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

162.    Officers' shocking actions of repeatedly pointing and training loaded assault rifles at close range on 4, 8, 11 and 13-year-old children, and at their mother and grandmother in front of them constituted serious abuses of power and authority.

163.    Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed at *4, 8, 11 and 13-year-old children.* The children's sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

164.    Officers' conduct was undertaken pursuant to, and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force, including unnecessary force against and/or in the presence of children.

165.    Plaintiffs are highly likely to be the victims of excessive force by Chicago police again in the near future.

166.    Due to no fault of their own, plaintiffs live in scattered-site public housing in a neighborhood or section of a neighborhood where there is high drug and gang activity.  They are stuck unable to move to another apartment in another location, despite recent and repeated requests for a transfer.

167.    In the weeks since August 9, 2018, Chicago police have returned to plaintiffs' block several times.  They have chased people on foot around plaintiffs' building.  On at least two occasions, they have initiated further contact with plaintiffs in particular.

168.    E'Monie and Legend Booth, currently ages 13 and 8, are likely to be viewed with suspicion and targeted by police as they begin to look even more like young men.

169.    For people especially children with PTSD, re-exposure to additional trauma can be permanently debilitating.  If plaintiffs are re-traumatized by further incidents of police excessive force, they may never recover.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO (Minor Plaintiffs Only)

170.    Plaintiffs E'Monie, La'Niya, Legend and LaKai'ya Booth ("the minor plaintiffs) re-allege paragraphs 1-88, 92-97, 104-106, 107, 129-169 above and 195-203 and 204-211 below and incorporate them into this count.  The minor plaintiffs assert this claim against defendant City of Chicago.  The officers' use of excessive force against them was directly and proximately caused by specific CPD and City of Chicago interrelated, *de facto* policies,

28

widespread practices, and/or customs, which existed for more than six years prior to August 9, 2018 ("the *Monell* period").

171.     The basic *de facto* policy and practice is a failure of official City policy: City has failed and fails to place official priority on avoiding unnecessary uses of force against young children and against their adult relatives in the children's presence.

172.     For more than six years preceding August 9, 2018, CPD's official use-of-force policy lacked any requirement or guidance for officers, including SWAT officers, to avoid using unnecessary or excessive force against young children and against their adult relatives in the children's presence, when possible.

173.     For more than six years preceding August 9, 2018, CPD's use-of-force training and subsequent supervision of officers on the job, including SWAT officers, failed to include any requirement or guidance that officers should avoid unnecessarily using force against or in the presence of young children, when possible.

174.     For more than six years preceding August 9, 2018, CPD's search warrant policy and related polices failed to require officers seeking or executing residential search warrants, including SWAT officers, to make reasonable efforts before obtaining and/or executing a warrant to determine, through investigation and surveillance, (a) whether children reside in the residence; (b) to avoid entry and search at times when children are likely to be present; or (c) to de-escalate themselves or change tactics when they encounter young children.

175.     In addition, for more than six years preceding August 9, 2018, defendant City had a pervasive practice of failing to adequately train, intervene with, investigate, and discipline its officers, including defendant SWAT officers, for the use of excessive force against and in the presence of young children.  The failure to investigate and discipline officers for

excessive force against young children occurred more often when the victim or complainant was African-American or Hispanic-American. These failures of accountability are illustrated in part by defendant officers' complaint histories. City was on notice of each of these failures from the conclusions and data contained in the 2017 United States Department of Justice investigative report (cited below).

176. As a result of these failures of official policy and practice, Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of using unnecessary and unreasonable force against young children and/or in their presence.

177. The 2017 United States Department of Justice ("DOJ") investigation into the CPD concluded that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct and recommended certain reforms. (*Investigation of the Chicago Police Department*, U. S. Dept. Justice, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35) (https://www.justice.gov/opa/file/925846/download, last checked 12/19/18). The report of the mayor-appointed Chicago Police Accountability Task Force ("PATF") reached related conclusions in 2016 and also recommended specific reforms to address police-youth interactions.

178. This widespread practice occurs during the execution of search warrants in citizens' residences, as in this case.

179. In spite of the DOJ's and the PATF's conclusions, CPD has since totally failed to implement or announce implementation of any reforms that purport to remedy or avoid the unnecessary use of force against or in the present of children, amounting to a deliberate choice not to take action. For example:

30

a.      CPD's recently revised use of force policy, GO3-02, does not require officers to avoid pointing guns and using force against young children or in the presence of young children whenever possible, and it does not require officers to use a trauma-informed approach to the use of force in situations where children are present and some force is necessary;

b.      Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore and others - CPD, in the wake of the DOJ finding, has not added officer training on the importance of preventing trauma to young children by avoiding unnecessary uses of force and utilizing a trauma-informed approach to policing in situations where children are or may be present and officers may need to make arrests or use other force;

c.      CPD has not reformed search warrant policy or added training that requires officers, before they obtain and/or execute a search warrant in a residence, to determine if children reside or are likely to be present, or to de-escalate or switch tactics in situations when they unexpectedly encounter young children;

d.      The proposed consent decree agreed to by the City of Chicago and the Office of the Illinois Attorney General does not provide for these or any similar reforms; and

e.      CPD has repeatedly rebuffed national and local legal advocates who have offered to provide training on trauma-informed policing with children and/or urged CPD to adopt a policy of avoiding unnecessary uses of force against and in the presence of children, even though the connection between violence-induced trauma and the mental and emotional development of young children has been well-understood for years.

180.    Finally, with respect to SWAT officers exclusively, City has unofficial and official policies that give them *carte blanche* license and encouragement to use extreme

amounts of force against citizens, including young children, with impunity:  a) CPD does not properly vet and select officers for SWAT teams, consistent with the standards of the National Tactical Officers' Association; b) CPD SWAT supervisors fail to conduct systematic pre-planning and surveillance for vulnerabilities, including for the presence of young children; and c) when conducting operations, SWAT officers do not wear body cams, have their faces covered except for their eyes, and do not wear or display readily identifiable name plates or badges.  The latter makes it virtually impossible for citizens to identify SWAT officers, to file misconduct complaints about them, and to have their complaints properly investigated or sustained.  Yet the special job of SWAT officers is to use an extraordinary amount of force against citizens.  Under these policies, SWAT officers are not and cannot be held accountable for the use of excessive force, including excessive force against children.

181.    By their combined lack of official policies that protect children and their failure to hold accountable officers who use excessive force, final City policy-makers – including the Superintendent of police, the Administrators of IPRA and COPA, the head of CPD's Bureau of Internal Affairs, the Mayor, and the Chicago City Council – condone, facilitate, encourage and perpetuate the unnecessary use of force against children.

182.    These same official failures facilitate, strengthen and reinforce the "thin blue line" or "code of silence" among Chicago police officers, which ratifies officers' misconduct and authorizes it for the future.

183.    Pursuant to the code of silence, defendant SWAT officers did not intervene in or report the actions of their fellow officers on August 9, 2018.  The supervising officers on the scene did not control, correct, intervene in or report the actions of his/their subordinates during the entry and search of plaintiffs' home.

184.     Leading up to August 9, 2018, one or more of City's failures of policy set forth above directly and proximately encouraged, authorized and caused defendant SWAT officers to use excessive force toward and in the presence of the minor plaintiffs, in violation of their constitutional right to be free from unnecessary and excessive seizures, such that the City of Chicago is liable for officers' conduct.

185.     The City's absence of policies to protect children and its past failures to adequately train, investigate, intervene with, and discipline officers with the goal of avoiding unnecessary uses of force against or in the presence of children, have led police officers, including defendant officers, to perceive that their actions will not be scrutinized, investigated or disciplined by CPD, the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA"). The perception of impunity emboldened future abuses, like the ones perpetrated against plaintiffs.

186.     Through its persistent lack of policies to protect children and its persistent failures to hold accountable officers who use excessive force against children, defendant City of Chicago, despite clear notice of these failures in the DOJ report and multiple other sources, has manifested and continues to manifest deliberate indifference to the deprivation of the minor plaintiffs' constitutional rights.

***The City of Chicago's De Facto Policies Resulted in Violations of Plaintiffs' – Especially E'Monie, La'Niya, Legend and LaKai'ya's - Constitutional Right to be Free of Unnecessary or Excessive Force***

187.     Under the circumstances, officers' conduct toward each minor plaintiff constituted excessive force, in violation of their right under the Fourth Amendment to free from unreasonable force.

188.     Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

189.     Under the circumstances, officers' uses of force against plaintiffs was totally unnecessary, unreasonable and unjustifiable.

190.     In addition, one or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

191.     Officers' misconduct and/or inaction was objectively unreasonable and was undertaken intentionally with willful indifference to plaintiffs' constitutional rights.

192.     Officers' misconduct and/or inaction was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

193.     The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policies, pervasive, long-standing practices and customs, as detailed above, such that defendant City of Chicago is liable for officers' misconduct toward plaintiffs.

194.     As the direct and proximate result of officers' misconduct, plaintiffs E'Monie, La'Niya, Legend and LaKai'ya Booth have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

## COUNT II – UNLAWFUL SEARCH – INVALID WARRANT, LACK OF PROBABLE CAUSE - 42 U. S. C. § 1983 (All Plaintiffs)

195.     Plaintiffs re-allege paragraphs 1 – 169 above and incorporate them into this count.  All plaintiffs assert this claim against all defendant warrant officers and any other as yet unknown officers who participated in obtaining and deciding to execute the search warrant for plaintiffs' apartment.

196.     These officers unreasonably approved, obtained and/or executed a search warrant for plaintiffs' apartment, the wrong apartment, a fact which invalidated the warrant from the start, prior to execution.

197.     Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

198.     As the sworn applicant for the warrant, officer Higgins had a duty to ensure that he had "credible and reliable" facts that the target resided at plaintiffs' address and that his investigation was "thoroughly conducted."

199.     Officer Higgins and the other officers named in this count knew before they obtained either of the two warrants for the target that they possessed conflicting addresses regarding where the target resided.  Instead of doing further investigation or surveillance to ascertain the probable address, officers separately obtained, through a different state's attorney, a second warrant on August 8, for the same target at a different address.  They knew the target did not reside at both addresses, but they executed both warrants, knowingly risking the property, safety and health of an innocent family in one of the locations.

200.     Officer Higgins and the other officers had a duty to thoroughly investigate and obtain credible and reliable facts regarding where the target resided before requesting, obtaining and executing the warrant for plaintiffs' address.

201.     Such an investigation or surveillance could have been done quickly and easily, as noted above.  However, on information and belief, officer Higgins and others did not do this.

202.     Moreover, the surveillance that officers did do of plaintiffs' apartment on or about August 8 did not show Mr. Bell going inside plaintiffs' apartment.

203.     Lt. Cascone approved officer Higgin's application for search warrant without ensuring that officer Cascone and other officers had performed the due diligence required by CPD Special Order S04-19.  On information and belief, Lt. Cascone also approved officer Burmistrz' application for search warrant.

204.     In consequence, defendant officers lacked probable cause to enter and search plaintiffs' apartment at the time they obtained the August 7 warrant for Bell at 5033, at the time they obtained the August 8 warrant for Bell at 5039, and at the time they entered plaintiffs' apartment to execute the warrant.  The August 7 warrant for Bell was no longer valid (lacked probable cause) once officers obtained the August 8 warrant for Bell.

205.     Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

206.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent

207.     Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking inaction in failing to cancel or call off execution of the search warrant for plaintiffs' apartment when they no longer had probable cause to support it constituted an abuse of power and authority.  Defendant officers' actions – of not investigating and resolving the issue of conflicting addresses and of executing both warrants, one of which was bound to be inaccurate as to target's residence - were directed toward the wrong residence and harmed citizens who were totally innocent of all criminal conduct.

208.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a

conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

209.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially E'Monie, La'Niya, Legend and LaKai'ya, defendants' conduct merits an award of punitive damages.

### COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983 (All Plaintiffs)

210.    Plaintiffs re-allege paragraphs 1 – 169 above and incorporate them into this count. All plaintiffs assert this claim against all defendant SWAT officers, several of whom entered and searched plaintiffs' apartment, and all defendant warrant officers.

211.    The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

212.    For example, when these officers entered plaintiffs' apartment, they did not knock or announce themselves or their office in circumstances where it was required, they set off flash bang explosives outside of plaintiffs' apartment, and they pointed assault rifles close range in the faces of plaintiffs.

213.    Additionally, these officers unnecessarily damaged or destroyed plaintiffs' personal property.

214.    Moreover, early in the search of plaintiffs' apartment, officers located and arrested the target of the warrant in the building next door and seized the gun described in that location. At that time, officers knew or should have known that probable cause to search

plaintiffs' apartment had been mistaken and/or was then lacking, and they should have immediately terminated their search and retreated from plaintiffs' apartment.

215.    Further, it was unreasonable for officers to detain plaintiffs who were plainly not the target described in the search warrant.  Plaintiffs were also detained for an unreasonable length of time and in an unreasonable and humiliating manner.

216.    Officers' manner of entry and search was objectively unreasonable in these and other ways and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

217.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

218.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

219.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking actions of extreme force against a totally unarmed family with young children constituted an abuse of power and authority.  Defendant officers' actions – of setting off flash bangs, not knocking or announcing, pointing guns at family members, damaging and destroying children's toys and other acts of excessive force - were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

220.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others, especially the children.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known

safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

221.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially the four children, defendants' conduct merits an award of punitive damages.

## COUNT IV - FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983 (All Plaintiffs)

222.    Plaintiffs re-allege paragraphs 1 – 169 above and incorporate them into this count.  Plaintiffs assert this claim against defendant SWAT officers.

223.    Some of these officers arrested and imprisoned plaintiffs in front of their home when, without a warrant for their arrest and without probable cause to arrest them, they ordered them to leave their home and confined them in the street in front of their home, barefoot and without adequate clothing, for a prolonged and unreasonable period of time.

224.    Officers' actions constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

225.    When officers confined plaintiffs, they unlawfully deprived them of their liberty to move about, despite the fact that they had done nothing illegal and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

226.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

227.    Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

228.     Plaintiffs were acutely aware of and were harmed by officers' confinement, as detailed above. *Inter alia*, Ms. Eason was unable to go into her apartment to obtain clothes to cover her underwear and bare legs.  Ms. Tate and the children were unable to go into the apartment to get shoes to put on their bare feet.  Plaintiffs were confined in a public area in full view of neighbors and gawkers who suspected them of criminal wrongdoing.

229.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

230.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent

231.     Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking actions in refusing to obtain or allow Ms. Eason to obtain clothing to cover her naked body, thus forcing her to stand semi-naked in the public street in front of her home in full view of her neighbors for over an hour, constituted an abuse of power and authority.  Defendant officers' actions were directed towards someone who was no danger, was not resisting or fleeing arrest, was fully compliant with instructions, and was totally innocent of all criminal conduct.

232.     Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

233.    In light of the degrading and humiliating character of defendant officers'

actions toward Ms. Eason, defendants' conduct merits an award of punitive damages.

### COUNT V – ASSAULT – STATE LAW (All Plaintiffs)

234.    Plaintiffs re-allege and incorporate paragraphs 1 – 169 above in this count.

They assert this claim against defendant City of Chicago and all defendant SWAT officers in

their individual and official capacities.

235.    The actions of these officers set forth above created reasonable

apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons.

236.    The officers intended to bring about apprehensions of immediate harmful

contact in plaintiffs or knew that their actions would bring about such apprehensions.

237.    In the alternative, the conduct of officers was willful and wanton and

constituted a course of action which shows an actual or deliberate intention to cause harm or

which, if not intentional, shows an utter indifference to or conscious disregard for the safety of

others and/or their property.

238.    The conduct of officers in entering and executing a residential search

warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have

occurred to civilians in this context.  Officers failed to take reasonable precautions after having

knowledge of impending danger to plaintiffs.

239.    The officers' conduct were the direct and proximate cause of plaintiffs'

apprehensions.

240.    Plaintiffs have been seriously harmed by officers' actions.

### COUNT VI – FALSE ARREST AND FALSE IMPRISONMENT – STATE LAW (All Plaintiffs)

241.    Plaintiffs re-allege paragraphs 1 – 169 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago and all defendant SWAT officers in their individual and official capacities.

242.    These officers arrested and imprisoned plaintiffs in front of their home when, without a warrant for their arrest and without probable cause to arrest them, they ordered them to leave their home and confined them in front of their home barefoot without adequate clothing on.

243.    Officers' actions restrained plaintiffs and confined them to a bounded area.

244.    Officers intended to restrain and confine plaintiffs to a bounded area.

245.    In the alternative, the conduct of officers was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

246.    The conduct of officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

247.    Officers' actions caused the restraint and confinement of plaintiffs to a bounded area.

248.    Plaintiffs were harmed by officers' actions in restraining and confining them, as detailed above.

### COUNT VII - INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – STATE LAW (All Plaintiffs)

249.    Plaintiffs re-allege and incorporate paragraphs 1 – 169 above in this count and assert this claim against defendant City of Chicago, all defendant SWAT officers and all defendant warrant officers in their individual and official capacities.

250.    The actions, omissions and conduct of these officers set forth above – including but not limited to pointing assault rifles at plaintiffs at point blank range - were extreme and outrageous and exceeded all bounds of human decency.

251.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress or in reckless disregard of the probability that their actions would cause such distress.

252.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, especially the young children, were especially vulnerable and fragile.

253.    As a direct and proximate result of officers' extreme and outrageous conduct, undertaken pursuant to the City's policies and practices as set forth above, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

254.    In the alternative, officers owed plaintiffs a duty of care that they breached when they pointed guns at them.  Plaintiffs are direct victims of officers' negligent infliction of emotional distress.  Officers' negligence was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

255.    In the alternative again, the conduct of officers was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or

which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

256.    The conduct of officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

### COUNT VIII - TRESPASS – STATE LAW (All Plaintiffs)

257.    Plaintiffs re-allege paragraphs 1 – 169 above and incorporate them in this count.  Plaintiffs assert this claim against defendant City of Chicago, all defendant SWAT officers and all defendant warrant officers in their individual and official capacities.

258.    These officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their apartment.

259.    Because officers knew they lacked probable cause to believe that the target of the search warrant resided at plaintiffs' address, they lacked legal authority to enter onto plaintiffs' property, thereby bringing about an intentional physical invasion of plaintiffs' apartment.  Further, the manner of their invasion was extreme.

260.    In the alternative, the conduct of officers was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

261.    The conduct of officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have

occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

262. Officers' actions caused a physical invasion of plaintiffs' apartment.

263. Plaintiffs were harmed by officers' physical invasion of their apartment in that both they and their personal property were damaged.

### COUNT IX – *RESPONDEAT SUPERIOR* – STATE LAW *(*All Plaintiffs*)*

264. Plaintiffs re-allege paragraphs 234-263 above and incorporate them into this count. Plaintiffs assert this claim against defendant City of Chicago.

265. In committing the acts and omissions alleged above, these officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

266. Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

### COUNT X – INDEMNIFICATION – STATE LAW (All Plaintiffs)

267. Plaintiffs re-allege and incorporate paragraphs 234-260 above. Plaintiffs assert this count against defendant City of Chicago.

268. Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

269. Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## **PRAYER FOR RELIEF (ALL COUNTS)**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in

their favor and against defendant on each count for:

      a.      Compensatory damages;

      b.      Appropriate equitable relief;

      c.      Reasonable attorney's fees and litigation costs and expenses; and

      d.      Such other or further relief as the Court deems just.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com

46

**JURY DEMAND**

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on March 19, 2019, filing and service of the foregoing ***Third Amended Complaint*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com