**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EBONY TATE, for herself and on behalf of her minor children, E'MONIE BOOTH, LA'NIYA BOOTH, LEGEND BOOTH, and LAKAI'YA BOOTH; and CYNTHIA EASON, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 18 C 07439 |
| THE CITY OF CHICAGO; Chicago Police Officers PATRICK BOYLE (star #975); JENNIFER BURMISTRZ (star #14060); MATTHEW EVANS (star #5815); MICHAEL FLEMING (star #15085); JOHN FOERTSCH (star #9195); MICHAEL HIGGINS (star #3766); PATRICK KENNEDY (star #14414); JEFFREY LAWSON (star #8353); LIEUTENANT JAMES D. CASCONE (star #560); S. ANTISUK (star #6607); BARDSLEY (star #13848); CUOMO (star #5853); SGT. HROMA (star #1729); JAMES (star #4308); KILPONEN (star #12854); LINKER (star #12858); LOPEZ (star #11987); MCCALLUM (star #16333); PANTANO (star #11886); ZENERE (star #17319); and unknown Chicago Police Officers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant City of Chicago ("the City") and named Chicago police officers' ("individual officers") (collectively, the "Defendants") motion to bifurcate Plaintiffs E'Monie, La'Niya, Legend, and LaKai'ya Booth's (collectively, the "Minor Plaintiffs") *Monell* claim for purposes of discovery and trial pursuant to Federal Rule of Civil Procedure 42(b). For the following reasons, the Court denies the Defendants' motion.

## BACKGROUND

The following facts are taken from the record and are undisputed unless otherwise noted.

Plaintiff Ebony Tate ("Tate") is a Chicago, Illinois resident and mother of the Minor Plaintiffs. LaKai'ya Booth was a four-year-old Chicago resident at the time of the incident at issue. Legend Booth was an eight-year-old Chicago resident at the time of the incident at issue. La'Niya Booth was an eleven-year-old Chicago resident at the time of the incident at issue. E'Monie Booth was a thirteen-year-old Chicago resident at the time of the incident at issue. Plaintiff Cynthia Eason ("Eason") (collectively with Tate and the Minor Plaintiffs, "Plaintiffs") is a Chicago resident and mother of Tate and grandmother of the Minor Plaintiffs. At all relevant times, the Plaintiffs lived together at 5033 S. Hermitage Avenue in Chicago.

Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. Defendants Michael Higgins ("Higgins"), Patrick Boyle ("Boyle"), Jennifer Burmistrz ("Burmistrz"), Matthew Evans ("Evans"), Michael Fleming ("Fleming"), John Foertsch ("Foertsch"), Patrick Kennedy ("Kennedy"), and Jeffrey Lawson ("Lawson") (collectively, "Police Defendants") were Chicago Police Department ("CPD") officers at all relevant times. Defendant Lieutenant James D. Cascone ("Cascone") was a supervising officer with the CPD.

Defendants S. Antisuk, Bardsley, Cuomo, James, Kilponen, Linker, Lopez, McCallum, Pantano, and Zenere were officers of the CPD SWAT Alpha Team at all relevant times. Defendant Sergeant Hroma (collectively with SWAT officers, "SWAT Defendants") supervised the Alpha Team.

On August 9, 2018, the Plaintiffs were spending a quiet evening at their apartment located at 5033 S. Hermitage Avenue. However, their relaxation was interrupted by the sound of loud flashbangs going off outside of their front door. Immediately after, the armed SWAT Defendants broke open the Plaintiffs' front door without knocking and announcing their presence or presenting a search warrant. Instead, the SWAT Defendants rushed inside the Plaintiffs' home and pointed their assault rifles at close range toward Tate and four-year-old LaKai'ya. The SWAT Defendants then shouted instructions for Tate and LaKai'ya to get out of the apartment, following the pair out with assault rifles pointed at them.

The SWAT Defendants proceeded into the remainder of the apartment, encountering Eason, La'Niya, Legend, and E'Monie in the hallway. The SWAT Defendants pointed an assault rifle at eleven-year-old La'Niya's face and screamed at her to get out of the apartment. They proceeded to follow her toward the exit of the apartment with a gun pointed at her back.

The SWAT Defendants tendered a similar treatment to the young boys and their grandmother. The SWAT Defendants trained their guns on the three Plaintiffs, with one officer pointing the tip of his assault rifle directly at the bridge of Eason's nose. The officer screamed at Eason, demanding to know who was in the apartment. Once Eason stated that only her daughter, grandkids, and herself were in the apartment, the officer turned his gun and pointed it directly at eight-year-old Legend's face. The officer then shifted again and pointed his gun at thirteen-year-old E'Monie's chest. Several other SWAT Defendants also had their guns fixed on Legend and E'Monie, with one gun aimed only inches from E'Monie's head.

When Eason asked why the officers were pointing their guns at the children, they screamed in response for her and the boys to get out of the apartment. Since Eason was preparing to take a bath before the SWAT Defendants arrived, she was only in a t-shirt and her underwear. She told the officers she wanted to get clothes to cover herself before going outside in her underwear, but the officers refused and told her to get out immediately. As Eason and the young boys were leaving the apartment, the SWAT Defendants kept their assault rifles pointed at the trio.

Once the SWAT Defendants had cleared the apartment of all residents, the Police Defendants entered the apartment. Their search lasted over an hour, during which the Plaintiffs were forced to sit on the running board of the SWAT truck while neighbors and onlookers witnessed the spectacle. Despite the Plaintiffs' various states of undress, the officers would not bring them appropriate items to cover themselves or allow them to get clothes or shoes. One SWAT Defendant "simply laughed at [Eason] and her humiliating predicament," given that she was forced to remain outside in only her t-shirt and underwear. Several of the Plaintiffs were crying, and Tate began to have a panic attack. One of the CPD officers sarcastically advised Tate to "breathe through [her] nose," but offered no other assistance until Eason demanded that someone help Tate.

After approximately one hour, one of the Police Defendants brought Tate into the apartment and gave her a copy of the search warrant for "Javale Bell" at her address. Tate replied that she had never seen Bell before, prompting another officer to retort, "I guess we got the wrong house."

As the circumstances proved, the Defendants did have the wrong house. In preparation for the search, Officers Higgins and Burmistrz secured two simultaneous search warrants for two different buildings based on the same information provided by a confidential informant. Both officers swore that the informant said Bell resided at the address listed on the search warrant complaint, one of which was Plaintiffs' address at 5033 S. Hermitage Avenue and the other at 5039 S. Hermitage Avenue. Despite their

5

knowledge of this inconsistent information, the officers pursued and executed duplicate search warrants.

At about the same time the Defendants entered and searched the Plaintiff's apartment, CPD officers entered and searched the neighboring building at 5039 S. Hermitage Avenue. There, they apprehended and arrested Bell and found the gun described in the warrant. Despite determining the correct address, the Defendants continued to search the Plaintiffs' home.

After seventy-five minutes, the Plaintiffs were permitted back inside their apartment. Upon their re-entry, the Plaintiffs found their apartment in a state of disarray. Their front screen door and door frame were damaged when the SWAT Defendants forced it open. There was a hole in Eason's bedroom closet. The utility room door was damaged. The Plaintiffs' personal belongings were scattered across the apartment, many of which were broken beyond repair. It took the Plaintiffs weeks to clean up the mess the officers left.

Worse yet, the Minor Plaintiffs have experienced "immediate, severe, and lasting emotional and psychological distress and injury" due to the Defendants' conduct. The Minor Plaintiffs now follow Tate around the house out of fear and anxiety and plead with her not to leave them when she goes to work. Legend is afraid to be alone and asks Eason to stand by the door when he uses the bathroom. The Minor Plaintiffs now freeze at the sight of police and often have trouble sleeping. Since the incident, the Minor Plaintiffs' teachers have asked whether the children have recently experienced

trauma. The Minor Plaintiffs "now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by [D]efendants' terrorizing display of unnecessary force."

Based on these events, the Plaintiffs filed their initial complaint on November 9, 2018, which was amended for the third time on March 19, 2019. The complaint alleges various civil rights and state law violations as to all the Plaintiffs, including unlawful search, false arrest, assault, intentional or negligent infliction of emotional distress, and trespass. The Minor Plaintiffs also allege a *Monell* claim against the City due to its *de facto* policy and practice of not avoiding unnecessary uses of force against children. On April 8, 2019, the Defendants filed a joint motion to bifurcate the Minor Plaintiffs' *Monell* claim for purposes of discovery and trial pursuant to Federal Rule of Civil Procedure 42(b).

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 42(b) provides that, "[f]or the convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims…." This rule "is read in light of the overarching policy principle behind the Federal Rules, which seeks the just, speedy, and inexpensive resolution of every trial. Accordingly, because bifurcation risks additional delay, it has remained the exception and not the rule." *A.L. Hansen Mfg. Co. v. Bauer Products, Inc.*, 2004 WL 1125911, at *2 (N.D. Ill. 2004); *See Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 620 (N.D. Ill. 2000) ("The piecemeal trial of separate issues in a single

7

lawsuit is not to be the usual course."); *See also Awalt v. Marketti*, 2012 WL 1161500, at *10 n.2 (N.D. Ill. 2012) ("The Court has looked at every decision in this District involving bifurcation of *Monell* claims…since the Seventh Circuit decided *Thomas v. Cook County Sheriff's Dep't*. It is clear that the weight of authority holds that bifurcation is now heavily disfavored.") (internal citations omitted). However, because this determination involves a balancing of equities, the ultimate decision is within the Court's discretion. *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999).

## **DISCUSSION**

The Defendants urge the Court to bifurcate the Minor Plaintiffs' *Monell* claim for purposes of discovery and trial. In deciding whether to grant a motion to bifurcate, the Court must consider "whether separate trials would avoid prejudice to a party or promote judicial economy." *Id.* If one of those circumstances exists, then the Court needs to ensure that the decision to bifurcate would "not unfairly prejudice the non-moving party." *Id.* Only once both criteria are found can the Court grant the motion to bifurcate.

**I. Avoidance of Prejudice**

The Court must first consider whether bifurcation would avoid prejudice to the Defendants. The Defendants argue that bifurcation would prevent prejudice because it would avert the possibility of *Monell* evidence being imputed to the individual officers when assessing their liability. Moreover, the Defendants allege that bifurcation would

prevent evidence of any individual officer's infractions being mistakenly attributed to the City in evaluating its *Monell* liability.

The Court finds neither of these arguments persuasive. Regarding potential prejudice to the individual officers, a limiting instruction to the jury is the proper mechanism to address that concern. As this Court has previously stated, "[t]hough the Court is cognizant of the possibility of prejudice to the individual officers if the claims are tried together, our system generally trusts jurors to understand and follow limiting instructions regarding consideration of evidence against some defendants and not others…." *Medina v. City of Chi.*, 100 F.Supp.2d 893, 897 (N.D. Ill. 2000). Concerning the potential prejudice to the City, the same principles prevent such evidence from being misattributed by a jury. Indeed, the Federal Rules of Evidence anticipate and provide for this exact scenario, asserting, "[i]f the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105. Given that the Court has appropriate mechanisms in place to address the Defendants' concerns, bifurcation would not serve the interests of avoiding prejudice in this case.

**II. Judicial Economy**

The Defendants next argue that bifurcation would serve the interests of judicial economy by avoiding unnecessary discovery and litigation. The Defendants first assert that the Minor Plaintiffs' *Monell* claim may not need to be adjudicated at all, as it is

contingent on a finding of liability on behalf of the individual officers.  The Defendants also assert that discovery on the *Monell* claim at this juncture would add needless time and expense to the case.  The Court addresses each argument in turn.

**A. Pendency of *Monell* Claim on Individual Officer Liability**

The Defendants contend that "unless Plaintiffs prove an underlying constitutional violation against the individual Defendant Officers, the City cannot be held liable."  However, that is not a bright line rule.  According to the Seventh Circuit, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict."  *Thomas v. Cook Cty. Sherrif's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010).  To determine whether the findings would be inconsistent, the Court must "look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth."  *Id.*

The Court first turns to the nature of the constitutional violations and theories of liability asserted.  The Plaintiffs' complaint alleges constitutional claims for unlawful search and false arrest pursuant to 42 U.S.C. § 1983 on behalf of all the Plaintiffs.  The complaint also alleges a *Monell* claim for use of excessive force on behalf of the Minor Plaintiffs.  The complaint is atypical in that there is no accompanying claim against the individual officers for use of excessive force.  Given that structure, there is no possibility for inconsistent verdicts, as there is no count other than the *Monell* claim that is predicated on excessive force.  *See Mendez v. City of Chicago*, 1:18-cv-5560, Dkt. 69 (denying motion to bifurcate where the *Monell* claim was based on excessive

force and the individual claims were based on unlawful search and seizure because "trial as to the individual claims will not resolve the *Monell* claim"). Therefore, the claims involved do not necessitate the conclusion that liability as to the City and not to the individual officers would be inconsistent.

Additionally, the Court needs to consider the defenses set forth by the parties, including the asserted defense of qualified immunity. In cases where qualified immunity is available, the jury could find the City liable for *Monell* violations despite the individual officers being shielded from liability. *Medina v. City of Chi.*, 100 F.Supp.2d at 896 ("Thus when a plaintiff loses his claim against a police officer based on qualified immunity, he can still recover against the municipality if he can prove a constitutional deprivation caused by a municipal policy or custom. In this situation, bifurcation will not avoid a second trial…."); *Awalt*, 2012 WL 1161500, at *12 ("In addition, it is likely that some of the Defendants in this case will assert immunity from liability—qualified immunity, state-law immunity, etc. …This leaves open the possibility that no inconsistent verdict will arise….").

Divergent findings between the individual officers and the City are not necessarily inconsistent of one another. Therefore, the Minor Plaintiffs' asserted *Monell* claim may proceed independent of a finding on the individual officers' liability. Accordingly, bifurcation would not serve the interests of judicial economy on this ground, as the claim could be adjudicated regardless of the outcome in the trial against the individual officers.

## B. Increased Discovery and Litigation Costs

The Defendants next assert that the increased discovery burden of proceeding with the *Monell* claim is grounds for bifurcation. Even if the Court agreed that the *Monell* claim could not proceed until a jury found individual officer liability, the argument that bifurcation would decrease the discovery burden is mistaken in practice. As our sister court reasoned in the analogous case *Sierra v. Guevara*:

> I do not believe that bifurcation of discovery or trial would materially facilitate the speedy and efficient resolution in this case. In fact, in my experience, bifurcating *Monell* discovery only tends to prolong the case and leads to unnecessary disputes as to the appropriate scope of non-*Monell* versus *Monell* discovery.

1:18-cv-3029, Dkt. 88. This problem is exacerbated in cases such as this where there is an overlap in the witnesses, experts, and evidence that would be involved in each phase of the litigation. This could create double work in the sense of, for example, needing to first depose witnesses or solicit testimony regarding the Defendants' specific actions in executing the search warrant on August 9, 2018 and a second time regarding how the City's policies regarding use of force impacted that case work. *See Cadiz v. Kruger*, 2007 WL 4293976, at *4 (N.D. Ill. 2007) ("The vast majority of these…witnesses have been identified as relevant to both the *Monell* and the individual claims. For those witnesses who would speak to both claims, bifurcation would lead to the possibility of requiring them to sit for multiple depositions, which likely would increase the cost of the depositions to the parties and which surely would be less convenient for the witnesses."). Although the *Monell*-related discovery may possibly

be a costly effort, that fact alone is insufficient to require bifurcation. *See Cadiz*, 2007 WL 4293976 at *3. Given the likelihood that bifurcation could increase litigation costs, the Court finds that bifurcation would not increase judicial economy.

### III. Prejudice to the Non-Moving Party

Although the Court would normally only reach this stage of the inquiry if it found that bifurcation would avoid prejudice to a party or increase judicial economy, the Court sees it fit to explain the prejudice the Minor Plaintiffs would face if their *Monell* claim was bifurcated. The Defendants moved to bifurcate the *Monell* claim in this case and stay all related discovery and trial until the resolution of the claims against the individual officers. In effect, this motion serves to prevent an adjudication of the *Monell* claim's merits regardless of the outcome of the first trial. *Cadiz*, 2007 WL 4293976, at *1. As the Court held in *Cadiz*:

> The City argues that if plaintiff does not establish Section 1983 liability against the officers, then there can be no *Monell* claim…. The City further suggests that even if plaintiff does establish Section 1983 liability against the officers, trial of the *Monell* claim will be unnecessary (and thus should not proceed) because it can provide plaintiff with no additional compensatory damages.

*Id*. Essentially, the Defendants are asserting the same arguments here to achieve a *de facto* dismissal of the *Monell* claim by way of bifurcation. This would undoubtedly prejudice the Minor Plaintiffs in their efforts to hold the City accountable for its continued use of excessive force against young children. Echoing the holding in *Cadiz*, this Court does "not believe that the City should be allowed to deprive a plaintiff of a

merits determination of a *Monell* claim by the expedient of agreeing to pay a judgment against its officers that the City may be statutorily or contractually obligated to pay anyway." *Id*.

The Minor Plaintiffs have a profound interest in pursuing their claims with an eye toward institutional reform. As the Supreme Court has avowed, "[Section 1983] is designed to provide compensation for injuries arising from the violation of legal duties, and thereby, of course, to deter future violations." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 727 (1999). As this District has recognized, a judgment naming the city itself and holding it responsible for its policies may have a greater deterrent effect than a judgment against a police officer that is paid by the city. *Medina*, 100 F.Supp.2d at 896. The City should not be allowed to strip the Minor Plaintiffs of this opportunity, and as such, must confront the merits of the *Monell* claim.

## CONCLUSION

For the aforementioned reasons, the Court denies the Defendants' motion to bifurcate. It is so ordered.

Dated: 05/20/2019

_____

Charles P. Kocoras
United States District Judge