## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EBONY TATE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 18 C 7439 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

Plaintiffs Ebony Tate, Cynthia Eason, E'Monie Booth, La'Niya Booth, Legend Booth, and LaKai'ya Booth brought this case alleging violations of 42 U.S.C. § 1983 and Illinois state law by Defendants Michael Higgins, Jennifer Burmistrz, Matthew Evans, Patrick Kennedy, Pachara Santisuk, Andrew Cuomo, Eric James, Evan Kilponen, Nicholas Linker, Ricardo Lopez, Ryan McCallum, Michael Pantano, Marco Zenere, Patrick Boyle, John Hroma, and James D. Cascone (together, "Defendant Officers")[1] and the City of Chicago ("City"). Before the Court is the Defendant Officers' motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment. For the following reasons, the Defendant Officers' motion is granted-in-part and denied-in-part, and Plaintiffs' motion is denied.

---

[1] Defendant Officers are herein further divided into the "SWAT Officers", including Santisuk, Cuomo, James, Kilponen, Linker, Lopez, McCallum, Pantano, and Zenere, and the "Warrant Officers", including Higgins, Burmistrz, Cascone.

## BACKGROUND

Plaintiffs initiated this case on November 9, 2018. Dkt. # 1. The operative third amended complaint was filed on March 19, 2019, and asserts ten claims: (1) a *Monell* claim under Section 1983; (2) unlawful search due to an invalid warrant under Section 1983; (3) unreasonable manner of entry and search under Section 1983; (4) false arrest under Section 1983; (5) assault under Illinois law; (6) false arrest under Illinois law; (7) intentional infliction of emotional distress[2] under Illinois law; (8) trespass under Illinois law; (9) *respondeat superior* under Illinois law; and (10) indemnification under Illinois law. Dkt. # 70. The Defendant Officers filed a motion for summary judgment on February 6, 2023, seeking judgment in their favor on all claims against them—i.e., Counts II through VIII. Dkt. # 376. Plaintiffs filed a motion for partial summary judgment on June 2, 2023, seeking judgment in their favor on Counts II, IV, VI, and VIII, and "portions" of Counts III, V, and VII.[3] Dkt. # 395.

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are

---

[2] Plaintiffs have dropped their claim for negligent infliction of emotional distress. Dkt. # 401, at 30 n.28.

[3] Plaintiffs also seek summary judgment on "portions of count I, the *Monell* claim," Dkt. # 395, at 2, but that claim is not asserted against the Defendant Officers.

undisputed unless otherwise noted.[4]

A registered confidential informant ("RCI") registered with the FBI, with an extensive history of providing credible and reliable information to the FBI and Chicago Police Officers, informed Defendant Higgins that Javale Bell, a convicted felon, was in possession of an all-black semi-automatic handgun in the basement apartment of 5033 S. Hermitage in Chicago ("5033 Residence"), where Plaintiffs live. The RCI specifically observed the handle of a black semi-automatic handgun sticking out of Bell's waistband before observing Bell place the handgun on a table, where it remained. The RCI provided Higgins with a photograph from Bell's Facebook account showing him leaning against the front door of the 5033 Residence while holding the all-black handgun like a cell phone.

The RCI also told Higgins that Bell resided at the 5033 Residence and used 5039 S. Hermitage ("5039 Residence") (together, the "Residences"), which is next door to the 5033 Residence, to keep narcotics and weapons and that the RCI had observed Bell in possession of firearms in both residences. Specifically, the RCI stated that Bell had a second weapon, a two-tone multi-capacity handgun, at the 5039 Residence, and possibly a rifle as well. Other social media photos confirmed that Bell had the two-tone handgun at the 5039 Residence.

After learning that the RCI observed Bell in the basement of the 5039 Residence

---

[4] Any asserted facts, or purported disputes of fact, that were immaterial or not properly supported have not been included.

with another firearm, Higgins asked Defendant Burmistrz to handle the search warrant investigation for the 5039 Residence. Higgins and Burmistrz then conducted their own separate investigations.

As to the 5033 Residence, Higgins conducted an investigation to corroborate the information he received from the RCI. Upon receiving the information, Higgins searched for Bell on police databases based on the RCI's description. He located Bell's criminal history and mugshot. Bell's criminal history report confirmed that Bell was a convicted felon who did not have a FOID card or Concealed Carry License ("CCL"). Higgins texted a CPD photo of Bell to the RCI who positively identified him as the individual with the black semi-automatic handgun in the 5033 Residence. Higgins also texted a photo of the two-story, three-unit apartment building located at 5033 S. Hermitage and the RCI positively identified Plaintiffs' basement apartment from the photo.

Higgins conducted surveillance of the 5033 Residence on three different occasions—once in the morning for about 15 minutes, once in the afternoon for about 5 minutes, and once in the evening for about 15 minutes—during which he parked his car at both corners of the 5000 block of S. Hermitage and watched the block and target residences. Each time he visited the 5000 block of S. Hermitage, Higgins drove around the Residences by driving down the street and through the alley. He did not observe anyone in front of, entering, or leaving the Residences during his surveillance. He observed children's toys adjacent to the 5033 Residence.

4

An Assistant State's Attorney approved Higgins's search warrant for the 5033 Residence ("5033 Search Warrant"). Higgins then appeared before Judge Sullivan and presented her with a complaint for a search warrant, the 5033 Search Warrant, and the RCI's criminal history and any payment, promise, or expectation of payment. Judge Sullivan approved the 5033 Search Warrant.

Once the 5033 Search Warrant and the search warrant for the 5039 Residence ("5039 Search Warrant") (together, "Search Warrants") were approved, they were submitted to SWAT for a risk assessment. As the SWAT Mission Supervisor and Command and Control, Defendant Sergeant Hroma reviewed the complaints and the Search Warrants and completed the Search Warrant Risk Assessment. A warrant is considered high risk if the assessment results in a score of 35 or above. Hroma searched databases for calls for service and arrests for the addresses and Bell's criminal background, viewed photos of the Residences obtained from Google and the Cook County Assessor's website, and had other SWAT officers conduct surveillance. The Search Warrants received a risk assessment score of 108 because (1) Bell had a documented gang affiliation, (2) surveillance revealed a large number of associates outside the Residences, (3) family and gang associates may be on site, (4) there was information that an AR-15 may be in one of the Residences, (5) a handgun with an extended magazine and four additional handguns may be present, (6) there were multiple lookouts on the block, and (7) there was a steel security door at the 5033 Residence. Hroma thus accepted the Search Warrants for SWAT service as high-risk

5

warrants.

It was determined that the Search Warrants would be executed simultaneously for the safety of the officers and occupants of the Residences, including any children possibly located in the basement apartment at the 5033 Residence, because there were social media photos of the weapons they were looking for, including a semi-automatic gun with an extended magazine and a weapon-mounted light. The Search Warrants were executed simultaneously on August 9, 2018.

The Defendant Officers planned for and executed a maximum force "dynamic entry" into the 5033 Residence. Upon entering, the entry process slowed down considerably when SWAT officers encountered Plaintiffs and directed them to exit. No Plaintiff was a target of the Search Warrants or a suspect in the related investigation. No Plaintiff was arrested and no contraband was found in the 5033 Residence. Plaintiffs LaKai'ya, Legend, La'Niya, and E'monie were ages 4, 8, 11, and 13, respectively. Tate is their mother, and Eason is their 55-year-old grandmother.

Between 6:00 and 6:30 p.m. on August 9, Plaintiffs heard two to four loud explosions. Plaintiffs say the Defendant Officers exploded stun grenades in front of and on the south side of the 5033 Residence. Defendants dispute this fact and assert the explosives were placed at the 5039 Residence. Plaintiffs further claim that despite knowing they did not have a "no knock" warrant, the SWAT Officers did not knock, announce themselves, or wait before forcibly entering the 5033 Residence, except for Pantano who waited only 5–15 seconds. Defendants dispute this, asserting Officers

6

Linker and Pantano knocked and announced while another officer was announcing over the SWAT vehicle's PA system that Chicago police were executing search warrants at the Residences. Plaintiffs state that no announcement from any loudspeaker was made.

Defendant Officers forced the screen door open and 10 officers rushed into the 5033 Residence holding a riot shield at the front of the line. As they entered, all except Defendant Santisuk trained their guns on Tate. One came to within 1–2 feet of her and pointed his rifle directly at her chest for 3–5 seconds with 3–4 inches between the gun and her body. His finger was on the trigger and he screamed "Who the f**k is in here?" Dkt. # 423, ¶ 60. Tate could see the inside of the barrel and was afraid she was going to be shot. She immediately put her hands up, answered, and repeatedly asked what was going on. The officer continued pointing the gun at her for about a minute and screamed at her to "get the f**k out!" *Id*.

Tate quickly picked up Lakai'ya and walked to the front door and out of the apartment while officers continuously pointed their rifles at them, specifically at Tate's back and at La'Kaiya's head from a couple of feet away. Plaintiffs claim officers pointed their guns at La'Niya for about 30 seconds as she ran after her mother; Defendants say it was only for a "quick second." *Id*. ¶ 63. La'Niya complied with the officers' direction to put her hands up.

According to Plaintiffs, when Eason reached the front of the apartment, several officers rushed at her and pointed their guns at her. One officer pointed his gun directly at her face, a couple of inches away so she was staring down the barrel. He screamed

at her, "who the f**k is in here?" *Id*. ¶ 64. Eason had the gun in her face for about 30 seconds, while she was frozen in shock. She answered the officer and complied with the direction to put her hands up. At the same time, officers were yelling at E'monie and Legend to put their hands up and "get the f**k out." *Id*. They complied and put their hands up. An officer pointed his rife at Legend's chest, with the barrel a couple inches from his body, for about 30 seconds, then moved his rifle to aim at E'monie's chest. An officer kept his rifle aimed at Eason and Legend for 3–4 minutes while other officers searched the apartment. An officer held his rifle an inch from the left side of E'monie's face or temple continuously for 2–4 minutes during the search. Defendants dispute these facts, stating E'monie was only in the 5033 Residence for 15–20 seconds after seeing the Defendant Officers, and Legend exited before him.

Eason had been about to take a bath when the SWAT Officers entered the apartment and she was dressed only in underwear and t-shirt that went down to her belly, with no bra on. An officer yelled at her: "You have to leave, get out, get the f**k out of here!" *Id*. ¶ 68. She asked to be allowed to put some clothes on and an officer screamed at her "No! Get Out!" *Id*. Officers told Legend and E'monie to "get the f**k out!" *Id*. Officers kept their guns pointed at Eason, E'monie, and Legend as they exited the apartment. Guns were pointed at Plaintiffs for as long as they remained inside the apartment.

All Plaintiffs followed all officer commands and instructions from the moment of entry, did not attempt to flee, did not raise their voices, and never verbally or

8

physically threatened the Defendant Officers. Plaintiffs were fully compliant at all times and never posed any safety threat. The Defendant Officers did not encounter any threat in the 5033 Residence.

The SWAT Officers who entered the 5033 Residence wore green army uniforms, black boots and gloves, helmets, visors, and earmuffs, and had their faces and ears covered with black or dark cloth (except their eyes). They carried what Plaintiffs believed to be AR-15s or assault rifles.

Plaintiffs were detained outside of the 5033 Residence during the execution of the 5033 Warrant. None of them were handcuffed. Immediately upon exiting the 5033 Residence, Plaintiffs were directed to the "safe side" of a SWAT truck so that the SWAT vehicle was between them and the Residences. The SWAT Officers kept their guns trained on Plaintiffs for the first 5–7 minutes they were outside. Defendants dispute this, citing testimony from E'monie that the Defendant Officers did not point firearms at Plaintiffs while they were outside. At the SWAT truck, Tate, Eason, La'niya, Legend, and Lakai'ya were crying the whole time they were in detention. Tate and Cynthia were also crying. All Plaintiffs were barefoot. Tate continued asking officers what was going on but no one would answer her. Defendants contend Plaintiffs were not crying the whole time, the Defendant Officers announced they had a search warrant, Higgins provided Tate with a copy of the 5033 Search Warrant, and Higgins and Boyle explained why they were there. Plaintiffs admit officers eventually presented a search warrant but claim it was not until the end of their detention outside.

When Tate began experiencing a panic attack and had difficulty breathing, the SWAT medic assisted her and an ambulance was called. Tate was then treated by a paramedic. *Id*. Plaintiffs contend that when Eason asked officers to call paramedics for Tate, one officer dismissed her as "just hyperventilating" and hesitated to call an ambulance, so Eason asked another officer. Dkt. # 423, ¶ 86.

Once outside and still wearing only a T-shirt and underwear, Eason unsuccessfully tried to pull her T-shirt down to cover her underwear and legs. When she sat on the SWAT truck, it looked like she was naked. Neighbors had gathered on their porches to see what was going on. Eason was mortified and had never been more embarrassed in her life. She asked three or more officers to be allowed to get pants; they all declined or did not respond. One SWAT Officer looked at her and laughed at her state of nudity. Defendants contend Eason was provided with a blanket shortly after exiting the apartment; Plaintiffs contend she did not receive the blanket until the ambulance arrived.

Once the scene was secured, Plaintiffs were moved to the outdoor stairway in front of the 5033 Residence until the officers finished executing the 5033 Search Warrant. Plaintiffs assert they remained outside for between 45 minutes and 2 hours; Defendants contend it was only 30–75 minutes.

When Plaintiffs were allowed back in the apartment, they saw three or four officers searching various rooms. It took Plaintiffs a week of work to clean up the mess the officers made. La'Niya testified that "everything was on the floor . . . toys, clothes,

everything." *Id*. ¶ 92. E'monie testified that the "whole entire house was just messed up . . . everything was just thrown everywhere." *Id*. Eason testified that it was "just like a tornado came in there. It was tore up." *Id*. During the search, the Defendant Officers made a hole in Eason's bedroom closet wall and tore her closet doors off the track, broke the closet door next to the utility room, smashed the screens of the four children's Samsung iPad tablets so that they no longer worked, broke Legend's controller/console for his Xbox video game, broke La'niya's Hello Kitty karaoke machine (her favorite toy), and damaged Lakai'ya's dolls (which had been in a toy bin but were scattered on the floor with three of the faces smushed in as if they had been stepped on). Those toys had been Christmas presents, and La'niya cried when she found her Hello Kitty toy broken on her bedroom floor.

As a result of the Defendant Officers' conduct, Plaintiffs suffered serious traumatic distress. Two of the minor Plaintiffs have been diagnosed with Post Traumatic Stress Disorder ("PTSD"). The night of the search, the children were crying and afraid all evening. They kept asking why officers would speak to them the way they did, and why they would break their games, toys, and dolls. Plaintiff Eason had a "meltdown," the minor Plaintiffs were "in shock" at how the officers cursed at them and their family, and none of the Plaintiffs slept that night. *Id*. ¶ 95.

Bell and the two-tone handgun were found in the 5039 Residence. No sign of Bell or any connection between him and Plaintiffs were found at the 5033 Residence.

11

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

We first note that Plaintiffs chose to use the same brief to both oppose the Defendant Officers' summary judgment motion and support Plaintiffs' motion. Dkt. # 401. The Defendant Officers then submitted one brief as both their reply in support of their motion and their response to Plaintiffs' motion, Dkt. # 431, to which Plaintiffs replied, Dkt. # 452. While, the Court appreciates this streamlining, it makes it so that

the parties' arguments as to each separate motion are virtually inextricable. Cross-motions for summary judgment are analyzed separately and we view the evidence in different lights depending on the movant. Here, our opinion will go claim by claim and determine whether summary judgment is appropriate for the Defendant Officers, Plaintiffs, or neither.

## I.     Count II: Validity of the Search Warrant

We first address Plaintiffs' claim that the Warrant Officers "unreasonably approved, obtained and/or executed a search warrant for [the 5033 Residence], the wrong apartment, a fact which invalidated the warrant from the start, prior to execution." Dkt. # 70, ¶ 196. Defendant Officers argue they are entitled to summary judgment on this claim because Plaintiffs fail to overcome the 5033 Search Warrant's presumed validity and because it was supported by probable cause. Plaintiffs counter that they are entitled to summary judgment on this claim because the 5033 Search Warrant was based on false and unreliable information and thus lacked probable cause. In the Court's view, based on the undisputed facts, no reasonable jury could conclude that the 5033 Search Warrant was invalid. Summary judgment is thus granted in the Defendant Officers' favor and Plaintiffs' motion is denied as to this claim.

The probable cause balance favors the government when an arrest is executed pursuant to a warrant. *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022). "When a judge authorizes an arrest, as one did here, 'we presume the validity of [the] warrant and the information offered to support it.'" *Id.* (quoting *Dollard v. Whisenand*, 946

13

F.3d 342, 354 (7th Cir. 2019)). "That is, we presume probable cause." *Id*. That presumption can give way, however, if the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id*. at 1068–69 (cleaned up). In such circumstances, "even a facially valid arrest warrant does not shield otherwise unreasonable conduct." *Id*. at 1069 (quoting *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013)).

A warrant's presumption of validity may also yield "on a showing that the officer who sought the warrant 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed.'" *Id*. (quoting *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)). This includes when an "officer intentionally or recklessly withheld material facts from the warrant-issuing judge." *Id*. (cleaned up). But these exceptions are "narrowly drawn by design" because "we accord 'great deference' to the issuing judge's 'determination of probable cause.'" *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Plaintiffs take issue with the fact that both the 5033 and 5039 Search Warrants were issued for Bell at neighboring residences, and that each stated Bell resided at that address. Because of this, Plaintiffs argue, the Search Warrants were based on false information. But we do not find the factual bases for the Search Warrants inherently inconsistent. A reliable RCI personally witnessed Bell engaging in criminal conduct in both the 5033 and 5039 Residences. Photos showed Bell possessing firearms, i.e.,

14

committing crimes, at both Residences. The RCI told Higgins that Bell resided at 5033 and stored drugs and weapons at 5039. Burmistrz testified that the RCI never specifically told her Bell resided at 5039, just that he would be there, and she independently used the word "reside" in her application for the 5039 Search Warrant. And even if the RCI had stated that Bell lived both at 5033 and 5039, people can live in more than one place, and furthermore it is not required that a target reside somewhere for that residence to be constitutionally searched. *See Gates*, 462 U.S. at 244 n.13 (probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); *see also London v. Guzman*, 26 F. Supp. 3d 746, 754 (N.D. Ill. 2014); *Horne v. Wheeler*, 2005 WL 2171151, at *4–5 (N.D. Ill. 2005). Judge Sullivan reviewed the Search Warrants in quick succession and approved both. Even if statements about Bell's residing in one or the other location were false, there is no indication that his residence was necessary to Judge Sullivan's determination that probable cause existed.[5]

Plaintiffs have come forward with no facts to show that Higgins knowingly, intentionally, or with a reckless disregard for the truth made false statements or withheld material facts from Judge Sullivan, nor that any such misstatements were necessary to her determination that probable cause existed. The 5033 Search Warrant is thus presumed valid.

---

[5] Nor do any of the other facts Plaintiffs cite indicate that the 5033 Search Warrant was based on false information. *See* Dkt. # 401, at 12–15.

Plaintiffs also fail to show the 5033 Search Warrant was not supported by probable cause. "[A]n affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018) (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)); *see also United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010) (affidavit submitted in support of search warrant application supports probable cause if "based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.").

The Supreme Court in *Gates* adopted a "totality-of-the-circumstances analysis that traditionally has informed probable cause determinations" for cases where a search warrant's affidavit is based on an informant's report. 462 U.S. at 238. Reliability, veracity, and basis of knowledge are all "highly relevant," but the totality-of-the-circumstances approach means "a deficiency in one may be compensated for . . . by some other indicia of reliability." *Id.* at 230, 233.

To evaluate the totality of the circumstances, the Seventh Circuit considers "five primary factors [] along with other pertinent concerns: the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). Again, no one

16

factor is determinative. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003).

We find that probable cause supported the 5033 Search Warrant based on the *Glover* factors. It contained Bell's name and address, the items to be seized, an account of the criminal activity observed firsthand by the RCI (i.e., he personally observed Bell with the black semi-automatic handgun in the 5033 Residence multiple times), the RCI's five-year history with Bell and his knowledge that Bell always carried firearms with him despite being a convicted felon with no FOID card or concealed carry license, and the RCI's statements that Bell lived in the basement apartment of the 5033 Residence. Higgins corroborated the RCI's information: he had the social media photo showing Bell holding the black handgun while standing outside the 5033 Residence, he provided the RCI with photos and the RCI positively identified both Bell and the residence, he found Bell's criminal history report which confirmed Bell was a convicted felon with no FOID card or concealed carry license, and he conducted surveillance on three different occasions and observed children's toys adjacent to the 5033 Residence, which supported the RCI's statement that children may be present.

The information was timely because the RCI observed Bell with the black handgun in the 5033 Residence during the 48 hours leading up to August 7, 2018, when the warrant was approved. *See United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011). Even though the RCI did not appear before Judge Sullivan, Judge Sullivan was presented with the RCI's criminal history, payment or expectation of payment, and his history of providing credible and reliable information.

17

Plaintiffs argue that Bell was not connected with the 5033 Residence and thus the RCI's "statement turned out to be wholly false." Dkt. # 401, at 11. But this is unavailing, since for probable cause we "look only at what [Higgins] knew at the time he sought the warrant, not at how things turned out in hindsight." *See Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018). Judge Sullivan had a "substantial basis for concluding that a search would uncover evidence of wrongdoing," and her probable cause determination is thus entitled to significant deference. *See Gates*, 462 U.S. at 236 (cleaned up).

Based on the totality of the circumstances, we find that the 5033 Search Warrant was supported by probable cause. Summary judgment on Count II is granted in Defendants' favor, and Plaintiffs' motion is denied as to this claim.

## II.    Count III: Unreasonable Manner of Entry and Search

Next, we turn to Count III, which alleges an unlawful search under Section 1983 based on the Defendant Officers' "objectively unreasonable" entry and search of the 5033 Residence, in violation of Plaintiffs' Fourth Amendment rights. Dkt. # 70, ¶ 211. Plaintiffs allege the entry and search was unreasonable because the Defendant Officers did not knock or announce themselves, set off flash bang explosives outside of the 5033 Residence, pointed assault rifles in Plaintiffs' faces and at their bodies, unnecessarily damaged or destroyed Plaintiffs' personal property, continued the search despite the target being discovered next door, and detained Plaintiffs for an unreasonably long time and in a humiliating manner despite Plaintiffs not being the target of the search.

18

Defendants, in turn argue that the manner of entry and search was reasonable under the circumstances. Because we find multiple disputes of material fact, we deny both summary judgment motions as to this claim.

Plaintiffs cite evidence showing the following: the Defendant Officers knew children were inside the 5033 Residence, the Defendant Officers requested, planned, and/or executed a "dynamic entry" into the 5033 Residence, the entry plan included the use of stun grenades outside the 5033 Residence, and no Defendant Officer knocked, announced themselves, or waited a reasonable time before forcibly entering the 5033 Residence. Additionally, eight of the nine SWAT Officers entered the 5033 Residence with their faces completely covered and they pointed their loaded assault rifles directly at Plaintiffs' faces, heads, chests, and bodies at close or point-blank range for several minutes despite all Plaintiffs being fully compliant at all times and posing no safety threat. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) ("gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment."); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992).

Defendants argue that once approved by Judge Sullivan, the Search Warrants were assessed as high risk, and Hroma prepared a mission plan that included executing the Search Warrants simultaneously for the safety of both the officers and occupants. Although the initial plan was to make a dynamic entry, the process "slowed down considerably" and was no longer a dynamic entry once Plaintiffs were encountered and

called out by the SWAT Officers.  Dkt. # 377, at 15.

Defendants dispute the facts cited by Plaintiffs and put forth their own set of facts.  They first contend that a flashbang was deployed near the 5039 Residence, not the 5033 Residence, specifically because the Defendant Officers were aware children might be present at 5033.  The SWAT Officers did knock and announce their office while there was an announcement over the PA system of a SWAT vehicle that police were executing search warrants at the Residences.  After they received no answer, the SWAT Officers rammed open the steel security door, and the interior door was already open.  As to the gun-pointing allegations, Defendants contend that the SWAT Officers held their firearms consistent with their SWAT safety training and did not intentionally point their firearms at any of the Plaintiffs.  They argue that displaying their guns upon entry was reasonable given the high-risk nature of the 5033 Search Warrant, and that "any minimal, inadvertent gun pointing during this short duration was not unlawful." Dkt. # 377, at 17.

While we find that most of the above-discussed evidence creates factual disputes for the jury, we do agree that Defendants Hroma and Cuomo cannot be held liable for Count III under supervisory liability since there is no evidence that they were personally involved or planned for or directed any unreasonable or excessive conduct.  *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).  Defendants' motion for summary is granted as to Hroma and Cuomo for Count III.

Furthermore, summary judgment is granted in the Defendant Officers' favor as

to the property damage allegations. Plaintiffs fail to supply evidence that the Defendant Officers' manner of searching the property was excessive or unnecessary, *United States v. Ramirez*, 523 U.S. 65, 71 (1998), or was anything more than negligence, *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002).

Otherwise, the reasonability of the Defendant Officers' actions is a question for the jury and both motions for summary judgment are denied as to Count III.

Although the Defendant Officers contend they should be afforded qualified immunity as to Count III, we disagree. Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (cleaned up). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. *Id*. "Although 'this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (cleaned up).

We decline to find the Defendant Officers are entitled to qualified immunity for this claim because precedent clearly establishes that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." *Baird*, 576 F.3d at 345 (collecting cases).

### III.  Counts IV and VI: False Arrest

Counts IV and VI allege claims for false arrest and false imprisonment under Section 1983 and Illinois law, respectively.

"[T]he Fourth Amendment authorizes officers executing a search warrant to take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *United States v. Clifton Banks*, 628 F. Supp. 2d 811, 815 (N.D. Ill. 2009) (quoting *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (cleaned up)). "In fact, officers executing a search warrant 'have categorical authority to detain any occupant of the subject premises during the search,' not only because 'the probable cause underlying a warrant to search a premises gives police reason to suspect that its occupants are involved in criminal activity,' but 'also because the officers have a legitimate interest in minimizing the risk of violence that may erupt when an occupant realizes that a search is underway.'" *Id.* (quoting *Jennings*, 544 F.3d at 818)); *see also United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994) (detention during execution of search warrant was reasonable under Fourth Amendment); *People v. Edwards*, 144 Ill. 2d 108, 126 (1991) ("a warrant to search for contraband, founded on probable cause, implicitly carries with it the authority to detain occupants of the premises while the search is being conducted").  Officers' authority to detain people incident to a search warrant carries with it the authority to use reasonable force to effectuate the detention. *Muehler v. Mena*, 544 U.S. 93, 98 (2005).

The Defendant Officers seek qualified immunity as to Count IV.  Because

Plaintiffs have not identified clearly established precedent applying to the manner of their detention, the Defendant Officers are immunized from liability on Plaintiffs' federal false arrest and unlawful detention claim and summary judgment is granted in the Defendant Officers' favor.

Turning to Count VI, as discussed *supra*, the 5033 Search Warrant was supported by probable cause. Thus, to the extent Count VI assert the Defendant Officers unlawfully detained Plaintiffs based on an invalid search warrant, summary judgment is granted in Defendants' favor. Summary judgment is otherwise denied as to this claim. Officers may only use *reasonable* force to effectuate a lawful detention. The facts regarding multiple aspects of Plaintiffs' detention are disputed, for example whether Eason was forced to stand outside in a state of partial nudity, and the length of Plaintiffs' detention. The reasonability of Plaintiffs' detention is a question for the jury.

## IV.   Count V: Assault

Plaintiffs argue that Defendants' summary judgment motion as to their state law assault claim must be denied because there are disputes of material fact. In Illinois, assault involves "intentional conduct that places the plaintiff in reasonable apprehension of an imminent battery." *Wagner v. Cook Cnty. Sheriff's Off.*, 453 F. Supp. 3d 1101, 1102 (N.D. Ill. 2020). Subjective fear is not enough—"[s]uch feelings must have a measure of objective reasonableness." *Hespe v. City of Chicago*, 307 F. Supp. 3d 874, 890 (N.D. Ill. 2018). Furthermore, while a search warrant authorizes the use of reasonable force to effectuate a detention of individuals in the area, that force

must still be "objectively reasonable" for the circumstances. *Mena*, 544 U.S. at 98–99; *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Count V alleges that the Defendant Officers' actions were intended to, and did, cause Plaintiffs reasonable apprehension of immediate harmful contact, and/or that the Defendant Officers' actions were willful and wanton, showed utter indifference or conscious disregard for the safety of Plaintiffs. Dkt. # 70, ¶ 234–40. The specific bases for Plaintiffs' claim are similar to those of the excessive force claim—evidence that the Defendant Officers exploded concussion grenades next to the 5033 Residence, forcibly entered without knocking, announcing, or waiting then rushed in with their faces covered, and pointed assault rifles at the "fully compliant" Plaintiffs. Dkt. # 401, at 27. Plaintiffs also claim the Defendant Officers emphasized their threat of deadly force by "screaming angry, profane comments" at Plaintiffs. *Id*. Defendants' arguments in response only highlight that disputes of material fact remain as to this claim.

Both Defendants' and Plaintiffs' motions are denied as to this claim. Despite the valid search warrant, Plaintiffs' have raised material fact disputes regarding the reasonability of Defendants' actions, as well as whether they were willful and wanton, and the reasonability of Plaintiffs' apprehensions of harm. *See Wagner*, 453 F. Supp. at 1103 (denying summary judgment when the defendant's "conduct was sufficiently threatening to place plaintiff in imminent apprehension of a battery."); *see also Callahan v. Aldridge*, 2011 WL 578848, at *4 (N.D. Ill. 2011).

## V.     Count VII: Intentional Infliction of Emotional Distress

Count VII alleges intentional infliction of emotional distress ("IIED") under Illinois law.[6]  To prevail on an IIED claim, a plaintiff must establish: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress; and (3) the defendant's conduct did cause emotional distress. *Hespe*, 307 F. Supp. 3d at 890 (citing *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016)).  "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21 (1992)).  Although it is not the only consideration, conduct may be characterized as extreme and outrageous where it "arises out of an abuse of a position or relationship in which the defendant has authority over the plaintiff."  *Woods v. Clay*, 2002 WL 731682, at *3 (N.D. Ill. 2002).  Abuse of one's position as a police officer constitutes outrageous conduct.  *Id.* (citing *Doe v. Calumet City*, 161 Ill. 2d 374, 392–93 (1994).  "The more control which a defendant has over the plaintiff, the more likely the defendant's conduct will be deemed outrageous."  *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) (cleaned up).

Plaintiffs base their IIED claim on the Defendant Officers' conduct discussed in detail *supra*.   Defendants argue that Plaintiffs' factual statements have been

---

[6] Plaintiffs dropped their negligent infliction of emotional distress claim.  Dkt. # 401, at 30 n.8.

"disproved," Dkt. # 431, at 38, but again, this only demonstrates that disputes of material fact remain.

Disputes of material fact exist as to whether the Defendant Officers' conduct was extreme and outrageous and whether they intended to inflict emotional distress. Relevant evidence includes the Defendant Officers' position of power over Plaintiffs, some of the Plaintiffs' young ages (between 4 and 13 years old), the Defendant Officers' seemingly aggressive behavior, that Plaintiffs complied with all orders and did not pose any threat to the Defendant Officers, and that Plaintiffs suffered traumatic distress, with two of the minor Plaintiffs developing PTSD.

Both Defendants' and Plaintiffs' motions are denied as to this claim. Disputes of material fact exist as to each of the IIED factors.

## VI.    Count VIII: Trespass

Finally, in Count VIII, Plaintiffs bring a state-law trespass claim. In Illinois, "trespass is an intentional invasion of the exclusive possession and physical condition of land." *Blassingame v. City of Chicago*, 2021 U.S. Dist. LEXIS 190452, at *12 (N.D. Ill. 2021) (cleaned up). "The validity of [a] search warrant is [] central to the viability of the state law claim for trespass." *Caldwell v. City of Chicago*, 2010 WL 2722207, at *5 (N.D. Ill. 2010). "To constitute a cognizable trespass, an entry onto the land of another must be unauthorized." *Id*. (citing *People v. Goduto*, 21 Ill. 2d 605, 609 (1961)).

Plaintiffs assert that the Defendant Officers "trespassed in [P]laintiffs' apartment twice"—first by entering Plaintiffs' apartment on an "invalid" search warrant, and

second by unreasonably excluding Plaintiffs from their apartment and "continu[ing] to occupy it for 2 hours" when the search took 20–30 minutes.

Given the validity of the 5033 Search Warrant, the Defendant Officers' "entry was authorized by law, negating a cause of action for trespass." *See Caldwell*, 2010 WL 2722207, at *5. And even if the facts surrounding the timing and duration of the search were undisputed, Plaintiffs cite no authority standing for the proposition that occupying the premises subject to a valid search warrant for two hours is inherently unreasonable or unlawful. *See Crespo v. Calvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("Arguments that are unsupported by pertinent authority[] are waived.").

Summary judgment on Count VIII is granted in the Defendant Officers' favor, and Plaintiffs' motion for summary judgment on this claim is denied.

## CONCLUSION

The Defendant Officers' motion for summary judgment [376] is granted-in-part and denied-in-part. The Defendant Officers' motion is granted on Counts II, IV, and VIII, granted-in-part and denied-in-part on Counts III and VI, and denied as to Counts V and VII. Plaintiffs' cross-motion for partial summary judgment [395] is denied in full. Status hearing set for 11/7/2024 at 9:50 a.m. to discuss whether resolution of this case is possible and if not, preparation for trial. It is so ordered.

_Charles P. Kocoras_

Charles P. Kocoras
United States District Judge

Date: 9/27/2024