UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EBONY TATE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 18 C 7439 |
| | ) |
| CITY OF CHICAGO, et al., | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This civil rights action against the City of Chicago ("City") and various individual Chicago Police Department ("CPD") officers arises from a 2018 incident involving the execution of a search warrant using a maximum force "dynamic entry" into Plaintiffs' residence when Plaintiffs, including the minor Plaintiffs, were home. As a result of the incident, Plaintiffs brought a number of *Monell* claims against the City under 42 U.S.C. § 1983.

Before the Court is the City's motion for summary judgment as to certain *Monell* claims and Plaintiffs' cross-motion for partial summary judgment. For the reasons that follow, both motions are denied.

### BACKGROUND

The Court presumes familiarity with the undisputed facts that form the basis of Plaintiffs' claims as set forth in the Court's September 27, 2024 Memorandum Opinion,

1

Dkt. # 461, and addresses herein only the facts necessary for resolution of the instant motions.

Count I of the operative complaint consists of five *Monell* allegations; however, the City moves for summary judgment only on the following three claims: (1) a failure to train officers to avoid the use of excessive force against or in the presence of minors; (2) "unofficial and official policies" that give SWAT officers encouragement to use "extreme" amounts of force; and (3) a code of silence. *See* Dkt. # 382, at 12. Plaintiffs' *Monell* claims at issue are based on the policies surrounding the use of force and excessive force. The parties dispute whether the claims are limited to the execution of search warrants or broadly encompass the use of force and excessive force against children ages 0–14 in all law enforcement contexts. *See* Dkt. # 412, at 3–4. Because Plaintiffs are the masters of their complaint, *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 557 (7th Cir. 2021), the Court will consider Count I to extend to all law enforcement contexts.

Despite the City's contention to the contrary, most of the facts the City claims are undisputed are actually disputed, some hotly so. *See generally* Dkt. # 412. This alone warrants a denial of summary judgment. *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) (summary judgment is not appropriate if there are any genuine disputes as to any material facts). Plaintiffs' cross-motion also relies on heavily disputed facts. *See generally* Dkt. # 439. Nevertheless, the Court addresses the arguments for summary judgment below.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

"To prevail on a [Section] 1983 claim, the plaintiff must prove that '(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.'" *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d

978, 986 (7th Cir. 2021) (citing *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).

It is well settled that under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality cannot be held liable for constitutional deprivations under the theory of *respondeat superior*. Instead, a municipality can only be held liable for its own actions. *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022). To establish *Monell* liability, then, a plaintiff must prove that "the constitutional violation was caused by a governmental 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *First Midwest Bank*, 988 F.3d at 986 (7th Cir. 2021) (citing *Monell*, 436 U.S. at 694). To differentiate between acts committed by a municipality and those of its employees or agents, municipality liability under *Monell* is limited to constitutional violations caused by "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). If the municipality did not directly violate the plaintiff's rights, the plaintiff must also prove that the municipality acted with "deliberate indifference" and that the municipality's action was the "moving force" behind the plaintiff's alleged violation. *See Giese v. City of Kankakee*, 71 F.4th 582, 588 (7th Cir. 2023).

The City contends it is entitled to summary judgment on Count I because Plaintiffs cannot meet the elements of a *Monell* claim. Specifically, the City argues that (1) the alleged "widespread" practices were not so widespread as to constitute a custom of the City; (2) the City's final policymakers were not deliberately indifferent to any of the purported practices, and rather took steps to combat four of the five alleged practices; and (3) there is no evidence that any of the alleged practices could be considered the "moving force" behind the alleged constitutional injuries. Plaintiffs, on the other hand, argue that summary judgment should be granted in their favor because the evidence shows that (1) there was a widespread practice of excessive force against children; (2) there were gaps in CPD policy and training; (3) and there was actual notice of the pattern and practice of the use of excessive force and the deficiencies in in training and policies. Upon review, neither party is entitled to summary judgment.

### a. Whether a Widespread Practice Existed in the CPD is a Question for the Jury

To establish a "policy or custom" under a "widespread practice" theory, Plaintiffs must prove the existence of a pattern of behavior or conduct within the CPD "that is so well-settled and pervasive that it assumes the force of law." *See Denno v. Sch. Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1277 (11th Cir. 2000). This Circuit has found that the word "widespread" should be taken seriously. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "There is no bright-line rule defining a widespread custom

5

or practice, but 'it is clear that a single incident – or even three incidents – do not suffice.'" *Arquero v. Dart*, 587 F. Supp. 3d 721, 728 (N.D. Ill. 2022) (citing *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014)). Plaintiffs must also introduce evidence "demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *See Phelan*, 463 F.3d at 790.

The City contends that Plaintiffs failed to produce sufficient evidence to show that the City engaged in a widespread practice or policy of failing to train SWAT officers, that it encouraged the use of extreme force by the SWAT team, and that it failed to prevent a culture with a pervasive "code of silence" which allowed officers to cover up misconduct. However, there are various disputes of material facts that prevent a granting of summary judgment on this claim.

### i. Training

First, the City argues that the training provided to CPD officers on the proper use of force against children under the age of 14 met state requirements and that there is "undisputed evidence" in the record to support its position that the City's training "goes above and beyond what is required by law." However, nearly all the evidence cited is, in fact, disputed.

For instance, the City cites "the testimony of various witnesses," including the testimony of Commander Daniel Godsel and Ms. Karen Conway, the Director of Research and Development, as undisputed evidence that the training was sufficient.

6

This testimony is disputed, however, and the weight to be afforded to this testimony largely depends on witness credibility. Credibility determinations are reserved for the jury, not the Court. At summary judgment, "[w]e have one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Stewart*, 14 F.4th at 760 (cleaned up).

Next, while the City contends that "the *undisputed testimony* also states that officers are trained to consider the totality of circumstances in the use of force, which includes the age, size, and strength of the individual," Dkt. # 382, at 11 (emphasis added), Plaintiffs provided about seven different evidentiary sources that directly dispute this. This Court "may only determine whether or not there exists a dispute as to a material issue of fact. [We are] not permitted to resolve that dispute." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001). Thus, summary judgment is not appropriate on this issue.

Plaintiffs also cite to gaps in the official policy and training that prohibited or discouraged officers from using excessive force against children. For example, Plaintiffs state that there was little to no relevant training between 2012 and 2018 that mentioned the use of excessive force against minors. Dkt. # 417, at 19. The CPD also did not enact a policy that required officers to "maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma following a search warrant" in the presence of minors until 2020. *Id*. at 20. The CPD also did not have a "no gun-pointing" policy of any kind until 2019.

The failure to provide adequate training "may serve as the basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "[M]unicipal liability under [Section] 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under [Section] 1983." *Id*. (cleaned up).

Plaintiffs contend that the evidence shows that policymakers had both actual and constructive notice of a pattern of excessive force against children before 2018. Plaintiffs also assert that the City failed to incorporate the Department of Justice ("DOJ") or Police Accountability Task Force ("PATF") reports' recommendations. Despite the City's position that the training on use of force was updated and provided to all officers in 2017, Plaintiffs provide evidence rebutting the City's claim that it "took steps" to address findings of the DOJ and PATF and that the City changed all of their excessive force policies prior to 2018. Thus, a genuine issue of material fact exists as to this issue that precludes a finding of summary judgment.

### ii. Unofficial/Official Policies

With regard to Plaintiffs' claim that the City had a widespread policy of encouraging the use of excessive force by the SWAT team, the City argues that there

are undisputed facts in the record showing that SWAT officers are highly vetted and trained and engage in meticulous planning before executing high-risk search warrants. SWAT officers are required to carry their identifying information on their person while on duty and they are trained to "expect to be videoed taped at all times." Dkt. # 382, at 12. Plaintiffs, on the other hand, provide evidence of hundreds of incidents between 2012–2018 where the City documented use of excessive force against children in all types of police-public interactions, including by SWAT officers.

"If a similar constitutional problem has arisen many times, then it is possible to infer there is a policy at work." *Calhoun v. Ramsey*, 408 F. 3d 375, 380 (7th Cir. 2005). Plaintiffs' citation to a three-figure number of incidents prior to August 2018 could allow a reasonable jury to infer that there was a widespread practice of using excessive force against children. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (conduct at issue must have occurred more than three times).

Plaintiffs' expert also concluded that the CPD "has a widespread custom and practice with respect to . . . improper use of force on children" that includes but is not limited to pointing guns at children "and a complete failure to direct officers on the need to consider the vulnerabilities of children in planning and executing law enforcement operations." Dkt. # 417, at 7. The City's Rule 30(b)(6) witness also admitted that officers used excessive force against children, including "commonly" pointing guns at them while executing search warrants. There are also DOJ and PATF reports containing

9

official government findings that CPD engaged in excessive force against, mistreated, and traumatized children between 2010 and 2016.

The Court finds that there is disputed evidence on both sides as to whether there was an established widespread practice of excessive force against children.

### iii. Code of Silence

Lastly, the City argues there is insufficient evidence to establish that there was a code of silence at the CPD which prevented officers from being held accountable for misconduct. It argues that Plaintiffs have failed to provide any evidence to support their claim that such a practice was so pervasive as to be considered a *de facto* policy. The City also asserts that the conduct that would support the existence of a code of silence took place prior to the reform in accountability systems that took place in 2017, and that at the time of the relevant incident, there were systems in place to prevent the existence of a code from becoming widespread, including policies to prevent officers from providing false testimony and covering up misconduct.

"Where a policy is not written, the adoption of a defacto [*sic*] policy is shown through a specific pattern or series of incidents that support the allegation of the existence of the policy." *Thomas v. Cannon*, 751 F. Supp. 765, 770 (N.D. Ill. 1990). As previously stated, the quality and timeframe for the reforms with the CPD are disputed. Further, there are admissions on record made by City officials stating that a code of silence did exist during 2012. The DOJ and PATF reports also concluded that there was

10

a code of silence. Therefore, whether a code of silence existed during the relevant time boils down to a question of fact that is reserved for a jury.

### b. Whether Policymakers were Deliberately Indifferent is a Question for the Jury

Even if Plaintiffs conclusively establish the existence of a widespread policy or practice, they must also show that the City's final policymakers were deliberately indifferent to the "known or obvious consequences" of the policies or practices in question. *See Doe v. Vigo Cnty., Ind.*, 905 F.3d 1038, 1045 (7th Cir. 2018) ("the plaintiff must show that the local policymakers were, at a minimum, deliberately indifferent as to [the] known or obvious consequences of their inaction with respect to the custom.") (cleaned up).

Here, the City states that the final policymakers for some policies would be the City Council and for other policies, including police training, the Superintendent of Police. The City contends that for each of the alleged widespread practices, the evidence fails to establish that any of the final policymakers either had knowledge of the widespread patterns or failed to act on them. To the contrary, the City argues that in many cases, it took active steps to combat the issues and that any failed efforts do not amount to an endorsement.

But, as Plaintiffs point out, a jury could conclude that the City's final policymakers had actual and constructive notice of the CPD's pattern of excessive force against children. From 2012–2018, both the Independent Police Review Authority

11

("IPRA") and Civilian Office of Police Accountability ("COPA"), which report to the City Council, had notice of the pattern of complaints of excessive force against children. Thus, a reasonable jury can infer, since the IPRA and COPA report to the City Council, that the City Council were made aware of these allegations. Also, the January 2017 DOJ report also informed the City Council and other final policy makers of the pattern and practice of the use of excessive force against children.

Plaintiffs also claim that despite having knowledge of the ongoing issue with the use of excessive force against children, the City was deliberately indifferent to the substantial risk of serious harm. The City had knowledge of hundreds of complaints of the use of excessive force against children, stemming at least six years from the date of the August 2018 incident in this case, and failed to take any substantive action to address this issue. Plaintiffs argue that any changes that were made were insignificant and did not address the actual issue of the use of excessive force against children.

Considering that the discussion involves the use of excessive force towards minors, it is reasonable to infer that the risk of a constitutional violation was imminent. Yet, there is a dispute of fact as to whether the City indeed had knowledge of the pattern of excessive force or if the City took adequate steps to address the matter. This is also an issue best suited for a jury.

### c. Causation is a Question for the Jury

Lastly, the City argues that Plaintiffs are unable to establish the causation element of their claim, namely that the policies at issue were the "direct cause" or "moving

12

force" behind the constitutional violation. *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) ("[A] rigorous causation standard [ ] requires the plaintiff to show a direct causal link between the challenged municipal action and the violation of his constitutional rights") (internal quotations omitted). To establish causation, Plaintiffs must show a direct causal link between the CPD's widespread practices or policies, or the actions or inactions of the City's final policymakers, with their constitutional injuries. The City argues that even if excessive force was used in this case, Plaintiffs have failed to present any evidence establishing causation.

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Commr's of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). While the connection between a municipality's inaction and a plaintiff's constitutional injury might be more demanding, it is not insurmountable. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020).

As previously discussed, there is evidence in the record that could lead a jury to conclude that the City was deliberately indifferent and failed to address the issue of the use of excessive force against minors. *See id.* at 384 ("[m]uch of the same evidence proving Polk County deliberately indifferent to the constitutional consequences of its inaction likewise illustrates that its indifference was the moving force behind J.K.J. and M.J.J.'s injuries"). If a jury concludes that the risk of constitutional injuries to minors

13

due to the use excessive force was indeed obvious, then the jury could also infer causation. *See id*. ("[t]he high degree of predictability that constitutes notice, the Supreme Court has emphasized, may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.") (internal quotation marks omitted). Thus, summary judgment on the issue of causation is also denied.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment [380] and Plaintiffs' cross-motion for partial summary judgment [413] are denied. It is so ordered.

Dated: November 1, 2024

_____

Charles P. Kocoras
United States District Judge