**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EBONY TATE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18 CV 7439 |
| v. | ) | Judge John J. Tharp |
| | ) | Jury Demanded |
| THE CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT MOTIONS *IN LIMINE*

NOW COME Defendants OFFICERS MICHAEL HIGGINS (Star #3766), MATTHEW EVANS (Star 5815), PATRICK KENNEDY (Star #14414), Pachara SANTISUK (Star #6607); ANDREW CUOMO (Star #5853), ERIC JAMES (Star #4308), EVAN KILPONEN (Star #12854), NICHOLAS LINKER (Star #12858), RICARDO LOPEZ (Star #11987), RYAN MCCALLUM (Star #16333), MICHAEL PANTANO (Star #11886), MARCO ZENERE (Star #17319), and SGT. PATRICK BOYLE (Star #975), ("Defendant Officers"), by and through their attorneys, Mohan Groble Scolaro, P.C., and Defendant City of Chicago ("the City"), by and through one of its attorneys, Marion C. Moore, Chief Assistant Corporation Counsel, (collectively, "Defendants") and for their Motions *in Limine* Nos. 1-53, state as follows:

**Motion *in Limine* No. 1: Bar Any Argument or Testimony that Officers Were Only Searching for One Gun, Given Two Different Guns Were Subject Of The Respective Search Warrants For 5033 and 5039 S. Hermitage**

The sole remaining claim against the search team officers (Sgt. Boyle, Officer Higgins, Officer Kennedy, and Officer Evans) is the part of Count III alleging that Officers unlawfully searched Plaintiffs' 5033 S. Hermitage residence after the target of the search warrant and one firearm were

found at 5039 S. Hermitage.[1] In making this claim, Plaintiffs have repeatedly obfuscated the fact that the search warrant for Plaintiffs' 5033 S. Hermitage residence identified a completely different gun than the search warrant for 5039 S. Hermitage.

Although the target for both search warrants was Javale Bell ("Bell"), each search warrant identified a different firearm as an item to be seized. Specifically, the search warrant for Plaintiffs' 5033 S. Hermitage residence described the firearm as an "all-black semi-automatic handgun," whereas the firearm described in the search warrant for 5039 S. Hermitage was a "two-tone multi-capacity handgun." (Search Warrants for 5033 S. Hermitage and 5039 S. Hermitage, attached hereto as Group Exhibit ("Ex.") 1). Social media photographs obtained by officers, and produced during discovery, show Bell with the two distinct firearms.





Bell holding the all-black semi-automatic handgun like a telephone directly next to the front door to Plaintiff's 5033 S. Hermitage residence.

Bell holding the two-tone multi-capacity handgun in front of 5039 S. Hermitage.

(See Social Media Photographs, QH 41-42, QH 120, attached hereto as Group Ex. 2). As shown above, one photograph even shows Bell holding the firearm identified in the 5033 S. Hermitage search warrant while standing directly next to Plaintiffs' front door. *Id.*, at QH 120.

---

[1] To the extent Plaintiffs are attempting to make this claim against any Defendant SWAT officers (which would be unsupported by the evidence), the same logic would apply.

Since the existence of two different firearms undermines Plaintiffs' unlawful search claim, Defendants anticipate that Plaintiffs and their counsel will continue to incorrectly represent or imply that Officers were only searching for one firearm, or alternatively, the discovery of a firearm at the 5039 S. Hermitage address meant that the Officers could have or should have stopped searching for a firearm. The Court should bar such an improper tactic because it is irrelevant and there is no probative value to incorrectly representing the evidence in this case. Rather, it would only serve to mislead the jury, confuse the issues, and cause unfair prejudice to Defendants. Fed. R. Evid. 401, 402, 403. Plaintiffs, their attorneys, and their witnesses should thus be barred from offering any testimony or arguments that Officers were only looking for one firearm. Similarly, for the reasons set forth below in Motion *in Limine* No. 4, Plaintiffs and their attorneys should be barred from introducing any evidence or argument that Officers were searching the "wrong residence" or "wrong house," etc.

**Motion *in Limine* No. 2: Bar Any Evidence, Testimony, Or Arguments Regarding Any Claimed Property Damage, Given Summary Judgment Rulings**

The Court granted summary judgment in Defendant Officers' favor as to Plaintiffs' property damage claim because "Plaintiffs fail[ed] to supply evidence that the Defendant Officers' manner of searching the property was excessive or unnecessary, . . . or was anything more than negligence." Dkt. 461, at 20-21. Given the Court's ruling, the Court should bar Plaintiffs, their attorneys, and their witnesses from introducing any evidence, testimony, or arguments regarding any claimed property damage. *See generally Foster v. Davis*, No. 10 C 6009, 2013 U.S. Dist. LEXIS 56844, at *10-11 (N.D. Ill. Apr. 22, 2013) (Der-Yeghiayan, J.) (barring evidence only relevant to dismissed deliberate indifference claim); *Walker v. County of Cook*, 2009 U.S. Dist. LEXIS 1636, at *8-9 (N.D. Ill. Jan. 9, 2009) (granting motion *in limine* barring evidence regarding code of silence and *Monell* claims because Sheriff's office had been afforded summary judgment and such evidence was not relevant to surviving claims).

Throughout the course of this litigation, Plaintiffs have complained of the fact that that certain belongings, including, but not limited to, toys, doors, and iPad were damaged during the search of their residence. Now, despite the Court's clear ruling, Plaintiffs appear intent on still introducing evidence of their now-dismissed property damage claim given their objections to Defendants' proposed jury instructions in which they object to a proposed instruction because it did not reference the alleged property damage.

Because the Court granted summary judgment in Defendant Officers' favor, evidence of the alleged property damage is irrelevant and lacks any probative value whatsoever. Fed. R. Evid. 401, 402, 403. Rather, the only reason for Plaintiffs to introduce evidence relating to the dismissed property damage claim would be to inflame the jury and improperly attempt to garner sympathy and damages for a claim that the jury is not tasked with deciding. As such, this evidence would only serve to confuse the issues, mislead the jury, and cause unfair prejudice to Defendant Officers. Fed. R. Evid. 403. Evidence is unfairly prejudicial if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented. *Davies v. Benbenek*, 836 F.3d 887, 890 (7th Cir. 2016). Defendant Officers would suffer unfair prejudice if Plaintiffs are permitted to bring forth evidence of their property damage claim that was previously dismissed on the merits. The Court should thus bar any evidence or argument of the dismissed property damage claim.

**Motion *in Limine* No. 3: To Bar Evidence, Testimony, or Argument on Any Lack of Body Worn Camera ("BWC") Footage or Failure to Wear or Activate Said BWC, and to Bar Certain BWC Footage**

The Court should preclude Plaintiffs from introducing or eliciting any testimony, arguments, or references regarding the lack of body worn camera ("BWC") video footage of the incident. On August 9, 2018, the Search Team Officers were assigned to the Narcotics Division, while the remaining Defendant Officers were assigned to the SWAT team. It is undisputed that neither unit was assigned or equipped with BWCs at the time of the underlying incident and thus there are no BWC

4

videos of the entry into and search of Plaintiffs' residence. As such, testimony or evidence criticizing the lack of BWC videos would be unduly prejudicial and improperly suggest fault on behalf of the Defendant Officers. Additionally, the absence of BWC videos is irrelevant as it makes no fact at issue in this case more or less probative, and would only serve to confuse and distract the jury.

Moreover, such evidence would also be improper because not only would this subject be irrelevant, but the City had no duty to equip officers with cameras, let alone cameras that were operable. *See* 745 ILCS 10/4-102 ("Neither a local public entity nor a public employee is liable . . . for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals."); *see also Kavanaugh v. Midwest Club, Inc.*, 164 Ill. App. 3d 213, 216-17 (2d Dist. 1987) (applying 4-102 immunity and affirming dismissal of claims that police officer acted negligently in attempting to rescue a driver from a submerged car when the officers did not have proper equipment for the rescue.). Further, such evidence or argument would be unduly prejudicial in that they could be used to improperly suggest an intentional effort to conceal conduct. Fed. R. Evid. 403.

This case is not about the lack of any BWC footage or the failure of any officer to wear or activate his BWC camera. Plaintiffs and their counsel should be barred from mentioning, insinuating, and arguing same as it would be irrelevant and prejudicial to the issues of this case. Fed. R. Evid. 401, 403.

Finally, to allow such arguments would also fail under the 403 balancing test because such evidence is irrelevant and would unfairly prejudice Defendants by implying a duty which does not exist. Fed. R. Evid. 403. Plaintiffs, their counsel, and their witnesses should be barred from arguing or eliciting evidence which would be critical of the fact that Defendant Officers did not have body worn cameras. Fed. R. Evid. 401, 402, 403.

**Motion *in Limine* No. 4: Bar Evidence and Argument Criticizing the Search Warrant Investigations or the Validity of the Underlying Search Warrant, including any mention, insinuation or reference that 5033 was the "wrong house" or a "wrong raid," as well as barring any argument that the target needed to reside at a target residence as the law does not require same.**

This Court has determined that the search warrant procured by Officer Higgins for Plaintiffs' 5033 S. Hermitage residence was valid and supported by probable cause. Dkt. 461, at 13-18. Plaintiffs should thus be barred from arguing, introducing any evidence, or attempting to elicit testimony that calls into question the search warrant's validity or the efforts taken to procure it.

Up until the Court issued its ruling granting summary judgment in Defendants' favor on the Unlawful Search-Invalid Search Warrant claim, Plaintiffs' litigation of this case focused heavily on that claim. In litigating the invalid search warrant claim, Plaintiffs' counsel spent a considerable amount of time not only questioning Officers, particularly Officers Higgins and Burmistrz, about the investigative steps taken to corroborate the RCI's information, but also questioning them about certain inquiries and steps Plaintiffs and their counsel contend should have been made but were not, i.e., subpoenaing records from utility companies and property managers, etc. Given the Court's ruling, Defendants request that the Court bar Plaintiffs, their counsel, and/or their experts or other witnesses from introducing any evidence, arguments, or criticism regarding the search warrant investigation, including any insinuations that the search warrant was bad, that the Defendant Officers could or should have taken additional steps to procure the warrant, or that it contained some legal defect.

The law of the case bars any attempt to relitigate or recover for these claims. Once an issue is litigated and decided, it should be the end of the matter. *Evans v. City of Chi.*, 873 F.2d 1007, 1014 (7th Cir. 1989). "'As most commonly defined, once a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues.'" *Sterling Fire Restoration, Ltd. v. Wachovia Bank N.A.*, No. 12 CV 3530, 2012 U.S. Dist. LEXIS

6

160819, at *5 (N.D. Ill. Nov. 9, 2012) (Feinerman, J.) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)). Any testimony, arguments, or criticism regarding the search warrant investigation and the procurement of the warrant are completely irrelevant given those claims have been dismissed and would severely prejudice Defendant Officers if they were forced to defend themselves against dismissed claims. Fed. R. Evid. 401, 402, 403.

*Mendez v. City of Chicago*, which was litigated by the same lead attorneys as those in this case, highlights the necessity of this Motion. *Mendez* consisted of almost identical claims to those here. The *Mendez* Court similarly granted Defendant Officers summary judgment on the invalid search warrant claim. *Mendez v. City of Chi.*, No. 18 C 5560, Dkt. 610. Defendants subsequently filed a motion *in limine* similar to this one in that it requested that the court bar evidence, arguments, or criticisms regarding the validity of the search warrant. Dkt. 637, at 8-9. The *Mendez* plaintiffs agreed to the motion. *Id.* Despite agreeing to the motion, the *Mendez* plaintiffs spent an extraordinary amount of time during the trial questioning witnesses regarding the search warrant investigation and procurement of the search warrant. For example, over Defendants' objections, Plaintiffs' counsel spent one full hour questioning Sgt. Egan regarding the investigative steps taken while procuring the search warrant even though the parties were very tight on time and it was becoming increasingly certain that they would not be able to finish the trial within the allotted two weeks. The tone and nature of the questions asked of the trial witnesses demonstrated that there was no valid reason for eliciting that testimony. Rather, its purpose was solely to draw into question the search warrant's validity. In fact, the *Mendez* court had to admonish the plaintiffs multiple times regarding this issue and warned them that a curative jury instruction would likely be necessary.

Despite the Court's ruling, Plaintiffs appear intent on re-litigating the invalid search warrant claim given that they have identified search warrant-related exhibits (i.e., the CCSAO's FOIA response related to the search warrants, Exhibits 16-18), and have also identified as may-call witnesses Lt.

7

Cascone, Officer Fleming (the CPD's liaison for the FBI's registered confidential informant), and now-Judge Regina Mescall, who was formerly the ASA who approved the search warrant. Defendants anticipate that, similar to *Mendez*, Plaintiffs may argue that such evidence and testimony is relevant to their punitive damages claim and/or their state law claims for which plaintiffs are required to prove that each individual Defendant's conduct was willful and wanton. Such an argument would be completely disingenuous as there is no legitimate basis to introduce such evidence.

First, for their punitive damages claims, Plaintiffs are required to prove that an officer's "conduct was malicious or in reckless disregard of the Plaintiffs' rights." Seventh Circuit Pattern Jury Instruction 7.28; *Martinez v. City of Chi.*, No. 14 CV 369, Dkt. 253, at 45 (Dow, J.). Evidence of the search warrant investigation and procurement is irrelevant as to that claim since the Court unequivocally found that the search warrant was valid and supported by probable cause and, therefore, did not violate Plaintiffs' rights. Thus, given the legality and reasonableness of the search warrant, Defendants were not acting maliciously or in reckless disregard of Plaintiffs' right.

Next, in addition to the Court's ruling, the state law claims are brought solely against Defendant SWAT Officers and the City, and not the search team officers. Since the SWAT officers had no involvement in the procurement of the search warrant for Plaintiffs' residence, such evidence is completely irrelevant as to whether the SWAT Officers' conduct was willful or wanton. In short, any argument that such evidence is relevant as to the punitive damages and/or state law claims are without merit.

Given the extraordinary and inappropriate amount of questioning and arguments designed to call into question the search warrant's validity and lawfulness during the *Mendez* trial, the Court should unequivocally bar Plaintiffs, their attorneys, and their witnesses from using the same tactics in this case. Any questioning, testimony, or arguments casting doubt on the reasonableness and validity of the search warrant for Plaintiffs' residence would be an improper attempt to relitigate an issue already

ruled upon by the Court. Not only is it irrelevant given the Court's ruling, but it would also only serve to mislead and confuse the jurors as to which issues they are being tasked with deciding. Fed. R. Evid. 401-403. Further, any negligible probative value would be significantly outweighed by the unfair prejudice Defendant Officers would face should such evidence and arguments be permitted. Fed. .R. Evid. 403. For these same reasons, Plaintiffs, their attorneys, and their counsel should also be barred from arguing or insinuating that their residence was the "wrong house" or that it was a "bad warrant" or "wrong raid." They should further be barred from eliciting testimony or offering arguments regarding certain inquiries and steps Plaintiffs and their counsel contend should have been made during the search warrant investigation but were not, i.e., subpoenaing records from utility companies and property managers, etc.

Next, in a similar vein, Defendants request that the Court bar Plaintiffs, their attorneys, and their witnesses from providing any evidence, testimony, or arguments that the target of a search warrant needs to reside at the place being searched and/or that officers must immediately find physical evidence directly linking the target of the search warrant to the residence in order to conduct a search. The only reason to introduce such evidence would be to imply that the search warrant was faulty or invalid because the target of the search warrant did not reside at Plaintiffs' residence. Significantly, there is no constitutional requirement that the target of a search warrant actually reside at the residence to be searched. *See London v. Guzman*, 26 F. Supp. 3d 746, 754 (N.D. Ill. 2014); *Horne v. Wheeler*, No. 03 CV 7252, 2005 U.S. Dist. LEXIS 19596, at *9-13 (N.D. Ill. Sept. 6, 2005) (explaining whether a target actually resides at the target residence is not material to the determination of probable cause). Rather, there only needs to be sufficient evidence, which there was here, for Officer Higgins to think Bell was engaging in criminal activity at Plaintiffs' residence. *Brock v. City of Chi.*, No. 17 CV 3393, 2018 U.S. Dist. LEXIS 123974, at *10 (N.D. Ill. July 25, 2018) (Feinerman, J.). Accordingly, Plaintiffs, their counsel, and their witnesses should be prohibited from introducing any evidence, arguments, or

9

testimony implying that Officers should not have been executing the search warrant for their residence because the target of the search warrant did not live there.

**Motion *in Limine* No. 5: Request That the Court Keep Track of Trial Hours/Days and Award the Same Amount of Time Per Side**

Defendants have been deeply concerned about the potential length of this trial for quite some time. Plaintiffs have repeatedly insisted that the entirety of the trial could be completed within three weeks. Defendants have repeatedly maintained that to present the witnesses Plaintiffs have indicated they wish to present and for Defendants to sufficiently rebut that evidence would more likely take more on the order of four to six weeks, given the existence of almost 20 parties and the broad expanse of Plaintiffs' *Monell* claims. Defendants strenuously believe Plaintiffs are grossly underestimating the amount of time that the trial may take, and as a result Defendants will face unfair prejudice by not being able to present key evidence at a reasonable pace, or potentially at all, due to time constraints from Plaintiffs' case running too long.

The trial of *Mendez v. City of Chicago,* 18 C 5560*,* is instructive. Plaintiffs, represented by some of the same counsel as in this case, had claimed that trial could be completed within two weeks. As a result, that Court accepted Plaintiffs' estimate and scheduled just two weeks for trial. Due to various factors, the individual defendants ended up dismissed in *Mendez*, and the case became one against the City for *Monell* and for various state law claims.

Even so, Plaintiffs' estimate of two weeks for the entirety of the trial proved grossly inaccurate and inadequate. Plaintiffs used about a week and a half of the scheduled two weeks on their case before the parties reached a settlement. Presented at that trial were about 15 witnesses: three plaintiffs, the two officers accused of pointing guns at the minor plaintiffs, Plaintiffs' four expert witnesses, the videotaped testimony of a CPD official, three pattern witnesses to attempt to establish that other children had been the victims of excessive force, one of Plaintiffs' treaters, and a defense medical expert taken out of order. Because the claims were only against the City, the length of the testimony

10

of some of these witnesses was abbreviated. For instance, the two officers did not have to go into detail about their financial condition because punitive damages were not an issue in the trial. Plaintiffs had yet to present at least one adult plaintiff in their case, had things proceeded. Given the need for closing arguments and deliberation to take place within the two weeks allotted for the trial and the likelihood of additional motion practice, Defendants would have had at best a mere two days to present testimony from about a dozen witnesses, including but not limited to: four officers who were formerly defendants, at least two police officers to debunk Plaintiff's evidence of alleged excessive force from other incidents in support of their *Monell* claims, a half-dozen CPD City officials to debunk Plaintiff's *Monell* claim by attesting to the final policymaker's position on police reform, the soundness of officers' training and the police-accountability systems, and two police-policy experts and a statistical expert. There would have been no way for Defendants to present a complete defense to the evidence Plaintiffs presented in the remaining time allowed.

The issue of insufficient time and the prejudicial effect toward Defendants looms even larger here. In the proposed pretrial order, Plaintiffs have listed 40 will-call witnesses and over 60 may-call witnesses. Defendants have an additional several dozen potential witnesses. It cannot reasonably be said that Plaintiffs can call that many witnesses and leave the defense a fair amount of time within the allotted time frame. Moreover, because there are two sets of defendants and additional issues presently at stake in this litigation, it is possible that there may be different questions to be asked of witnesses by the Defendant Officers and by the City, meaning that the questioning of witnesses is likely to inherently take longer. For instance, any number of the 14 Defendant Officers may need to testify as to their financial background as a defense to Plaintiffs' pursuit of punitive damages.

Defendants therefore seek to avoid prejudice they would suffer by allowing Plaintiffs to take the overwhelming amount of time allotted for this trial and to leave Defendants with insufficient time to present the overwhelming evidence rebutting Plaintiffs' claims. Without a court-imposed limit,

11

Plaintiffs may deliberately or inadvertently leave Defendants in an awkward position where their ability to refute Plaintiffs claims is severely prejudiced. Given that Defendants have long and loudly been attempting to point out that Plaintiffs are downplaying the length of the case, that would be doubly unfair.

A perfect trial day would allow for six hours of exam time. *LinkEpic Inc. v. Vyasil, LLC*, 2019 WL 11717160 at *5 (N.D.Ill. Oct. 15, 2019). But between ordinary delays, sidebars, and unexpected developments, the potential to have repeated perfect trial days is unrealistic. It would be more accurate to say each day would likely have about five hours of exam time. The three weeks the Court has scheduled for the trial realistically will need at least one day for devoted to *voir dire* and opening statements. There will also be at least one day for closing arguments, motion practice, unexpected issues, and the beginning of deliberations. Finally, the case will need to take February 16, 2026 off for the federal holiday of Presidents' Day. Thus, within the present schedule, there are effectively 12 court days available for the parties' examinations, or approximately 60 court hours.

Defendants offer two possible proposals to ensure both sides have sufficient time to present their respective claims and defenses. The first would be for the Court to limit each side to 30 hours of examination time total. The second would be for the Court to require Plaintiffs to end their case by February 12, 2026, giving Plaintiffs eight full days for their case and giving Defendants a minimum of four full days for their defense. Either proposal would guarantee both sides adequate time to present the witnesses they need while staying within the Court's three-week window.

It is well within the Court's inherent authority to establish firm limits for both sides in terms of the length of time to present their case. See Fed.R.Civ.P. 16(c)(4) & (15); Fed.R.Evid. 611(a). The Seventh Circuit has explained that "'it has never been supposed that a party has an absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by his own judgment and whim .... The rule should merely declare the trial court empowered to enforce a

12

limit when in its discretion the situation justifies this.' " *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1171 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (quoting 6 Wigmore, Evidence § 1907 (Chadbourne Rev.1976)).  Rather, the Seventh Circuit acknowledged that such limitations may indeed be appropriate, "provided that witnesses are not excluded on the basis of mere numbers." *Id.* The court explained that "[t]he circumstances of each individual case must be weighed by the trial judge, who is in the best position to determine how long it may reasonably take to try the case." *Id.* at 1172.

Courts have set time limits for the parties before. See, *e.g.*, *LinkEpic Inc.*, 2019 WL 11717160 (setting 9 hours of exam time per side); *Enright v. Auto-Owners Ins. Co.*, 2F.Supp.2d 1072, 1077 (N.D.Ind. March 12, 1998)(setting 15 hours of exam time per side); *Gaines v. The Chicago Board of Education et al.*, No. 19 C 775 at Dkt. 377 (N.D.Ill. April 19, 2024)(setting 20 hours of exam time per side).

Defendants therefore respectfully request the Court to establish the above time limits, or time limits it deems appropriate.

**Motion *in Limine* No. 6: Bar Any Use of Any Media Reports or Pieces Regarding the Search Warrant for Plaintiffs' Residence With the Exception of Any Relevant Statements Made on Video By Plaintiffs**

Plaintiffs' exhibit list includes clips from interviews conducted with CBS2 Chicago and other news outlets, including interviews with CPD'S Lt. Matthew Cline and former Mayors Emanuel and Lightfoot. Exhibits 59, 108, 112, 428, 447. Plaintiffs' use of the news accounts and statements made by City and CPD personnel is likely to violate Rules 401 and 403 because much of the materials will have nothing to do with the issues in the case or be blatant attempts to gain sympathy.

Any statements from Plaintiffs offered by Plaintiffs should also be barred as inadmissible hearsay. Rule 801(c)(1)-(2) defines hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter

13

asserted in the statement." Plaintiffs should not be allowed to introduce statements by themselves, reporters or other witnesses in a fashion that does not allow for the witnesses to be properly cross-examined. Such statements are inadmissible hearsay.

In short, apart from non-hearsay statements made by Plaintiffs on video that comport with Rules 401 and 403, and impeachment of Plaintiffs, as well as video footage that rebuts any Plaintiffs' damages claims, this Court should bar any use of any media reports or pieces. This would include barring any references to the titles of the various media reports, which include, but are not limited to, "wrong raid," "botched raid," and/or "Unwarranted" (nor should this last piece be referred to as a "documentary").

**Motion *in Limine* No. 7: Bar any Evidence of Civilian Complaints, Other Lawsuits, Employee or other Disciplinary Proceedings, Pending or Past Claims Against Defendants**

Defendants seek to bar Plaintiffs from offering any testimony, evidence, or argument regarding their disciplinary histories, disciplinary records, and other lawsuits of the Defendant Officers involved in this incident. Such evidence is irrelevant, highly prejudicial to the issue of the Defendant Officers' conduct in this case, and would be offered for no other reason other than to introduce impermissible propensity evidence to the jury.

This evidence would most likely be, but not necessarily be limited to, prior or pending lawsuits, citizens' complaints, internal investigations and discipline against Defendant Officers. It should be barred because it constitutes improper character or propensity evidence under Federal Rule of Evidence 404. *See* Fed. R. Evid. 404. Any party seeking to introduce Rule 404(b) material "must be able to identify a 'chain of reasoning that supports the non-propensity purpose for admitting the evidence.'" *Brooks v. City of Chi.*. No. 13-cv-3090, 2015 U.S. Dist. LEXIS 73387, at *4 (N.D. Ill. June 5, 2015) (quoting *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014)). In making the decision as to whether evidence may be admissible under Rule 404(b), "'the district court should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the

14

evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference.'" *Id.* at *4-5 (quoting *Gomez*, 763 F.3d at 856).

Unrelated past discipline cannot be used "to prove the character of a person in order to show action in conformity therewith," nor would any tangentially related investigation fall into any exception under Federal Rule of Evidence 404(b). Fed. R. Evid. 404(b). *See also Delgado v. Mak*, No. 06 C 3757, 2008 U.S. Dist. LEXIS 27140, *17-18 (N.D. Ill. 2008) (excluding evidence of disciplinary records based on Fed. R. Evid. 404(b)). Moreover, such evidence is irrelevant, contains inadmissible hearsay, and any probative value it may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *See* Fed. R. Evid. 402, 403. *See Anderson v. City of Chicago*, No. 16-cv-726, Dkt. 111, at 4 (N.D. Ill. June 9, 2018) (Wood, J.) (barring evidence of other lawsuits, civilian complaints, and disciplinary records under Rules 403 and 404(b)), attached hereto as Ex. 1. *See also Patterson v. City of Chi.,* No. 15 C 4139, 27572, *10-13 (Feb. 28, 2017) (St. Eve, J.) (similar motion granted); *Betts v. City of Chi.,* 784 F. Supp. 2d 1020, 1031 (N.D. Ill. 2011) (other lawsuits, incidents, and disciplinary history inadmissible). *See also Brown ex rel. Walker v. Irvin*, No. 08 CV 2637, 2011 U.S. Dist. LEXIS 97674, at *4-5 (N.D. Ill. Aug. 30, 2011) (barring evidence of civilian complaints); *Sughayyer v. City of Chi.*, No. 09 CV 4350, 2011 U.S. Dist. LEXIS 60143, at *16-18 (N.D. Ill. June 6, 2011) (same); *Heflin v. City of Chi.*, No. 95 CV 1990, 1996 U.S. Dist. LEXIS 672, at *2, 4 (N.D. Ill. Jan. 22, 1996) (barring evidence of other complaints against Officers); *Daniels v. De Felice*, No. 87 C 9951, 1992 U.S. Dist. LEXIS 9325, at *4-5 (N.D. Ill. June 26, 1992) ("OPS complaints are like arrests in one sense—they are someone's assertions that somebody has done something wrong but are not themselves evidence of wrongdoing. They are not normally admissible."). The prejudice of this evidence would exponentially add to the prejudice already facing Defendants.

This is especially true given that investigations conducted by BIA/IAD/IPRA/COPA are not carried out under the same standards and evidentiary rules as this case. Such evidence would also

15

necessitate many trials within a trial as Defendants would need to present evidence to rebut any allegations and/or dispositions.

When ruling on a similar motion in *Mendez*, the Court granted Defendants' motion to bar the use of a sustained CR against one of the defendant officers and reserved ruling on the admissibility of the others CRs. *Mendez*, 18 CV 5560, Dkt. 719, at 6. None of the officers' CRs ended up being used in the *Mendez* trial

Next, the Court, based on the arguments before it at that stage, found that Plaintiffs could introduce "the summary, career complaint histories of defendant officers" for their *Monell* claim, he appeared to invite further arguments and/or objections. *Id.* at 4-5. Defendants respectfully disagree with this portion of the *Mendez* Court's rulings and request that the Court deviate from it. Although Plaintiffs will claim that such evidence is relevant as to their *Monell* claim that the City failed to investigate or discipline officers, the minimal probative value is significantly outweighed by the danger of extremely unfair prejudice to Defendant Officers. Fed. R. Evid. 403. First, Plaintiffs do not need this evidence for their *Monell* claim as they received evidence relating to other CR file materials and data (for non-defendant officers) during discovery. There is no reason to introduce evidence of the individual Defendant Officers' CR histories other than to infame the jury. There are no curative or limiting jury instructions sufficient to cure the prejudice to the Defendant Officers should Plaintiffs be allowed to introduce evidence of their career-long CR histories for which most, if not all, of the CRs were not sustained. Although Plaintiffs allege the lack of sustained findings and discipline are the result of the City's alleged failure to discipline, Defendants contend that it is simply because there was no wrongdoing. Accordingly, in order for Defendants to sufficiently defend themselves against the improper 404(b) evidence, there would need to be multiple mini-trials which would result in a sideshow and unnecessarily delay this trial. Accordingly, the Court should bar evidence and testimony of Officers' CR histories.

16

Finally, Plaintiffs identify as Trial Exhibits the complaints for two other lawsuits against Defendant Officers. (Pltf. Tr. Ex. 32, 34). The first, *Acey v. Hromo*, No. 16 CV 2843, Dkt. 43 (N.D. Ill. May 1, 2017), was brought against Defendant Cuomo and other officers. In that case, the adult plaintiff alleged that officers, who were assisted by SWAT officers, arrested him in his home, threatened to injure him if he did not provide information regarding evidence, broke his arm, and then questioned him for eight hours at the police station. *Id.* Not only does the Amended Complaint not make any specific allegations of wrongdoing against Officer Cuomo, but the facts of that lawsuit are completely irrelevant to the conduct alleged in this case where officers were executing a valid high-risk search warrant. Further, the case was settled without any admission of liability. Next, in *Hunter v. Cuomo*, No. 06 CV 6709, Dkt. 1 (N.D. Ill. Dec. 5, 2006), the Plaintiff brought claims for false arrest, failure to intervene, due process violations, and malicious prosecution claim against Officer Cuomo and other officers after he alleges he was unlawfully stopped, searched, and arrested while he was in a public place. *Id.* Once again, those allegations do not attribute any specific alleged misconduct to Officer Cuomo, are completely different than those alleged int his case, and the case was settled. Further, in the settlement agreement, the defendants denied the allegations of wrongdoing further denied liability. *Id.*, Dkt. 29. In short, these Complaints constitute nothing more than unsubstantiated allegations of wrongdoing and should thus be barred under Rules 402, 403, and 404(b).

For these reasons, this Court should preclude Plaintiffs from attempting to elicit testimony or otherwise introduce evidence relating to any prior discipline or other complaints of misconduct against Defendant Officers and bar Plaintiffs' Trial Exhibits 32, 34, 183, 186, 189, 192, 195-196, 199, 202, 205, 209, 211, 213, 217, 221, 223, 226, 230, 233, 236, 239, 241, 244, 247, 250, 252, 253, 258-260, 264-267, 270, 272-274, 280, 282, 284, 286-287, 302-303, 309-310, some of which include complaint histories, personnel files, fitness for duty results, and non-disciplinary intervention program documentation for officers who are no longer defendants in this case.

**Motion *in Limine* No. 8: Bar Any Evidence or Reference that COPA Investigated this Incident and Any Conclusions and/or Recommended Discipline as a Result of the Investigation.**

Plaintiffs should be barred from mentioning the Civilian Office of Police Accountability's ("COPA") investigation of Defendant Officers in this case, including making any reference to an "internal investigation" or similar term regarding the search warrant in question. Following the filing of this lawsuit, COPA initiated an investigation to determine whether any CPD rules and policies had been violated. COPA did not reach any findings or conclusions as a result of their investigation, instead administratively closing the investigation as "Closed/No Finding" on June 4, 2020. The nature and quality of the underlying COPA investigation, including its mere existence, is entirely irrelevant to the claims, is prejudicial in that it could be used to suggest that the Defendant Officers in this case did something wrong, and would confuse the jury as it may suggest that if any investigation took place, it was only done because some sort of misconduct occurred.

Reference to any COPA investigation or internal investigation would unduly prejudice Defendant Officers by creating an improper negative inference that they engaged in some form of wrongdoing bearing disciplinary scrutiny by an internal agency. *Lyles v. Gambino*, No. 2019 U.S. Dist. LEXIS 189295, at *16-18 (N.D. Ill. Oct. 31, 2019) (Gilbert, J.) (barring evidence and testimony relating to the OPS investigation, including the mere fact that an investigation existed and the findings of same, into the officers' conduct with the narrow exception that the investigator's testimony could be used for the limited purpose of impeachment); *Delgado v. Mak*, 2008 U.S. Dist. LEXIS 27140, at *2 (N.D. Ill. 2008) (finding that potential prejudice from testimony regarding internal affairs investigation substantially outweighed its probative value); *Sallenger v. City of Springfield*, 2007 U.S. Dist. LEXIS 64991, at *3-4 (C.D. Ill. 2007) (finding that evidence related to internal investigations, or lack thereof, and any outcome, was inadmissible as probative value is outweighed by danger of unfair prejudice if admitted as there was substantial risk of jury confusion or possibility that the jury would base its

18

decision on improper basis). COPA's investigation into the underlying incident also constitutes a subsequent remedial measure, and is thus inadmissible under Rule 407.

Courts have notably also barred evidence of COPA investigations and findings where COPA conducted a full investigation and rendered its findings because such evidence would almost certainly cause the jury to base any decision on the COPA investigation and findings rather than the evidence presented at trial. Such evidence would also mislead the jury regarding the issue of liability and the burden of proof. *See Mendez v. City of Chicago*, No. 18 C 5560, Dkt. 719, at 7 (N.D. Ill. Apr. 18, 2025) ("The Court agrees with Defendants that evidence of COPA's investigation into the underlying events, findings, and disciplinary recommendations is not relevant to any issue the jury will be tasked with deciding and introduction of this evidence may confuse the jury."); *Arrington v. City of Chicago*, No. 17 C 5345, 2023 U.S. Dist. LEXIS 73100, at *10 (N.D. Ill. Apr. 27, 2023) (Durkin, J.) (explaining that the Court had barred evidence of the COPA report because it "carried a substantial risk of unfair prejudice and confusion due to the close relationship between the findings and disputed issues before the jury and the fact that the investigation was not conducted under the same standards or evidentiary rules as applied in [the civil] case").

The Seventh Circuit has not recognized an allegation of "inadequate police investigatory work" as a civil rights claim in the absence of another recognized constitutional right. *Jacobson v. AMTRAK*, 1999 U.S. Dist. LEXIS 18754, at *36 (N.D. Ill. 1999); *see also David v. Village of Oak Lawn*, 954 F. Supp. 1241, 1245-46 (N.D. Ill. 1996) (holding that plaintiff did not have constitutional right to have his complaints investigated).

In short, this Motion should be granted and Plaintiffs should be barred from introducing evidence of the underlying COPA investigation, including the COPA file as well as the testimony of COPA Investigator Andrew Dalkin who is listed as a may-call witness, because the proposed evidence is irrelevant, consists of inadmissible hearsay, lacks foundation, its probative value is substantially

19

outweighed by the danger of unfair prejudice and confusion of the issues, and because it constitutes a subsequent remedial measure. See FED. R. EVID. 401, 402, 403, 407.

**Motion *in Limine* No. 9: Bar Evidence of or Argument Regarding Other Publicized Events Concerning Alleged Police Misconduct**

Plaintiffs should not mention, discuss or refer to other events regarding alleged police misconduct, such as, but not limited to, highly publicized incidents like Michael Brown (Ferguson, MO), Laquan McDonald (Chicago), George Floyd (Minneapolis, MN), other search warrant lawsuits filed by Plaintiffs' counsel and/or other search warrant incidents such as those involving Annjanette Young (Chicago), Amir Locke (Minneapolis, MN), and Breonna Taylor (Louisville, KY). Such unrelated incidents and reports have placed the issue of allegations of police misconduct before the public by way of extensive media coverage, such that law enforcement personnel are often depicted in an unfavorable, and even hostile, manner. Defendants do not condone any alleged misconduct and should not be forced to defend the conduct of others in this Court.

Comments and implied references regarding police misconduct in other cases are completely irrelevant, have no probative value, and are completely irrelevant to Plaintiffs' claims against Defendants in this case. Fed. R. Evid. 401, 403. Accordingly, Plaintiffs should be precluded from making any reference to any alleged police misconduct, including highly publicized instances of such misconduct, here in Chicago or in other jurisdictions. *See Mendez,* No. 18 C 5560, Dkt. 719, at 7 (granting similar motion *in limine* because "any such argument or evidence is not only irrelevant, but any probative value is outweighed by the danger of unfair prejudice"); *Martin v. City of Chi.*, No. 15 C 4576, 2017 U.S. Dist. LEXIS 104914, at *18-19 (N.D. Ill. July 7, 2017) (barring reference to unrelated publicized events of alleged police misconduct); *Gonzales v. Olson,* No. 11 C 8356, 2015 U.S. Dist. LEXIS 76203, at *45, 64-65 (N.D. Ill. June 12, 2015) (granting motion to bar unrelated police misconduct).

**Motion *in Limine* No. 10: Bar the Use of Any Subtitles/Captions In Video Testimony/Statements**

The Court should bar Plaintiffs and their counsel from showing any witnesses or the jury any videos of testimony or statements containing subtitles or captions. To the extent the jury is shown any videotaped depositions or interviews, Defendants anticipate that Plaintiffs will attempt to use videos to which they have added subtitles or captions appearing to reflect their version of what is being said in the video. In *Mendez,* Plaintiffs provided defense counsel with versions of various videos with transcripts that they had added only shortly before their attempt to use them.. The plaintiffs' attempt to use videos containing their created subtitles and captions created disputes given that they did not appear accurate or complete to defendants based on what was being said in the videos and were ultimately not used. Here, there is simply no reason to use captions or subtitles in video evidence. The jurors will be able to watch any video evidence they are provided and determine for themselves what they are hearing. They do not need Plaintiffs to suggest to them what is being said. The use of any captions or subtitles, especially without providing them to opposing counsel with sufficient time to review same, would confuse the jury and prejudice Defendants. Fed. R. Evid. 403. For these reasons, Defendants request that the Court bar the use of any video evidence containing subtitles or captions created by counsel, their employees and/or outside vendors.

**Motion *in Limine* No. 11: Bar Any Subsequent Remedial Measures, Including Any Mention or Reference to the Peter Mendez Act**

Federal Rule of Evidence 407 expressly forbids evidence of subsequent remedial measures to prove, among other things, culpable conduct or a need for a warning or instruction. Fed. R. Evid. 407. The Court should preclude Plaintiffs, their counsel and witnesses from offering any testimony, argument, or evidence regarding subsequent remedial measures, including any revised CPD directives or Illinois state laws, including the Peter Mendez Act. The Court should also bar such evidence, argument or mention because it would be irrelevant, unduly prejudicial, and would cause the jury to

21

believe that the City's policies at the time of the incident were bad. Any reference to or evidence of subsequent remedial measures and the Peter Mendez Act should thus be barred. *See Mendez*, No. 18 C 5560, at 8 (reserving in part and granting in part a similar motion).

**Motion *in Limine* No. 12: To Bar Evidence, Testimony, or Argument that any Officer Violated Chicago Police Department General Orders, Special Orders, Rules, or Regulations**

Any testimony, evidence, or argument that Defendant Officers violated any CPD directive should be inadmissible at trial. Violations of state statutes, local ordinances, or administrative or department regulations do not give rise to an action under § 1983, unless the rights are guaranteed under the United States Constitution. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984); *Thompson v City of Chi.*, 472 F.3d 444, 455 (7th Cir. 2006); *Kraushaar v. Flannigan*, 45 F.3d 1040, 1048-49 (7th Cir. 1995); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985). "The Seventh Circuit 'has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations and police practices . . . . In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established.'" *Hinch v. O'Connor*, 2018 U.S. Dist. LEXIS 25393, at *15 (N.D. Ill. 2018) (Pallmeyer, J.) (quoting *Thompson*, 472 F.3d at 454) (internal citations and quotations omitted).

Whether any Defendant violated CPD rules, regulations, or directives is irrelevant to Plaintiffs' claims in this case. Fed. R. Evid. 401, 402. Defendants anticipate that Plaintiffs will argue that such evidence is relevant as to their state law claims and to their punitive damages claim. Defendants disagree. If this Court were to permit Plaintiffs to present evidence or suggest to the jury that any Defendant or other police officer witness may have breached an obligation they had to their employer through an alleged rule violation, it would be confusing to the jury and unfairly prejudicial to Defendants. Fed. R. Evid. 403. *See also Walker v. Saenz*, No. 91 C 3669, 1992 U.S. Dist. LEXIS 16454,

22

at *12 (N.D. IL. Oct. 27, 1992) (granting motion *in limine* because of confusion in distinguishing a Chicago Police Department rule violation from a constitutional violation). This is especially true here where there is no evidence of any rule violations, causing any implication of such to be pure argument or speculation on behalf of Plaintiffs' counsel. A jury may very well attribute liability to an officer in this case just because they believe he may have violated an internal rule or directive. Alternatively, Defendants request that the Court instruct Plaintiffs that they must "tread lightly and notify the Court and Defendants' counsel, outside the presence of the jury, if Plaintiffs believe that there is a permissible basis for this evidence, at which time Defendants may object or seek a limiting instruction." *See Mendez v. City of Chicago*, No. 18 C 5560, Dkt. 719, at 10 (N.D. Ill. Apr. 18, 2025). Accordingly, Plaintiffs should not be permitted to inject any argument or evidence of possible rules violations into these proceedings.

**Motion *in Limine* No. 13: Bar Any Evidence, Opinions, and Argument by Plaintiffs Regarding Lost Income, Past or Future Medical Bills, Medical Records Not Disclosed, Any "Recommendations of Therapy" With No Assessment, Any Lack of Medical Insurance Coverage, and Materials Not Disclosed During Discovery**

Plaintiffs should be barred from introducing evidence of or providing testimony regarding any claimed lost income and any medical bills beyond the specific, disclosed amounts listed below, and any medical records not already produced. First, Cynthia Eason testified she never missed any work, (Eason Dep, attached hereto as Ex. 3, at 201:6-8), while Ebony Tate testified that she only missed two days of work for which she earned $11.00 per hour. (Tate Dep, at 19:3-10, 192:8-20). ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As such, apart from Ebony Tate's approximately $176.00 in claimed lost wages, the Court should bar any evidence, opinions, and/or arguments regarding lost wages and past medical bills.

"The exclusion of non-disclosed evidence as sanction is automatic and mandatory under discovery rule unless non-disclosure was justified or harmless." *Musser v. Getiva Health Services*, 356 F.3d 751, 758 (7th Cir. 2004). The allowance of such evidence at trial in this matter absent the prior disclosure of records supporting such evidence would be neither justified nor harmless to Defendants as Defendants have had no opportunity to conduct discovery on such matters. Further, without any supporting documentation or expert testimony, any such claim would be impermissibly speculative. *Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 739 (N.D. Ill. 2004) (Bucklo, J) (barring lost wages evidence where plaintiff failed to produce an expert linking that claim to his specific allegation of police misconduct); *Bob Willow Motors, Inc., v. General Motors Corp.*, 872 F.2d 788, 797-98 (7th Cir. 1989) (damages must be based on something more than speculation and conjecture). Because any such evidence would be speculative and because Plaintiffs did not disclose any documentation beyond those specific bills referenced above during the discovery period, the Court should bar Plaintiffs from introducing evidence or argument regarding any lost income, damages in the form of medical bills outside of those specifically disclosed, and evidence of any medical treatment/records not disclosed.

███████████████████████████████████████████████████████████

████████████████████████████████████████████

The Court should also bar Plaintiffs, their attorneys, and their witnesses from introducing any evidence, arguments, or reference to lacking of insurance coverage. "Evidence of insurance coverage is ordinarily inadmissible." *See Mendez*, No. 18 C 5560, Dkt. 719, at 11 (denying in part and granting in part similar motion and barring evidence regarding lack of therapy unless defendants open door by arguing that plaintiffs did not see treatment). *See also generally Braun v. Lorillard, Inc.*, No. 94 C 976, 1996 U.S. Dist. LEXIS 204, at *2 (N.D. Ill. Jan. 10, 1996) (Manning, J.). *See also Crecy v. Kankakee Sch. Dist. #111*, 2017 U.S. Dist. LEXIS 219158, at 16-17 (C.D. Ill. Feb. 6, 2017) (barring any reference to mentions of, or implications that the plaintiff was unable to pay for or could not afford certain medical treatments or did not have health insurance because "[t]he issue of the finances of a party can distract the jury from the real issues in the case" and the plaintiff's financial condition is irrelevant). Such evidence is irrelevant and prejudicial, Fed. R. Evid. 401, 403, and may influence the jury to sympathize with plaintiffs and award higher damages.

Finally, the Court should bar Plaintiffs from introducing Plaintiffs' Trial Exhibit 396 as was neither produced nor disclosed during discovery. Indeed, at the time of filing, Plaintiffs have not provided Defendants with a copy of what they were contemplating introducing. It should, therefore, be barred pursuant to Rule 37(c)(1).

**Motion *in Limine* No. 14: Bar Witnesses From Offering Their Opinions As to the Credibility or Accuracy of Other Witnesses' Testimony or Statements**

Defendants request that this Court bar any witness from offering his or her opinions as to the credibility or accuracy of other witnesses' testimony or statements. Specifically, Plaintiffs should be barred from offering any testimony or opinions from their experts regarding their views of Defendant Officers' credibility and/or version of events. Such evidence would be improper because determining

witnesses' credibility is a task assigned exclusively to the jury. Any opinion as to credibility is barred by Fed. R. Evid. 702 and would invade the jury's province by improperly telling them who to believe. The probative value of such opinion testimony is thus substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Accordingly, all witnesses, including expert witnesses, should be barred from giving their opinions as to the credibility or accuracy of other witnesses' testimony or statements. *See Mendez*, No. 18 C 5560, Dkt. 719, at 12 (granting similar motion).

**Motion *in Limine* No. 15: Bar Any Comment on the Defendants' Failure to Call Witnesses or Produce Evidence**

"The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial." Federal Civil Jury Instructions of the Seventh Circuit 1.18. The Court should thus bar Plaintiffs, their counsel, and their witnesses from conveying to the jury that by choosing not to call a particular witness or present certain evidence, Defendants are trying to hide unfavorable evidence or that it reflects poorly on Defendants' case.

In addition, the burden of proof rests with Plaintiffs and not Defendants. Defendants are under no obligation to present any evidence at all. Therefore, it would be improper burden-shifting to argue that Defendants failed to call a witness, in violation of Fed. R. Evid. 403.

**Motion *in Limine* No. 16: Bar Argument That The City Should Be Punished Or That The Jury Should Send A Message To The City With The Verdict**

Any argument that the jury should send a message to the City with its verdict or that the jury should punish the City with its verdict should be barred. Though the City is a defendant, as a matter of law, Plaintiffs cannot recover punitive damages from it in this case. See 745 ILCS 10/2-102. Sending a message or punishment cannot form the basis for any damages other than punitive damages. See *Cobige v. City of Chicago*, 06 CV 3807 at Dkt. 215, (N.D.Ill. Jan. 14, 2010)(St. Eve, J.). Thus, any such argument would be an improper attempt to inflame the passions of the jury and should be prohibited.

**Motion *in Limine* No. 17: Bar Testimony, Evidence and Arguments About Personal Information Relating to Any Plaintiff or Witness That Would Constitute Improper Bolstering**

Plaintiffs should be precluded from introducing any evidence or arguments at trial relating to their "good" character. This evidence may consist of testimony or arguments that Plaintiffs attend church. The introduction of evidence beyond what is minimally necessary to provide the jury with basic biographical and personal information about the Plaintiffs would tend to create unfair prejudice, confuse the issues, mislead the jury, and waste time. Fed. R. Evid. 403. Evidence of Plaintiffs' characters has no relevance or probative value under the circumstances of this lawsuit because resolution of the case depends entirely upon the reasonableness of Defendant Officers' actions.

Moreover, such evidence, even if admissible under Fed. R. Evid. 402, should be barred under Fed. R. Evid. 403 because it suggests that citizens such as Plaintiffs are entitled to special treatment by law enforcement officers, or jury sympathy, that is not warranted under the circumstances of the events in question, thereby creating unfair prejudice to Defendants, and confusing the jury. The Court should thus bar Plaintiffs and their counsel from introducing any evidence attempting to bolster their "good" character. *See generally Mendez,* No. 18 C 5560, Dkt. 719, at 13 (granting motion with limitation that plaintiffs may rehabilitate witness whose credibility has been attacked).

**Motion *in Limine* No. 18: Bar Plaintiffs From Testifying as to Any Opinion that the Officers Involved in the Incident Should Have Been Disciplined or Fired as Irrelevant.**

The Court should preclude Plaintiffs, their witnesses, and attorneys from introducing any evidence or argument that any of the Defendant Officers should have been disciplined or fired as a result of the incident. During their depositions and in statements made to the media, Plaintiffs offered opinions regarding the Defendants' conduct. Plaintiffs, however, are not police practices experts and have no law enforcement training. As such, they are not qualified under Rule 702 to provide any opinions regarding the appropriateness of Defendant Officers' conduct. Plaintiffs' personal opinions regarding the officers' conduct and whether they should have been disciplined or fired would be

27

irrelevant and would pose extremely unfair prejudice to Defendant Officers. Fed. R. Evid. 402, 403. Such opinions would not be helpful to understanding any testimony or a fact at issue. Fed. R. Evid. 701. Of note, it is the jury who will be tasked with deciding the reasonableness and lawfulness of the Defendant Officers' conduct, not Plaintiffs. For these reasons, the Court should bar any testimony, evidence, or arguments that Defendant Officers should have been fired or disciplined. *See Mendez*, No. 18 C 5560, Dkt. 719, at 13 (granting similar motion *in limine* and barring plaintiffs from offering their personal opinions regarding whether officers should have been disciplined or fired as it was not relevant and the probative value would be substantially outweighed by its prejudicial nature).

**Motion *in Limine* No. 19: Bar Lay Medical and Police Practices Opinions**

Plaintiffs and their lay witnesses should be barred from offering any evidence or testimony regarding any medical treatment or diagnoses they received, including using any medical terminology. Laypersons are not competent to offer a medical opinion concerning their injuries. *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996). Lay opinions are only admissible "to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanation or interpretation that an untrained layman could not make if perceiving the same acts or events." *United States v. Conn.*, 297 F.3d 548, 554 (7th Cir. 2002); *Cooper*, 97 F.3d at 917. Issues of causation, permanency, future disability, or future pain and suffering, however, all require expert testimony based on scientific, technical or specialized knowledge, which Plaintiffs and other lay witnesses do not have. *See Griffith*, 233 F.R.D. at 516, 518-19; *Krischel*, 533 F. Supp. 2d at 795.

Plaintiffs and any other lay witnesses must thus be barred from offering any evidence, testimony, arguments, or innuendo regarding any medical or psychological treatment, diagnoses, causation, permanency, future disability or future pain and suffering relating to any health or psychological injuries they claim they suffered as a result of the underlying incident. Fed. R. Evid. 701(c). This includes any reference to any "PTSD" Plaintiffs claim resulted from the incident. *See*

*Mendez*, No. 18 C 5560, Dkt. 719, at 14 (barring plaintiffs from testifying as to causation, permanency, or complex medical diagnoses, including any PTSD diagnoses).

Similarly, Plaintiffs and any other lay witnesses should be barred from offering any opinions on police practices. Fed. R. Evid. 701. Specifically, Plaintiffs must be barred from offering any testimony from any lay witnesses, including the individual Plaintiffs, their opinions on the propriety, necessity, reasonableness, lawfulness, and/or excessiveness of the use of force employed by Defendants, the search warrant that was procured for their residence, the manner in which the search warrant was executed, and the manner in which they were detained.

The law is clear that third party lay witnesses are not permitted to render such opinions or opinions regarding the nature and motives of persons involved in such incidents. Indeed, "lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by Rule 701(b)." *U.S. v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009). "This is because a lay witness's purpose is to inform the jury what is in the evidence, not to tell it what inferences to draw from that evidence." *Id.* Here, the *jury* must decide whether certain SWAT Officers employed excessive force, whether the search warrant was executed in a reasonable manner, and whether Plaintiffs' detention incident to the search warrant was reasonable. *See Graham v. Connor*, 490 U.S. 386 (1989); *Tenn. v. Garner*, 471 U.S. 1 (1985); *Sallenger v. Oakes*, 473 F.3d 731, 742 (7th Cir.2007); *see also* Sev. Cir. Pattern Jury Instruction 7.08. Thus, such opinion evidence from lay witnesses is routinely excluded. *See Estate of Northington v. City of Indianapolis*, 2023 WL 8543724, *3 (S.D. Ind. 2023)("The motion in limine regarding evidence or references to IMPD's use of force as improper, unnecessary, or unlawful by lay witnesses is granted to the extent it does not comply with Federal Rule of Evidence 701. That is, lay witnesses may not opine about whether officers' beliefs regarding the use of force were 'reasonable', or whether the force used was 'necessary'..."); *Williams v. Boley*, 2023 WL 4351500, *10 (S.D. Ind., 2023)(same); *McGown v. Arnold*, 2014 WL 5502612, *5 (N.D. Ind. 2014)(lay witnesses cannot testify about excessiveness or

reasonableness of officer's actions); *Larsen v. Barrientes*, 2010 WL 2772325, *3 (N.D. Ind. 2010)(same); *Norman v. City of Lorain*, 2006 WL 5249724, *4 (N.D. Ohio 2006)(same); *see also Thompson*, 472 F.3d at 458; *Trexler v. City of Belvidere*, 2023 U.S. Dist. LEXIS 12662, *10-11 (N.D. Ill. 2023)(barring opinions that use of force was "an inappropriate use of force," "completely unjustified," and "unreasonable and excessive force" because such opinions were inadmissible legal conclusions. For these reasons, the Court should bar Plaintiffs from introducing testimony from lay witnesses regarding the reasonableness of the use of force, the search warrant execution, and Plaintiffs' detention.

**Motion *in Limine* No. 20: Bar Evidence or Testimony of the Wealth or Poverty of the Parties**

This Court should bar Plaintiffs from introducing any evidence regarding wealth or poverty. Defendant believes Plaintiffs may attempt to introduce testimony or other evidence that they did not seek medical or psychological treatment because of an inability to pay for such care and treatment. Any reference to or evidence of the wealth or poverty of Plaintiffs are completely irrelevant to the issues in this case. Fed. R. Evid. 401. *See also Mendez*, No. 18 C 5560, Dkt. 719, at 15 (granting motion but noting plaintiffs may be able to introduce evidence of a lack of insurance if defendants open the door on them not seeking treatment); *Van Bumble v. Wal-Mart Stores, Inc.*, 407 F.3d 823, 826-27 (7th Cir. 2004) (finding that the District Court did not abuse its discretion by barring evidence of the wealth or poverty of plaintiffs because it "is irrelevant and would have been prejudicial to the jury's determination of damages"). *See also generally Crecy*, 2017 U.S. Dist. LEXIS 219158, at *16-17 (determining that the poverty or wealth of plaintiff was irrelevant even where he was claiming he could not afford medical care). Such evidence only serves to call attention to the relative pecuniary or financial status of the plaintiff and would serve to inflame and impassion the jury and to seek to gain the jury's sympathy. *Id.* The minimal probative value of this evidence would be substantially outweighed by the danger of unfair prejudice to Defendants. Fed. R. Evid. 403. This Court should

thus bar Plaintiffs from introducing evidence or testimony regarding their wealth or poverty and should further be barred from testifying that they could not afford medical and/or psychological care.

**Motion *in Limine* No. 21: Bar Evidence of Settlement Discussions In This Case and Bar The Use of Verdicts Or Settlements, Including As Evidence of Plaintiffs' *Monell* Claims**

Defendants respectfully move this Court to bar Plaintiffs, their attorneys, and their witnesses from offering any evidence, testimony, or arguments regarding settlement discussions in this case and from using any past verdict and settlement against the City as proof of their *Monell* claims. In general, such verdicts and settlements tend to have multiple problems that would prevent them from being applicable to this case. Those problems include, but not limited to, the time frame in which the allegations happened being different from the ones at issue here; the underlying facts or *Monell* theories of those cases being dissimilar from the case at bar; and/or ambiguity over what the verdict may represent. Such evidence runs afoul of Rules 401, 403, and 408.

"The mere fact that a case settled out of court is not an indication of wrongdoing by any party to the settlement." *Am. Med. Ass'n v. 3Lions Publ'g, Inc.,* No. 14 C 5280, 2015 WL 1399038, at *5 (N.D.Ill. Mar. 25, 2015) (Kendall, J.) Because there are multiple reasons why the City may have opted to settle cases and because settlements are not an admission of wrongdoing, bringing in any settlements would violate Rule 403 by introducing high risks of unfair prejudice and jury confusion.

Defendants respectfully move this Court to bar Plaintiffs from offering any evidence of settlement discussions in this matter, including any Rule 68 discussions and/or offers of judgment. Based on the clear language of Rule 408, Plaintiffs should similarly be barred from referencing any settlements or verdicts in any other cases involving any of the Defendant Officers.

**Motion *in Limine* No. 22: Bar attorneys from conferring or speaking with any witnesses while that witness still under oath to provide sworn testimony**

Defendants request that once a witness is called to testify, no attorney shall confer with that witness, who is under oath, about his or her trial testimony, until the termination of the testimony. If

31

attorneys are allowed to confer with witnesses while the witness is still called to the stand to testify, while the trial is in recess either for a break or while the trial is adjourned to the following day, the attorney could have undue influence upon the witness and sway the testimony of that witness. Attorneys should also not be allowed to confer with witnesses or speak with witnesses in any way during a recess or adjournment so that the witness does not feel pressure or intimidation from attorneys involved in the case.

**Motion *in Limine* No. 23: Bar Evidence That the Defendant Officers May Be Indemnified by Their Employer, the City of Chicago, for Any Portion of the Judgment**

The Court should bar any reference or evidence of the City's indemnification of the Defendant Officers for compensatory damages. Whether or not the City indemnifies Defendant Officers is completely irrelevant to the issue of whether any of the Defendant Officers are liable. It is undisputed that the City has agreed to indemnify the Defendant Officers for any compensatory damages assessed in this case. Thus, the only reason to mention that the City will indemnify the Officers for compensatory damages would be to signal to the jury that "deep pockets" are available to pay any judgment which runs afoul of federal and Illinois law that evidence of indemnification against liability is inadmissible as irrelevant and highly prejudicial to the issue of liability. Fed. R. Evid. 411; *Mendez*, No. 18 C 5560, Dkt. 719, at 16 (granting similar motion but noting such evidence may be allowed if defendants open the door by introducing evidence of their inability to pay damages); *Walker v. Saenz*, No. 91 C 3669, 1992 U.S. Dist. LEXIS 16454, *10 (N.D. Ill. Oct. 27, 1992) (granting motion *in limine* to bar indemnification evidence because such evidence is unduly prejudicial.)

Knowledge that the City will indemnify Defendant Officers for possible damages might encourage jurors to find for Plaintiffs—regardless of the facts presented at trial. Such knowledge can also lead jurors to inflate an award out of sympathy or other irrelevant factors. This Court should thus

preclude Plaintiffs from presenting evidence or arguments regarding the City's obligation to indemnify Defendant Officers in the event the jury decides in Plaintiffs' favor.

**Motion *in Limine* No. 24: Bar any reference to the fact that Chicago police officers are "on duty" and are being paid to prepare for trial and appear in court to testify.**

The Court should bar Plaintiffs and their counsel from eliciting testimony that Defendant Officers or any other City employees are being paid for their time spent in court. "[E]vidence that police personnel are being paid their normal wage to appear in court is outweighed by the potential prejudice of that argument" under Rule 403. *Mendez,* No. 18 C 5560, Dkt. 719, at 16 (granting similar motion ); *Martinez v. City of Chicago*, No. 14 C 369, 2016 U.S. Dist. LEXIS 84231, at *49-20 (June 29, 2016) (Dow, J.). While it will be apparent to jurors that the officers are paid employees of the City, Plaintiffs should be barred from arguing that their testimony is somehow being provided in exchange for money. *See, e.g., Dyson v. Szarzynski*, No. 13 CV 3248, 2014 U.S. Dist. LEXIS 174671, at *27 (N.D. IL. Dec. 18, 2014) (Kim, J.) (granting Defendants' motion to bar Plaintiff from arguing or insinuating at trial that the officers are providing testimony in exchange for payment for the City.) Nor is such an assertion true. Defendant Officers and other City witnesses are simply being paid incident to their employment.

Similarly, evidence relating to Defendant Officers or other City employees meeting with City attorneys runs the risk of confusing the issues and leading a jury to conclude that such meetings are improper – which is not true. See Seventh Circuit Civil Pattern Jury Instruction 1.16. Thus, any such testimony or arguments should be barred.

**Motion *in Limine* No. 25: Bar any argument that the jurors are the "guardians of the community" or otherwise that they are tasked with protecting the public.**

A juror's role is to make their determination based on the evidence presented to them during a trial. Any argument that a jury should decide the case based on their self-interest or the interest of the community at large would violate the "golden rule" about putting themselves in the position of

33

the party. Such an argument is wholly improper and should be barred. *See, e.g. Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982) (explaining that the "Golden Rule" appeal "is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence") (internal quotations omitted); *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007); *Below by Below v. Yokohama Tire Corp.*, No. 15 C 529, 2017 U.S. Dist. LEXIS 27280, at \*25 (W.D. Wis. Feb. 27, 2017) (Conley, J.).

The Court should thus preclude Plaintiffs, their attorneys and their witnesses from asking the jury to be the "guardian of the community" or otherwise protect the public under Rules 401 and 403 because that would invite the jury to consider something other than the evidence when reaching its decision. *United States v. Roman*, 492 F.3d 803, 805-06 (7th Cir. 2007) (asking jury to place themselves in party's shoes and depart from position of neutrality by deciding the case based on personal interest or bias is improper); *United States v. DeSilva*, 505 F.3d 711, 718 (7th Cir. 2007), citing *United States v. Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005) (comment in closing argument that jury is protecting the community is "clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact."); *Smith v. City of Chi.*, No. 21 C 1159, 2025 U.S. Dist. LEXIS 119493, at \*67-68 (N.D. Ill. June 24, 2025) (Cummings, J.) (finding "that any argument that the jurors are 'guardians of the community' and tasked with protecting the public . . . would be inflammatory" thus granting defendants' motion *in limine*).

In *Mendez*, the Court granted the motion barring the plaintiffs from making any golden rule argument, but denied without prejudice  as to the request to bar discussion about the community's larger interests. *Mendez*, No. 18 C 5560, Dkt. 719, at 17. Defendants respectfully disagree with the Court's declining to bar discussion of the community's interests as such an argument would clearly only be made to encourage the jury to reach a verdict solely on the basis of emotion. *Weatherspoon*, 410 F.3d at 1150. Accordingly, the Court should grant this Motion.

**Motion *in Limine* No. 26: Bar Certain Opinions Rendered by Dr. Berkowitz**

The benchmark for the admissibility of expert testimony has been established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Rule 702 permits testimony by an expert, or someone with the necessary "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or [] determine a fact in issue. Rule 702. Such a witness may testify when: (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* Under *Daubert*, a court should ensure that experts satisfy Rule 702's requirements of reliability and relevance before allowing their testimony. Expert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions. *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998). An expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).

Expert testimony cannot be based on subjective belief or speculation. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *Geraty v. Vill. of Antioch*, No. 09 C 6992, 2013 U.S. Dist. LEXIS 209311, at *12 (N.D. Ill. Oct. 1, 2013). *See also McCann v. Ill. Cent. R.R. Co.*, 711 F. Supp. 2d 861, 868 (C.D. Ill. 2010) (explaining that courts are to consider "whether testimony has been subjected to the scientific method, ruling out any subjective belief or unsupported speculation").

██████████████████████████████████████████████

████████████████████████

Finally, Dr. Berkowitz is not qualified to provide any police practices opinions. Establishing whether a witness is "qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Courts may properly "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Dr. Berkowitz is a psychiatrist. He has no educational or employment experience in law enforcement. Despite this, his reports contain charged language calling the raid "unacceptable" and "completely irresponsible," as well as his unsupported personal views on police procedures during the procurement and execution of a search warrant." (*See, e.g.* ████████████████████████████). Since Dr. Berkowitz is not a police practices expert, any testimony of this nature is inadmissible speculation and should thus be excluded.

**Motion *in Limine* No. 27: Bar Certain Opinions of Police Practices Expert John "Jack" Ryan**

Plaintiffs' expert John J. Ryan ("Ryan") is a former police captain with the Providence, Rhode Island police department with 20 years of law enforcement experience. He is a licensed attorney who has taught graduate courses in the Administration of Justice and written manuals for police officers and has trained thousands of police officers from various agencies. Defendants thus do not challenge Ryan's qualifications under *Daubert*, generally, to speak to police practices. A copy of Ryan's 26(a)(2) report ("Ryan Report") and Deposition ("Ryan Deposition") are attached hereto as Group Ex. 6. As discussed more fully below, many of Ryan's opinions or comments should be barred pursuant to *Daubert*, as well as Federal Rules of Evidence 702, 401 and 403.

The benchmark for the admissibility of expert testimony has been established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 permits testimony by an expert, or someone with the necessary "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or [] determine a fact in issue. Rule 702. Such a witness may testify when: (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* Under *Daubert*, a court should ensure that experts satisfy Rule 702's requirements of reliability and relevance before allowing their testimony.

District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). In deciding whether to admit expert testimony, district courts examine whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielsksis v. Louisville Ladder, Inc.* 663 F.3d 887, 893-4 (7th Cir. 2011).

Under Fed. R. Civ. P. 26(a)(2)(B), a party must disclose all opinions to be offered by a specially retained expert as well as the reasons therefore. Expert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions. *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998). This is because an expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). An expert witness cannot merely present his qualifications alongside his opinion; rather, he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). The Court must ensure that the testimony "assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)

(quoting *Porter v. Whitehall Labs.*, 9 F.3d 607, 616 (7th Cir. 1993)). An expert cannot offer legal opinions or conclusions. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).

Plaintiffs' expert Ryan offers a variety of opinions that do not meet the standard outlined above. Indeed, especially after Judge Kocoras's summary judgment ruling finding the search warrant lawful, many of Ryan's opinions are irrelevant to the remaining claims. Moreover, many of his opinions are mere *ipse dixit* or legal conclusions and will not assist the trier of fact and still more opinions lack the necessary support. Indeed, Ryan's reasoning and methodology is suspect in many ways and his opinions will not be helpful to the jury because they either are based on materials readily within the understanding of laypeople or because they will serve to confuse the issues. Because Ryan lays out numerous opinions in his report spanning hundreds of paragraphs and over 150 pages, it would be unwieldly to address every single opinion in detail in this brief. Instead, Defendants will lay out general bases for exclusion followed by reference to specific paragraphs with specific objections to those paragraphs.

**I. Ryan's Opinions Relating to the Search Warrant Investigation and Procurement should be Excluded under FRE 401, 403, and 702.**

Ryan offers many opinions relating to the pre-warrant investigation done by the Defendant Officers. Indeed, he spends a large majority of his report outlining the various steps that the Defendant Officers took during the investigation and warrant procurement process. However, Judge Kocoras has already determined that the search warrant procured by Officer Higgins for Plaintiffs' 5033 S. Hermitage residence was valid and supported by probable cause. Dkt. 461 at 13-18. As mentioned in motion *in limine* No. 4 above, this finding should preclude Plaintiffs from arguing, introducing any evidence, or attempting to elicit testimony that calls into question the search warrant's validity or the efforts taken to procure it. This necessarily includes Ryan's opinions on these matters, found mostly at paragraphs 725-733 and 768 of his report. Because the procurement of the warrant is no longer a

claim or issue in this case, any opinions regarding such are not relevant or helpful to the jury and should thus be excluded under FED. R. EVID. 702 and 401. Moreover, any claimed relevance by Plaintiffs would be substantially outweighed by the unfair prejudice of introducing these opinions and they should therefore likewise be barred under FED. R. EVID. 403. Indeed, an onslaught of negative opinions related to the procurement of the warrant could cause the jury to unjustly decide against the Defendants on the other claims and will certainly cause juror confusion regarding what claims are actually at issue in this matter.

## II.     Many of Ryan's Opinions are Based on Unreliable Reasoning and Methodology.

### a.     *Ryan's Reasoning and Methodology is Unsound Because his Opinions Attempt to Place a Greater Duty on Defendants than the Law Requires.*

Throughout his Report, Ryan attempts to impose greater obligations on the Defendants than the law requires. Indeed, he seeks to impose greater duties on the City in terms of training officers and instituting policy than is required by law. Report at, *e.g.*, ¶¶ 736, 737, 760 (affidavit requirement), 787, 792, 796. Despite repeating that his opinions are based on various factors, Mr. Ryan failed in his report and in his deposition to provide any support for these positions beyond his say-so. Indeed, when pressed at his deposition, he had to admit that there was no Supreme Court case supporting many of his criticisms of the officers' or the City's actions. Ryan Deposition at, *e.g.*, pp. 86-87, 133-134, 141 (no Supreme Court case says officers can't have guns out while clearing a residence, no case law on ascertaining whether children live in house prior to warrant execution or cannot serve search warrants when children may be present), pp. 116-118 (no constitutional obligation to use a trauma-informed approach). By suggesting that the officers and the City have far greater responsibilities than they do under the law, Mr. Ryan's methodology and reasoning is unsound.  Moreover, because he is effectively offering legal conclusions in these opinions, they should be barred. *Jimenez*, 732 F.3d at 710, 721. Because Mr. Ryan is a licensed attorney, there is a much greater danger that his statements that fail to address the relevant case law will confuse the jury.

41

b.        *Ryan Provides an Insufficient Basis for his Opinions.*

Throughout his report, Ryan offers conclusions and opinions without sufficient basis. These should be excluded.

First, Ryan opines that the fact that the City is under a Consent Decree suggests that the City's practices were deficient. Ryan Report at ¶¶ 746, 766. However, the Consent Decree by its own terms is not meant to be used to "create, establish or support a claim of liability." *See State of Illinois v. City of Chicago*, No. 17 CV 6260 at Dkt. 703, p. 219. Ryan has therefore provided an insufficient basis for this opinion, and it should be excluded. These exact same opinions were recently barred by Judge Valderrama and should likewise be barred here. See *Mendez v. City, et al.*, 2024 WL 4661139 at *6*7-8 (N.D. Ill. Sept. 20, 2024)(Valderrama, J.)

Second, Ryan makes opinions related to the SWAT team being unequipped with bodyworn cameras (BWC). Report at ¶¶ 736, 737. These opinions are nothing more than *ipse dixit*. Ryan provides no basis in his report as to how he came to these conclusions and further supplies no support regarding SWAT teams throughout the country who were provided with BWC. Additionally, Ryan admitted in his deposition that there is no constitutional requirement that an officer wears BWC (Group Ex. 6, Ryan Deposition, at p. 56). He further admitted in his deposition that he did not remember the reason that CPD's SWAT team did not have BWC and could not give an explanation of how many such teams were equipped with BWC in 2018. *Id.* at pp. 213-19. His opinion comes down to: if CPD had access to BWC, SWAT should have had it. See *Id.* at pp. 215. This is *ipse dixit* and should be excluded.

Third, at paragraph 760 of his Report, Ryan opines that the City, through IPRA and COPA, would have had the data that would put them on notice of the allegedly improper policies he is opining on. He goes on in this same paragraph to discuss remarks by former Mayor Rahm Emanuel and makes an argumentative note regarding the affidavit requirement. Group Ex. 6, Report, at ¶ 760. He makes a similar unsupported opinion in Paragraph 806. Any such opinions should be excluded. Ryan is

42

jumping to a conclusion not only as to what data the City may have and the ability of the City/IPRA/COPA to analyze the data they have but most importantly, what the data would show. Ryan presumes that an analysis of the data would confirm his hypothesis that there is a problem with the City's investigations, use of force on children, and lack of consideration for the vulnerability of children. Moreover, Ryan's opinion seeks to impose a non-existent legal duty on the City to show more consideration for the vulnerability of children than to refrain from unconstitutional conduct. It further seeks to have the potential existence of this data to serve as putting the City's policymaker on notice, which is a legal conclusion he is not entitled to draw. All without any reasonable basis to support it. Additionally, Ryan's citation to the statement of former Mayor Emanuel will create further jury confusion. And his statement about the sworn affidavit requirement ignores that formerly state law required people who wanted to complain about police misconduct to sign such an affidavit. See Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/1 et seq. This is also not relevant or helpful to the jury. For all of these reasons, paragraph 760 should be excluded.

Fourth, in Paragraph 773 of his Report, Ryan states "a city that negotiates away its ability to investigate officer misconduct is indicative of a city that does not care about such misconduct." Group Ex. 6, Report, at ¶ 773. Ryan was not involved in the City's contract negotiations, nor has he done any independent research into what went into them. He has no basis whatsoever to make such a claim, and it should therefore be excluded.

## III.     Ryan's Opinions will not Assist the Trier of Fact and will Prejudice Defendants.

First, in many cases, Ryan's opinions will not assist the trier of fact because there is no special expertise needed for a lay person to perceive what is going on. For example, Ryan's expertise is not needed to explain what is stated in reports like those issued by the Department of Justice, the City's Office of Inspector General or the Police Accountability Task Force. See Group Ex. 6, Report, at paragraphs 726, 761, 762, 770. Such reports speak for themselves. Indeed, courts have barred police-

practice experts for failing to provide independent research. See, *e.g.*, *Estate of Loury v. City of Chicago*, 2019 WL 1112260 at * 5 (N.D.Ill. March 11, 2019)(barring expert who only would convey the findings of the DOJ and PATF reports). Therefore, Ryan should be barred from simply re-stating the findings of these reports pursuant to FED. R. EVID. 702.

Second, as mentioned above, Ryan's opinions often suggest or state that the Defendant Officers or the City should have done more than what the law requires, such as determining whether children will be home prior to execution of a search warrant, training on a trauma-informed approach, having an affidavit requirement, or equipping SWAT teams with BWC. Such opinions will likely cause jury confusion. That is doubly so because Mr. Ryan's credentials as a licensed attorney may make jurors believe him when he misconstrues the law. This will give his dubious opinions more weight than they deserve, and will cause undue prejudice to the Defendants. Notably, other courts have barred some of Ryan's opinions because they have found that they would usurp the province of the jury, cause jury confusion and/or were outcome-determinative. *See Sanders v. City of Chicago Heights*, 2016 WL 4417257, No. 13 C 0221, at *6-8 (N.D.Ill. August 19, 2016)(St. Eve, J.)(barring several of Ryan's opinions as outcome determinative with "real potential of confusing or misleading the jury" or having an insufficient basis.); *Estate of Smart by Smart v. Chaffee*, 2020 WL 7643505 at *14-15 (December 23, 2020 D. Kan)(barring Ryan's opinion that the force used in a fatal shooting was reasonable as impermissible legal conclusion.). For this additional reason, the above opinions should be barred.

Third, Ryan also repeatedly references a behavior or policy as contrary to "legal mandates" or otherwise offers a legal conclusion. See Paragraph 734, 769, 779. This constitutes a legal conclusion and should be barred. See *Mendez*, 2024 WL 4661139 at *6.

Fourth, in paragraphs 741-743 of his Report, Ryan gives opinions relating to gun pointing at compliant individuals. These opinions are not helpful to the jury and should thus be barred under FED. R. EVID. 702. No Defendant is arguing that training a weapon at a compliant individual is lawful

44

or within generally accepted police practices. Since Ryan cannot make a credibility determination to opine that guns were indeed pointed, this opinion carries no weight.

Fifth, at pages 139-143 of his Report, Ryan summarizes complaint register files against certain defendant officers. The large majority of these should be excluded under FED. R. EVID. 401 and 403. These complaint register summaries could only conceivably be relevant to Plaintiffs' *Monell* claims, and the only officers whose conduct is the subject of the *Monell* claims are the SWAT officers. Therefore, any of the non-SWAT defendant officer complaint registers are not relevant to whether a SWAT officer unlawfully pointed a weapon, and any arguable (at best) relevance would be outweighed by the undue prejudice and potential juror confusion that would arise from allowing Ryan to discuss these complaint register files. The same rings true for any discussion of complaint register files investigated by IPRA instead of COPA. Ryan relies heavily on alleged faults in IPRA's investigations, but COPA replaced IPRA a year before the incident underlying this lawsuit. IPRA's investigations therefore have very little relevance to the claims here and heavy reliance on those investigations would be unduly prejudicial because that was not the agency investigating claims at the time of this incident. Undue emphasis on complaint register files investigated by IPRA should therefore likewise be barred. Fed. R. Evid. 401, 403.

Sixth, at paragraphs 750-759 of his Report, Ryan includes summaries of various statements made by public officials including former Mayor Lori Lightfoot and former Superintendent David Brown. These paragraphs should be excluded for many reasons. At the outset, these are after-the-fact statements and Ryan has no knowledge regarding any factual support for them. Additionally, most of these statements are in relation to warrant procurement and use of informants, which as previously discussed, is not relevant to the claims here. Lastly, any arguable relevance is outweighed by the unfair prejudice Defendants would suffer if Ryan was allowed to discuss these statements for which he has no basis of knowledge.

45

Seventh, in paragraph 765, Ryan discusses a 2019 firearm pointing bulletin. This bulletin was issued after the incident in question here and thus has no relevance to the policies or practices at the time. It should therefore be excluded under Fed. R. Evid. 401 and 403, as it is irrelevant and will cause juror confusion and undue prejudice to Defendants in that it will create the assumption that CPD should have already had such a bulletin. Moreover, this could be considered a subsequent remedial measure under Fed. R. Evid. 407 and should be excluded on that basis as well.

Eighth, this Court should bar Ryan from using the phrase "force multiplier" (see paragraph 738 of the Report). Such a phrase implies that mere presence of SWAT means that more actual force was used. The phrase is inflammatory and misleading and should be barred. Fed. R. Evid. 403.

Ninth, at paragraph 780 of his Report, Ryan discusses the statements relating to the code of silence made by former Mayor Rahm Emanuel and former Superintendent Eddie Johnson. For the same reasons discussed in the motions *in limine* (Nos. 6 and 37) related to these statements, Ryan should likewise be barred from discussing them.

Tenth, at paragraph 786 of his Report, Ryan opines that there is evidence of code of silence in this case based on the actions of the Defendant Officers. This is based on pure speculation on his part and largely constitutes a credibility determination. Ryan should therefore be barred from making this opinion. FED. R. EVID. 403, 702.

Eleventh, and lastly, at paragraphs 787-805 of his Report, Ryan outlines evidence and makes opinions related to training involving the vulnerabilities of youth. These opinions should be excluded because Ryan has not provided support that they are the nationally recognized standards, offering only a reference to the Denver police report and vague references to other trainings he has done or policies he is aware of. This is insufficient. At most, this is evidence of "better or more training" training that the Court in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386-88 (1989) cautioned against being a basis for a failure to train claim. It must also be noted that these opinions are cumulative and duplicative

of the opinions offered by Plaintiffs' other expert Lisa Thurau, and that offering this same information from both experts is unnecessary. Accordingly, these opinions should be barred under Fed. R. Evid. 702, 401, and 403.

**Motion *in Limine* No. 28: Bar Opinions of Statistician Max Schanzenbach**

### INTRODUCTION

Plaintiffs seek to introduce the opinion testimony of Max Schanzenbach, a statistician, economics expert and law professor with no background as to law enforcement, internal-affairs investigations, police accountability or related topics. Schanzenbach purports to offer numerous opinions about the City's disciplinary systems that rely on areas outside his expertise, that use suspect methodology, and/or that would be unhelpful to the jury. Schanzenbach analyzed data about complaint registers ("CRs") pertaining to excessive force, which on a basic, mathematics level he is competent to do. However, he attempts to turn his basic numerical calculations about that CR data into opinions about the CR process and its effectiveness without the expertise or the data to do so. Schanzenbach also ignores disclaimers as to the data he uses and adopts his own methodology to analyzing the data to further distort the results. His analysis encompasses categories that are no longer relevant, including cases of complaints where there were allegations of improper search and cases where children were alleged witnesses of excessive force. Further, he refers to broad reports conducted by the Police Accountability Task Force and the Department of Justice about the use of force and concurs with the conclusions of those reports without any basis for doing so.

Defendants therefore ask this Honorable Court to exercise its gatekeeping function and bar or limit Schanzenbach's opinions on those subjects in the areas where he lacks qualification, uses suspect methodology, or would be unhelpful to the jury. That is to say, virtually all his opinions.

## ARGUMENT

### A.      Schanzenbach's Opinions for which he Lacks Qualification should be Barred.

Defendants concede that Schanzenbach is an expert in law and economics. But that is where his expertise lies – *not* in policing, investigations, or police administrative data. Though he attempts to couch his opinions in terms of economic deterrence, many of his opinions are plainly and simply qualitative assessments of the City's disciplinary system for which he has no basis. Schanzenbach does not hold any degrees in criminology, and has only published *one* peer-reviewed article that touches on the topic of police accountability. *See* Schanzenbach Report, attached as part of Group Exhibit 7, generally. Schanzenbach has never been a law enforcement officer, has never investigated police misconduct, and has never even reviewed any IPRA or COPA investigatory file. Schanzenbach Deposition, attached hereto as part of Group Exhibit 7, at 8-9, 15-17, 36-37, 103-104. Schanzenbach is not well-acquainted with the City's accountability systems (or any city's accountability systems, for that matter) and does not appear to have any command over the relevant research literature on police complaints and discipline. *See* Hickman Report, attached as part of Group Exhibit 7, at pp. 16-19. Simply put, Schanzenbach does not have the knowledge, skill, experience, training, or education to give opinions on these matters. Fed. R. Evid. 702. He does not have any specialized knowledge in police accountability policy and has never worked in law enforcement or investigations in any capacity. Schanzenbach himself admitted at his deposition that he is unqualified to offer qualitative assessments:

> Q. And did you do any qualitative assessments for this case?
>
> A. I would not offer myself as an expert to make such assessments in a case such as this.
>
> Schanzenbach Deposition, 66:8-11

But "qualitative assessments" are exactly what is at the heart of his key opinions. Schanzenbach issues several broad opinions that assess the City's quality of disciplinary system: that he agrees with the findings of the PATF and DOJ reports as they pertain to IPRA's performance; that the City did not

take civilian complaints seriously because they were not resolved in a timely fashion or did not result in "sufficient" discipline; that the City did not address problematic officers, that the accountability system was "not designed to detect or deter misconduct, nor was it designed to produce and make use of information regarding problematic patterns of officer conduct;" "the IPRA/COPA civilian complaint system maintained by the City of Chicago did not create an environment in which the detection and discipline of misconduct in excessive force and improper search involving children 0-14 was treated with the seriousness it merited;" and that there was a "systemic failure of the City of Chicago to use civilian allegations to detect, deter, and address misconduct on the part of its officers." Schanzenbach is not qualified to make these opinions.

Schanzenbach's whole basis for making sweeping opinions on the entire accountability system consists of numbers from a spreadsheet, experience applying public numerical data, one peer-reviewed article, one article that is not yet peer-reviewed, and an understanding of economic deterrence theory. *See* Hickman Report; Schanzenbach Report at ¶¶ 12-13. Schanzenbach is qualified, for example, to analyze a data set and say that the average time it took to investigate a case according to that data is X. But such conclusions are not in and of themselves helpful to the jury. Without underlying information to compare X to, Schanzenbach is in no position to say that X is short, long or to be expected. Schanzenbach is in no position to say that that X was longer than it should be, longer than most such investigations are, or that such a time was too long to have a deterrent effect. To form such opinions requires qualifications Schanzenbach doesn't have, data or even anecdotal evidence that Schanzenbach neither possessed nor reviewed, and an analysis that Schanzenbach does not even purport to perform. This is not sufficient, and these opinions should be excluded because Schanzenbach is not qualified to make them. In essence, Schanzenbach generates some irrelevant numbers and then states opinions unrelated to his expertise or those numbers.

49

**B.     Schanzenbach's Methodology is Unreliable.**

Schanzenbach's opinions should be excluded because his methodology is unreliable. In coming to his opinions on sustained finding and discipline imposition rates, Schanzenbach looked only at excel spreadsheets[2] reflecting administrative data relative to complaint register files. The data he examined contained information on log numbers (the way civilian complaints against officers are tracked) for allegations of illegal search and excessive force where a child was a victim or a witness. The data set included the log number, the number of allegations against each officer with allegations, the category code (type, i.e. excessive force) of the allegation, the recommended finding, and the discipline, if any, imposed. The methods Schanzenbach used to come to his conclusions on this data are unreliable for many reasons.

First, this type of data set is not reliable for the questions that Schanzenbach was trying to answer. *See* Hickman Report at pp. 5-8. Indeed, this limited data can only explain so much, and often does not tell the full story. *Id.* Moreover, the limitations on what can be inputted and the possibility for human error in data entry mean that the data can contain errors. Defense Expert Matthew Hickman looked at summary reports (summaries of investigations written at the end of investigations to explain findings) for five individual log number files (commonly referred to as complaint registers, or "CRs") to see whether the information on the spreadsheet reflected what actually happened in the investigation and outcome. In many cases, it did not. *See* Hickman Report at pp. 5-8. So, while the data is "reliable" in that it is an accurate reflection of what was contained in the City's database, it is unreliable because it is limited and can contain inaccuracies. The issue is not that the spreadsheets were generated incorrectly: the issue is that this limited data set cannot address the questions that Schanzenbach sought out to answer.

---

[2] Schanzenbach looked at spreadsheets produced in this litigation as well as data he retrieved from the Invisible Institute.

50

As Defense Expert Hickman put it, "[t]he bottom line is that the spreadsheet records are, at best, a far removed and abstract representation of what is alleged to have occurred, and at worst, a wholly inaccurate information source for purposes of answering the questions that Schanzenbach sought to answer." Hickman Report at p. 8. Schanzenbach's methodology and analysis are therefore unreliable because the data sets he used are not useful and cannot result in meaningful statistics. Hickman Report at p. 9.

Second, assuming the data itself was reliable to answer the questions presented (and it was not), the methodology employed to analyze the data was also unreliable. To come to his conclusions, Schanzenbach counted each officer in each log number as its own individual "officer complaint." So, if a particular log number had ten officers with allegations against them, Schanzenbach would count this as *ten* officer complaints – instead of *one* log number. This inflates the number of complaints because it does not take into account, for instance, unfounded allegations that may be included against particular officers in a given incident if a group of officers is named.

Notably, conventional approach and reporting practice for this type of data is not done at the "officer" level, but rather at the "case" (log number) and "allegation" level. *See* Hickman Report at p. 9. Looking at the rates by log number and by allegation creates a more accurate picture. Moreover, as one can see when comparing the Hickman and Schanzenbach reports, each method of analysis results in different sustained and disciplinary rates. *See* Hickman Report at 15. Because Schanzenbach's analysis looked only at numbers, and not at what the allegations consisted of (whether they were warranted), this results in a heightened and skewed number of complaints, thereby making the sustain and discipline rate appear lower than it is.

Third, Schanzenbach's method of analysis is unreliable because of what he chose to include and exclude. For instance, Schanzenbach includes log numbers that were closed for "no affidavit," which at the time could not be investigated, unless under limited circumstances, pursuant to Illinois

law. Moreover, some log numbers had allegations against an unclear number of officers (for instance, several allegations against an officer with an unknown star). Instead of including this unknown as one "officer complaint," Schanzenbach counted each "blank" star number as its own "officer complaint." Both of these tactics skew the data set. Moreover, in calculating the average length of investigation, Schanzenbach again uses the "officer complaint" level, which necessarily makes the average investigation length appear to be longer. Hickman Report at 15-16. Simply put, the methods employed are misleading and unreliable.

### C. Schanzenbach has Insufficient Basis for his Conclusions Relating to "Adequate" Discipline, how Seriously Complaints are Taken, Addressing Problem Officers, Problematic Practices, and Investigation Length.

In paragraphs 22 and 23 of his report, Schanzenbach re-states findings of the DOJ and PATF reports and states that he agrees with them. In fact, Judge Valderrama agreed with Defendants to exclude some identical opinions to those rendered in paragraphs 22 and 23. See 18 C 5560 at Dkt. 577, pp. 57-60. (holding that Schanzenbach could not parrot the DOJ or PATF reports and could not opine that the City did not take disciplining cases of alleged excessive force against children "seriously")

Schanzenbach then goes on to opine, in paragraphs 27 through 29, that the City did not treat complaints involving children differently, and that "Chicago did not take civilian complaints seriously by resolving them in a timely fashion, imposing sufficient discipline on officers after a sustained allegation, addressing problematic officers who tally up significant allegations, or addressing problematic patterns and practices revealed by civilian complaints." Schanzenbach provides no basis for these opinions and they should be excluded.

Indeed, in coming to these sweeping conclusions, Schanzenbach relies solely on his (unreliable) number crunching and his understanding of deterrence theory. This does not suffice. Schanzenbach did not consider IPRA's intake standards. He did not consider – and, in fact, does not

52

know – IPRA's investigatory standards or the steps investigators would take to obtain an affidavit to continue an investigation. He did not consider witness cooperation. He did not consider that some cases are more complicated than others. Again, he has never even seen a full investigatory file. Nor does he have any basis of knowledge for what "sufficient" discipline would or should be, see e.g. his Deposition at 99:15-100:20. What is more, Schanzenbach was not aware and therefore did not consider that in the relevant time-frame, the City did develop a disciplinary matrix with disciplinary guideposts.[3] Nor did he take into consideration that, pursuant to Illinois law, the City had to negotiate with the Fraternal Order of Police over disciplinary issues. As for his statements regarding the DOJ and PATF, Schanzenbach does nothing more than re-state what is in the reports. He has no personal knowledge of the information these entities reviewed or who they interviewed. He does not know their methodology. He has simply read the reports and come to the conclusion that he agrees. As Hickman put it, "[t]here is nothing in Schanzenbach's report that bears on the genesis or design of the CPD's accountability system, its ability to detect or deter misconduct, or its ability to produce and make use of information about patterns of officer conduct." Hickman Report at p. 19.

"'[E]xperts' opinions are worthless without data and reasons.'" *U.S. v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) (quoting *Kenosha v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990)). "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *Mamah,* 332 F.3d at 478. To make opinions such as these, Schanzenbach would have had to engage in a much more comprehensive approach and data collection to demonstrate this link. He did not do so, and these opinions should be excluded.

---

[3] The City had to cease implementation of said matrix due to an order from the Illinois Labor Relations Board.

**D.** **Schanzenbach's Opinions are so Fundamentally Misleading that they are Unhelpful, will Cause Juror Confusion, and will Prejudice the Defendants.**

As discussed at length above, Schanzenbach's opinions are fundamentally misleading and are supported by a shaky foundation. Not only should his opinions be excluded for those bases independently, but also because those issues with his opinions make them unhelpful, confusing, and prejudicial.

Expert evidence that is otherwise relevant may be excluded when the probative value is substantially outweighed by the danger of unfair prejudice or confusing the issues. Fed. R. Evid. 403; *see also Daubert*, 509 U.S. at 595. Expert testimony should not be admitted to the trier of fact when the witness is "'the mere paid advocate[] or partisan of those who employ and pay them.'" *Davis*, 277 F.R.D. at 365 (quoting *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir. 1986)). The Court's gatekeeping function "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Part of that function is to prevent expert testimony from carrying more weight than it deserves. *Smith*, 215 F.3d at 718.

First, Schanzenbach's methodology is so unreliable that it could cause confusion with the jury and will therefore be unhelpful. Moreover, since both is data and his analysis are unreliable, his opinions are so fundamentally misleading that it will prejudice the Defendants.

 Second, Schanzenbach's opinions related to the DOJ and PATF report are unhelpful and prejudicial for many reasons. Schanzenbach is a well-credentialled individual. This could cause the jury to give more weight than is deserved to both his own opinions *and* the opinions in the DOJ and PATF reports, without any basis for doing so other than Schanzenbach said so. His opinions on the "systemic failure" of the accountability system and length of investigations are flawed in this exact same way. He

54

does not apply facts or data as to these opinions and rather just says so. But "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Obrycka v. City of Chicago,* 792 F.Supp.2d 1013, 1025 (N.D. Ill. June 2, 2011) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "We have said over and over that an expert's *ipse dixit* is inadmissible. 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Wendler & Ezra, P.C. v. American Intern. Group, Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

Simply put, Schanzenbach has used his expertise in statistics and economics to make opinions on police accountability for which he has no basis. Not only is this unhelpful, but, due to his credentials, these opinions will likely carry unwarranted weight with the jury, causing prejudice to Defendants. Schanzenbach's opinions should be excluded.

### D. A Wide Assortment Of Schanzenbach's Opinions Should Be Barred.

In addition to the objections laid out above, Defendants object to the following paragraphs:

Schanzenbach's underlying analysis of the various datasets should be barred because his methodology is unreliable and it is unhelpful to the jury. Schanzenbach Report ¶¶ 15-21. In analyzing how complaints are handled, Schanzenbach mixes data as to when children are witnesses and victims, when the allegations are as to improper search. *Id.* at ¶ 15. This data is going to be unhelpful to the jury and confusing as it includes irrelevant categories of information, and it is meaningless without a point of comparison. The same is true with the analysis in ¶¶ 16 and 19. In ¶ 19, Schanzenbach opines that discipline is "qualitatively speaking, extremely rare." This is something by his own admission he is not qualified to opine on.

55

¶ 20: Schanzenbach has simply no basis for his assumptions and speculations about when cases will be reversed, or whether it is unlikely that all disciplinary recommendation will be upheld.

¶ 25: Schanzenbach's analysis of the SWAT unit-related complaints lacks relevance because there is no meaningful point of comparison to other units within the Chicago Police Department, other SWAT units in other departments, includes information about illegal search complaints, which is no longer an issue here. It is unhelpful to the jury without information as to whether any of the complaints were valid. Because the methodology behind the paragraph is questionable and because it will not be useful to the finder of fact, this paragraph should be excluded.

¶ 26: Schanzenbach is competent to perform a statistical analysis of the complaints against the defendant officers. However, his methodology is off in looking at complaints for illegal search and excessive force between 2000 and 2018, both because it expands the time frame and the scope of the complaints at issue. Without looking at the qualities of the complaints against these officers and without speaking to the officers, the investigators or anyone, and without looking at the complaint registers themselves, he has no basis for labeling officers as "among the worst" in the department.

¶ 27: Schanzenbach has no basis to assert that "complaints of police misconduct involving children are treated no differently by the City of Chicago than complaints in the aggregate." He has the qualifications to determine that, for example, the rates of sustained complaints in cases involving children are about the same as the rates of sustained complaints overall. But it would again take a qualitative analysis to assess how complaints against children are treated, how complaints overall are treated, and Schanzenbach simply did not do the work and does not have the qualifications to determine these things.

¶ 28-30: This paragraph involves Schanzenbach leaping to various conclusions that about the overall disciplinary system and the officers' own disciplinary history that again require expert

56

knowledge Schanzenbach does not have, qualitative analysis that Schanzenbach did not perform and that he should be barred from offering.

For the foregoing reasons, Defendants respectfully request this Court bar the overwhelming majority of Schanzenbach's opinions.

**Motion *in Limine* No. 29: Bar Opinions of Plaintiffs' Expert Lisa Thurau**

Plaintiffs hired Lisa Thurau to answer a series of fourteen (14) questions related to the Chicago Police Department's training and written policies during the 2012-2018 *Monell* period. See Expert Report of Lisa Thurau, (hereinafter "Thurau Report") and Lisa Thurau Tate Deposition, (hereinafter "Thurau Dep.") attached hereto as Group Ex. 8. Lisa Thurau's one-hundred and eleven (111) page report is not a structured and concise analysis. Rather, her Report begins with a statement that "for this case, Plaintiffs' counsel asked me to answer the following questions …" Thurau Report at p. 17. Unfortunately, each "question" prompts a long narrative response in which Thurau broadly critiques Chicago Police Department ("CPD") policies and training according to her own advocacy framework. She renders opinions she is not qualified to render, applies no reliable methodology, makes impermissible credibility determinations, and makes legal conclusions that invade the province of the jury. Because her testimony fails every requirement of Federal Rule of Evidence 702 and risks confusing the jury, it should be excluded in its entirety.

**LEGAL STANDARD**

The benchmark for the admissibility of expert testimony has been established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 permits testimony by an expert, or someone with the necessary "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or [] determine a fact in issue. Rule 702. Such a witness may testify when: (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied

57

the principles and methods to the facts of the case." *Id.* Under *Daubert*, a court should ensure that experts satisfy Rule 702's requirements of reliability and relevance before allowing their testimony.

District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). In deciding whether to admit expert testimony, district courts examine whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielsksis v. Louisville Ladder, Inc.* 663 F.3d 887, 893-4 (7th Cir. 2011).

Expert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions. *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998). This is because an expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). Experts cannot offer opinions as to the believability or truthfulness of witness testimony. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999). An expert witness cannot merely present his qualifications alongside his opinion; rather, he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). The Court must ensure that the testimony "assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (quoting *Porter v. Whitehall Labs.*, 9 F.3d 607, 616 (7th Cir. 1993)).

## ARGUMENT

### I.    LISA THURAU'S OPINIONS.

Across more than 100 pages, Thurau provides conceptual commentary. Her principal conclusions can be summarized as follows:

1.     CPD's use-of-force and search-warrant policies did not adequately protect children from the use of excessive force, Thurau Rep. at p. 30-41.

2.     "CPD's failure to create and implement any official policy and practice for officers' interactions with children, which meant that officers were simply not equipped to consider, much less proactively protect, children's well-being during the execution of search warrants," *Id.* at 42-56.

3.     CPD's Safe Start and Children Exposed to Violence initiatives were "insufficient." *Id.* at 57-60.

4.     CPD failed to train patrol and SWAT officers to use "trauma informed policing." *Id.* at 61-67.

5.     CPD's failures in its use of force and search warrant policies and training, and "to direct or guide officers and its SWAT team on how to interaction with children," left the minor Plaintiffs vulnerable. *Id.* at 67-71.

6.     If CPD had trauma-informed policies, the incident would have been different. *Id.* at 71-73.

7.     CPD ignored offers from her own organization, Strategies for Youth, to assist in revising policy. *Id.* at 74;

8.     The officers in this case "did wrong" by failing to anticipate children, pointing guns, and failing to mitigate the harm to the children. *Id.* at 74-78.

9.     "CPD's failures to develop meaningful policing philosophy, developmentally appropriate, trauma-informed, racially equitable policies, practices, and partnerships led a violently traumatic experience for the Booth children." *Id.* at 78-86.

10.     The absence of any provision in the Consent Decree or CPD policy to prevent excessive force against children "require the conclusion that Chicago children continue to be at risk

59

of becoming victims of and/or exposed to unnecessary or excessive force by Chicago police officers." *Id.* at 86-87.

11.     National standards and model policies existed but CPD failed to adopt them. *Id.* at 87-101.

12.     "The absence of any provisions in CPD policy or training directing offices to prepare for encounters led directly to the traumatic exposure of LaKai'ya (age 4), Legan (age 8), La'Niya (age 11), and E'Monie (age 13) to guns pointed at them and their caregivers." *Id.* at 102-110.

The structure of her report – responding to counsel's questions and issuing repetitive, categorial adequacy judgments – confirms that her testimony is not as an expert, but advocacy framed as expertise. The entire report is conceptual, speculative, and premised on her personal policy preferences. As discussed below, Thurau is not qualified to render such opinions, employed unreliable methodology, and offers testimony that is irrelevant, speculative, and invades the province of the jury.

## II.     LISA THURAU'S QUALIFICATIONS.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir.2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990)). Under that standard, Thurau is not qualified to opine on CPD's use of force and search warrant policies, use of force training, or alleged trauma to children.

a.     *Use of Force Policies and Search Warrant Policies and Training.*

Thurau has never by employed by a police department, never served as a sworn or civilian-enforcement officer, and has never been trained as one. Thurau Dep. at 52-10:22. She has never executed a search warrant, conducted a use-of-force review, or trained officers in either discipline. *Id.*at 52:23-60:11. Yet the majority of Thurau's opinions are focused on what use of force policies and search warrant policies need to include in order to protect children. For example, Thurau opines that

"the officers clearly violated elementary principles on use of force." Thurau Report at 33. Thurau is no use of force expert. Thurau admits that she has no basis to opine on that CPD's use of force policies do not meet the standards promulgated by Illinois law. Thurau Dep. at 145:4-9. At minimum, any police practices expert hired to opine the use of force policies and training should be familiar with what the law requires as it relates to use of force.

The two training programs that she helped create – Juvenile Justice Jeopardy and Policing the Teeb Brian – do not involve use-of-force or search warrant tactics. The former teaches juveniles the consequences of getting involved in the legal system and the latter teaches officers about adolescent development or communication. Thurau Dep. at 29:9-17. When testifying in *Mendez v. City of Chicago,* a case in which she rendered a very similar opinion on these same topics, she admitted that she is not-generally hired to review use-of-force policies See Thurau Mendez Testimony, (hereinafter "Thurau Testimony"), attached hereto as part of Group Ex. 8, at 447:6-24. In forming her opinion here, Thurau looks at CPD's search warrant and use of force polices and also "Other Law Enforcement Agency Policies for Treatment of Children at Time of Arrest." Thurau Report at p. 19-21. However, she did not review the use-of-force policies for these other agencies. Thurau Testimony at 447:6-460. When asked by her own counsel during direct examination in *Mendez,* if components of the training, her organization offers touches on use of force, she answers no. *Id.* at 373:11-374:5. She explains that the "the whole thing focuses on avoiding use of force." *Id.* The basis of Plaintiffs' entire case against the City is about use of force and their expert's opinion is that no use force should ever be used against children. When looking at CPD's policies, Thurau looked at the policies she has no qualifications to evaluate such as use of force and search warrants. Thurau Report at p. 4-14. She is not qualified to opine that CPD's policies and training that followed the policies were "inadequate," "deficient," or "caused" any harm. See *Supra* Section I. 1, 2, 5, 10, 12. As such, all her opinions on CPD's use of force and search-warrant policies must therefore be excluded.

b. *Opining on psychology and causes of trauma.*

Thura similarly lacks any qualifications to testify about the psychological or emotional effects of police conduct on children. Thurau has a J.D. and a master's degree in anthropology. See Lisa Thurau CV, attached hereto as part of Group Ex. 8. But a bulk of Thurau's opinions state that the officers' actions during the execution of the search warrant traumatized the minor children. See Thurau Report at p. 32, 57, 62, 72, 78. She has no degree, certification, or professional training in psychology, psychiatry, or counseling. Thurau Dep. at 61:9-62:1; *see also* Thurau Testimony at p. 423:3-11. She has never diagnosed or treated anyone for trauma. Thurau Dep. at 61:9-62:1. Her only "training" on trauma came from a continuing-education presentations that she attended between 2000 and 2004, and she could not recall how many hours of instruction she received. Thurau Testimony at p. 423:12-425:11. She therefore lacks any specialized expertise to testify about the psychological effects of police encounters or to interpret the causes of the alleged trauma.

Indeed, in *Mendez,* Judge Valderama held that "Thurau herself testified that she has expertise in the 'psychology of youth' or 'what can cause trauma and traumatized in children.'" *Mendez v. City of Chicago, et al.*, Case No. 18-cv-5560, Dkt. No. 577 at p. 37-38. Judge Valderama expressly held that she is not qualified to opine on the "the psychology of youth" or "what can cause trauma and traumatized responses." *Id.* The same limitation should apply here. Her opinions describing what "traumatized" plaintiffs or how CPD's conduct "caused trauma" are clinical in nature and outside her expertise. She cannot speak to the psychological mechanisms of trauma, its causes, or its effects on children. Any clinical or psychological causation testimony should therefore be barred.

## III. LISA THARU'S METHODOLOGY IS FLAWED.

Under 702(b) and (c), an expert's opinion must be "based on sufficient facts or data" and "the production of reliable principle and methods." Thurau fails on both requirements. Her "methodology" is policy comparison with no analytical rigor or objective criteria. Thurau conducted

no independent research and relied on advocacy materials produced by organizations that she is personally affiliated with. What Thurau must do, but fails to do, is link her conclusions to "the data employed and the opinion offered." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). Thurau employes no identifiable or accepted methodology, provides no standards by which her opinions can be tested or replicated, and fails to connect her experience to any reliable professional standard.

When an expert does not employ **any** articulable methodology, their testimony should be barred:

> Accordingly, the Court finds that [expert's] testimony is inadmissible. He has not conducted an independent investigation or research . . . He has articulated no technique or methodology by which his conclusions can be scientifically and objectively tested or subjected to peer review. He prepared his testimony specifically for this litigation . . .

*Dukes v. Illinois Cent. R. Co.*, 934 F. Supp. 939, 951 (N.D. Ill. 1996).

Here, Thurau reads the search warrant policies and use of force policies to determine if they mention the term children or youth. Then she opines that "the Chicago Police Department's us of force and search warrant policies during the *Monell* period were not adequate to protect children from officers' use of unnecessary or excessive force or to inform officers of their potential to inflict trauma on children by their actions. That is because children were not acknowledged or considered in these policies." Thurau Report at. p. 36. Her conclusions are not linked to any data. They are not linked to other policies that she conducted an independent review of. As stated *supra*, Thurau does not even have the training or experience to conduct scientific research regarding police practices. Thurau further testified that when she works with other agencies she generally looks at whether their policies mention children, however, here, she conducted no comparative review and only looked at CPD's use of force and search warrant policies. Thurau Testimony at 445:3-447:1. Because Thurau does not use

63

recognized methods of police practices or psychology in arriving at any of her expert opinions (or even her own methodology), her opinions should be barred in their entirety.

## IV. LISA THURAU'S OPINIONS ARE IRRELEVANT, UNHELPFUL, AND DO NOT FIT THE ISSUES IN THIS CASE.

### a. *Her opinions are not helpful to the jury.*

Rule 702(a) allows expert testimony only if "it will help the trier of fact to understand the evidence or to determine a fact in issue." For expert testimony to be helpful, it "must concern a matter **beyond the understanding of the average person**." *Davis v. Duran*, 277 F.R.D. 362, 366-67 (N.D. Ill. June 10, 2011) (emphasis added). It is proper for a trial court to exclude portions of an expert witness' expected testimony if that testimony is "irrelevant or unreliable" *Id.* at n.3. A true police-practices expert can assist a jury when the testimony explains specialized concepts – such as use of force tactics, threat assessment, or use of police weapons – that are beyond the ken of laypersons. *See Florek v. Village of Mundelein*, 649 F. 3d 595, 602 (7th Cir. 2011) (expert testimony is helpful when it "informs the jury about law-enforcement tools or circumstances"); *Garrit v. City of Chicago*, No. 16-cv-7319, 2022 WL 124544 at *4 (N.D. Ill. Jan. 13, 2022)(allowing police-practices expert to explain specialized tactics and training relevant to reasonableness analysis).

Thurau's report does not illuminate any specialized field or technical process. She does not explain police tactics, force options, how weapons are used during the execution of search warrants. Thurau's opinion rests on this premise: children are different than adults. The average layperson is aware of this. Thurau takes issue with the fact that none of CPD's policies affirmatively directs officers with to not use force against children. Thurau Report at p. 32-33, 36, 38, 42, 47, 49, 52-53, 56, 71, 76, 78, 81. Again, whether those policies mention children, whether they prohibit certain conduct, and whether they could have been more detailed are all matters the jury can determine by reading the policies themselves. See *Obrycka v. City of Chicago*, 792 F. Supp. 22d 1013, 1028 (N.D. Ill. 2011) (stating that an expert's analysis must address subjects "beyond the ken of the average layperson."). None of

64

Thurau's observations require specialized expertise. What her opinions actually do is impermissibly bootstrap Plaintiffs' legal theories. She repeatedly opines that CPD's "inadequate training" and lack of "trauma-informed policies" caused the alleged constitutional violations – which is Plaintiffs' entire case. "An expert who provides nothing, but a bottom line supplies nothing of value to the judicial process." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). The jury does not need an expert to tell them that pointing guns at children will make children fearful. Her opinions do not assist the jury in understanding any evidence or determining any fact in dispute; they merely restate Plaintiffs' allegations in a more technical language.

   b.   *Her opinions are legal conclusions.*

Expert testimony that gives opinions on "'legal issues that will determine the outcome of a case" are prohibited. *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2011) (quoting *U.S. v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)). It is improper for an expert witness to give opinions that instruct the jury on the applicable and relevant portions of the law. *Davis v. Duran*, 277 F.R.D. 362, 371 (N.D. Ill. June 10, 2011). Claiming that role "'does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach and thus attempts to substitute the expert's judgment for the jury's.'" *Davis*, 277 F.R.D. at 371 (quoting *Nimely v. City of New York*, 414 F.3d 381, 391 (2nd Cir. 2005)).

Thurau's Report is riddled with improper legal conclusions. Some specific examples include the following opinions:

   1.   "The policies in effect during the *Monell* period were completely inadequate; the policies failure to direct officers to proactively protect children from the traumatic consequences of observing law enforcement action harmed them." Thurau Report at p. 33, 35

65

2. "The officers clearly violated elementary principles on use of force so intent they were on protecting themselves, they ignored their obligation to protect the sanctity of life and those who they were charged to protect due to their vulnerability." *Id.*

3. "It is my opinion that at the time of the mistaken raid and search of Ebony Tate's home, CPD was on notice that its use of force against children and youth was problematic." *Id.*

Any opinion about the "adequacy" CPD's policies is a legal conclusion. *See, e.g., Trexler v. City of Belvidere,* 2023 WL 415184, at *4 (N.D. Ill. Jan. 25, 2023) (noting that there is sometimes "a thin line between" a permissible "'ultimate issue' and a legal conclusion," but finding that expert's "opinions about what was 'proper', 'unjustified', 'unreasonable', or 'excessive' regarding the arrest of Plaintiff, [were] all legal conclusions and must be barred") (citing, inter alia, *Jimenez,* 732 F.3d at 720). In rendering these opinions Thurau does not apply the CPD policy against national standards and comment on any purported deviation from such standards. Rather, she is usurping the role of the jury because it for the jury to decide the elements of Plaintiffs' *Monell* claim (use of excessive force, policy adequacy, indifference, and causation).

Thurau's conclusions are particularly troubling because they use legal terms of art at the heart of this case - "unnecessary force," "excessive force," "inadequate training," "caused the harm"- these are issues for the jury to decide. An expert cannot offer legal opinions or conclusions. *Jimenez,* 732 F.3d at 721. In a materially similar case involving the same expert and a near-identical report, the court barred her opinions that CPD's policies were not adequate to protect children and barred her opinion that the lack of policy and training caused trauma to the children. *Mendez v. City of Chicago, et al.*, Case No. 18-cv-5560, Dkt. No. 577 at p. 40-41. Judge Valderrama has already found that Thurau's "adequacy" and "causation" formulations are impermissible legal conclusions. *Id.* The same result should follow her. Because Thurau's report does not stop at factual description but proceeds to opine on the ultimate legal issues, her testimony must be excluded in its entirety or, at minimum, limited to

exclude opinions that characterizes CPD's policies or training as inadequate, unreasonable, or causative.

c.   *Improper credibility determinations.*

Experts cannot opine on the credibility of witnesses. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999). Determining which testimony to believe is the exclusive function of the jury, not an expert witness. When an expert adopts one party's narrative as fat and rejects conflicting testimony, the expert ceases to assist the tier of fact and instead becomes an advocate. That is precisely what Thurau does here. In her deposition, she admitted that she did not read the Defendant Officers' depositions and that, even those accounts conflicted with the Plaintiffs' version of event, it would not change her opinion. Thurau Dep. at 158-163. She further acknowledged that she relied on  Plaintiffs' *allegations* from both Tate and Mendez as the factual foundation for her analysis. *Id.* Her report reflects the bias.  For example, her report asserts that "no officer made any effort to explain, comfort, or soothe the family – much less tell his peers to lower their guns," and that "'[t]he children were exposed to guns being pointed at them; they saw their mother and grandmother exposed to guns; the officers' treatment of their caretakers compounded their traumatic sense of powerlessness." Thurau Report at p. 78. Thurau is presenting these as factual certainties and, thus, implicitly determining the credibility of witnesses.

Thurau even makes credibility judgments within Plaintiffs' own testimony, choosing to believe that a minor Plaintiff was held a gunpoint for forty-five minutes, despite that same Plaintiff testifying that he was only held at gunpoint for only fifteen to twenty seconds. Thurau Dep. at 177.  This is improper. To the extent Plaintiffs argue that Thurau is merely "assuming a set of facts," her report shows otherwise. She does not condition her conclusions on hypothetical assumptions; she asserts factual determinations, such as officers "pointed guns at children" and "failed to minimize trauma as the established truth. By crediting Plaintiffs' version of events as true (and by necessity finding

Defendants' version of events to be false) Thurau is performing a function that should be left to the trier of fact. *Richman v. Sheahan*, 415 F. Supp. 2d 929, 941–42 (N.D. Ill. 2006). Because credibility determinations should be left to the trier of fact, Thurau's opinions that make credibility determinations must be barred.

## CONCLUSION

In sum, Thurau's opinions are inadmissible under Rule 702 and Daubert. She is not qualified to opine on the use-of-force or search-warrant policies, has no education or experience in psychology or trauma, and applied no reliable methodology. Her opinions are irrelevant, speculative, and unhelpful to the jury because they restate Plaintiffs' allegations rather than explain specialized subject matter beyond a layperson's understanding. Most notably, however Thurau's report is replete with impermissible legal conclusions, asserting that CPD's policies were inadequate, unreasonable, and caused Plaintiffs' harm.

## Motion *in Limine* No. 30: To Excuse Defendant Officers To Attend To SWAT/Detective/Other Work Assignments As Needed Throughout Trial

Trial in this case is scheduled to proceed for approximately three weeks, not including pre-trial preparation. All but four of the Defendant Officers are assigned to the SWAT unit, and Defendant Evans is now a Detective. Defendant Officers take this lawsuit and the claims lodged against them extremely seriously. However, given the nature of their various job duties, they are unlikely to be able to appear at trial every day. Specifically, SWAT officers are highly trained and specialized to respond to high risk incidents. There are only so many SWAT officers and units in the Chicago Police Department. It is therefore not feasible to have nine SWAT Officers sitting in court for four weeks and unavailable to respond to SWAT incidents that may arise during that period. For these reasons, Defendant Officers respectfully request that the Court excuse them from Court as needed so that they can continue to fulfill their job duties during the three-week trial. Defendant

68

Officers further request that the Court instruct the jury that Defendant Officers have been excused from appearing in Court every day, given the need to have them available to perform their job duties.

Further, any mention of a Defendant Officers' absence or commentary on the same by Plaintiffs or their counsel would be unfairly prejudicial, confuse the issues, and mislead the jury as to the issues before them. Fed. R. Evid. 403. Plaintiffs also should not be allowed to argue or suggest that the fact they were present for more of the trial than some Defendants should be weighed or considered by the jury as this has no relevance to any fact at issue in this case. It would also wrongly imply that a party has an obligation to be present for the duration of trial, which has no basis in the law and would also improperly shift the burden of proof. Defendants thus move to bar any mention, commentary, or argument regarding the absence of any Defendant Officer from trial, other than a statement by the Court informing the jury of such an absence is not improper as discussed above.

**Motion *in Limine* No. 31: Bar Or Limit The Use Of Full CR Files In Plaintiffs' *Monell* Claims**

Defendants move *in limine* to bar or limit the use of the full *Monell* Complaint Register files ("CRs") in this case as exhibits on multiple grounds. Defendants in discovery produced thousands of pages of CR-related documents related to hundreds of CRs, many of which are encompassed in Plaintiffs' Exhibits 304-307. The individual files consist of various documents that can include arrest reports, witness statements, photographs, and potentially other records, along with summaries of the evidence included. The Court should bar or limit the use of these CR files because the unfettered use of them would be problematic in multiple ways.

First, Plaintiffs' Exhibits 304 and 305 pertain to search warrant-related CRs, something that has never been an issue in the case. Plaintiffs never brought a claim as to widespread practices pertaining to search warrant procurement or execution. Plaintiffs' claims have always been based on the alleged use of excessive force on children 0-14. To the extent any search-warrant related CRs might

have held any relevance, they are even less relevant now that the Court has granted summary judgment as to the Defendant Officers' procurement of the search warrant.

Second, Plaintiffs seek to introduce CRs outside the relevant timeframe. To the extent any CR is from prior to 2012 or after the incident at bar, it should be excluded.

Third, each CR includes numerous statements that Plaintiffs seek to introduce for the truth of the matter asserted – the allegations made against the accused officers – without those statements falling within an appropriate hearsay exception. Fourth, in many, if not most cases, the finding of the agency was that the alleged misconduct was not sustained or the investigative agency closed the file because the complaining witness declined to sign a sworn affidavit as required by the version of the Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/1 *et seq.*, in place at the time. Plaintiffs cannot introduce evidence to suggest that these findings were incorrect; neither Plaintiffs, nor Plaintiffs' police practices expert, nor Plaintiffs' statistics expert have done any investigation into the underlying subject matter of the files. Thus, it would be misleading the jury to argue that IPRA or COPA failed to conduct a sufficient investigation when the prevailing law at the time required governments to not investigate in the absence of a sworn affidavit.

Fifth, this evidence violates Rule of Evidence 403 in numerous ways. It is unduly prejudicial to the Defendant Officers to parade allegations of misconduct by unrelated officers, most of which are unestablished as valid. Should the files themselves come into evidence, it would lead to juror confusion, as jurors would be expected to parse the results of dozens of unrelated CRs. The sheer volume of facts needed to sift through each case to determine whether the investigation was adequate would call for mini-trials as to each. To go through each of the files would be unduly time-consuming and could cause the jury to decide the case based on those incidents instead of this one. Asking jurors to keep track of the ins and outs of each of the various investigations is far too strenuous. Plaintiffs should be barred from showing the individual files themselves to the jury and instead should rely on

70

the numbers of CRs – which they already do with the spreadsheet – which has the same effect on proof for their claim of a widespread practice of use of excessive force against minors. Using the files themselves is unnecessary when the expert can talk about them. Accordingly, this motion should be granted.

**Motion *in Limine* No. 32: To Bar Testimony, Argument, or Innuendo Expanding Plaintiffs' *Monell* claims**

Defendants are concerned that Plaintiffs will seek to inflame the passions of jurors or confuse the issues by eliciting testimony or making arguments as to *Monell* claims that are not part of the operative complaint. In this and similar cases, Plaintiffs' counsel have sought to raise such issues as the alleged widespread practices of procuring search warrants without sufficient vetting, the failure to investigate or discipline officers for not properly using bodyworn cameras, not equipping SWAT with BWC, choosing to use the SWAT team as a form of "excessive force," and about alleged racial discrimination in the use of force against minor children. None of these issues are properly part of this case. Such efforts would violate Rules 401 and 403. Such issues are irrelevant to any of the *Monell* claims at bar. Moreover, it would be unduly prejudicial to require Defendants to anticipate avenues of attack that are not part of the case. Injecting such volatile topics as race into the case is unjustified. Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560, in part. See Dkt. 726 at 3.

**Motion *in Limine* No. 33: To Exclude Or Limit Pattern Testimony From Plaintiffs' Counsel's Present Or Former Clients**

Defendants move to exclude or limit testimony from present or former clients of Plaintiffs' counsel as to their allegations that they too were the victims of gun pointing. The Court should also naturally bar any exhibits associated with the barred witnesses and the alleged incidents that they are scheduled to testify about. All told, Plaintiffs have identified 36 potential witnesses (nine will-call witnesses and 27 may call) testify as to 10 alleged instances in which excessive force was used against minors to support their allegation that there was a widespread pattern of such force. Each of these 10

71

alleged instances have led to lawsuits in which the witnesses were or are represented by Plaintiffs' counsel. On its face, the number of witnesses Plaintiffs seek to potentially call is excessive. It should be underscored that Plaintiffs claimed on June 24, 2025 in their response to Defendants' Motion to Bifurcate that they intended to call "approximately seven (7) pattern witnesses." Dkt. 499 at 25. Given that they have now listed five times that number as potential witnesses, it calls into serious question either Plaintiffs' ability to correctly estimate the scope of their case or their candor to the Court.

However, Defendants respectfully request that the Court exclude all or the majority of these witnesses and limit the scope of their testimony as such testimony violates FRE 401 and 403 in multiple ways. First of all, it must be noted that each individual incident is different and many of them are quite distinguishable from the case at hand. For instance, the case of Jaylin Stiger, Defendants concede that guns were pointed at a minor but contend that it was reasonable under the circumstances. They are therefore not relevant. Moreover, even if there is some relevance, allowing these witnesses to testify would cause multiple different mini-trials that would distract and confuse the jury and cause undue prejudice to the Defendants because it could lead the jury to improperly find against the Defendants here based on the actions of officers in those other cases. Moreover, like with the individual CR files mentioned above, the evidence is unnecessary and the minimal probative value of the specifics of the incidents is substantially outweighed by the undue prejudice Defendants would suffer. Indeed, Plaintiffs are already planning to use the spreadsheet listing all of the CR files and have their expert, Jack Ryan, talk about the numbers of complaints involving alleged use of force on children. The testimony from the "pattern" witnesses is therefore cumulative. It cannot be overstated how unduly prejudicial it would be to Defendants to have a witness testify about their experience rather than just have their expert talk about the numbers.

Defendants also specifically move to bar the witnesses whose allegations of excessive force against minors took place outside the relevant *Monell* period in this case, from January 1, 2012 to

August 9, 2018. The only pattern witnesses whose testimony could pertain to alleged acts within the relevant *Monell* time frame are Dante Smith, Melvina Smith and former plaintiff Yana Lavow, plaintiffs in *Smith v. City of Chicago et al.*, 21 CV 890, Dkt. No. 90 at ¶ 42 (alleged July 1, 2017 incident); Jolanda Blassingame, Justin Harris and Nasir Norman, plaintiffs in *Blassingame v. City of Chicago et al.*, 19 C 7287, Dkt. No. 135 at ¶ 44 (alleged January 29, 2015 incident); Daviana Simmons and Emily Simmons, former plaintiffs in *Simmons v. City of Chicago et al.*, 14 C 9042, Dkt. No. 37 at ¶ 19 (alleged August 29, 2013 incident); and Peter, Jack and Hester Mendez, former plaintiffs in *Mendez v. City of Chicago et al.*, 18 C 5560. Any witness set to testify about excessive force used against a minor outside the relevant *Monell* time frame cannot provide facts supporting Plaintiffs' theory that there was a widespread pattern of use of force within that time frame. "Subsequent conduct usually cannot be used to establish municipal liability." *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994).

Thus, the Court should at least bar the following witnesses: Alberta Wilson, Royal Smart, Royalty Smart, Jeremy Harris and Roy Wilson, the former plaintiffs from *Wilson v. City of Chicago et al.*, 21 C 4135 (alleged March 15, 2019 incident); Savannah and Telia Brown, plaintiffs from *Archie v. City of Chicago et al.*, 19 CV 4838 (alleged incidents starting in February 2019); Lazerick James and Jaylin Stiger, plaintiffs in *James v. City of Chicago et al.*, 21 C 6750 (alleged December 24, 2019 incident); Regina Evans, Reyshyla Winters and Savayla Winters, former plaintiffs in *Evans v. City of Chicago et al.*, 21 C 4135 (alleged August 7, 2019 incident); Jasmine Vale, Leyalina Lazar and Khamme Lazar, former plaintiffs in *Vale v. City of Chicago et al.*, 20 C 5037 (alleged February 27, 2020 incident); and Sharon Lyons and Lillie Savage, plaintiffs in *Lyons v. City of Chicago et al.*, 20 C 3412 (alleged February 26, 2020 incident).

In addition, Defendants seek to bar witnesses from cases that have settled: Former plaintiffs Daviana Simmons and Emily Simmons were part of *Simmons v. City of Chicago et al.*, 14 C 9042, which settled in 2018. Former plaintiffs Regina Evans, Reshyla Winters and Savayla Winters were part of

73

*Evans v. City of Chicago et al.*, 21 C 4135, which settled in 2022. Former plaintiffs Alberta Wilson, Royal Smart, Royalty Smart, Jeremy Harris and Roy Wilson were plaintiffs in *Wilson v. City of Chicago et al.*, 19 L 8047, which settled in 2023. Former plaintiffs Jasmine Vale, Leyalina Lazar and Khamme Lazar, were part of *Vale v. City of Chicago et al.*, 20 C 5037, which settled in 2025. Peter, Jack and Hester Mendez are former plaintiffs in *Mendez v. City of Chicago et al.*, 18 C 5560, which settled in 2025.

Upon information and belief, all these plaintiffs have signed settlement documents stating that their settlements were not admissions of liability and that the settlement shall not be used as evidence of wrongdoing. That settlement agreement would include similar language about not admitting liability. Yet if they were able to testify in this case, Defendants would be in a bind where they would either not be able to confront these witnesses with their acknowledgement that the settlements were not indicative of misconduct, or run the risk that the jury may wrongly conclude that the very fact of the settlements indicates guilt both by those officers and the City, even when the settlements expressly state otherwise.

In addition to the multiple violations of Rule 403 stated above, it would prove to be poor public policy to allow Plaintiffs to sign documents disclaiming liability as part of settlements and then to allow them to claim that the misconduct alleged in the lawsuit actually happened. Such testimony violates Rule 408. See *Cent. Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir. 1982)(analyzing the purpose of Rule 408 and concluding "The fear is that settlement negotiations will be inhibited if the parties know that their statements may be later used as admissions of liability.")

Lastly, since the underlying allegations concern SWAT team members pointing guns, Defendants submit that any pattern witnesses should only involve other cases involving the SWAT team. Incidents involving non-SWAT officers are irrelevant to the claims here because the SWAT team receives additional, specialized training and uses different tactics than non-SWAT search warrant teams.

Should this Court be inclined to allow any of these "pattern" witnesses, it should be limited to only those incidents that are within the *Monell* period and have a similar fact pattern. Moreover, the witnesses themselves should be the adult plaintiffs and not the minors. It would be unduly prejudicial to the defendants to parade children in front of the jury when the exact same testimony could be given by the adult plaintiffs. Moreover, Plaintiffs' pattern witnesses' testimony should be confined to their summary of the alleged incidents of excessive force that was used against them. They should not be able to testify as to any ongoing effects of the alleged force, their opinions of the Chicago Police Department, of the City's reform efforts, of policing in general. To have the pattern witnesses testify outside these parameters in most cases would exceed the scope of their competency as witnesses. It would also in many respects violate Rule 401 as much of such testimony would not be material to any allegations at issue in the lawsuit. Most importantly, such testimony would violate Rule 403, as it would be unduly prejudicial to Defendants, cumulative, lead to mini-trials, and confuse the jurors. Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560, in part. See Dkt. 726 at 3-6 (holding that Plaintiffs should be limited to calling one witness per incident, limiting the post-incident witnesses to those within 12 months of the incident, requiring witnesses to limit their testimony to alleged excessive force towards minors rather than their feelings, must provide the Court and defense counsel the name of witnesses 24 hours in advance of their testimony)

**Motion *in Limine* No. 34: To Include Sufficient Limiting Instructions With Each *Monell* Witness**

The Court has ruled that limiting instructions could be used to avert the danger of unfair prejudice to Defendants. Dkt. 505 at 3. Defendants respectfully request that the Court give appropriate limiting instruction before each *Monell* witness, and if necessary, during and after their testimony. Such limiting instructions are necessary to limit the undue prejudice Defendants will suffer given the confusing nature and lack of overlap between the *Monell* and underlying claims.

**Motion *in Limine* No. 35: Bar Independent Monitor Maggie Hickey, And Evidence Related To The Consent Decree, Including Reforms Not Going Far Enough**

Plaintiffs have listed Independent Monitor Margaret A. Hickey, or a member of her present or former staff, as a may-call witness to support their *Monell* claims. This move should be barred for multiple reasons.

First, pursuant to the Apex Doctrine, Ms. Hickey's personal testimony should be barred. The Apex Doctrine is meant to shield top officials from the burden of having to testify as to matters. The doctrine "bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information." *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at *1 (N.D. Ill. April 22, 2016). Allowing Plaintiffs to call Ms. Hickey as a witness would set an untenable precedent where Ms. Hickey could be called in any number of lawsuits in which it is alleged that police reform efforts are insufficient or too slow. It would detract from her duties of actually facilitating police reform to require her to give her thoughts on the status of police reform.

Second, Ms. Hickey was appointed as independent monitor on March 1, 2019. *State of Illinois v. City of Chicago*, 17 CV 6260 at Dkt. 713. Therefore, neither she nor her staff are likely to have meaningful knowledge of the City's policies and efforts at or before the time of the November 7, 2017 incident, the relevant time frame. Third, the purported purpose of calling Ms. Hickey or a member of her staff is to attest to "the actual degree of the City's cooperation in the Consent Decree and whether it has (or has not) made certain reforms." This is completely irrelevant and unduly prejudicial. FRE 401 and 403. Indeed, Judge Kennelly has already ruled on this very issue and opined that witnesses regarding the consent decree are not necessary as it is a publicly available document. See *Bures et al., v. City of Chicago, et al.*, 19cv02040, Dkt. No. 125. (*stating* "the consent decree is a matter of public record, and its terms are what they are). Further, the Consent Decree was approved on January 31, 2019. *State of Illinois v. City of Chicago*, 17 CV 6260 at Dkt. 702-703. Therefore, it is well beyond the relevant time

frame here and will only confuse and enflame the jury. Whether or not the City has complied with the consent decree has no relevance whatsoever to whether or not any of the policies alleged by Plaintiffs existed in August 2018 and whether any policy makers were deliberately indifferent to said policies prior to August 2018, and, notably, they certainly could not be the moving force behind the Defendant Officers' conduct in August 2018.

Most importantly, the Consent Decree itself flatly prohibits testimony from Ms. Hickey and her staff, barring unusual circumstances:

> The Parties will jointly select an independent monitor who will assess and report whether the requirements of this Agreement have been implemented, and whether implementation is resulting in constitutional policing and increased community trust of CPD. The independent monitor will be assisted by a team of individuals (collectively, "Monitor") with the knowledge, skills, and expertise necessary to accomplish the Monitor's duties under this Agreement. …

> The Monitor will not testify in any other litigation or proceeding with regard to any act or omission of the City, CPD, or any of their officials, officers, agents, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of the Monitor's performance under this Agreement without an order issued by the Court. *State of Illinois v. City of Chicago*, 17-CV-6260 (N.D.Ill. Jan. 31, 2019, Dkt. 703-1), ¶¶ 610, 673.

The only sensible reading of these paragraphs is that only Judge Pallmeyer, the judge overseeing the Consent Decree, may grant leave for Ms. Hickey or any of her staff to testify. To the best of defense counsel's knowledge, Plaintiffs have not sought such leave from Judge Pallmeyer.

Moreover, it is a subsequent remedial measure and literally the result of a settlement between the State and the City. Evidence as to it, thus, should be limited by Rules 407 and 408. Moreover, to explain the Consent Decree in detail would take considerable time and effort. It is a complex piece of litigation with numerous requirements for public notice, negotiation, and court approval before matters could proceed. It should therefore be barred or limited under Rule 403 because of the dangers of unfair prejudice and confusion of the issues. As but one example, jurors may believe the very existence of the Consent Decree means that the City has admitted that it has poor practices when the Consent Decree explicitly denies that. See *State of Illinois v. City of Chicago*, 17 CV 6260, Dkt. 703 at p.

2, para. 5. The Consent Decree is 236 pages long and covers numerous topics and terms. In-depth testimony about the Consent Decree would undoubtedly run afoul of Rule 403. For these reasons, Defendants request the Court bar the testimony of Ms. Hickey and members of her staff as to the Consent Decree.

In addition, Defendants seek to bar Plaintiffs from eliciting testimony, implying or arguing that the Consent Decree and other reform efforts did not go far enough.  In *Bedford v. DeWitt*, 662 F. Supp. 3d 856 (N.D. Ill. 2023), plaintiffs similarly argued that the City's failure to reach full compliance with the Consent Decree showed that the City was not serious about its reforms. But the Court rejected that argument, finding "failure to reach full compliance within a few years is a far cry from a complete failure to act." *Id.* at 890. That logic holds even more true in this case, when the Consent Decree had not been entered into at the time of the incident, and where the reform efforts were shaped by the fact that the City was working with the State, community groups and others to begin the process of establishing the Consent Decree.

Defendants also anticipate that Plaintiffs may argue that the City did not achieve additional reforms as to the purported alleged widespread practice of violence against youth after the issuance of the 2016 Police Accountability Task Force Report and the January 2017 Department of Justice Report. Plaintiffs should be barred from arguing as to any alleged lack of effort past November 2017, and for reasons similar to those articulated in *Bedford*, should be prohibited from arguing that the reform efforts achieved or contemplated by November 2017 were insufficient.

**Motion *in Limine* No. 36: Bar Department Directives and Training That Went Into Effect After August 2018 As Evidence of Allegedly Faulty Policy**

Defendants move to bar the use of general or special orders issued after August 9, 2018. General and special orders are internal rules by which the Chicago Police Department operates. Plaintiffs have listed as part of Exhibits 73 and 74 search warrant special orders that were issued in 2020 and 2021. They have also included the department notification as to firearm pointing incidents

from October 2019 as Exhibit 65. Plaintiffs have also listed a 2020 Search Warrant Training as part of Exhibit 75. These materials should be barred for multiple reasons. First, these orders had not been created and were not in effect at the time of the incident at bar. They are therefore not relevant to show what the City's policies were at the time and thus violate Rule 401. Second, the orders will lead to juror confusion on multiple grounds, including, but not necessarily limited to: the orders are from the incorrect time period; the orders pertain to search warrants rather than use of force (and as Plaintiffs have pointed out, their claim is about whether there was a widespread policy of use of excessive force against minors period, not a widespread policy of excessive force against minors during the execution of search warrants); the general and special orders likely will lead to a conflation of what is required under the general and special orders and what is required under the Constitution. The general and special orders are in many cases more restrictive than what is required under the Fourth Amendment. Moreover, the revised general and special orders represent efforts by the City to update its policies and should be barred under Rule 407 as subsequent remedial measures. Third, the evidence would be unduly prejudicial in violation of Rule 403 because it could cause the jury to assume that the directives and training were faulty simply because they have been updated. Lastly, Defendants point out that Plaintiffs have also filed a motion *in limine* requesting that *Monell* evidence from outside of the time-frame be excluded. Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560. See Dkt. 726 at 8-9.

**Motion *in Limine* No. 37: Bar Evidence From Former Superintendent Eddie Johnson, Former Superintendent Brown, Former Mayor Emanuel and Former Mayor Lightfoot**

Plaintiffs have included as may-call witnesses former Chicago Mayor Rahm Emanuel for making "key admissions relevant to the *Monell* theories in this case" and former Chicago Police Superintendent Eddie Johnson for making "key admissions regarding the *Monell* theories in this case" and as a rebuttal witness. Plaintiffs have also included as exhibits statements by former Mayor Emanuel, former Chicago Police Superintendent Brown and former Mayor Lori Lightfoot. Plaintiff's

79

Exhibits 58-60, 107-113, 445-447. These witnesses and statements should be barred for multiple reasons.

First, each was at the top of their respective organizations and their testimony should be barred by the apex doctrine, as Defendants argued above in seeking to ban Margaret Hickey. The doctrine applies to former heads of organizations as well as present ones. See *Lee v. City of Chicago*, No. 20 CV 1508, 2021 WL 2399999 at *3 (N.D.Ill. June 11, 2021)(Cummings, J.). It would be unduly burdensome to Mayor Emanuel and Superintendent Johnson to require them to prepare to be potential witnesses in this case. Requiring either Mayor Emanuel or Superintendent Johnson to testify in this case would set an untenable precedent to them (and/or their successors) being required to testify in virtually every case where it is alleged that that there was some form of police misconduct and questions about the City's police policies or reform efforts may be raised.

Second, none of the officials has made relevant statements as to the issues pertinent to this case. Plaintiffs have said their *Monell* claim is confined to the use of excessive force against minors under the age of 14 and several related topics. Neither Mayor Emanuel, nor Superintendent Johnson have made statements on that specific topic to the best of the City's knowledge. The City imagines that Plaintiffs seek to elicit testimony from both officials as to the existence of the broader code of silence within the police department. Plaintiff has listed three exhibits of Mayor Emanuel's statements: Exhibits 114-116. However, neither Superintendent Johnson nor Mayor Emanuel made statements that the code of silence in general existed in 2018, let alone a code of silence as to the use of excessive force against minors as in existence, after the City had engaged in reform efforts. Rather, the statements from former Mayor Emanuel were made in the context of an excessive force case involving a police shooting. Courts in this district have found that Mayor Emanuel's statements were insufficient to help those plaintiffs even state a plausible *Monell* claim, particularly when the claims at issue did not also involve a police shooting. See, *e.g.*, *Milan v. Shulz*, No. 21 CV 765, 2022 WL 1804157 at *5 (N.D.Ill

June 2, 2022)(Kness, J.). Mayor Emanuel's comments are not probative of what happened between the Defendant Officers and Plaintiffs, or of whether a policy or practice allegedly caused any officer to point guns at any of the plaintiffs. See *Lopez v. Vidljinovic*, No. 12 CV 5751, 2016 WL 4429637 at * 5 ("the purported lay opinions and hearsay statements of Mayor Rahm Emmanuel [sic] concerning an alleged code of silence' within CPD are inadmissible" and "simply not probative of the questions at hand or the defendants at issue."). For similar reasons, Superintendent Johnson's lay opinions are similarly not probative. It is unclear as to what matters Plaintiffs may seek to call Superintendent Johnson as a rebuttal witness. Plaintiffs have not and cannot establish the relevancy of these witnesses' statements as to the particular issues in this case and will not be able to overcome the Rule 403 balancing test when it comes to undue prejudice.

Statements of Mayor Emanuel, Superintendent Johnson, Superintendent Brown and Mayor Lightfoot should be barred pursuant to Rule 403's prohibition as to unfair prejudice and confusing the issues. Indeed, at least some of the specific statements that Plaintiffs seek to introduce concern issues that took place after the incident – the Anjanette Young search warrant, which has nothing to do with the alleged use of excessive force against a minor. Moreover, the content of the statements is largely irrelevant to the claims remaining here, largely focusing on warrant procurement. The statements are irrelevant and unduly prejudicial and should be excluded.

The presence of any such former official will give undue weight to Plaintiffs' claims. It will likely lead to questioning of each beyond the scope of the statements that they made. The Court should prevent this case from being filled with the distractions that these witnesses would inevitably bring. To the extent that the Court may consider allowing Plaintiffs to admit the statements of Mayor Emanuel without his testimony, the City respectfully requests the opportunity to admit Emanuel's interrogatory answers explaining these statements, which were publicly filed in *Laporta v. City of Chicago*,

No. 14 CV 665, Dkt. No. 356-1 (Sept. 26, 2017). Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560. See Dkt. 726 at 9.

**Motion *in Limine* No. 38: Bar The Use of Verdicts Or Settlements, Including As Evidence of Plaintiffs' *Monell* Claims**

Plaintiffs should be barred from using any past verdict and settlement against the City as proof of Plaintiffs' *Monell* claims. In general, such verdicts and settlements tend to have multiple problems that would prevent them from being applicable to this case. Those problems include, but not limited to, the time frame in which the allegations happened being different from the ones at issue here; the underlying facts or *Monell* theories of those cases being dissimilar from the case at bar; and/or ambiguity over what the verdict may represent. Such evidence runs afoul of Rules 401, 403, and 408.

"The mere fact that a case settled out of court is not an indication of wrongdoing by any party to the settlement." *Am. Med. Ass'n v. 3Lions Publ'g, Inc.,* No. 14 C 5280, 2015 WL 1399038, at *5 (N.D.Ill. Mar. 25, 2015) (Kendall, J.) Because there are multiple reasons why the City may have opted to settle cases and because settlements are not an admission of wrongdoing, bringing in any settlements would violate Rule 403 by introducing high risks of unfair prejudice and jury confusion.

Defendants respectfully move this Court to bar Plaintiffs from offering any evidence of settlement discussions in this matter, including any Rule 68 discussions and/or offers of judgment. Based on the clear language of Rule 408, Plaintiffs should similarly be barred from referencing any settlements or verdicts in any other cases involving any of the Defendant Officers. Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560, in part. See Dkt. 726 at 10.

**Motion *in Limine* No. 39: Bar Plaintiffs From Eliciting 30(b)(6) Testimony on Topics For Which They Were not Designated, and From Eliciting 30(b)(1) Testimony**

Plaintiffs noticed up multiple Rule 30(b)(6) witnesses on various topics through multiple lengthy 30(b)(6) notices in this and companion cases. These notices were subject to extensive motion practice. In taking their depositions, Plaintiffs also deposed most of these witnesses as 30(b)(1)

witnesses. In summary judgment briefing, Plaintiffs sought to use several of these witnesses' 30(b)(1) testimony as if they had given it as 30(b)(6) testimony. Defendants also have concerns that Plaintiffs will seek to question the 30(b)(6) witnesses in areas outside the areas they were prepared and presented for. Defendants therefore move to bar Plaintiffs from soliciting 30(b)(1) testimony from these 30(b)(6) witnesses, and from questioning them about topics outside the areas in which they were designated. Plaintiffs should be barred in general from seeking to elicit Rule 30(b)(6) witness outside the topics for which the witnesses are designated. To the extent Plaintiffs may be allowed to question a 30(b)(6) witness in their 30(b)(1) capacity, Defendants respectfully request that the Court make it clear to the jury through the use of an instruction that that particular testimony is not binding on the City.

**Motion *in Limine* No. 40: Bar DOJ Report, PATF, OIG Reports, and Witnesses Associated with them**

Plaintiffs have listed as potential exhibits several reports in support of their *Monell* claims, including the U.S. Department of Justice Report of its Investigation of the Chicago Police Department ("DOJ Report," Exhibit 33), the Report of the Police Accountability Task Force ("PATF Report," Exhibit 411), Office of Inspector General's January 2020 report "Evaluation of the Use of the Affidavit Override in Disciplinary Investigations of Chicago Police Department Members," several reports with regard to search warrant practices from June 2021 or later, a report concerning CPD and COPA practices ("OIG Reports," Exhibits 105-106, 415, 417. This motion necessarily also includes any witnesses Plaintiffs have listed to testify regarding these reports.

As a preliminary matter, Plaintiffs have failed to sufficiently identify which portions of these reports which they may rely on or seek to introduce. It is fundamentally unfair to Defendants and the Court for Plaintiffs to have not designated which portions of these thousands of pages of reports they intend to potentially use. Nevertheless, the City moves to bar these reports on multiple grounds.

First, the OIG Reports were not disclosed by Plaintiffs in response to discovery requests and should be barred on that basis. Second, it is doubtful that Plaintiffs will be able to establish the foundation for any of these exhibits. Plaintiffs have listed Assistant U.S. Attorney Patrick W. Johnson or another current or former DOJ employee involved in the DOJ Report on their will-call witness list. Upon information and belief, neither AUSA Johnson nor any other present or former member of the DOJ is likely to have the requisite knowledge to give competent testimony about particular areas of the DOJ Report more than eight years after it was issued. Similarly, Plaintiffs' listing of several members of the PATF as may-call witnesses is likely to be unavailing. Plaintiffs have not listed any witnesses to provide foundation for the OIG Reports or the Safer Report.

Third, these reports are replete with inadmissible hearsay. While the City concedes that other courts have ruled that some of the reports may be admissible either as the admission of a party-opponent or as the result of a government investigation, this does not allow either legal conclusions or hearsay-within-hearsay to be admissible.

Fourth, the reports often constitute stealth expert opinions that fall short of the *Daubert* standards for reliability and admissibility. Generally, they do not show who signed off on which sections, what methodology was used to reach the report's conclusions, or the entirety of the facts on which the report-writers relied on to reach their conclusion.

Fifth, much of these reports generally do not have any relevance to Plaintiffs' *Monell* claims or the City's defenses. There is little in any report that specifically addresses the issue of alleged excessive force against minors or ways to prevent it. Indeed, the PATF Report only talks about how some youths have reported to its members that they have felt "humiliated by those who have sworn to serve and protect them" and that they heard "story after story of officers treating youth with disrespect, humiliating them or worse." PATF Report at 54-55. Rather than discuss even a single incident of youths having allegedly been victims of excessive force, the PATF Report talks more broadly as to

84

positive interactions. *Id.* The OIG Reports as to Urgent Recommendations on the City's search warrant policies are irrelevant with the Court's ruling in Defendants' favor as to the procurement of the warrant and the knock-and-announce claim.. Moreover, the OIG reports that Plaintiff references are outside of the *Monell* period. For example, the report related to recommendations related to warrant policies is from January 2021, three years after the *Monell* period ends.

To the extent that the evidence from the reports may be relevant, they run afoul of Rule 403's prohibition as to material that is unfairly prejudicial, confusing to jurors and unnecessarily cumulative. Attempting to sort through the few relevant sections of the various reports, to explain the irrelevance of other sections, to ask the jurors to parse through hundreds of pages of findings, is unduly burdensome. Having the jury hear about alleged misconduct by other officers on other grounds and allegedly unsuccessful attempts to curb it will unfairly prejudice the Defendant Officers. The DOJ Report uses terms that are almost certainly going to confuse the jury as to its standard of proof, the terms "pattern" and "practice" with the applicable standards under *Monell*. There can be no reasonable argument that introducing evidence as to multiple reports will be unnecessarily duplicative and a waste of time.

**Motion *in Limine* No. 41: Bar Certain Of Plaintiffs' Exhibits About Alternative Policies And Trauma-Informed Policing**

Defendants seek to bar various exhibits Plaintiffs seek to introduce as to alternative policies and trauma-informed policing, including, but not limited to: Exhibit 418 (study entitled "Enhancing Police Responses to Children Exposed to Violence"), 419, 499 (article entitled "The officer's role in responding to traumatized children"), 87 (Enhancing Police Responses to Children Exposed to Violence), 88 (The officer's role in responding to traumatized children), 89 (International Association of Chiefs of Police "Law Enforcement's Leadership Role in Juvenile Justice Reform"), 421 (International Association of Chiefs of Police article "Trauma-Informed Policing: Responding to

Children Exposed to Violence"), 422 (International Association of Chiefs of Police and Dept. of Justice Report "Safeguarding Children of Arrested Parents"), 91 (law enforcement publications on trauma-informed policing), 68- (model policies and training curriculum for Strategies for Youth, Inc.), 93 (article by Strategies for Youth as to model policies for law enforcement), 94 (The Council of State Governments "Trauma-Informed Policing: Addressing the Prevalence of Trauma in Law Enforcement Encounters"), 95 (Publications about the Child Development Community Policing Program), and 262 (Strategies for Youth letter and publications).

The first ground on which these exhibits should be barred is foundation. With the exception of the exhibits from Strategies for Youth, which is the company of Plaintiffs' expert Ms. Thurau, Plaintiffs have not listed witnesses who are capable of establishing the foundation of any of the above exhibits. Without being able to lay the proper foundation, these documents are inadmissible.

Even assuming that Plaintiffs can overcome the obstacle of foundation, Plaintiffs run into the next obstacle of relevance. These exhibits largely talk about issues such as juvenile justice reform or violence perpetrated not by police officers but by others prior to the involvement of police and the need to be sensitive to such factors. They do not speak to the need to avoid targeting small children with handguns and semi-automatic rifles, which is the only thing that matters here. Simplified, the question the jury has to answer is whether the City's policies (or lack thereof) caused any officer to allegedly target the Minor Plaintiffs with their weapons. The notion that officers should generally use a trauma-informed approach and not arrest adults in front of their young children does not speak to that at all. Moreover, even conceding for argument's sake that the model policies and approaches that are suggested in the aforementioned exhibits are superior to the ones the City had in place during the *Monell* period, that does not speak to problems with the City's actual policies. Indeed, most of these documents have nothing to do with officers' use of force. Rather, they pertain to the notion that

86

officers should be sensitive to the notion that minors may have seen force used in the home or the community and act appropriately.

Even assuming that any of these documents could be said to be better policies than those in place at the City, it still is of limited relevance. The mere "existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000) (emphasis added). It is "always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm." *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) (emphasis added).

Finally, even assuming some relevance could be gleaned from these policies, they would still run afoul of Rule 403. The danger of unfair prejudice and confusion of issues would be too strong, as the jury would be distracted by trying to understand "trauma-informed" policing and the reasons why there had not been a further adoption of that approach by the City when the evidence shows that the City had policies in place that were more than sufficient to let officers know that they should not needlessly target children (or anyone, for that matter) with their guns, and should not use excessive force against children (or anyone).

**Motion *in Limine* No: 42: Bar News Accounts Or Other Media To Support Plaintiffs' *Monell* Claims, including comments made by City personnel**

Plaintiffs' exhibit list includes clips from interviews conducted with CBS2 Chicago, including an interview with CPD'S Lt. Matthew Cline and former Mayors Emanuel and Lightfoot. Exhibits 59, 108, 112, 428, 447. Any statements from Plaintiffs offered by Plaintiffs should be barred as inadmissible hearsay. Rule 801(c)(1)-(2) defines hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." Plaintiffs should not be allowed to introduce statements by

themselves, reporters or other witnesses in a fashion that does not allow for the witnesses to be properly cross-examined. Such statements are inadmissible hearsay.

Moreover, Plaintiffs' use of the news accounts and statements made by CPD personnel is likely to violate Rules 401 and 403 because much of the materials will have nothing to do with the issues in the case or be blatant attempts to gain sympathy.

Apart from non-hearsay statements made by Plaintiffs on video that comport with Rules 401 and 403, and impeachment of Plaintiffs, as well as video footage that rebuts any Plaintiffs' damages claims, this Court should bar any use of any media reports or pieces. This would include barring any references to the titles of the various media reports, which include, but are not limited to, "wrong raid," "botched raid," and/or "Unwarranted" (nor should this last piece be referred to as a "documentary").

**Motion *in Limine* No. 43: Bar Argument That IPRA's Being Replaced By COPA Should Be Considered Evidence In Support of Plaintiffs' *Monell* Claim**

Defendants anticipate that Plaintiffs may seek to argue the very fact that the City replaced the Independent Police Review Authority ("IPRA") with the Civilian Office of Police Accountability ("COPA") shows that the City's police accountability mechanism was deficient.

Under Rule 403, any probative value is substantially outweighed by the danger of unfair prejudice. Introducing the fact that COPA replaced IPRA without full context of all relevant legislative considerations suggests that all of the work IPRA performed was deficient. In other words, introduction of the fact that IPRA is defunct would serve as a back door mechanism for Plaintiffs to suggest that there was a failure to investigate all cases prior to the creation of COPA when there is no such evidence in the record. Finally, introduction of the fact that IPRA is now defunct should be barred by Federal Rule of Evidence 407 to the extent the COPA ordinance (replacing IPRA) amounts to a subsequent remedial measure. Therefore, any testimony, argument, or reference to this fact is

88

inadmissible under FRE 407. Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560, in part. See Dkt. 726 at 13-14.

### Motion *in Limine* No. 44: Bar Argument About the Parties' Conduct During Discovery Or In Response To FOIA Requests, Or Argument Concerning Failure To Produce Documents

Defendants anticipate that Plaintiffs may attempt to comment or introduce testimony as to the City's conduct in discovery, including but not limited to whether and when documents were produced, that discovery took a long time and required motion practice, and so forth. Such evidence is irrelevant and improper. *See Soltys v. Costello*, 520 F. 3d 737, 744 (7th Cir. 2008) (improper for attorney to raise issue of discovery sanctions before jury). Plaintiffs have listed a number of responses to their pre-discovery Freedom of Information Act requests as Plaintiffs' exhibits 6-15. This raises a concern that Plaintiffs intend to do so not for the content of those responses but in order to argue that they were stonewalled by the City in seeking information, or that the City in some other way acted inappropriately in those responses. To the extent that Plaintiffs have a valid complaint regarding the City's conduct in discovery or in its FOIA responses, it should have been raised in the pre-trial stage of this litigation. A jury trial is not the proper forum for airing such grievances. Moreover, to permit Plaintiffs to imply that the City, or its attorneys, attempted to hide information violates Rule 403 because it is extremely unfairly prejudicial and unwarranted. As a result, any testimony, argument or comment regarding the City's conduct in discovery should be barred.

Judge Valderrama granted a similar motion in *Mendez*, 18 C 5560. See Dkt. 726 at 14.

### Motion *in Limine* No. 45: Bar evidence or argument relating to Jack Ryan and Lisa Thurau's work for the City of Chicago

Defendants seek to bar Plaintiffs' experts Jack Ryan and Lisa Thurau from using the fact that they have engaged in work on behalf of the City to improperly bolster their expertise. Mr. Ryan was hired to be an expert witness by a different division in the City's Law Department regarding a completely different topic. Ms. Thurau has presented a webinar through the Annie E. Casey

Foundation with members of the Chicago Police Department called Partnering with Law Enforcement to Address Juvenile Detention Reform, has presented a training entitled "Policing the Teen Brain," and has been asked by CPD to review its policies.

The City moves to bar eliciting testimony that their consultancy has included the City as a client because it is not relevant to their opinion and therefore in violation of Rule 401. It is also unfairly prejudicial disproportionate to any probative value as Plaintiffs will seek to improperly bolster the witnesses' credentials by saying that the City recognizes them as experts. Explaining the conditions under which both had limited retention by the City would also require undue time and lead to jury confusion. For these reasons, such testimony and argument violate Rule 403.

**Motion *in Limine* No. 46: Bar Reference to Unidentified "Official Policymaker" or "Final Policymaker" Of The City**

Plaintiffs may seek to hold the City liable for their *Monell* claims without specifically identifying who the City's final policymaker may be for a given alleged widespread practice or policy. That would be improper. The jury should not be left to interpret or decide who the City's final policymaker is. As the Supreme Court has explained, prior to submitting a case to the jury, "the court must determine the identity of the official policymakers and that once the policymakers have been identified, 'it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice which constitutes the 'standard operating procedure' of the local governmental entity.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 510 (7th Cir. 1993), *quoting Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 737 (1989).

**Motion *In Limine* No. 47: To Structure Trial To Require Plaintiffs' Underlying Claims To Go First**

Defendants move this Court to use its authority to structure the trial so that Plaintiffs present their evidence as to the *Monell* claims last.

90

Defendants have long argued that the nature of trying the evidence about the underlying claims side by side with the myriad policy claims against the City would endanger judicial economy and create a substantial danger of unfair prejudice against the Defendant Officers. Admittedly, the Court and its predecessor have opted to not bifurcate this trial.

However, an alternative to bifurcation would be requiring that Plaintiffs present their evidence as to the majority of claims before then proceeding to present their evidence as to Plaintiffs' *Monell* claim. This demarcation of evidence would be easier for the jury to follow, streamline the evidence, lower the need to give repeated limiting instructions, greatly lessen the danger of the Defendant Officers' suffering unfair prejudice. It would also allow the parties to make clearer presentation of the evidence supporting their respective claims and defenses.

It is well within the Court's inherent authority to structure the trial in this fashion.

Therefore, Defendants respectfully request the Court structure the trial to have Plaintiffs present evidence as to their *Monell* claims last.

## Motion *In Limine* No. 48: To Require Plaintiffs To Provide Sufficient Advance Notice Of When They Intend To Call City Witnesses

Defendants respectfully request that this Court order Plaintiffs to give sufficient advance notice of when they intend to call City witnesses who are not defendants in this case.

Plaintiffs presently have the following five present or former City officials listed on their will-call witnesses with the intention of calling them live: former Commander Matthew Cline, Lt. John Benigno, Lt. Trak Silapaduriyang, Commander Daniel Godsel, Shannon Hayes of the Civilian Office of Police Accountability. Plaintiffs also have listed a number of additional present or former City officials as may-call witnesses. Those include former Mayor Rahm Emanuel and former Chicago Police Superintendent Eddie Johnson, who Defendants have moved separately *in limine* to bar. See MIL No. 37.

These witnesses have demanding full-time jobs and complicated schedules. In fairness to their regular duties and deference to their public service, and to enable Defendants to properly prepare them for their testimony, Defendants respectfully request the Court require Plaintiffs to provide a minimum of 48 hours' notice of when they may be calling these witnesses.

In the recent *Mendez* trial, Plaintiffs were only required to inform defense counsel of the witnesses they planned to call the next day. In practice, that meant that defense counsel were informed at 6 p.m. or later who Plaintiffs intended to call for the next day. This was both unduly prejudicial to defense counsel and the witnesses. By keeping defense counsel uncertain of when these City witnesses might be called, Plaintiffs put the City witnesses in an unfair position as they attempted to balance their regular duties, their trial preparation and their possible trial testimony.

In deference to the public service that non-defendant City officials provide, Defendants respectfully ask that the Court require Plaintiffs provide a minimum of 48 hours notice of calling any such witnesses to allow the witnesses to adjust their schedules accordingly and to prepare for their testimony. In addition, Defendants request that Plaintiffs be required to inform defense counsel as soon as practical when they decide that they are not going to be calling any of those witnesses.

**Motion *In Limine* No. 49: To Require Plaintiffs To Provide Sufficient Advance Notice Of Demonstratives And Video Evidence**

Defendants respectfully request the Court to order Plaintiffs to provide them with any demonstrative PowerPoint exhibits and any video depositions they intend to use at least 24 hours in advance of their proposed use.

It should go without saying that trials should not be conducted by ambush. Part of the reason why there is a proposed pretrial order and a pretrial conference is to allow the parties to discuss potential ground rules for the trial, to reach compromises, and when necessary, for the Court to rule on issues.

However, Defendants are concerned that Plaintiffs will seek to introduce demonstrative exhibits or versions of video exhibits without giving defense counsel sufficient time to vet them. Unfortunately, this happened several times in the recent *Mendez* trial. For instance, Plaintiffs sought to introduce a version of body-worn camera exhibits with a transcript that defense counsel had not previously been shown. Defense counsel only learned of the transcript, which was in part inaccurate, as Plaintiffs' counsel sought to use it with a witness. In another example, Plaintiffs sought to use a demonstrative PowerPoint with one of their experts and only informed defense counsel of this the day that expert was about to testify. In a third, Plaintiffs used excerpts from a video deposition that included materials that had been barred by the Court's motion *in limine.*

Defendants wish to avoid these kinds of issues arising at the last minute by requiring both sides to give any demonstrative exhibits, PowerPoints to be used with witnesses, or other materials that are not part of the pretrial order that feasibly could have been provided in advance at least 24 hours before their anticipated use.

**Motion *In Limine* No. 50: To Limit the Testimony or Argument Relating to Procuring the Search Warrants in Question or the Decision to Use the Assistance of SWAT Officers to Execute the Search Warrants**

Defendants respectfully request that Plaintiffs be limited in eliciting testimony or making arguments concerning any alleged impropriety in procuring the search warrant in this case, or the decision to use SWAT Officers to execute the search warrant.

In this case, Chicago Police officers were provided information that a known felon, Javale Bell, had shown a confidential informant a gun while in Plaintiffs' residence. On top of that, officers obtained a picture that Bell had posted on his social media page of him posing in front of Plaintiffs' residence with a gun like it was a telephone. See Plaintiffs' Exhibit 152. With this information, the officers obtained a valid search warrant for Plaintiffs' residence from a Cook County Circuit Court judge. Because officers received information that Bell had also shown a second gun at a nearby

residence and because Bell was deemed armed and dangerous, the Chicago Police Department decided to have SWAT officers conduct both searches.

The Court has previously ruled in Defendants' favor that the procurement of the search warrant was proper. Dkt. 461 at 13-18. It would thus be improper for Plaintiffs to devote more than the bare minimum time to elicit such testimony as that Plaintiffs were not contemplated as the targets of the search warrant and that Plaintiffs deny having any connection to Bell, and that Defendants are unaware of any connection between Plaintiffs and Bell other than the picture and the informant's account. Although such testimony is not in the strictest sense relevant to any claims or defenses in the matter, it is background that Defendants agree the jury deserves to know.

But instead of establishing those types and points and moving on, Defendants are concerned that Plaintiffs will instead harp on the notion that Defendants could or should have done more to investigate the lack of a potential connection between Bell and Plaintiffs, that Defendants spent insufficient time corroborating the tip and the like, and that because Defendants did not do a better job investigating the claims of the informant, the Plaintiffs were harmed. This would be nothing more than an attempt to circumvent the Court's ruling on summary judgment and a play for sympathy. Those subjects are no longer relevant to any claim in the case. Such testimony or argument runs afoul of Rule 401. It also would be unduly prejudicial to Defendants, and represent a confusion of the issues, be unduly cumulative and a waste of time. In all these ways, such testimony or argument would violate Rule 403.

The *Mendez* case is illustrative of why Defendants have this concern. As in this case, the *Mendez* Court granted Defendants summary judgment as to any claim for impropriety in procuring the search warrant. 18 C 5560, Dkt. 610 at 12-32. And yet in opening statements and in his examinations of the two officers accused of using excessive force, Plaintiff's counsel devoted an undue amount of time to the procurement of the warrant. See, *e.g.*, Transcript from April 24, 2025, 1-11, 19-21, 23-24, 25-27

94

(asking Officer Joseph Cappello about the lack of connection to the Mendez family to the search warrant, the steps he had taken or failed to take to corroborate the informant's tip, and similar subjects). Indeed, more time was spent on that subject in the examination of the officers than was on their alleged use of excessive force in that case. These diversions also called for numerous sidebars to discuss these issues as they arose.

Similarly, Defendants are concerned Plaintiffs may attempt to contend it was improper for the Chicago Police Department to decide to employ SWAT officers in the first place. The decision to use SWAT was based on the information that known to the officers – that a felon could be in either of two residences, and he was believed to have two different guns. The decision to deploy SWAT is not in of itself a use of force, and there is no evidence or reasonable inference from the evidence that would suggest that underlying decision was unreasonable. To be clear, Defendants are not seeking to prevent Plaintiffs from arguing that the alleged use of certain weapons or tactics by the SWAT Officers Defendants was excessive under the circumstances. Rather, Defendants seek to prevent Plaintiffs from arguing that the very fact that SWAT Officers were called meant that the City overreacted. That is not an opinion reached by any police-practices expert in the case, and it is not a reasonable inference from the evidence.

**Motion in Limine No. 51: To Limit Counsel From Speaking To Press During Pendency Of Trial**

The case at bar has already been the subject of, or referred to in, a number of news stories. See, *e.g.*, https://www.chicagotribune.com/2018/11/09/federal-lawsuit-alleges-chicago-police-raided-wrong-home-terrorized-family/; https://www.chicagobusiness.com/crains-forum-police-misconduct/chicago-police-department-misconduct-cases-slow-reform-0; https://www.cbsnews.com/chicago/news/cbs-2-investigators-multiple-police-raids-gone-wrong-this-is-just-irresponsible/?intcid=CNM-00-10abd1h (last checked November 4, 2025). In each of these stories, defendants and their counsel have been unable to comment as a matter of City policy

and the journalists involved did little to depict the information reflecting defendants' position that they did not use unreasonable force and that the City did not have the alleged widespread practices, despite ample material supporting those positions available on the court docket. Defendants have thus been unfairly prejudiced by such pretrial publicity.

Against this backdrop, Defendants are concerned that the pattern will continue that Plaintiffs and their counsel will speak to the press early and often to seek favorable coverage while Defendants and their counsel will be unable to. This asymmetry will potentially taint the venire as one-sided stories about the case will almost certainly appear prior to jury selection. Any such press would be prejudicial to Defendants, could possibly influence the jury, and could diminish the pool of possibly unbiased jurors. And although the selected jurors will undoubtedly be admonished to not pay attention to media about the case, there still remains the danger that jurors may inadvertently be exposed to press coverage or a plaintiff's attorney holding a press conference in the lobby of the federal building.

Rule 3.6 of the Illinois Rules of Professional Conduct states:

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and would pose a serious and imminent threat to the fairness of an adjudicative proceeding in the matter.

With this in mind, Defendants respectfully request that at a minimum, counsel for all parties be barred from making extrajudicial statements about the case until a verdict is reached. In addition, Defendants further request that the parties themselves similarly be restrained from engaging in discussions about the case with the media.

**Motion in Limine No. 52: To Allow Defense Counsel To Point Out That Plaintiffs' Pattern Witnesses Are All Clients Of Plaintiffs' Counsel**

Defense counsel should be able to attack the credibility and sufficiency of Plaintiffs' pattern witnesses by establishing that they are all clients of Plaintiffs' counsel. Being clients of the same counsel as Plaintiffs' counsel gives them a financial incentive to side with Plaintiffs' counsel. The fact that

96

Plaintiffs' counsel has not been able to find a single independent witness who claims that Chicago Police officers used excessive force on a child in the six years prior to the incident, let alone a single witness who has proven that Chicago Police officers used excessive force on a child during that time frame.

When the subject arose at the *Mendez* trial, Plaintiffs' counsel argued that such questioning would potentially "open the door" to asking about settlements that the clients had received. Against the backdrop of numerous issues, defense counsel opted to refrain from asking about the relationship between the witnesses and Plaintiffs' counsel.

Defense counsel now asks the Court to weigh in on this topic, and to permit such questioning of Plaintiffs' pattern witnesses without the risk that Plaintiffs' counsel or the witnesses discussing any settlements that may have been attained.

**Motion in Limine No. 53: To Bar Evidence Unrelated to the Claims at Issue Here.**

Plaintiffs have listed multiple exhibits and witnesses that have no bearing on the underlying claims. Exhibits relating to the Safe Start Program and generalized search warrant training are not relevant to the *Monell* claim here, which revolves around whether the Defendant SWAT officers pointed guns at the Minor Plaintiffs. Defendants included specific objections in the Joint Pretrial Order relating to these exhibits and witnesses, but seek to expand on the objections slightly more in this motion. The SWAT team receives additional training and has additional policies relating to the service of high-risk search warrants. Accordingly, much of the evidence related to search warrants or other training, generally, is far too attenuated to be relevant here. Indeed, testimony from Aileen Robinson and Marlita White related to the Chicago Safe Start Program, and the exhibits associated with that, have very little to no relevance to the *Monell* claim here. This was a program that was discontinued due to the Federal government cutting off funding. The same rings true for the search warrant training conducted by former Commander Matt Cline. That training was geared towards

various tactical teams. While there is admittedly some relevance to this testimony and training, given the amount of other testimony and evidence related to these issues provided by other witnesses that is far more related to the SWAT defendants, Defendants submit that this evidence is cumulative, cause unnecessary lengthening of the trial, and could cause juror confusion.

WHEREFORE, Defendants respectfully request that this Honorable Court grant Defendant Officers' Motions *in Limine*, and for any other relief the Court deems just.

Respectfully submitted,

CITY OF CHICAGO,

By: /s/ *Marion C. Moore*
Chief Assistant Corporation Counsel

Marion C. Moore, Chief Assistant Corporation Counsel
Raoul Vertick Mowatt, Assistant Corporation Counsel Supervisor
Simerdeep Kaur, Assistant Corporation Counsel
City of Chicago, Department of Law
2 N. LaSalle Street, Suite 420
Chicago, Illinois 60602
312.744.5170
Atty No. 6302566
**Attorneys for Defendant City**

DEFENDANT OFFICERS,

By: /s/ *Larry S. Kowalczyk*
Assistant Corporation Counsel

Larry S. Kowalczyk, Special Assistant Corporation Counsel
Megan K. Monaghan, Special Assistant Corporation Counsel
Mohan Groble Scolaro P.C.
55 W. Monroe, Suite 1600
Chicago, IL 60603; (312) 422-9999
**Attorneys for Defendant Officers**

## CERTIFICATE OF SERVICE

       I hereby certify that on November 4, 2025, I electronically filed the foregoing Defendants' Joint Motions *in Limine* Nos. 1-53 with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to counsel of record.

                                        */s/ Larry S. Kowalczyk*