```
 1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
        EBONY TATE, et al.,            )  Case No. 18 C 7439
 4                                     )
                   Plaintiffs,         )
 5                                     )
           v.                          )
 6                                     )
        CITY OF CHICAGO, et al.,       )  Chicago, Illinois
 7                                     )  January 28, 2026
                   Defendants.         )  3:01 p.m.
 8

 9
              TRANSCRIPT OF PROCEEDING - FINAL PRETRIAL CONFERENCE
10               BEFORE THE HONORABLE JOHN J. THARP, JR.

11      APPEARANCES:

12      For the Plaintiffs:   THE LAW OFFICES OF AL HOFELD, JR., LLC
                              BY:  MR. AL HOFELD, JR.
13                                 MR. ZACHARY J. HOFELD
                              53 W. Jackson Boulevard, Suite 204
14                            Chicago, Illinois 60604

15                            CHAKA PATTERSON LAW, PLLC
                              BY:  MR. CHAKA M. PATTERSON
16                            220 Green Street, Suite 225
                              Chicago, Illinois 60607
17
                              ACTION INJURY LAW GROUP, LLC
18                            BY:  MR. ANDREW M. STROTH
                              1 S. Dearborn Street, Suite 1400
19                            Chicago, Illinois 60603

20                            THE LAW OFFICE OF JULIAN JOHNSON, LLC
                              BY:  MR. JULIAN M. JOHNSON
21                            125 S. Wacker Drive, Suite 300
                              Chicago, Illinois 60606
22

23

24

25
```

```
 1    APPEARANCES:   (Continued)

 2    For Defendant
      City of Chicago:        CITY OF CHICAGO, DEPARTMENT OF LAW
 3                            BY:  MS. MARION C. MOORE
                                   MR. RAOUL V. MOWATT
 4                                 MS. SIMERDEEP KAUR
                                   MR. MAXWELL E. LISY
 5                            2 N. LaSalle Street, Suite 420
                              Chicago, Illinois 60602
 6
      For Defendant
 7    Officers:              MOHAN GROBLE SCOLARO, P.C.
                             BY:  MR. LAWRENCE S. KOWALCZYK
 8                                MS. MEGAN K. MONAGHAN
                             55 W. Monroe Street, Suite 1600
 9                           Chicago, Illinois 60603

10

11    Also Present:          MR. THOMAS WALSH
                             MR. PATRICK JOHNSON
12

13

14

15

16

17

18

19

20    Court Reporter:        Laura LaCien, CSR, RMR, CRR
                             Official Court Reporter
21                           219 S. Dearborn Street, Room 2304A
                             Chicago, Illinois 60604
22                           Telephone:  (312) 408-5032
                             laura_lacien@ilnd.uscourts.gov
23
                                  *   *   *   *   *
24
                        PROCEEDINGS REPORTED BY STENOTYPE
25         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1      (Proceedings heard in open court:)

2          THE CLERK:  Calling 18 civil 7439, Tate, et al.,

3 versus City of Chicago, et al.

4          THE COURT:  All right.  Would -- good afternoon.

5 Let's have everybody put your appearances on the record,

6 please.

7          MR. A. HOFELD:  Good afternoon, your Honor.  Al

8 Hofeld, Junior, on behalf of the plaintiffs.

9          MR. Z. HOFELD:  Good afternoon, your Honor.  Zach

10 Hofeld for the plaintiffs.

11          MR. STROTH:  Good afternoon, your Honor.  Andrew

12 Stroth for the plaintiffs.

13          MR. PATTERSON:  Good afternoon, your Honor.  Chaka

14 Patterson for the plaintiffs.

15          MR. JOHNSON:  Good afternoon, your Honor.  Julian

16 Johnson for the plaintiffs.

17          THE COURT:  All right.  Defendants?

18          MS. MOORE:  Good afternoon, your Honor.  Marion Moore

19 on behalf of the City.

20          MS. KAUR:  Good afternoon.  Simerdeep Kaur on behalf

21 of the City.

22          MR. LISY:  Good afternoon, your Honor.  Maxwell Lisy,

23 L-i-s-y, on behalf of defendant City of Chicago.

24          MR. MOWATT:  Good afternoon, your Honor.  Raoul Mowatt

25 on behalf of the City.

1      MR. KOWALCZYK:  Good afternoon, Judge.  Larry

2  Kowalczyk on behalf of the individual defendant officers.

3      MS. MONAGHAN:  Good morning, your Honor -- or good

4  afternoon.  Megan Monaghan also for the defendant officers.

5      MR. WALSH:  Good afternoon, your Honor.  Thomas Walsh

6  and Patrick Johnson.  We're here because there's a motion to

7  compel Patrick Johnson to testify in this trial and we're told

8  that it might be heard this afternoon.

9      THE COURT:  It will be.  You had good information.

10      MR. WALSH:  Thank you.

11      THE COURT:  All right.  Good afternoon.  Feel free to

12  have a seat.

13      MR. WALSH:  Sure.

14      THE COURT:  All right.  Since Mr. Walsh and

15  Mr. Johnson are here, why don't we start with the motion

16  relating to the subpoena issued to Mr. Johnson.  Mr. Hofeld?

17      MR. A. HOFELD:  Good morning.

18      THE COURT:  It's your motion, right?

19      MR. A. HOFELD:  Yes, your Honor.

20      THE COURT:  You can start off.

21      MR. A. HOFELD:  Okay.  Very good.  Thank you.  I

22  appreciate it.

23      Your Honor, as we detail in the motion, I don't think

24  there's much question about the relevance and the high

25  probative value of multiple findings in the report for the

1     minor plaintiffs' Monell claim in this case.  Additionally,

2     Mr. Johnson has unique personal knowledge of the report and its

3     findings and the investigation having played -- maybe I --

4     having played a key role in the investigation here in Chicago

5     and in the writing of the report.  Certainly live witness

6     testimony is the far preferred method for conveying important

7     information at trial.

8            Additionally, there are -- you know, there are terms

9     of art used in the DOJ report -- in particular, in some of the

10    DOJ findings that plaintiffs seek to admit -- such as pattern

11    and practice, unreasonable force, and similar terms.  DOJ

12    uniquely conducts these kinds of investigations so Mr. Johnson

13    would be uniquely positioned to explain those terms.

14           And, finally, your Honor, in this case and at this

15    trial, the City of Chicago will be attacking the findings of

16    the DOJ report, their reliability, the basis for those

17    findings.  Their expert, their police practices expert Jeff

18    Noble attacks them in his report.  He's expected to do so at

19    trial.  Mr. Johnson is in a unique position to be able to

20    answer at least in general terms some of those attacks.  Our

21    expert, our police expert were he to be allowed to testify

22    about the DOJ report would not be able to explain and defend

23    the report in the same way that Mr. Johnson can.

24           And we think that Mr. Johnson would be able to do

25    those things without going much or at all below the surface of

1   the text of the report because he knows the report, he knows

2   the investigation.  He would be able to explain, you know, what

3   was done in the investigation.  The City says that the

4   findings, the conclusions of the investigation are not

5   supported.  I think he would be able to answer that.  And the

6   City critiques the methods and the data the report relies on.

7   Mr. Johnson would be able to address that.  And he would be

8   able to do all of these things without, as I said, going much

9   or at all below the surface of the text.  We certainly do not

10  want to and would not get into any work product privilege

11  issues.  We would steer completely clear of that.

12          And so I think these are all the reasons why his

13  testimony is critical to plaintiffs' Monell claim in this case

14  and I think the -- the relative burden on Mr. Johnson of

15  testifying is minimal given that he already knows the report

16  and the investigation that could come in without need for

17  spending a great deal of time on preparation and we could

18  elicit just the key findings from the report that are essential

19  to the plaintiffs' Monell claim here.  Thank you.

20          THE COURT:  All right.  Mr. Walsh, before I hear from

21  you, let me just confirm my suspicion as to what the

22  defendants' position is.

23          MS. MOORE:  As to this motion, you know, we -- the

24  City has already in many ways expressed its objections to the

25  DOJ report being entered into evidence.  Your Honor has already

1  ruled on some of those and obviously some of those are probably

2  going to be discussed more today.  And so obviously, we

3  maintain those objections and that would -- they would all

4  apply to his testimony.  And I don't really -- in terms of this

5  motion right here, I'm not really sure what Mr. Johnson is

6  going to offer if it's only going to be what's in the text of

7  the report.  If the report is coming in, then it can come in

8  through other witnesses and what I'm hearing is that plaintiff

9  intends to only ask questions about the report which

10  Mr. Johnson might be able to answer but then when I get up on

11  my cross-examination, that's when the objections are going to

12  start.

13       And so it's a little -- I feel like it's allowing what

14  plaintiffs want is getting their evidence in and then

15  preventing the defendants from being able to put up a defense

16  to the report.  Obviously, we would want to explore the exact

17  issues that our expert witness has with the report with this

18  witness if he's testifying.  So I guess those -- that's our

19  stance on this motion.  If he's going to testify, then we

20  obviously are going to want to be able to cross examine him.

21       THE COURT:  All right.  Mr. Walsh, what's

22  Mr. Johnson's position?

23       MR. WALSH:  First, Judge, the process before we get to

24  the question of whether he needs to testify, when -- anytime a

25  Department of Justice employee is subpoenaed, there's the Touhy

1    regulations that govern how we're supposed to process it.  We

2    went through that.  Mr. Hofeld submitted the relevancy

3    required -- relevancy statement required by the regulations.

4    Because this -- this report was issued out of -- basically out

5    of Main Justice out of the Civil Rights Division, we consulted

6    with them and we were not given permission for Mr. Johnson to

7    testify.  That said -- you, of course, can rule differently but

8    just so you know, the Department of Justice has declined

9    authorization for Mr. Johnson to testify.

10           Getting to the merits of it, though -- first of all, I

11    guess I should start by saying Mr. Johnson is tickled that he's

12    being painted as the primary author of this report.  It's

13    actually a product of about 20 or 25 lawyers and other

14    investigators and so he's not the primary author of it but he

15    is -- he certainly was involved with it.

16           If he were to testify, really all he could testify to

17    is what's in the report itself.  Anything else would be work

18    product and a lot of it would be something that he wouldn't

19    even know about because he was only one of 20 or 25 people

20    working on the investigation.  And if all he's going to do is

21    confirm that this was what the report says and that the report

22    was issued, that seems like something that is completely

23    unnecessary and it's going to lead to the problem the City, I

24    think, has just identified -- I hadn't even thought of that --

25    which is that if there was an attempt to go into what happened

1    behind the scenes or what people were thinking when they wrote

2    a particular section of the report, that's going to be work

3    product and we would object on privilege grounds.  And not only

4    that, Mr. Johnson probably won't remember exactly what went

5    into each section anyhow.  So that's our position and we leave

6    it up to you.

7            THE COURT:  All right.  Well, I think -- I think

8    Ms. Moore is right, there's some question as to what can come

9    in and what Mr. Johnson can do that I think have to be

10   answered.  Some content from the DOJ report I believe will be

11   admissible.  I think that's consistent with Seventh Circuit

12   precedent looking at other similar investigative reports in,

13   most notably, Cook County Jail.  The Seventh Circuit has looked

14   at the admissibility of that report and found that report in

15   that context, which is quite similar clearly to the context

16   here, to be admissible under 803(8).

17           I have -- I have some questions about what that means

18   exactly and that -- a resolution of those questions may prompt

19   Mr. Hofeld to reconsider whether he wants to call Mr. Johnson

20   particularly in light of the concerns that the City and the

21   individual defendants have raised about being able to fully

22   cross examine Mr. Johnson about the content of the report that

23   is admitted, assuming that some will be admitted.  So I think

24   we're going to have to figure that out before I can

25   definitively determine that Mr. Johnson should be -- the

1    subpoena that's been issued should be enforced as to

2    Mr. Johnson.

3            So that's where we go next, I think.  You're welcome

4    to observe the proceedings as we do that and reach some final

5    determination this afternoon I anticipate.  Alternatively,

6    you're not required to stay.  I understand your position so

7    I'll leave it up to you whether you want to stay for the

8    parsing of the DOJ report.

9            MR. WALSH:  It sounds fascinating but I think we'll

10   pass.

11           THE COURT:  However tickled Mr. Johnson is to be

12   identified as the author of the report.  All right.  I

13   appreciate your appearance here this afternoon.  We got to talk

14   in detail about what is going to happen with respect to this

15   report and a couple of other items so somebody will get back to

16   you.

17           MR. WALSH:  Thank you, your Honor.

18           THE COURT:  Okay.

19           MR. JOHNSON:  Thank you.

20           MR. A. HOFELD:  Thank you.

21           THE COURT:  All right.  Since we're on that subject

22   and we've started down that road, let's -- let's continue on

23   our merry way and we might as well start with the DOJ report,

24   though the resolution of some of the issues with respect to

25   that report might essentially resolve questions as to some

1    other items as well.

2         I denied the motion in limine as a motion in limine

3    and wanted the plaintiffs to identify specifically the content

4    of the report -- and I'm just going to talk about the context

5    of the DOJ report just right now -- the contents of that report

6    that you were seeking to admit, now maybe I should have

7    realized that that was a bit ambitious given the length of the

8    report and the formatting of the report but what the plaintiffs

9    provided isn't in my view adequate and I don't mean this

10   pejoratively at all.  I think plaintiffs made a good faith

11   effort to comply with the directions that I gave which perhaps

12   should have been more -- more detailed.  But what I was

13   anticipating was really a statement-by-statement identification

14   as to, you know, what content of the report you were looking to

15   admit.  Taking a step back from that, however, gets us into

16   some questions about the admissibility of the report.

17        As I have just indicated, I think the Seventh Circuit

18   in the *Dixon* case -- or the *Daniel* case, rather, is the one

19   that really sets it out and does the analysis suggest that a

20   report like this -- in *Daniel*, the reported issue was the DOJ

21   investigation of the Cook County Jail operations and Seventh

22   Circuit found that report to be admissible under 803(8).  But

23   in the analysis of that opinion which is, you know, lengthy and

24   thorough, what's not really dealt with is something that seems

25   clear to me needs to be dealt with or addressed in coming to a

1    determination of what can be presented, if anything, from those

2    reports is the multiple hearsay layer of the contents of that

3    report.

4           The report itself is -- reports, you know, findings,

5    conclusions by the participants in the process of conducting

6    that investigation but the report, you know, in discussing the

7    investigation and providing the foundation for the findings

8    that the participants -- or reflected in the report created by

9    the participants in that process, I mean, there is, you know,

10   rank hearsay.  You know, we heard stories upon stories upon

11   stories.  And with that, there's no way to judge whether those

12   stories are reliable or not.  And clearly stories that were

13   told by third parties to investigators are statements,

14   out-of-court statements that ultimately will be offered for the

15   truth and I understand your notice argument and we'll talk

16   about that as well --

17          MR. A. HOFELD:  Thanks, Judge.

18          THE COURT:  -- but I need to understand what, if any,

19   argument there is that allows us to disregard this hurdle of

20   Rule 805 and multiple levels of hearsay because it seems like

21   most and the substantial majority of, you know, the material

22   that's relied on is information -- or much of the material

23   relied on is information provided from -- by third parties

24   that, you know, sure looks like hearsay to me.  And if it is,

25   that would mean, okay, that foundational material doesn't come

1    in.  But what you're left with -- I think the problem you've

2    got at that point is what you got left are conclusions without

3    any identification of what the conclusions are based on, what

4    the findings are based on because the predicate for it were,

5    you know, all these interviews with third parties and people

6    who have, you know, encountered or been involved in the DOJ

7    investigative process in some fashion.

8           So I want to hear from the parties about that problem

9    and from the plaintiffs particularly -- and, you know, as I

10   said, you can raise your notice argument as well.  But I'm

11   not -- I'm not convinced that notice -- it may get you

12   part -- it may get you somewhere, but I don't think it gets you

13   to the wholesale introduction of the report.  And getting back

14   to what I opened with, you know, in terms of what I was

15   expecting, it's -- I didn't go through and do the math or add

16   up the pages but the pages in the, you know, 20-plus page range

17   for this finding, 12 pages for this finding, I didn't add them

18   up but I think that probably the number of pages that have been

19   identified are a significant majority of the entire report.  So

20   while I appreciate your efforts in trying to identify the

21   relevant content of the report as you did, it doesn't really

22   narrow the field much to go from 160 pages to 130 pages.

23          So with that, I'll hear from the plaintiffs first.

24          MR. A. HOFELD:  Sure.  Thank you, your Honor; and

25   understood.  I think that what we tried to do in -- on January

1 21st when we made the disclosure to the defendants was to

2 state -- either state very closely either to the text or to

3 paraphrase the findings as a series of propositions that we

4 want to admit and then we cited the page numbers.

5   What we can certainly do is go back and pull out the

6 direct quotes that articulate the findings, you know, for

7 pattern and practice, excessive force against children, you

8 know, that would be, you know, one or a couple of quotations

9 there.  The custom of failing to investigate complaints of

10 investigative force; that would be another one.  We can

11 certainly go back and quickly and do -- you know, and highlight

12 the exact text that we want.

13   It's certainly not our purpose to introduce into

14 evidence a lot of stuff about race or, you know, quotations

15 from people that were interviewed or, you know, any kind of

16 double or triple hearsay.  I think most of what we want to

17 admit, your Honor, are the findings, the findings of fact that

18 the report articulates which are -- which are not legal

19 conclusions and -- and which the Seventh Circuit has said in --

20 I think it's the *Beech* case that we cited in our papers, I can

21 find it -- you know, those kinds of conclusions of fact and

22 opinions that are expressed in a government investigative

23 report are admissible.  And so I think it's mostly that stuff,

24 not the stuff that's problematic from the standpoint of -- of

25 hearsay.

1      I would also say that -- yeah, it's *Beech Aircraft*

2  *Corp. versus Rainey* -- it's a U.S. Supreme Court case 488 U.S.

3  153 at 170 -- quote, portions of investigatory reports

4  otherwise admissible under the -- it's the 803(8) exception are

5  not inadmissible merely because they state a conclusion or an

6  opinion.  As long as the conclusion is based on a factual

7  investigation and satisfies the rule's trustworthiness

8  requirement, it should be admissible along with other -- along

9  with the other portions of the report, unquote.

10      I would say as your Honor -- as your Honor -- as your

11  Honor noted, we do believe that if not the quotations, at least

12  some of the anecdotes that are cited in the report as factual

13  bases for or as examples of the reports' findings, we do

14  believe those would be admissible -- not for the truth of the

15  matter asserted but they would be admissible as non-hearsay

16  under 801 as notice to the City that the reports' findings have

17  a basis in fact and are supported by the facts and -- yeah,

18  period.

19      And that would be true, for example, your Honor, with

20  respect to, you know, the major finding of the report that's

21  relevant to this Monell claim that officers had a pattern and

22  practice of using less lethal, excessive force against

23  children.  There are examples in the report, anecdotes

24  that -- yes, they're anecdotes -- that involve officers

25  pointing guns at children when it doesn't appear to be -- to

1    have been justified.  And there are other examples, not just

2    gun pointing at children but taser use, handcuffing, canines,

3    grabbing, choking, slamming, pulling someone off -- pulling a

4    kid off a bike and so on and so forth.

5         I think -- I think some of these would be admissible

6    just as notice that the DOJ's finding that they have a pattern

7    and practice -- that CPD had a pattern and practice of

8    excessive force against children has a basis in the facts and

9    in the data.

10        THE COURT:  How does that differ from the notice that

11   would be provided by the report absent those anecdotes which

12   were just exemplars as opposed to, you know, full-blown

13   independent --

14        MR. A. HOFELD:  Well, I mean, certainly -- right.  I

15   mean, certainly -- and I think -- the City -- you know, in this

16   case, the City has and the City's expert are criticizing the

17   DOJ report for not being based on facts.  And I think it's one

18   thing for a federal agency to tell a municipality, you know, in

19   the abstract you have this problem but it's another thing for

20   the agency, you know, to explain with facts and data what the

21   finding is based on and so that -- I mean, I think it makes a

22   supported finding.  You know, it has more -- more truth value,

23   more power, more impact than an unsupported finding and so I

24   think -- I think the findings are more relevant and more

25   probative if it's clear that they're based on facts.

1         THE COURT:  Well, I think that begs the question of,

2    you know, the hearsay problem is -- I mean, we don't know

3    the -- I mean, ultimately the investigation reaches a

4    determination and makes findings that the participants in that

5    process conclude are accurate and reliable based on the

6    information that they have obtained and reviewed in the course

7    of creating -- conducting the investigation and creating the

8    report but I -- I have trouble understanding how a -- an

9    anecdote which is used to illustrate a larger finding is

10   itself, you know, taken outside the realm of hearsay because

11   the report which outlines -- all right.  Here's an example of

12   what does not seem problematic to me as part of the content of

13   the DOJ report that could come into evidence would be what

14   happened, what was -- how did this report get created, who was

15   involved in it, what did they do and presumably somebody is

16   going to supply the answer to that question as we reviewed

17   complaint register files, we talked to 300 people, we talked to

18   officers, we talked to -- you know, whatever was done, that's

19   not hearsay.  That's just a description of the acts that were

20   done in the course of the investigation.  We know from that

21   that they did work and they've reached conclusions that, you

22   know, their -- they've reached their findings as to, you know,

23   excessive use of force, whatever other findings are set forth

24   in the report on that basis alone.

25        I have -- I have trouble seeing what the exemplars add

1    other than a lot of color and prejudice to the defendants who
2    have no way of contesting that out-of-court statement offered
3    for its truth.  They have no way to test for it.  No way to
4    cross examine that storyteller.  I don't mean that in a
5    pejorative way but that's -- the report itself uses the word
6    stories.  So I have some real difficulty with the idea that
7    that material can come in outside of 803(8) or outside of any
8    aspect of the hearsay rules for, you know, purposes of
9    providing notice to the City.
10           I mean, you got a DOJ investigation going on that
11   produces 160-page report that, if nothing else, explains what
12   they did.  If that doesn't put the City on notice, I'm not sure
13   what would and I'm not sure what incrementally these anecdotes
14   do.  But put side -- and put aside the anecdotes, you know,
15   the -- there are not just anecdotes but there are, you know,
16   wholesale descriptions of the accounts of people that were
17   spoken to and interviewed that offers, you know, very broad
18   brush amalgamations of the content of those stories.
19           Maybe everyone who they interviewed -- maybe every
20   single person they interviewed told them, you know, about some
21   egregious conduct by a police officer but we don't -- we don't
22   know that and I'm certainly -- it's not a criticism of the
23   report that -- you know, all of that detail is not put in the
24   report by itself but it doesn't allow for us to really assess
25   the reliability of the report when it's based on these

1    third-party -- based to some material level on these

2    third-party statements.

3         You know, I mentioned the *Daniel* case.  You know, that

4    talks -- to the extent it talks about this problem, it does

5    seem to acknowledge that you can't just put into evidence, you

6    know, essentially a transcript of what somebody said in an

7    interview just because that gets incorporated into an official

8    investigative file.  That makes sense to me.  That seems

9    consistent with Rule 805, the double hearsay rule.  But

10   nevertheless, the Seventh Circuit in *Daniel* found the

11   third-party statements to be admissible under the statute --

12   under the hearsay rule and I think -- you know, which suggest

13   to some degree that where third-party hearsay is part of the

14   evidence on which the investigative findings are based, to the

15   extent that they're relied on by the investigators, you know,

16   we have to take that into account.  But I don't -- I don't

17   think that means that you can just take anecdotes out of a

18   report and, you know, offer them up as evidence of the truth of

19   the contents of the report so I have -- I have obviously a

20   problem with that.  And what I -- what I think you've got to do

21   is you've got to do what I anticipated and intended for you to

22   do in the first place which was to go through and literally

23   whatever statement you're seeking to admit out of that report,

24   you're going -- you need to identify it.

25        MR. A. HOFELD:  Okay.

1       THE COURT:  I'll give you an example of, you

2  know -- well, I don't know if it's necessary.  I mean, we

3  went -- take a big gang case where you've got a lot of

4  co-conspirator statements going on but, you know, my practice

5  is to make the government identify every single individual

6  statement that they're going to try to admit into evidence

7  under the co-conspiracy theory or rule.  You want the content

8  of the -- or some of the content of the DOJ report, you've got

9  to identify the content specifically that you want to give the

10 defendants an opportunity to object.  And I would suggest so

11 that you don't spend unnecessary time doing it and defendants

12 don't spend unnecessary time responding to it that you use a

13 very fine-tooth comb in determining what you can put in.  You

14 know, again, I denied the motion in limine.  I'm still -- as a

15 motion in limine, I'm still going to deny it as a motion in

16 limine.  The process -- this is the process that will be

17 necessary to introduce it at trial so I want this process to

18 take place and you're going to need to explain how this comes

19 in.

20       The other issue that I have on the -- on this topic

21 is, you know, Ms. Moore you talked about, you know, you're

22 going to want to cross examine Mr. Johnson.  As I think about

23 it -- I mean, I understand it on one level and it's your case,

24 your defense, but I'm -- I'm not sure that that wouldn't open

25 the door further to come back and say, well, they've now

 1  challenged the reliability of this report so, you know, we do

 2  need leeway to go further than you let us go as an initial

 3  matter, Judge, so I think you need to think about that.  You

 4  can't do it in a vacuum.  You need to see exactly what they've

 5  proposed but I think that's something to be aware of as well.

 6         So in terms of timing -- today is Wednesday at a

 7  quarter to 4:00 -- at what point does this become an issue,

 8  Mr. Hofeld, in terms of the presentation of your case?

 9         MR. A. HOFELD:  I mean, if permitted, your Honor, we

10  would like to reference, you know, a couple of the findings in

11  opening and then I think probably during the first week of

12  trial we would -- we would want to be able to present some of

13  the findings.

14         THE COURT:  All right.  Then you need to get the

15  redacted, filtered collection of statements to the defendants

16  by close of business tomorrow.

17         MR. A. HOFELD:  Okay.

18         THE COURT:  Defendants can get your responses back to

19  me by -- get them back to me by close of business on Monday.

20  If we have to open before then, it will be up to you whether

21  you want to roll the dice about something that hasn't been

22  definitively admitted.  But when I get them on Monday, I'll try

23  to go through them on Monday.  I'll try to go through them --

24  not if I don't get them until Monday.

25         MS. MOORE:  Your Honor --

1      THE COURT:  Get them to me by 9:00 a.m. on Monday and

2   I'll do what I can.

3      MR. A. HOFELD:  And did you want us to file something,

4   Judge, by tomorrow or just provide the statements to --

5      THE COURT:  Provide them to the defendant.

6      MR. A. HOFELD:  To the defense, okay.

7      MS. MOORE:  And just to make things a little I think

8   easier for everyone, if plaintiffs when they identify for us by

9   tomorrow which ones they might want to use in opening, we can

10  prioritize responding to those and we can try to get that

11  portion at least on file by Friday to give your Honor more time

12  and then we can do the rest on Monday.

13     THE COURT:  That would be helpful.

14     MR. A. HOFELD:  Great.

15     THE COURT:  All right.  Now adding to that, I think

16  the same issues pertain to the PATF --

17     MR. A. HOFELD:  Okay.

18     THE COURT:  -- so whatever you want from that needs to

19  be included.

20     MR. A. HOFELD:  Okay, Judge.

21     THE COURT:  All right.  Now following from that, I

22  think if I'm understanding correctly, there were no media

23  reports that were submitted so I take that to mean you're not

24  introducing those.

25     MR. A. HOFELD:  The -- yes.  The media -- the

1  statements and news stories by former Superintendent Johnson,

2  the former Mayor Lightfoot from 2020, yeah, that's correct,

3  your Honor, we're not seeking to admit.

4       THE COURT:  All right.  And you had also represented

5  in the motions in limine that the -- you're not seeking to

6  admit anything from the OIG reports.

7       MR. A. HOFELD:  Not from the OIG reports that deal

8  with search warrant practices.  We agree that that issue is off

9  the table based on the summary judgment ruling on the invalid

10 warrant claim.  There was one ambiguity -- I should have

11 mentioned something.  There is an OIG report that deals with

12 the infrequency with which COPA and IPRA used the affidavit

13 override procedure and that study is squarely within the Monell

14 period in this case.  That was the one OIG report that -- that

15 we do -- that our expert relies on and we might or he might

16 want to mention something about that.  I understood that to be

17 accepted from your Honor's ruling but I don't -- I also don't

18 think that was explicit, so.

19      THE COURT:  All right.  Well, that doesn't sound like

20 something that's of immediate import so if you decide you're

21 going to offer something like that, raise it at that time.

22      MR. A. HOFELD:  Okay.

23      MS. MOORE:  If we are -- if they -- I did understand

24 your Honor's ruling to be -- or the discussion, I should say,

25 as to the IOG reports to mean all of them that were mentioned.

1    If plaintiff --

2             THE COURT:  Well, I think I remember there was -- it

3    was phrased as I think there are three OIG reports.  I don't

4    know if that's -- it would include this one or if -- exclude

5    this one.

6             MS. MOORE:  I believe it -- the three total I think

7    would include it.  That was my understanding that it was all of

8    them.  But if now the affidavit override is back in play, I

9    think we might have to go through a similar type of process

10   with the report.

11            THE COURT:  Well, certainly we -- we would need to go

12   through that report.  The affidavit override process is in

13   play.

14            MS. MOORE:  Oh, yes.  Yes.  Yes.  I -- correct.  That

15   is definitely a part of this lawsuit but there is an OIG report

16   regarding the affidavit override process which after our

17   pretrial conference -- one of them, one of the pretrial

18   conferences before, I was of the understanding that the -- that

19   report was no longer going to be offered.  Now it sounds like

20   it is.  And so that similarly is a whole report's worth of

21   information that I think we would need to know what exactly

22   they --

23            THE COURT:  Yes, yes.  But that -- that can wait until

24   you've made a determination whether you're going to pursue

25   that.  And if and when you do -- well, you need to do so within

1    the context of the time frame that gives the defendants an

2    adequate time to respond.

3          MR. A. HOFELD:  Okay.

4          THE COURT:  Okay.  So then let's turn to the related

5    issue of testimony of Emanuel, Lightfoot, Ferguson, Johnson.

6    If I'm understanding correctly, Mr. Hofeld, what you've -- the

7    information that you indicated for Mr. Emanuel is the remarks

8    in the City Council from 2015, remarks on WTTW the day after,

9    and a video of those remarks, those taken -- I think these are

10   December of 2015 -- and that's it?

11         MR. A. HOFELD:  That's correct, your Honor.  And

12   only -- not the entire speech, not the entire interview, just

13   the statements relative to a general code of silence.

14         THE COURT:  All right.

15         MR. A. HOFELD:  And yeah, there's -- there are a

16   couple of related statements but basically it's the focus on

17   the code of silence.

18         MS. MOORE:  As we said in the motion, you know,

19   we're -- the statements happened.  We know what they are.  We

20   have transcripts of them.  There's a video of them.  There

21   are -- at the statement as a whole, I mean, hearing that it

22   might only be part of that, that might lessen some of our

23   objections because obviously the whole statement, it goes into

24   the Laquan McDonald shooting, all of that, and that is largely

25   what we have a problem with.  If the statement is -- I don't

1   want to say edited but redacted as such that only certain

2   things are in there, we might have less of a problem.

3   Obviously, I think that might have to be a kind of back and

4   forth counter-designation because in the City's opinion, there

5   are explanations for the state -- for certain of Mayor Emanuel

6   statements as to the code of silence.  You know, they're more

7   generalized.  That is kind of explained later on in the

8   statement and so I think it would have to be a kind of working

9   together to come up with something that works.

10         But we would -- if this statement is coming into play,

11  then I -- you know, I think we could work out a stipulation as

12  to the statement.  Obviously as we argued in our motion, it's a

13  political speech.  It by no means explicitly admits anything.

14  He's talking about generalized conduct and we -- like, Judge

15  Valderrama found in *Mendez*, it's just kind of this vague

16  statement regarding to a generalized code of silence.

17         So we don't think it has the evidentiary weight that

18  plaintiffs are saying it does; but to the extent it's coming

19  in, we're not going to object to the foundation.  He doesn't

20  need to come in and say that he said those statements -- he

21  did.  We -- we have the transcript of them and we stipulate to

22  when he said it, that this was the contents of it.  If they

23  want a transcript with certain portions of it, we can do that.

24  But I think if the statement is coming in, there are a lot of

25  ways for the fact that the statement was made and what was

1   actually said to come in without having former Mayor Emanuel

2   come in to testify about them and that's pretty much our

3   position on former Mayor Emanuel.

4        THE COURT:  All right.  Well, as I said previously,

5   the mayor put himself in play with those comments.  I'm not

6   going to bar him from being called to -- for questioning about

7   those comments.  You'll obviously have your opportunity to

8   cross.  And again, with respect to the specific statements at

9   issue, you know, we need to have clarity about -- I want you to

10  try to come to an agreement about what is fair game, what's not

11  fair game with respect to those comments.

12       MR. KOWALCZYK:  Your Honor, just for the record, could

13  I add we joined the motion as to barring all of the mayors and

14  that and just referencing from the officer perspective, we had

15  joined in the motion to bifurcate.  Our main focus was the

16  prejudice to the officers.  And just noting it for the record

17  our -- our specific issue is the prejudice that causes the

18  individual officers who are in a, you know, underlying

19  incident, a very small slice of this and then, for lack of a

20  better word, parading in former mayors and that creating

21  something that could result in prejudice to them, I want it

22  just noted for the record then.

23       THE COURT:  All right.  That is noted.

24       MR. KOWALCZYK:  Thank you, sir.

25       THE COURT:  Okay.  All right.  Former Mayor Lightfoot

1   and Mr. Johnson, it's not clear to me from the submissions

2   what, if any, statements you're seeking to admit.

3           MR. A. HOFELD:  Thank you, your Honor.  Well, with

4   respect to former Mayor Lightfoot and former Inspector General

5   Ferguson, I think our -- we -- if we don't call Lightfoot or

6   Ferguson, then we have to call -- first of all, this all --

7   they relate to the PATF; okay.  One of them would be the most

8   efficient way to present the PATF to the jury.  If we don't

9   call one of them, then we have to call at least two witnesses

10  to cover the various sections of the PATF where there are

11  findings that are relevant to our Monell claim.  By calling one

12  witness who had knowledge of the overall investigation involved

13  in the drafting of the entire report, it would be a much more

14  efficient presentation of the PTF findings and the

15  investigation that preceded them.  And certainly of the two,

16  Lightfoot -- it's clear from the public record from her

17  involvement in the report and the investigation -- has the

18  deepest personal knowledge of the PATF.

19          Second, your Honor, we need -- we have to call

20  witnesses because it's the same thing with the DOJ report.

21  The City in this case is in the position of attacking the

22  reliability, the methodology, the bases or lack thereof of the

23  findings in the PATF report so someone with personal

24  knowledge -- with personal knowledge of the report has been

25  made necessary, someone who can explain and address some of

1    these attacks from the City.

2         Also -- yeah.  So those are the reasons -- those are,

3    I think, the main reasons why we need someone -- why we

4    want to -- we want to have a single witness on the PATF who can

5    cover the entire report efficiently, who can explain -- who can

6    explain it, defend -- defend it against the City's attacks.

7    And if -- also, if we have a quote/unquote -- and I don't mean

8    this to sound pejorative at all, but if we have a lower-level

9    PATF witness, then that person will certainly be exposed to

10   cross-examination about what they, you know, don't know about

11   the report or the investigation and whereas if we are able to

12   call Ms. Lightfoot or Mr. Ferguson, again they have -- they

13   have personal knowledge of the entire report and investigation

14   and all of its findings and they, you know, can stand up under

15   cross-examination.

16        THE COURT:  The other issue that isn't really there

17   with respect to Mr. Emanuel but is here is the disclosure issue

18   that the defendants have raised with respect to Ms. Lightfoot

19   or Mr. Ferguson as witnesses that the defendant intended to

20   call.  Why should we continue to go down that path when -- I

21   mean, their involvement in the PATF process is obviously

22   nothing new.  It's well known.  They weren't identified as PATF

23   witnesses.  Had they been so identified, the defendants may

24   well have pursued depositions of one or both of them to see

25   exactly what they had to say about the PATF.  That wasn't done.

1    They weren't disclosed until much more recently.  Why do

2    you -- why does not come home to roost?

3            MR. A. HOFELD:  Sure.  Judge, I think it's -- as we

4    point out in the motion, I think it's very clear from the

5    language of our pretrial disclosure of PATF witnesses and

6    similar language in our Rule 26 disclosures going back to the

7    beginning of discovery that we said, you know, one of these

8    named -- one of these named individuals, quote, or another

9    available member of the City's Police Accountability Task

10   Force -- or another available former member of the City's

11   Police Accountability Task Force and I think clearly and based

12   on the, you know, plain text and the meaning of that, you know,

13   it encompasses Ms. Lightfoot, Mr. Ferguson, and others.  And I

14   think -- I mean, you know, we've cited cases in our response in

15   similar circumstances where a witness or witnesses were, if not

16   disclosed in the pretrial order by name, they were certainly

17   logically included within the pretrial disclosure and were

18   allowed to testify especially when, you know, it makes sense in

19   terms of judicial economy to have either Lightfoot or Ferguson

20   be the one witness who can testify efficiently about the entire

21   report and all of the findings.

22           So I would -- in short, your Honor, I would say that

23   Lightfoot and Ferguson were included in the pretrial

24   disclosure.  And, you know, the way it's worded -- the way it

25   was worded in our Rule 26 disclosures, it clearly always

1    included them, contemplated them.  There's no -- you know,

2    there's -- if there's a -- if there's a technical issue with

3    that kind of disclosure, it's certainly harmless here because,

4    as you said, the City has always known, everybody has always

5    known that Ms. Lightfoot was the PATF, led the process, held

6    all the meetings, drafted and approved the report.  It's no

7    surprise to anyone and so, you know, there's -- there would be

8    no prejudice from her coming in and briefly -- briefly talking

9    about the report, the process, and the findings.

10             THE COURT:  If you needed to know the specific

11   witness, why didn't you follow up on their disclosures?  They

12   reserved --

13             MS. MOORE:  Because --

14             THE COURT:  You know, they identified the subject

15   matter.  They should have identified a particular witness that

16   they contemplated calling.  Understanding that, you could have

17   said who is this witness going to be, we might want to depose

18   them.

19             MS. MOORE:  Because they did specifically name

20   witnesses.  They named I think four or five witnesses from the

21   PATF.  That, you know, is reasonable to assume that those would

22   be the witnesses who they would be calling.  This catch-all,

23   anyone else involved, that doesn't put us on any notice

24   whatsoever.

25             THE COURT:  Did you depose any of the individuals who

1       were identified?

2               MS. MOORE:  No, we didn't.  The issue is -- to be

3       completely frank, your Honor, more so that if Ms. Lightfoot was

4       disclosed and Mr. Ferguson were disclosed as witnesses to

5       testify about this, we would have engaged in motion practice

6       about it at the time.  This case was heavily litigated and

7       there were 30(b)(6) notices about all of this.  We -- we

8       litigated so much over depositions in this matter and in

9       narrowing it down and not related to the Monell claim and if at

10      any point -- you know, Ms. Lightfoot was mayor at the time that

11      most of the discovery in this case took place.  And if she was

12      disclosed as their PATF witness, we would have filed a motion

13      about it then.  There would have been litigation about it then.

14              And -- and that actually does remind me of something

15      in terms of Emanuel.  It's a similar disclosure problem -- I

16      know your Honor has ruled but he wasn't disclosed as a witness;

17      this statement was.  And so the way things are disclosed has a

18      meaning for the City in terms of how the City is going to

19      defend the case and what motions the City is going to bring and

20      not bring during the discovery period.

21              And so if these witnesses were disclosed as such at

22      the time in the 26(a) disclosures, we would have filed a motion

23      about it and so that's where a lot of the prejudice comes in

24      here.  It wasn't until just very recently, not even in the

25      pretrial order -- Ms. Lightfoot is not even listed as a witness

1  in the pretrial order nor is Joe Ferguson.  It's not until, I

2  don't know, within the past week or two that we're being told

3  well, we want to bring these people in for this matter.

4      You know, I -- it does prejudice the City to -- to not

5  have been able to litigate this issue.  Plaintiffs knew -- I

6  agree, we all knew Ms. Lightfoot was involved in the PATF.  In

7  other cases, she was listed as a witness and the City did file

8  a motion about it.  And so it's just this kind of surprise at

9  trial for it to be Ms. Lightfoot and Mr. Ferguson when they

10  were disclosed actually in other ways on the 26(a)'s but not as

11  to this and other witnesses were disclosed as to the PATF

12  report.

13      And if I can just respond to some of the other

14  arguments made by plaintiffs' counsel -- and if you would like

15  me to do that now, I can.  I can also wait.

16      THE COURT:  Go ahead.

17      MS. MOORE:  In terms of Lightfoot and/or Ferguson

18  being the most efficient witness, that -- that's not

19  necessarily the case.  The plaintiffs in what they have

20  identified so far is what they want to put forth from the PATF.

21  It is within these specific areas of findings and the people

22  who are going to have that specific knowledge are the people

23  who worked on that portion -- on those portions of the report

24  and those are the people who plaintiffs identified in their

25  26(a) disclosures.

1       Ms. Lightfoot was chair of the whole thing but

2  she -- she is not going to have deep personal knowledge of

3  every aspect of the report and she did not work on the aspects

4  of the report that plaintiffs are trying to bring in.  And that

5  is actually the same with Mr. Ferguson.  Mr. Ferguson actually

6  was the OIG at the time, the current OIG and had to recuse

7  himself from portions of the investigation and of the report

8  and that is noted, I think, in the text of the report.  So the

9  two of them are by no means the best witness to come in and

10  talk about the statements that have been identified by

11  plaintiff.

12      And with their argument and their response that they

13  would have to call two witnesses because it's two sections of

14  the report, I mean, frankly they've listed a hundred witnesses

15  already on the pretrial order so I'm a little confused by that

16  argument that now it's suddenly a big deal to bring in two

17  different witnesses.  And, you know, I think once we have more

18  clarity on which portions of the report are actually coming in,

19  I'm not sure that it actually will have to be two witnesses,

20  so.

21      THE COURT:  Okay.

22      MR. A. HOFELD:  Your Honor, can I respond briefly?

23      THE COURT:  Very briefly.

24      MR. A. HOFELD:  I appreciate it.  So we have to have a

25  PATF witness because the City refuses to stipulate to the

1   admissibility.  So we have to have a -- we have to have a

2   witness who can talk about the PATF.  Everybody knows Lori

3   Lightfoot was the architect of the PATF.  She was appointed by

4   the mayor.  She reviewed, approved the entire report.  If

5   there's a section here or a section there where she wasn't --

6   you know, she doesn't know detail, she can still talk about the

7   findings.  She can talk about the -- the investigation that was

8   done, the process that was done in a way that no one else can.

9   And as your Honor noted, they didn't depose any of the named

10  PATF witnesses that we disclosed.  If we had disclosed

11  Lightfoot or Ferguson by name, they wouldn't have deposed them

12  either.  The only litigation that could have been had at that

13  time during discovery would be a motion for protective order

14  based on the Apex Doctrine.  And certainly if she was the mayor

15  at the time and Mr. Ferguson was the -- was the inspector

16  general at the time, their deps wouldn't have been permitted

17  but it's a whole different ball game when you get to trial and

18  the Apex Doctrine doesn't, you know, bar them and especially

19  now because they're former officials.  They're not current

20  officials.  So she is the -- she is -- she is by far the most

21  efficient PATF witness to present the PATF through.  And, you

22  know, when the City attacks the PATF on cross-examination,

23  we -- you know, we need to have a witness who can answer their

24  attacks.  Lightfoot can do that.

25          THE COURT:  Well, I think the -- the time to identify

1   Ms. Lightfoot as a witness has come and gone.  I'm particularly

2   persuaded by the fact that there were other PATF witnesses

3   identified in the disclosures other than Ms. Lightfoot or

4   Mr. Ferguson.  You don't get to just identify subject matter or

5   have a catch-all, you know, anybody else that we find has

6   relevant information about this -- this particular topic.  The

7   disclosure rules are there for a reason.  People knowledgeable

8   about the PATF presumably were identified by the plaintiffs and

9   they're the ones who are going to have to carry the water in

10  terms of whatever evidence you're seeking to admit relating to

11  the PATF which, subject to the process that we've talked about,

12  has yet to be fully finally determined.

13          So out of that group of four or five that have been

14  disclosed depending on what is deemed admissible from the PATF,

15  you can determine who you need to call out of that group but it

16  won't be Ms. Lightfoot or Mr. Ferguson.

17          That leaves Mr. Johnson, and I saw nothing relating to

18  any statements by Mr. Johnson.  Am I safe in assuming he's not

19  going to be called?

20          MR. A. HOFELD:  He's not -- no.  We do not plan to

21  call former Superintendent Johnson, your Honor.

22          THE COURT:  All right.  Then we don't need to talk

23  about him anymore.  Okay.

24          Then I think that covers the three motions that were

25  pending.  We'll issue an order with respect to those motions

1  that will advise Mr. Johnson with respect to that motion that a

2  determination has not yet been made as to the content that will

3  be admitted from the DOJ report and therefore -- he has not

4  already been subpoenaed.  You're seeking an order --

5          MR. A. HOFELD:  We did serve him with a subpoena, your

6  Honor --

7          THE COURT:  Okay.  All right.

8          MR. A. HOFELD:  -- back in November.

9          THE COURT:  So I'll indicate the subpoena is still in

10 force but that he'll be -- there will be further information

11 about what, if anything, is going to be admitted from the DOJ

12 report.

13         MR. A. HOFELD:  Okay.

14         THE COURT:  Okay.  Is there anything else substantive?

15 I've got some logistical -- oh, okay.

16         We sent you the amalgamation of the voir dire requests

17 that were submitted; and based on those requests, we've got a

18 questionnaire that you received.  Anybody have issues or things

19 you think you just got to know?  Keeping in mind, you know, if

20 somebody says "yeah, I own a cache of AK-47s in my home," there

21 will be follow-up questions so, you know, that's -- that's

22 explanation for why, you know, many of the specific questions

23 that you've asked are not necessarily put into the

24 questionnaire.  The questionnaire -- the theory here is that

25 the questionnaire would identify people that there needs to be

1    particular follow up on an issue and we'll do that.  That

2    doesn't mean that I anticipate everyone will be subject to

3    follow up.  Somebody who basically says I've lived in a shell

4    and don't have any hobbies and never worked for the government

5    and, you know, blah, blah, blah, there may be very little, if

6    anything, to follow up on.  But the purpose of the

7    questionnaire is not to be itself the exhaustive vehicle of

8    getting information from people.  It's to identify areas that

9    we need to follow up on and get further information.

10           So with that, anybody have any issues you want to

11   raise with respect to the questionnaire?

12           MR. A. HOFELD:  Not from plaintiffs I don't think,

13   your Honor.  Thank you.

14           THE COURT:  All right.

15           MR. KOWALCZYK:  None from defendants.  Your Honor,

16   will we get a couple copies for the table once those are --

17           THE COURT:  Yeah.  What we'll -- the jurors report I

18   think at 8:00 o'clock or between 8:00 and 9:00 to the jury

19   assembly room and they will be given this cover letter and the

20   questionnaire.  They fill the questionnaires out in the jury

21   room.  When all the jurors have filled out their

22   questionnaires, we will make copies as quickly as we can,

23   multiple copies for both sides -- for the Court as well -- and

24   we'll get those to you as quickly as we can.  There will be a

25   very short period that I'll give you to at least get started on

1     looking through them but -- and then we'll bring the jurors,

2     the venire up, sit them in numerical order one through however

3     many we've got.  And, as I think we put in the email, there are

4     some general questions that are not on the jury questionnaire

5     that I'll ask them as a group.  Those are just juror

6     qualification questions.  Then we'll start calling individual

7     jurors up by number for follow up.

8          The jurors will have the ability to go to sidebar with

9     the headphones.  Everybody familiar with that?  One of the few

10    technology things that works great here.  So some of their

11    follow up for some of them will be, you know, at sidebar.

12         And as we go through, we're going to be a little fluid

13    here from the standpoint of the jury is going to consist of the

14    eight lowest-numbered jurors.  And along with the

15    questionnaires, you'll get a list of the jurors by number that

16    also provides some very basic employment information.  But once

17    we've gone -- well, let me take a step back.  So the jury will

18    consist of the eight lowest-numbered unstruck jurors.  That

19    means at a minimum we've got to interview eight people.  Each

20    side has three peremptories so that's six additional jurors

21    that could be struck.  Eight and six is 14.  Let's say -- try

22    to keep the math easy that there were six challenges for cause,

23    that would take it up to 20.  Civil case, we don't have

24    alternates.  So when it comes time to exercise your peremptory

25    challenges, there would be no point in striking juror number 21

1    because there's no way that juror 21 could ever be one of the

2    lowest eight jurors because you got eight jurors, three

3    peremptories per side is 14.  Six challenges for cause would

4    get you 20.  Anybody above that will mathematically never be

5    one of the eight lowest jurors.

6            So if -- let's say we go through ten jurors and if I

7    think that in that group of ten jurors there's three that might

8    be challenges for cause, we may interrupt the process and hear

9    any challenges for cause as to those ten people before we then

10   resume follow up.  The idea being, so if we get to a point

11   where it looks like we've got more than 20 people or more

12   people than we are going to need given the likely challenges

13   for cause, we may stop the process there as opposed to

14   interviewing all 40 people that come in here.  We might -- you

15   know, again depending on how many challenges for cause get

16   granted, it might not be necessary to do more than 18 or 20 or

17   24.

18           So I may at some point as we go through here if we

19   get -- well, either way.  I may interrupt the process to say,

20   okay, let's talk about challenges for cause for the people that

21   we've gotten to and I'll entertain challenges for cause at that

22   point and then we'll have a better sense of where we can stop

23   with the process as opposed to interviewing 40 people and then,

24   you know, half of whom in all likelihood aren't going to

25   realistically be eligible to be on the jury.  Sorry if that's

1    not very clear.

2              MS. MOORE:  Makes sense.

3              THE COURT:  Okay.  So hopefully we will be able to get

4    that process done by early afternoon and still have time to do

5    two hours of openings.  If we don't -- if -- if we don't go

6    that quickly, I still would anticipate that we would finish

7    jury selection on the first day but I won't split up the

8    openings.  So you won't go on Monday and you Tuesday morning.

9    If we're in that situation, we'll call it a day on Monday and

10   start with opening statements on Tuesday morning.

11             Let me see here.  I just wanted to read this to you.

12   Having looked at your respective statements of the case, I

13   drafted my own which is briefer than either of yours.

14   Certainly briefer than the plaintiffs which was a little

15   argumentative shall we say.

16             So what I'm going to tell the jury about the case is

17   as follows:  In this case, plaintiffs Ebony Tate, for herself

18   and on behalf of Legend Booth, LaKai'ya Booth, E'Monie Booth,

19   and La'Niya Booth, and Cynthia Eason, bring this case against

20   defendants City of Chicago, Patrick Boyle, Andrew Cuomo,

21   Matthew Evans, Michael Higgins, Eric James, Patrick Kennedy,

22   Evan Kilponen, Nicholas Linker, Ricardo Lopez, Ryan McCallum,

23   Michael Pantano, Pachara Santisuk --

24             How do you say --

25             MR. KOWALCZYK:  Santisuk.

1          THE COURT:  One more time.

2          MR. KOWALCZYK:  Santisuk.

3          THE COURT:  -- Santisuk -- I wasn't even close -- and

4    Marco Zenere based on events that occurred at the plaintiffs'

5    apartment at 5033 South Hermitage on August 9th, 2018.

6          Plaintiffs claim that the defendant officers used

7    unreasonable force in their execution of a search warrant at

8    their home and that in doing so, the defendants violated their

9    civil rights and state law and caused damages.  Plaintiffs

10   further claim that the conduct of the defendant officers was

11   the product of policies -- was the product of policies of the

12   City of Chicago.  I neglected to put in the sentence that says

13   the defendants deny that they are liable to any of the

14   plaintiffs.  And then based on that brief description, does

15   anyone think they know anything about the case.

16         Any objections to that statement of the case?

17         MR. A. HOFELD:  No objections, your Honor, for

18   plaintiffs.  Thank you.

19         MS. MOORE:  No objection from the defendants.

20         THE COURT:  Okay.

21         MR. A. HOFELD:  One technical thing, your Honor.  Two

22   of the -- there were four children on the incident date.  Two

23   of them are now no longer minors.  That would be E'Monie and

24   La'Niya Booth so I think --

25         THE COURT:  She's not -- she's no longer

1    representing her.

2         MR. A. HOFELD:  Exactly.  And we should probably -- to

3    cross I's and dot T's, we should probably amend the complaint

4    in that one respect which we can certainly do.

5         THE COURT:  Okay.  Assuming the defendants have no

6    problem with that.

7         MR. KOWALCZYK:  I think they can amend it on its face.

8    It's a 40-page complaint.

9         THE COURT:  Yeah.  I don't know that we need to file a

10   new document --

11        MR. A. HOFELD:  Okay.

12        THE COURT:  -- that reflects that, but we'll grant

13   your oral motion to amend the complaint to reflect that E'Monie

14   Booth and La'Niya Booth are no longer minors and therefore that

15   their mother Ebony Tate is no longer acting on their behalf.

16        Okay.  So hopefully nobody has heard about the case

17   but we'll address that if they have.  Then we'll introduce

18   counsel and whoever you're going to have in the courtroom in

19   terms of your clients or your clients.  Then I'm going to read

20   the witness list which will be a riveting process full of drama

21   and whatever but we'll get -- we'll get through it.  And

22   I'll -- I'll stop along the way to not force people to try to

23   remember 100 names if they thought there was somebody that they

24   might know, but.  So we'll read the witness list to see if they

25   know anybody or think they know anybody, then I will give them

1    some basic principles of law that apply -- they're the judges

2    of the facts, that kind of thing -- and then we will start with

3    the follow-up questions based on their questionnaire responses.

4           Again, once we have figured out who the lowest

5    numbered 20 members of the -- or not -- 20 was the example.

6    Once we've identified the eight lowest-numbered jurors, we'll

7    swear in the jury.  I will give them some preliminary

8    instructions which are nothing controversial -- again, roles of

9    the Judge, roles of the jury, that kind of thing -- and I will

10   give them some logistical information, use the south bank

11   elevators.  You should try to remember to use the north bank

12   here closest to the courtroom, things like that, and then we

13   will be able to get started again depending on what time of day

14   it is.  If we can get through openings, we'll do that.  I don't

15   see any way that we're going to realistically be able to do --

16   start evidence on Monday so you can assume you'll start your

17   evidentiary presentation on Tuesday.  That's all I have.

18   Questions?

19          MR. KOWALCZYK:  Just a couple of logistical points I

20   discussed with plaintiffs' counsel.  First one, Judge, it's not

21   an imminent one but we have two treaters.  We were contacted by

22   their attorney -- it's the same individual who is general

23   counsel at Access -- requesting because of hardship reasons,

24   the person being the only doctor in a particular section of

25   Access and the other one also having -- being the only worker

1    as a social worker in a particular place where she's at, asking

2    if they could present via video testimony which we would be

3    fine with if the Court is amenable to it.  And we would work

4    out whatever logistics work best for the Court in terms of

5    doing it on a morning, doing them both together, that sort of

6    thing, and wanted to raise it to the Court to make sure it was

7    okay.

8              THE COURT:  Yeah.  If you -- whatever you work out in

9    that regard would be fine.

10             MR. KOWALCZYK:  Thank you, your Honor.  And this is a

11   very minor point, but could we submit a proposed order that

12   would allow attorneys and clients to bring in food and water

13   during the course of the trial?  We've generally done that, I

14   think, on other trials and it's --

15             MR. A. HOFELD:  Don't forget coffee.

16             MR. KOWALCZYK:  It had assisted the -- the ability to

17   think of the attorneys.

18             THE COURT:  Well, do you need an order to get through

19   the lobby?

20             MR. KOWALCZYK:  We do, Judge.  We've had a standard

21   one we've --

22             THE COURT:  Okay.  Yeah, give that to --

23             MR. KOWALCZYK:  We'll share it with counsel and make

24   it an agreed order, if possible.

25             THE COURT:  Yeah.  That's fine.

1    MR. KOWALCZYK:  And then lastly, because of the

2  rulings in the last final pretrial conference and that, I have

3  reached out to counsel regarding the search team officers who

4  are four in number and in terms of them -- do they still --

5  what remains as to them in terms of the "remaining in the

6  residence" claim too long where there is a valid search warrant

7  found by this Court, there is a weapon that's specific to this

8  residence that they have not found, and they're in the

9  residence for way less time than *Muehler versus Mena*, the U.S.

10  Supreme Court case that allows them four or five hours even in

11  handcuffs to conduct a valid search warrant.

12    So my question to plaintiffs' counsel -- we had this

13  discussion last week -- was, you know, is there any effort in

14  trying to streamline things given the number of witnesses, all

15  that we have to do here already of potentially dismissing them

16  with my promise that I would arrange for anyone who was needed

17  as a witness to procure them in that regard.

18    And then I didn't raise it at the time but now as

19  we're preparing, we have other officers too like a shield

20  officer, for example, who clearly was not being identified as

21  pointing a weapon.  If there are further agreements that could

22  be made to streamline witnesses that we're presenting, you

23  know, that's where my thought process was and I wanted to

24  identify that for the Court.

25    THE COURT:  It sounds like fertile ground for

1    discussion, so.

2           MR. A. HOFELD:  Yes.

3           THE COURT:  I don't think it serves anyone to draw

4    this out longer than it is going to be already so I, of course,

5    encourage you to confer and try to work out any ways that

6    you're mutually able to streamline the case.  We'll all be

7    better off for that.

8           MR. KOWALCZYK:  Thank you, your Honor.

9           MS. MOORE:  I have just a few clarifying questions,

10   your Honor.

11          THE COURT:  All right.

12          MS. MOORE:  First, as to our motion in limine -- I

13   believe it's 42 -- relating to the media statements from

14   Matthew Cline, those were also not on the list.  I just want to

15   confirm that those have been withdrawn.

16          MR. A. HOFELD:  Yeah.  The only reason we didn't

17   disclose the specific statements is because we don't plan on

18   seeking to admit any of his statements.

19          MS. MOORE:  Okay.  So I just wanted to confirm that.

20          And then as to Rahm Emanuel, I wanted to clarify that

21   his testimony is related to the -- the statements that we have

22   been discussing relating to the code of silence and not

23   anything else.

24          THE COURT:  December 8th and 9th, I think, on 2015.

25          MS. MOORE:  That sounds right.

1          THE COURT:  That's what I recall.

2          MS. MOORE:  Yeah.

3          THE COURT:  The three -- there were really two

4    occasions, before the City Council and WTTW interview.

5          MS. MOORE:  Yes.

6          THE COURT:  That's what we're talking about.

7          MS. MOORE:  Okay.  So just to be clear that that's the

8    subject matter.  And then I know that we have -- and we can

9    confer but, you know, I have been in contact with him and he

10   is traveling out of the country quite a bit.  He's traveling

11   all the time.  So we are going to need, I think, a lot of grace

12   with his schedule in getting him in so I'll talk with you about

13   that.  It might have to be as soon as next week --

14         THE COURT:  Okay.

15         MS. MOORE:  -- or in the last week of trial.  I know

16   for a fact he's going to be out of the country February 6th

17   through 12th and --

18         MR. A. HOFELD:  Okay.

19         MS. MOORE:  -- additionally will be out of the state

20   on multiple days in the last couple weeks of February.  And so

21   as much as we can have advance notice or hopefully maybe we can

22   even work out the exact date within the next couple days with

23   plaintiffs' counsel.

24         MR. A. HOFELD:  Yeah, hopefully.  I think we want him

25   earlier.  I think we want him early in the trial so -- and I

1    know he's -- he's campaigning quite a bit, but.

2         MS. MOORE:  So it sounds like we should be looking at

3    next week then?

4         MR. STROTH:  Yes.

5         MR. A. HOFELD:  Yes.

6         MS. MOORE:  Okay.

7         MR. A. HOFELD:  And my understanding is that the City

8    will accept service.

9         MS. MOORE:  Oh, yes.  We will be -- we don't -- he's a

10   City employee.  I mean, he's being called in his official

11   capacity so we don't even need to send a subpoena.

12        THE COURT:  Okay.  Anything else?

13        MS. MOORE:  No, not right now.  Well, we're trying to

14   schedule when our expert is going to fly in and I think we're

15   going to have him come for the third week that -- sometime

16   probably towards the end of that week of the 20th.  Obviously

17   that's a very expensive flight and I understand it's impossible

18   to predict how long this trial is going to go but I just wanted

19   to flag that for everyone that he likely will be in town

20   probably the 19th or the 20th is what we're looking at and I

21   just wanted to make sure that was in line with what plaintiffs

22   were thinking in terms of their scheduling of the case.

23        MR. A. HOFELD:  Yeah.  I think it is.  I think -- I

24   mean, our plan is to be done with plaintiffs' case I think, you

25   know, well before then.

1      MS. MOORE:  Okay.  We'll have him come a little

2  earlier then.  Okay.

3      THE COURT:  All right.

4      MR. Z. HOFELD:  Your Honor, if I may -- one more point

5  of clarification.

6      THE COURT:  Sure.

7      MR. Z. HOFELD:  Thank you, your Honor.  This was with

8  respect to our first pretrial conference.  There was a ruling

9  on a motion in limine regarding use of law enforcement

10  databases during jury selection.

11      THE COURT:  Right.

12      MR. Z. HOFELD:  I just wanted to clarify the scope of

13  the ruling.  You mentioned something about no -- no internet --

14  I've got the quote here.  So to the extent that anybody has the

15  ability to connect to the internet or law enforcement

16  databases, that that is forbidden.  I just want to make sure

17  we're allowed to connect to the internet.  It's really the

18  connection for law enforcement databases that is prohibited.

19      THE COURT:  Yeah.  You can't research jurors or

20  prospective jurors, I mean, so that's --

21      MR. Z. HOFELD:  So no internet.  Got it.

22      THE COURT:  -- that's what we're talking about.

23      MR. Z. HOFELD:  Thank you, your Honor.  Thank you for

24  the clarification.

25      THE COURT:  You can be on the internet.  I don't even

1    know if you can get on the internet in this courtroom.

2            MR. KOWALCZYK:  With a hot spot.

3            MS. MOORE:  We have a hot spot so we can.

4            MR. KOWALCZYK:  But we won't be -- we won't be

5    researching jurors.

6            THE COURT:  Yeah.  So that's the concern there

7    is -- whether you're connected to the internet or in any other

8    way, you cannot investigate the members of the jury to try

9    to -- the members of the venire or once they're jurors.  I'm a

10   pretty jealous guardian of the privacy of the jurors which I

11   will also take that -- segue from that to say -- and I think I

12   already mentioned this, you should -- and I understand we've

13   got a lot of moving parts here and I'm confident you will all

14   do it, but if somebody is off the witness stand, somebody

15   should be going to get the next witness.  We don't need five

16   minutes between witnesses waiting to grab them from the witness

17   room.  Did you get -- you made arrangements to have the witness

18   rooms on this floor?

19           MR. A. HOFELD:  No.

20           MS. MOORE:  I think we did.

21           MR. KOWALCZYK:  Oh.

22           MS. MOORE:  I think we talked to someone.

23           THE COURT:  Because this courtroom only has one

24   witness room right across from it but --

25           MS. MOORE:  I believe we spoke with someone at one of

1    the times we were here about needing multiple witness rooms.

2           THE COURT:  You probably talked to Alberta who

3    is no -- has retired and Brenda is my new courtroom deputy.

4    She's the one to talk to about making arrangements if you need

5    an attorney room during the trial.  You can use the closets,

6    you can leave stuff in there overnight but you'll also have at

7    least one attorney room for each of you, so.

8           MR. Z. HOFELD:  Thank you, your Honor.

9           THE COURT:  Anything else?

10          MR. A. HOFELD:  No.  I think that's it.

11          THE COURT:  All right.  Be here -- I think 9:00

12   o'clock on Monday will be fine given that it will be -- it will

13   be probably 10:00, 10:30 before we get the questionnaires

14   copied and distributed.  But let's be here at 9:00 so if, as is

15   inevitably the case, there is there's something to talk about,

16   we can -- we can do that while we're waiting.  All right.

17   Okay.

18          MS. MOORE:  Thank you, your Honor.

19          THE COURT:  Okay.  No more pretrial conferences.

20       (Concluded at 4:47 p.m.)

21                       *   *   *   *   *

22       I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24
     /s/Laura LaCien                    January 29, 2026
25   Laura LaCien, CSR, RMR, CRR               Date
     Official Court Reporter