# Exhibit A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   EBONY TATE, et al.,          )  Case No. 18 C 7439
 4                              )
              Plaintiffs,       )
 5                              )
       v.                       )
 6                              )
   CITY OF CHICAGO, et al.,     )  Chicago, Illinois
 7                              )  January 15, 2026
              Defendants.       )  10:04 a.m.
 8

 9
                    TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE JOHN J. THARP, JR.

11
   APPEARANCES:
12
   For the Plaintiffs:    THE LAW OFFICES OF AL HOFELD, JR., LLC
13                        BY:  MR. AL HOFELD, JR.
                               MR. ZACHARY J. HOFELD
14                        53 W. Jackson Boulevard, Suite 204
                          Chicago, Illinois 60604
15
                          CHAKA PATTERSON LAW, PLLC
16                        BY:  MR. CHAKA M. PATTERSON
                          220 Green Street, Suite 225
17                        Chicago, Illinois 60607

18                        ACTION INJURY LAW GROUP, LLC
                          BY:  MR. ANDREW M. STROTH
19                        1 S. Dearborn Street, Suite 1400
                          Chicago, Illinois 60603
20
                          THE LAW OFFICE OF JULIAN JOHNSON, LLC
21                        BY:  MR. JULIAN M. JOHNSON
                          125 S. Wacker Drive, Suite 300
22                        Chicago, Illinois 60606

23

24

25
```

```
1
     APPEARANCES:   (Continued)
2
     For Defendant
3    City of Chicago:           CITY OF CHICAGO, DEPARTMENT OF LAW
                                 BY:  MS. MARION C. MOORE
4                                     MR. RAOUL V. MOWATT
                                      MS. SIMERDEEP KAUR
5                                     MR. MAXWELL E. LISY
                                 2 N. LaSalle Street, Suite 420
6                                Chicago, Illinois 60602

7    For Defendant
     Officers:                   MOHAN GROBLE SCOLARO, P.C.
8                                 BY:  MR. LAWRENCE S. KOWALCZYK
                                      MS. MEGAN K. MONAGHAN
9                                 55 W. Monroe Street, Suite 1600
                                 Chicago, Illinois 60603
10

11

12

13

14

15

16

17

18

19
     Court Reporter:            Laura LaCien, CSR, RMR, CRR
20                              Official Court Reporter
                                219 S. Dearborn Street, Room 2304A
21                              Chicago, Illinois 60604
                                Telephone:  (312) 408-5032
22                              laura_lacien@ilnd.uscourts.gov

23                                  *   *   *   *   *

24                       PROCEEDINGS REPORTED BY STENOTYPE
           TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
25
```

 1          (Proceedings heard in open court:)

 2          THE CLERK:  Calling 18 Civil 7439, Tate, et al.,

 3    versus City of Chicago, et al.

 4          THE COURT:  All right.  Good morning, everyone.  Would

 5    you put your appearances on the record, please?

 6          MR. A. HOFELD:  Good morning, your Honor.  Al Hofeld,

 7    Junior, for the plaintiffs.

 8          MR. Z. HOFELD:  Good morning, your Honor.  Zach Hofeld

 9    for plaintiffs.

10          MR. STROTH:  Good morning, your Honor.  Andrew Stroth

11    on behalf of the plaintiffs.

12          MR. PATTERSON:  Good morning, your Honor.  Chaka

13    Patterson on behalf of the plaintiffs.

14          MR. JOHNSON:  Good morning, your Honor.  Julian

15    Johnson on behalf of plaintiffs.

16          MS. MOORE:  Good morning, your Honor.  Marion Moore on

17    behalf of the City of Chicago.

18          MS. KAUR:  Good morning, your Honor.  Simerdeep Kaur

19    for the City of Chicago.

20          MR. LISY:  Good morning, your Honor.  Maxwell Lisy,

21    L-i-s-y, on behalf of the City of Chicago.

22          MR. MOWATT:  Good morning, your Honor.  Raoul Mowatt

23    on behalf of the City of Chicago.

24          MR. KOWALCZYK:  Good morning, your Honor.  Larry

25    Kowalczyk for the individual defendant officers.

1 MS. MONAGHAN:  Good morning, your Honor.  Megan

2 Monaghan also for the individual defendant officers.

3 THE COURT:  All right.  We're going to -- unless

4 there's anything we need to talk about beforehand, I'm prepared

5 to just pick up where we left off last week.

6 MR. A. HOFELD:  We would just -- your Honor, just one

7 minor thing.  I figured I would mention it so we don't have to

8 raise it again later but the parties have agreed if it's -- if

9 it pleases the Court for -- we've agreed to a proposal of one

10 hour for opening statements for plaintiff, one hour for

11 defendants, and then two hours per side for closings and we

12 just wanted to report that -- report that to your Honor.

13 THE COURT:  All right.  You're on board with that?

14 MS. MOORE:  That's correct, Judge.  We're fine with it

15 and we are also fine with it being per side.  You know, we'll

16 split -- we'll split the time as needed.

17 THE COURT:  Excuse me.  All right.  And, plaintiffs,

18 that includes your rebuttal time as well?

19 MR. A. HOFELD:  Yes, your Honor.

20 THE COURT:  Okay.  Good.  That seems quite reasonable

21 to me.  In light of the parties' agreement, that's what we will

22 do.

23 MR. A. HOFELD:  Very good.  Thank you, Judge.

24 THE COURT:  All right.  I saw, Mr. Hofeld, that you

25 filed a motion for reconsideration as to the ruling on motions

5

1  31 and 32 -- excuse me.  Sorry.

2      (Pause.)

3          THE COURT:  The gist of those motions was the -- or

4  the issue presented by both of those motions was whether there

5  should be -- it should be precluded to go into Mr. Booth's --

6  the fact that Mr. Booth was incarcerated as opposed to just not

7  in general around his family.

8          I guess that sort of brings up one question in my mind

9  on this issue which is what would the -- in the absence of the

10  explanation for Mr. Booth's absence, what would be the -- what

11  would be the explanation for that absence?  How do you envision

12  someone testifying, you know, Mr. Booth was unaccounted for for

13  three years or his whereabouts were unknown for three years

14  or -- I mean, what --

15          MR. A. HOFELD:  Sure.  Sure, Judge.  Well, I mean, it

16  would -- I mean, I think we could come up -- we could confer

17  with the defense and come up with a proposed instruction, I

18  guess, for the jury or a proposed stipulation to address that

19  but I think it would -- you know, it would straddle -- it would

20  have to be something that was truthful, you know, that -- you

21  know, he was absent from the family and, whatever, didn't see

22  his children for that period but without -- but without giving,

23  you know, a specific reason, that was, you know, incorrect or

24  referenced the incarceration so it would have to be something

25  that a stipulation that Mr. Booth was, you know, absent from

6

1    his family and did not see his children for the three-year

2    period that he was incarcerated.

3              THE COURT:  All right.  What's the defendants'

4    response?

5              MR. KOWALCZYK:  I think your Honor had already

6    expressed that it didn't have undue prejudice, the -- itself.

7    It is in the medical records of the -- particularly the

8    plaintiff Legend Booth and how it bothered him and how it

9    affected him, you know, his mental health but I would defer to

10   the Court on that.  I think your Honor has already ruled --

11             THE COURT:  Well, you filed a motion to reconsider,

12   so.

13             MR. KOWALCZYK:  Right.

14             MR. A. HOFELD:  May I address what was -- may I

15   address -- may I reply, your Honor?

16             THE COURT:  Well, actually, let me follow up with the

17   defendants.

18             MR. A. HOFELD:  Sure.

19             THE COURT:  I mean, what is -- what is the relevance

20   of the fact that Mr. Booth was incarcerated as opposed to

21   being --

22             MR. KOWALCZYK:  I think it's --

23             THE COURT:  -- otherwise unaccounted for?

24             MR. KOWALCZYK:  And your Honor is correct.  It was

25   more the absence of the father and I think that is Dr.

1    Berkowitz's criticism -- or, I'm sorry, Dr. Kraus's criticism

2    of Dr. Berkowitz not taking that into account and not going

3    into that issue, that -- the absence of a parental figure.  So

4    in terms of relevance, the impact of a child knowing his parent

5    is incarcerated, again, in terms of relevance, it's more the

6    absence that is the pertinent issue.

7         MS. MOORE:  Just to chime in a little bit here.  I

8    agree with Mr. Kowalczyk.  I do think the fact that the records

9    say "incarcerated" and not "absent" counts for something.

10        And just to respond to something that was actually in

11   the motion to reconsider is there was some argument about no

12   opinion that -- no expert opinion that the father being

13   incarcerated had any impact on the mental health or anything

14   like that and we're not actually saying that.  Our argument is

15   more so we want to be able to attack Dr. Berkowitz for not

16   addressing this thing that is obviously mentioned explicitly in

17   the records.  So there is that layer there, that it is actually

18   specifically the incarceration that is what is mentioned that

19   is affecting this child.

20        But then separately, I did want to address the idea of

21   a stipulation or instruction and I don't know that that's

22   necessary.  If your Honor is going to say that we just go with

23   "absent," then I think we should just pick a phrase that we use

24   and use it during the testimony.  I think a stipulation or

25   instruction would bring unnecessary attention to it and I just

1     don't know that that is necessary.

2             THE COURT:  All right.  Mr. Hofeld?

3             MR. A. HOFELD:  Thank you, your Honor.  I mean, we --

4     we agree with Mr. Kowalczyk that the relevance is the absence

5     and there is no -- there's no opinion from the defense medical

6     expert that -- really, either that the absence or the fact of

7     incarceration affected any of the children.  It's just not --

8     he references something when he's summarizing medical records.

9     There's a single note in the medical record where mom, not the

10    kids, mom is summarizing various things and, among other

11    things, she mentioned -- mentions the dad was recently released

12    from jail after being there for three years.  That's the only

13    reference in the entire record and the defense expert doesn't

14    make that the basis of any opinion on causation or damages.  He

15    just passes by it when he's summarizing the medical records.

16            So there's nothing in the entire record that even

17    suggests that the fact of incarceration was some kind of cause

18    of traumatic distress.  The discussion has always been, you

19    know, when -- the discussion has always been about his absence

20    and that was the question that was asked of Dr. Berkowitz.  Dr.

21    Berkowitz did consider it and he explained his position why he

22    didn't think it was significant.

23            Your Honor, we don't -- we understand that the absence

24    is perhaps relevant to damages.  It may be another factor,

25    another source of distress but certainly "incarceration" is

9

1    just so -- "conviction," you know, "convicted felon," all of

2    that is just so prejudicial that it would -- it would put a

3    cloud of criminality over the family that would be difficult to

4    recover from.

5         THE COURT:  Let me -- I just need to understand

6    factually, what is the specific document that you're relying on

7    that says -- this is which child?  I can't remember.

8         MR. KOWALCZYK:  Yes, Judge.  It is the -- it is Kay

9    Warren who was a social worker that Legend Booth saw.  It's in

10   her record explicitly that it's bothering him, the father, his

11   incarceration.

12        THE COURT:  Ms. Warren's record reflects that Legend

13   said it bothers me that my father is incarcerated.

14        MR. KOWALCZYK:  It's not a direct quote but it

15   absolutely says that he relayed that -- that it's bothersome to

16   him.

17        And I had would disagree that there's no opinions

18   because Mr. Kraus is very critical of Dr. Berkowitz not taking

19   into account other stressful events including the father

20   returning from prison after three-and-a-half years.  He did not

21   take this into account.  So he's -- Dr. Kraus is critical of

22   Dr. Berkowitz in that regard.

23        MR. A. HOFELD:  Your Honor, I have the record here and

24   it does not say -- I'm happy to hand it up if given leave.  But

25   it does -- it does not -- it just says "dad recently released

1    from jail in October.  Was there for three years and six

2    months," period.  This is after -- this is at the end of a

3    medical note with a lot of other information.  There is no

4    interpretation or spin that this was a source of distress.

5                THE COURT:  Okay.  Let me take a look at it.

6                MR. A. HOFELD:  Sure.

7                MR. KOWALCZYK:  What page are you reading from?

8                MS. MOORE:  Yeah.  Can we --

9                MR. A. HOFELD:  Yes.  This is -- this is exactly what

10   Larry referenced, Tate 2375, Kay Warren's note.  Well, here.

11       (Counsel conferring.)

12               MR. A. HOFELD:  And, your Honor, I would note that

13   that statement is not attributed to the children.  It's

14   attributed to the mother.  The note clearly indicates that the

15   mother was giving the information; not any of the children.

16   There's no testimony from the children themselves that they

17   were bothered by their father's absence.

18               THE COURT:  I can't read and listen at the same time.

19               MR. A. HOFELD:  I'm sorry.

20       (Pause.)

21               THE COURT:  All right.  Mr. Kowalczyk, do you have

22   anything else that goes to or connects with this document?

23               MR. KOWALCZYK:  I'm trying to connect, your Honor -- I

24   apologize -- to pull up the record and the -- the later part of

25   that record if I could --

1          THE COURT:  All right.

2          MR. KOWALCZYK:  -- but I am having difficulty with the

3     web.

4       (Pause.)

5          MR. KOWALCZYK:  And I have to say, these are Dr.

6     Karpinski's records that plaintiff has pointed to.  What I was

7     actually -- there are records of doctor -- of Kay Warren that I

8     believe also contain a reference to that and I don't know if

9     that is in this set of records here.  I think it's in another

10    set that I need to pull up in the 5300, 53.

11         I think there was an outage yesterday or 19 hours ago

12    with Verizon that's slowed down a lot of my downloadability and

13    I apologize to the Court.

14      (Pause.)

15         MR. KOWALCZYK:  Your Honor, I don't want to keep the

16    Court waiting if I can circle back on once it uploads; and I

17    apologize.

18         THE COURT:  Okay.  What you're going to need to show

19    me is something that suggests that Legend himself raised the

20    issue of his father's incarceration as something that was

21    bothering him.  Absent that, we're going with absence.

22         MR. KOWALCZYK:  Thank you, your Honor.

23         THE COURT:  All right.

24         MR. KOWALCZYK:  And if I don't find it, I will alert

25    the Court as well but I will be looking for it right now.

1        THE COURT:  Okay.  The other thing that we left

2    hanging or for further consideration I think was the question

3    of the consent decree.  The defendants I think reasonably want

4    to be able to provide evidence of what they did in response to

5    the raising of various issues with these investigations and

6    reports.  As I stated last week, the -- it's certainly fair

7    game for the plaintiffs to, number one, point to any evidence

8    that it would be relevant to show that the defendants weren't

9    genuinely engaged in these pretrial processes that were

10   addressing these issues that were coming about.  The plaintiffs

11   also think that it is relevant to show that the consent decree

12   ultimately -- that was ultimately entered was -- did not

13   include provisions relating to use of force against children

14   and that they should be able to indicate or present in

15   some -- some manner which Mr. Hofeld described as one witness

16   and one question -- I don't know that I would hold you to that

17   draconian limitation -- but Mr. Hofeld says can be addressed

18   very quickly.  I think given that timing and the chronology of

19   the consent decree which, as I'm understanding it, what was

20   essentially close to if not the final draft was tendered in

21   September of 2018 and was ultimately signed off by Judge Dow

22   right after the new year in 2019, I think that's close enough

23   in time to make the question of whether there was anything in

24   the consent decree that addressed the subject of children's --

25   of force used against children relevant to the policy that was

1   in effect at the time of this incident or -- not relevant so

2   much to the policy but relevant to the question of whether the

3   defendants were deliberately indifferent.

4          So what -- in other words, I think there's merit on

5   both sides of this argument and what I am inclined to do is

6   allow certainly the defendants to present their evidence of,

7   you know, what it was they were doing in reaction to these

8   issues that were coming about, allow the plaintiffs to

9   challenge that evidence either by evidence of -- that at the

10  time their participation of the defendants was not --

11  participation of the City, not the individual officers was not

12  genuine to the extent there is any such evidence, and to allow

13  extremely brief presentation of evidence presumably by

14  testimony that the consent decree did not include a provision

15  about the use of force against children.

16         What I would also allow is the defendants in their --

17  somewhere in that process to explain that the consent decree

18  was the result of litigation brought by the government and

19  still did not include -- was brought against the City but still

20  did not include in its final form a provision relating to the

21  use of force against children.  I think that's fair to allow

22  the defendant to essentially say this was not a unilateral

23  decision, it was a decision that reflected consideration by all

24  the stakeholders; and even at the end of that process, there

25  was no provision for use of violence -- use of force against

1    children.  That's my inclination but I will hear your further

2    thoughts.

3            MS. MOORE:  Thank you, your Honor.  I do have one -- I

4    have a couple follow-up questions.  I understand this order to

5    mean that the consent decree itself and this one witness to

6    talk about that process and entering into the final consent

7    decree.  I am -- I know the motion I think also included

8    getting into what's happening now, what happened several years

9    later, monitoring reports, all of that --

10           THE COURT:  No.

11           MS. MOORE:  -- that stuff.

12           THE COURT:  That would not be permitted.

13           MS. MOORE:  Okay.

14           THE COURT:  It would only go as far as I've outlined.

15           MS. MOORE:  Okay.  Thank you.

16           And then secondly, my follow-up question is I think

17   the last part of your Honor's order was saying that we could

18   explore on cross-examination with this witness the topics your

19   Honor said.  I mean, we would obviously want to really get into

20   the details there and so I am -- I have a little bit of

21   concern.  I don't know which witness Mr. Hofeld is talking

22   about, who this is going to be but I am wondering if any issues

23   related to deliberative process privilege, attorney-client

24   process, all these privileges that governmental agencies

25   usually -- and obviously settlement discussions, all of these

1    things that are usually confidential and privileged I think

2    would be the answers to a lot of these questions and so I do

3    have some -- I'm just wondering if that has been discussed with

4    this witness or not.  You know, I don't know.  I don't know who

5    it is because I wouldn't want to be totally thwarted in my

6    cross-examination by someone perhaps from the Attorney General

7    saying "well, I'm asserting privilege over that, I'm not going

8    to answer that question."

9              THE COURT:  Well, the -- my first response to that

10   point would be I -- I don't see how answering the question

11   about what's in the -- what's in or is not in the consent

12   decree would implicate privilege.  How or why it's not in the

13   consent decree might, but this -- but I'm talking about the

14   simple fact that it's not in the consent decree.  That's what I

15   understand the plaintiffs to want to point to so I don't --

16             MR. A. HOFELD:  Yes.

17             THE COURT:  -- I don't think that would implicate

18   issues of privilege.  I think you, you know, through your own

19   witness or through cross-examination of the plaintiffs'

20   witness could establish who the stakeholders are, who the

21   participants are in the process of coming up with the consent

22   decree and -- presuming they respond by saying that there's not

23   a use of force provision in the consent decree, you can point

24   to the fact that it's not a unilateral decision by the City and

25   that despite the participation of all of these stakeholders --

1  and for that matter, the approval of the Court -- there was not

2  a use of force provision against children as I think this

3  through.  Again, it's not my case.  It's your case.  You have

4  to pursue it.  But I think it's -- certainly the fact that it's

5  not in the consent decree is something that could be spun in

6  two different ways so you have to -- you'll have to decide

7  whether it's worth the comeback argument, but.

8        MS. MOORE:  Understood and agreed, your Honor.  I -- I

9  am wondering, though, who the witness is just so that we can

10  start preparing.

11        MR. A. HOFELD:  We -- we did disclose.  I mean,

12  there's several witnesses listed on -- in our -- on our witness

13  list in the pretrial order and we haven't made a final decision

14  and we wanted -- we wanted this issue to be with the Court

15  before we issued subpoenas so I don't have an answer today.

16  But you know we have listed --

17        MS. MOORE:  I know there are multiple people listed

18  but I also know from experience like, for instance, if it is

19  somebody from another governmental agency, I'm concerned, like

20  are they aware that they're coming to testify?  I don't want to

21  get some kind of -- dealing with a motion from the Attorney

22  General's office to quash the subpoena or something like that.

23  I just --

24        MR. A. HOFELD:  Well, I mean, that's -- that's always

25  a risk; right.  I mean -- I mean, we can talk -- Marion, we'll

1  work with you, we'll talk, and happy to confer about all of

2  this.  But to answer your question -- and for the benefit of

3  the Court -- we have not decided, we have not made a final

4  decision on which witness and we want to -- like -- as I told

5  the Court, we want to try to do it with one witness so that may

6  take a couple of conversations but we'll be -- you know, we'll

7  be making a decision very soon.

8            MS. MOORE:  Thank you.

9            THE COURT:  All right.  Let the defendants know who

10  you expect that witness to be by the 21st.

11            MR. A. HOFELD:  Okay, Judge.

12            MS. MOORE:  Thank you, your Honor.

13            THE COURT:  Okay.

14       (Pause.)

15            MR. KOWALCZYK:  Your Honor, I apologize for

16  interrupting.  I just can update on that issue relative --

17            THE COURT:  Okay.

18            MR. KOWALCZYK:  The record that Mr. Hofeld pointed out

19  is the correct record, the correct reference.  It was in

20  testimony in the deposition of Ms. Warren where she indicated

21  it did come directly from Legend and it was -- it was something

22  that was bothering that client so that's where the -- and I can

23  show the dep transcript testimony if your Honor wants to see it

24  or --

25            THE COURT:  And when you -- you're referring to Ms.

1    Warren, you're referring to Keshara Warren?

2         MR. KOWALCZYK:  That's correct, Judge.  And for

3    counsel's benefit, it starts at Page 43 where I go through that

4    history from that date and that was in the medical record that

5    counsel showed you.

6         THE COURT:  All right.  You all can be looking for

7    that, Mr. Hofeld.

8         MR. A. HOFELD:  Sure, Judge.

9         Mr. Kowalczyk, would you mind if I looked at your

10   screen?

11        MR. KOWALCZYK:  Yeah.  Come on over.

12        MR. A. HOFELD:  Okay.  Thank you.

13       (Counsel conferring.)

14        THE COURT:  All right.  I think we had made it through

15   defendants' motion in limine number 8 when we left off so

16   picking up with defendants' 9 --

17        MS. MOORE:  I apologize, your Honor.  I believe we

18   left off at number 6.

19        THE COURT:  All right.

20        MS. MOORE:  Or we finished 6.  I think we're on to 7.

21        MR. A. HOFELD:  I think that's right, your Honor.

22        THE COURT:  Okay.  All right.  Defendants' 7 I'm going

23   to deny as a motion in limine.  This motion seeks to bar a

24   category of evidence that might have an alternative basis for

25   admission depending on context and what it's -- what it's

1    offered for and when it's offered so I'm going to require the

2    defendants to lodge a timely objection to the extent that the

3    evidence is offered.

4         That said, evidence of complaints that did not result

5    in findings of misconduct much less misconduct of the sort

6    relevant in this case does seem to be character evidence that

7    is unlikely to be admitted but I will address those motions if

8    and when they're made.

9         Defendants' 8, any evidence -- bar any evidence or

10   reference that COPA investigated this incident and any

11   conclusions or recommended discipline as a result of the

12   investigation.

13        MR. A. HOFELD:  Your Honor, I think the parties are in

14   agreement on this one just -- if it would save your Honor time.

15        THE COURT:  That's what I thought.  That's why I

16   thought we had already done this, but.

17        MR. A. HOFELD:  We each filed the same motion in

18   limine basically.

19        THE COURT:  That might be the issue.  Okay.  So that's

20   granted without opposition.

21        Defendant 9, bar evidence or argument regarding other

22   publicized events concerning alleged police misconduct.  I'm

23   going to deny that as a motion in limine.  It's too broad.  It

24   would, for example, preclude evidence of other gun pointing at

25   minor situations involving CPD which is clearly relevant to the

1    Monell claim.  Keep in mind, understanding that, that there has

2    to be similar context and the context also has to be situated

3    in the -- in Chicago to warrant relevance.  So dissimilar

4    episodes of police misconduct again face some likelihood that

5    they would not be admitted but I'm not going to make

6    categorical determinations without seeing the specific context

7    of a particular piece of evidence.

8           MS. MOORE:  Just to clarify, your Honor.  Is that

9    other instances related to -- that's as to the Monell claim,

10   correct, the use of force against children?

11          THE COURT:  Right.

12          MS. MOORE:  Thank you.

13          THE COURT:  Defendants' 10 is to bar the use of any

14   subtitles/captions in video testimony and statements.  Are you

15   seeking in this motion to -- I assume you're not seeking in

16   this motion to preclude the presentation of video deposition

17   testimony?

18          MS. MONAGHAN:  No, your Honor.  In the *Mendez* case,

19   there's a few issues with video depositions where the

20   plaintiff -- plaintiffs' counsel had included or added

21   subtitles to the testimony and we were not provided with those

22   subtitles in advance to check them or it was late the day

23   before so we just want the video depositions to be played as is

24   without any subtitles.  If the witness was testifying live, the

25   jury would not be given subtitles so we don't think subtitles

1  are appropriate or necessary for video depositions.

2          THE COURT:  When you say "subtitles," you mean like

3  closed captioning --

4          MS. MONAGHAN:  Correct.

5          THE COURT:  -- like the text of what --

6          MS. MONAGHAN:  Correct, your Honor.

7          MR. A. HOFELD:  Your Honor, in brief reply.

8          THE COURT:  Yep.

9          MR. A. HOFELD:  I mean, the -- you know, the text

10 that's synced to the video dep is, of course -- you know, is

11 the certified transcript of the -- by the court reporter who,

12 you know, who recorded and transcribed the deposition so

13 there's no debate about, you know, the accuracy of the synced

14 text.

15         The issue we had in *Mendez* was when we attempted to

16 introduce body worn camera video that had text of what was

17 being said and I think -- from my recollection, that was the

18 main issue.  But there should be no issue with -- I mean,

19 there's no debate about the accuracy of the synced text when

20 we're presenting a video dep because it's from the certified

21 transcript.

22         MR. Z. HOFELD:  And if I may add one point, your

23 Honor.  In addition to there not being a debate about the

24 accuracy of the deposition transcript, our position is that

25 having closed captioning is also helpful to the jury to the

1    extent there's some individuals who learn through different

2    modalities, whether seeing the text or hearing what's being

3    said.

4               THE COURT:  Do you want to --

5               MS. MONAGHAN:  Yeah.  With respect to what Mr. Zach

6    Hofeld just said, the jury is going to have to listen to live

7    witnesses and hear what they're saying and not rely on any

8    closed captioning.  We think the same should just -- it should

9    just be the same for video depositions.

10              And then in addition to the video depositions, there

11   is some cell phone video taken by a neighbor of the incident

12   and she's talking in it so we want to make sure there's no

13   subtitles for those videos -- or closed captioning for those

14   videos as well.

15              THE COURT:  Do we have any other video other than

16   video deposition testimony?

17              MR. A. HOFELD:  There's -- there's a very small amount

18   of cell phone video, your Honor, and there's a very small

19   amount of body worn camera video of events that were tangential

20   out on the street.

21              With the cell phone video, I'll just remind counsel

22   that the way it was produced to us by the upstairs neighbor who

23   took the cell phone video, there were already some -- just some

24   comments that were put on it so I don't know that we have the

25   ability to -- I mean, I could check.  Maybe's it's a technical

1    question.  But I'm not sure that we have the ability to remove

2    whatever comments the person who recorded the video, but it's

3    not --

4          THE COURT:  All right.  Well, here -- you need to

5    figure that out.  If there's a dispute about the accuracy of

6    any text that's appended to a video, that has to be resolved

7    before trial.

8          MR. A. HOFELD:  Okay.

9          THE COURT:  I'm not going to bar the use of deposition

10   text in conjunction with the video deposition.  Yes, witnesses

11   have to -- you know, when they're testifying in the courtroom,

12   we don't provide that but I see no prejudice.  And to the

13   extent it has a potential to help jurors hear and understand

14   the deposition testimony, I think that it's fine to use the

15   video synced to the deposition text.  That's commonly done, I

16   see no prejudice to it, and it may be helpful to some jurors.

17   So the fact that we don't always do it isn't in my view a good

18   reason not to do it when it can be done.

19         But if there's any other video you're planning to

20   present whether you put the text on it or the source of the

21   video put the text on it, you need to confer with the

22   defendants on that.

23         MR. A. HOFELD:  Okay.

24         THE COURT:  Maybe there will be no dispute about

25   what's there.  I'm particularly concerned about the idea that

24

1   there's gratuitous comments that are somehow attached to that.

2   If there are, you need to figure out how to get rid of them

3   because if you can't, the jurors are not going to see that

4   video.

5           MR. A. HOFELD:  Okay.

6           THE COURT:  Defendant 11, bar subsequent remedial

7   measures including mention or reference to the Peter Mendez

8   Act.

9           All right.  As we all know, Rule 407 provides that

10  measures are taken that would have made an earlier inquiry or

11  harm less likely to occur.  Evidence of the subsequent measures

12  is not admissible to prove negligence, culpable conduct -- or

13  culpable conduct but the Court may admit the evidence for other

14  purposes such as impeachment.

15          The defendants request to bar evidence of revised CPD

16  directives but they don't identify the specific directives so

17  I'm going to deny the motion as premature as a motion in limine

18  at this point.  You're going to have to present that in the

19  context that -- in which it arises at trial.

20      (Pause.)

21          THE COURT:  Sorry.  I'm having a computer problem

22  here.

23      (Pause.)

24          THE COURT:  What was the date of the enactment of the

25  Peter Mendez Act?

1    MR. A. HOFELD:  I think I have that, your Honor.  It

2  was signed -- it was signed by the Governor in August of 2019.

3    (Pause.)

4    THE COURT:  All right.  I'm going to allow the

5  presentation of the enactment of the Mendez Act as it could be

6  relevant to the plaintiffs' Monell claims in the context of

7  showing the inadequacy of prior policies, for impeachment

8  purposes, and for demonstrating the feasibility of

9  precautionary measures.  I think that chronology is

10  sufficiently close in time that it does have relevance on those

11  issues.

12    Defendants' 12 is to bar evidence, testimony, or

13  argument that any officer violated CPD general orders, special

14  orders, rules or regulations.

15    (Pause.)

16    MR. MOWATT:  Your Honor, I hate to bring us back to

17  number 12 but if I may make a quick point.

18    THE COURT:  Yes.

19    MR. MOWATT:  I do not believe that anybody is going to

20  get up on the stand and say the change in the Peter Mendez Act

21  is something that couldn't have been done nor -- so I do not

22  believe that it is relevant to either impeachment or

23  feasibility.

24    MR. A. HOFELD:  Your Honor, if I may just briefly?

25    THE COURT:  I'm sorry.  It was number 11 is what I was

1   referring to.

2         MR. A. HOFELD:  As I understand the Court's ruling, I

3   mean, it's still -- it's not automatically admitted.  It still

4   has to be -- we still have to obviously show that -- it has to

5   be introduced in response to testimony that the prior -- that

6   the existing policies and -- or prior policies and training

7   were adequate.

8         From my recollection, there's plenty of testimony from

9   the City's 30(b)(6) witnesses that the use of force policy and

10  training during the Monell period was adequate and that the --

11  it did not need to address the issue of force on children.  And

12  I'd be happy to gather up some record citations to present to

13  the Court or counsel, but we think that there is plenty of

14  testimony about the adequacy of prior policies and training

15  that would allow for the introduction of the Peter Mendez Act

16  to show that that policy and training was inadequate.

17        MS. MOORE:  Just --

18        MR. MOWATT:  Mr. Hofeld is trying to sidestep the very

19  purpose of rule -- of the subsequent remedial measures

20  provision.  There's always going to be an argument that there's

21  adequate, if -- that a policy is adequate.  If you were to able

22  say but then they did something after that shows that they

23  could have done something more, it's --

24        (Counsel conferring.)

25        MR. MOWATT:  The issue about impeachment is whether or

1    not it's feasible and nobody is going to get up on the stand on

2    behalf of the City and say we couldn't do the additional

3    training that was called for by the Peter Mendez Act because it

4    was not feasible to do that.

5          THE COURT:  Well, if there's nothing to impeach, then

6    they won't be using it for impeachment.

7          MR. A. HOFELD:  Right.  Right.

8          MS. MOORE:  Thank you for that clarification.  And I

9    do, I guess -- it does warrant discussion that Peter Mendez

10   himself is one of plaintiffs' pattern witnesses so I assume

11   that this ruling means that he's not going to be questioned

12   about it and that it would be limited to a City witness who

13   could be impeached if there's testimony about feasibility or

14   one of the other exceptions to 407.

15         THE COURT:  Well, they can't call -- I'm not sure how

16   Peter Mendez would be testifying about the enactment of a state

17   law so I don't think that's going to be an issue.

18         MS. MOORE:  All right.  Thank you.

19         THE COURT:  All right.  So getting back to 12, I'm

20   going to grant the motion in limine 12 to the extent that

21   anyone is seeking to argue that violation of CPD rules is

22   per se a constitutional violation.  This is -- you know, there

23   are -- there are a fair number of cases where there are

24   categorical statements that CPD rules and regulations are --

25   have no relevance to the assessment of the constitutionality of

1   the conduct.  I don't think that's quite accurate from the

2   standpoint of departures from accepted standards are

3   potentially relevant to the issues presented particularly by

4   the Monell claim and those departures I think can have some

5   relevance to the assessment of whether the training and

6   planning and execution of the conduct was objectively

7   reasonable.

8          The difference, I think, is in part at least due

9   to -- there's a difference between national generally accepted

10  understanding that this is what the law requires and specific

11  CPD rules or regulations which are just data points along the

12  way to determining whether there is an accepted standard or

13  not.  So from that standpoint, that's why I say we're not going

14  to have argument that because a Chicago Police Department rule

15  was violated that there was a constitutional violation but

16  there can be and it is relevant to point out departures from

17  standard -- generally accepted procedures which rests itself on

18  the presentation of evidence to establish that there are, in

19  fact, national generally accepted standards in terms of, you

20  know, what we're talking about in this case use of force

21  against children.

22         So there's -- that line of distinction may not always

23  be very obvious and it may be difficult to tread so that's why

24  I'm granting it only as to the argument that the violation of

25  rules is per se probative of whether there was a constitutional

1    violation but, otherwise, I'm going -- we're going to have to

2    make those determinations in the specific context of whatever

3    rule is being addressed.  All right.

4            Defendant 13, bar evidence, et cetera, regarding lost

5    income, past or future medical bills and medical records of the

6    plaintiffs.  I don't think there's any dispute as to lost

7    income.  The plaintiffs are not seeking any lost income beyond

8    the $176 that Ms. Tate claims in lost wages.  As to medical

9    records, the plaintiffs represent that they've all been

10   provided.

11           As to medical bills, the defendants' motion is denied.

12   There's no requirement that any recommendation for therapy has

13   to be included in a medical record.  The plaintiffs can prove

14   that need in other ways.

15           As to insurance, the motion is granted.  But if the

16   defendants open the door by introducing evidence that the

17   plaintiffs did not seek any medical or mental health treatment,

18   then the plaintiffs are permitted to respond with evidence that

19   shows that they could not afford such treatment and did not

20   have insurance.

21           And as to the salary chart, the motion will be denied.

22   I don't see any prejudice in allowing that to be introduced if

23   I'm only ruling on the argument that's been made which is that

24   it was not previously disclosed.

25           Defendant 14, bar witnesses from offering opinions as

1    to the credibility or accuracy of other witnesses' testimony or

2    statement.  That will be denied as a motion in limine.  It

3    seeks -- simply seeking a ruling, it seems to me, that Rule 702

4    applies but no specifics or specific context is provided with

5    the motion in limine so Rule 702 will be enforced.  But as a

6    motion in limine, defendant 14 is denied.

7         Bar comment -- defendants' 15, bar comment about

8    defendants' failure to call witnesses or produce evidence.

9    Again, we don't have any particular specifics here that are

10   presented so I'm going to deny it as a motion in limine.

11   Anyone who is going to argue missing witness or thinks they

12   have an argument that permits or that something has occurred

13   that would permit them to make a missing witness argument needs

14   to front that with the Court.

15        Regarding body worn camera or the absence of body worn

16   camera evidence, as previously indicated evidence that the

17   defendants didn't have body worn camera -- weren't equipped

18   with body worn cameras is admissible.  It's relevant to the

19   Monell claim.

20        Defendant 16 --

21        MS. MOORE:  I apologize, your Honor.

22        THE COURT:  Yeah?

23        MS. MOORE:  I'm looking for some clarification on that

24   last portion of it.  I understand the relevance of the body --

25   lack of body worn camera as to the Monell claim but I think

1    what this motion is more specifically about is an argument

2    that -- you know, kind of an actual missing evidence argument,

3    like this video would have shown this happening.  Almost like a

4    spoliation instruction.  So I think there is a difference there

5    between an argument that says, well, the City didn't equip the

6    SWAT officers with body worn camera and thus they were

7    emboldened to act with impunity.  I think that's a different

8    argument than, well, if we had video of the incident, it would

9    have showed exactly what the plaintiffs were saying.

10           THE COURT:  I -- I don't disagree with you but I don't

11   understand the plaintiffs to be making this second argument.

12           MS. MOORE:  Okay.

13           MR. A. HOFELD:  We don't make it in the response to

14   this motion in limine.  It is actually in the black letter of

15   our complaint that is part of the -- as part -- it's part of

16   the causation, the Monell causation.  So it's not -- it doesn't

17   come up in this motion.

18           MS. MOORE:  I understand that --

19           MR. A. HOFELD:  Yeah.

20           MS. MOORE:  What I'm -- I'm saying two different -- I

21   understand the Monell causation and the emboldening.  What I'm

22   talking about is more of spoliation-type arguments.

23           THE COURT:  That would entitle -- if one established

24   spoliation, that it would entitle you to an adverse inference

25   that --

1      MS. MOORE:  Exactly.  And so I'm just looking for some

2  clarification that in granting -- because this is -- you know,

3  there's no body worn camera here.  What would it have shown?

4  It would have -- it would have shown the gun pointing.  That

5  I -- that's the evidence we're looking to have -- or the

6  argument we are seeking in part to be barred here.  I

7  understand your Honor's argument as to the Monell and the

8  Monell causation with the not equipping them with body worn

9  camera, you know, caused them to think they could act however

10  they wanted and I'm not disagreeing with that right now.  I'm

11  seeking for clarification on this other -- other aspect of a

12  missing evidence argument.

13      THE COURT:  All right.  Well, there's not going to be

14  an argument that you can infer that things went down the way

15  the plaintiffs say they went down because there was not body

16  worn camera.  They can certainly argue that the failure to

17  equip the police officers conducting a search with body worn

18  cameras, as this more points out, emboldens them, you know,

19  removes a check on what happened and that's part of the City's

20  plan or, you know, to -- it's part of their deliberate

21  indifference to trying to prevent the use of force against

22  minors so that's the ruling.  You can use it for that purpose.

23  You can't use it to argue that jurors should somehow believe

24  the plaintiffs because if there had been video, it would have

25  corroborated the plaintiffs.  Is that clear enough?

1          MS. MOORE:  Yes.  Thank you, your Honor.

2          MR. A. HOFELD:  And yes, it is.  And we never had a

3     spoliation argument because the video never existed, so yeah.

4          THE COURT:  All right.  So that was 15, right?

5          MS. MOORE:  Yes.

6          THE COURT:  Defendants' 16, bar argument that the City

7     should be punished or the jury should send a message to the

8     City with the verdict.  All right.  I think this is pretty

9     clear that you can't make that argument against the City

10    because the City can't -- you can't recover punitive damages

11    from the City but that it's a fair argument to be made with

12    respect to compensatory and punitive damages against the

13    individual officers so that's granted in part and denied in

14    part.

15         Defendants' 17, bar arguments, evidence about personal

16    information relating to any plaintiff or witness that would

17    constitute improper bolstering.  All right.  And I'm going to

18    grant the motion, though this is kind of categorical as well

19    just to put more meat on the bone.  You get to introduce your

20    witness.  You don't get to tell their life story and the

21    dividing line between those two extremes is much closer to "my

22    name is David," next question, you know, "what happened on" --

23    you know, moving to the substance as opposed to, you know,

24    another species of the "why I want a police officer" background

25    questions, the -- you know, "I'm a loving mother and single

1   mother working to support my children" and those kinds of

2   questions.  They're not relevant typically.  We're not going to

3   spend very much time on it.  If you've got more than two or

4   three background questions about your witness, you should be

5   trying to pare it down.

6        Defendants' 18, bar plaintiffs from testifying that

7   the officers involved should have been disciplined or fired as

8   irrelevant.  I'm going to grant in part and deny in part.

9   Granted to the extent we're talking about lay opinions

10  suggesting that the officers should have been disciplined or

11  fired.  Those would be not admissible but it does have

12  relevance.  Whether the defendant officers were disciplined is

13  relevant to the Monell claim and so evidence on that -- to that

14  basis can be offered.  So that's grant in part and deny in

15  part.

16       MR. MOWATT:  Your Honor, point of clarification.  We

17  can't -- we have -- basically both sides have agreed to bar the

18  COPA investigation as to the underlying matter so I don't fully

19  understand how any opinion about whether or not they should

20  have been disciplined as to this incident how we would even get

21  into that.

22       THE COURT:  Okay.  Well, don't.  So, I mean, I'm

23  granting the motion barring opinion testimony about that

24  officers should have been disciplined or fired.  It's not

25  admissible.  Whether they were disciplined if that evidence

1    comes in -- I mean, although put it this way, whether the

2    defendant officers were disciplined is relevant to the Monell

3    claim.  So if that evidence is otherwise admissible, it won't

4    be barred because it's not relevant to the Monell claim.

5         MS. MOORE:  Just to -- so, your Honor, if they're

6    getting into the defendant officers not being disciplined, then

7    we kind of do have to get into the underlying COPA

8    investigation because it was closed because there was no --

9    largely I believe -- cooperation from the plaintiffs and

10   there's an affidavit in there about that and we have agreed to

11   not get into that, so -- you know.

12        MR. A. HOFELD:  I don't think we need to.  If I

13   could -- I think we're -- we're missing the mark a little bit.

14   I think the -- whether the defendant officers were investigated

15   or disciplined in other incidents prior to the incident in this

16   case I think is what's relevant to our causation, Monell

17   causation.  I don't think we're seeking to introduce any

18   evidence that they weren't investigated or disciplined for the

19   underlying incident in this case --

20        THE COURT:  Okay.

21        MR. A. HOFELD:  -- so I think we're okay.

22        MS. MOORE:  That clarifies things.

23        MR. A. HOFELD:  Okay.

24        THE COURT:  Defendants' 19, bar lay medical and police

25   practices opinions.  I'm going to grant in part and deny in

1      part.  The plaintiffs can testify to their own symptoms and

2      reactions.  For example, I was afraid I was going to be shot

3      and haven't been able to sleep since that time but the

4      plaintiffs cannot testify that I felt the officers used too

5      much force.  That opinion testimony is not a lay opinion that

6      should be admitted and certainly cannot offer a lay opinion

7      that the defendants' conduct did not comport with their

8      understanding of how police should behave.

9              Defendant 20, bar evidence or testimony of the wealth

10     or poverty of the defendants.  That's essentially the same

11     motion as plaintiffs' 42 and the same ruling.

12             Defendant 21 is to bar evidence of settlement

13     discussions in this case and to bar the use of verdicts or

14     settlements including -- included as evidence of plaintiffs'

15     Monell claims.  Settlements with the defendants -- settlements

16     with the City are -- in other cases are inadmissible and the

17     plaintiffs represent that they don't intend to offer such

18     evidence.  Plaintiffs again said they don't intend to offer

19     such evidence.  If that changes, you've got to front it with

20     me.

21             MR. A. HOFELD:  Judge, if -- I'm not sure -- maybe --

22     maybe we've been misunderstood.  I'm not sure -- I think

23     we -- our response argues that verdicts and settlements in

24     cases with similar incidents are relevant to the Monell claim

25     for multiple purposes, I mean, as notice to the City as

1   pattern -- as pattern evidence, as deliberate indifference.

2   We're certainly not seeking to admit any settlement discussions

3   about this case or -- to the extent there have been any.

4          THE COURT:  Well, I guess where I was coming from with

5   respect to understanding this motion is not that it would

6   address the specifics of what happened in other cases but it

7   seems to be directed specifically toward evidence of prior

8   settlements with the City in other cases and that prior

9   settlements would be inadmissible.  Settlement as opposed to,

10  you know, your evidence about what actually happened.  I

11  presume those settlements say this is a settlement that is, you

12  know, not intended to be considered proof -- truth or -- that

13  the allegations of the complaint were true.

14         MR. A. HOFELD:  I understand.  I have -- go ahead.  Go

15  ahead, Zach.

16         MR. Z. HOFELD:  If I may just flag, your Honor, that

17  this also connects to one of the later motion in limines of

18  defendants and specifically with respect to when pattern

19  witnesses are testifying and the defendants sought I think

20  clarification in a motion in limine as to how your Honor

21  would -- would react to them trying to elicit the fact that the

22  pattern witnesses were represented by plaintiffs' counsel in

23  those other lawsuits.

24         And as we made clear in response, we believe that -- I

25  mean, we oppose that for the reasons we state.  But just to

1    make the connection here, if they were allowed to do that, we

2    believe it would be absolutely fair game to introduce evidence

3    of settlements in those other cases to rebut this notion that

4    the City is trying to make of, well, these are all -- you know,

5    this is just orchestrated by lawyers who are -- you know, and

6    it's all frivolous and has no merit and in order to rebut that,

7    you know, to show that there have been very significant

8    outcomes in these cases that clearly the City took seriously.

9            MR. A. HOFELD:  And in one additional sentence, the

10    fact that settlements have already occurred and paid out is

11    relevant to the lack of bias on the part of the pattern

12    witnesses in that they no longer have any financial incentive

13    to come into court and testify.  Part of the City's, as I

14    understand it, purpose in eliciting that pattern witnesses were

15    represented by our firm is to try to show that they had some

16    kind of financial incentive to come into court and testify.

17    But to the extent that settlements have already occurred and

18    paid out and all of that, that fact would -- would show a lack

19    of bias.

20            THE COURT:  Well, we'll get to that motion in limine

21    in my notes.  Off the top of my head, I don't know what my

22    notes say.  I'll have to get there.  But subject to some

23    further caveat based on that argument, this seems to me to be a

24    straightforward motion in limine that evidence of prior

25    settlements by the City of Monell claims are -- or not

1    necessarily Monell claims but claims against plaintiffs who

2    allege excessive use of force against minors are settlements

3    that are not admissible as proof of the conduct that was

4    alleged in the case so I'm going to grant defendant 21.

5         Defendant 22, bar attorneys from conferring or

6    speaking with witnesses while that witness is still under oath

7    to provide sworn testimony.  Once the witness takes the stand,

8    he or she is off limits to counsel.  The exception -- and I

9    will grant an exception to that general rule as to parties

10   because there may be need to confer about things other than a

11   parties' testimony on the stand but that's the extent of the

12   exception.  Otherwise, once you put them -- once they're

13   called, they're not available to you.  Once you start

14   cross-examination, they're not available to you.

15        And for further clarity because we did have -- discuss

16   at the close of last week's session that it will be permissible

17   on cross to go beyond the scope of direct.  None of that

18   changes anything.  You can't talk to them about their testimony

19   once you've started asking them questions, whether they're

20   questions about your case or questions of -- in

21   cross-examination.

22        Defendant 23, bar evidence that the defendant officers

23   may be indemnified by their employer.  That will be granted

24   unless the defendant officers open the door by presenting

25   evidence of their inability to pay damages.

1    Defendant 24 is to bar reference to the fact that

2  Chicago police officers are on duty and are being paid to

3  prepare for trial and appear in court and testimony.

4  Plaintiffs aren't going to introduce evidence that the City

5  witnesses are being paid to testify so I think that's without

6  opposition.

7    The defendants also seek to preclude any evidence that

8  the defendant officers met with City attorneys.  I'm going to

9  deny that.  That's fair game for cross-examination.  So that is

10 granted, that motion in limine.

11    25, bar argument that jurors are the "guardians of the

12 community" or otherwise that they're tasked with protecting the

13 public.  That will be granted.  And it certainly bars any

14 golden rule or put yourselves in the shoes of the plaintiff

15 argument.

16    Defendant -- all right.  Skipping to -- over Daubert

17 motions to defendant 30, to excuse defendant officers to attend

18 SWAT, detective, other work.  Okay.  We talked about this at

19 the end of last week.  We'll --

20    MR. A. HOFELD:  Yes.

21    THE COURT:  I expect everyone to do their best to

22 accommodate the witnesses' schedules and to ensure that we

23 don't have to have somebody testifying after working for 24

24 hours straight so for the record, I'm going to grant that

25 motion.

1    Defendant 31 is to bar or limit the use of full CR

2  files in plaintiffs' Monell claim.  I'm going to deny that as a

3  motion in limine.  I'll have to see the specifics that are

4  challenged and defendants will have to be prepared to address

5  arguments that the files are not hearsay because they're not

6  offered for the truth.  Limiting instructions are likely to be

7  needed and defendants may propose those.

8    Defendant 32, bar testimony, argument or innuendo

9  expanding plaintiffs' Monell claims.  We covered last week the

10  Monell claim is the excessive use of force against minors.

11  That's the scope of what we're dealing with so keep it to that.

12  That will be -- defendants' 32 will be granted on that basis.

13    Defendant 33, exclude or limit pattern testimony from

14  plaintiffs' counsel, present or former clients.  Okay.  This is

15  what we were just talking about.  I'm going to grant the motion

16  as to any issue of improper warrant, vetting or

17  disproportionate use of force against children of color.  Deny

18  as to lack of body worn camera.

19    MR. A. HOFELD:  I think that's on 32, Judge, the body

20  worn camera, unless I'm -- unless I'm -- 33?

21    MR. Z. HOFELD:  33 was to -- defendants' motion in

22  limine to exclude or limit pattern testimony.

23    MR. A. HOFELD:  Yeah.  32 referenced counsel -- right.

24  It was 32.  32 deals with not introducing evidence of excessive

25  force against children of color and body worn camera video.

1          THE COURT:  That's 32?

2          MR. A. HOFELD:  Yeah.  That's -- those are ways in

3     which plaintiff will not expand their Monell claim in response

4     to 32, your Honor.

5          (Counsel conferring.)

6          THE COURT:  Sorry.  I've got -- I got that misnumbered

7     on mine.

8          (Pause.)

9          THE COURT:  All right.  We've got kind of a hodgepodge

10    here.  With respect to 33, evidence of gun pointing incidents

11    involving minors during the Monell period is relevant to show

12    the City's police officers had widespread practice of using

13    excessive force against children during the Monell period, the

14    Court agrees that -- with the plaintiffs that some

15    post-incident event could also be relevant to this point.

16         As we were just discussing, plaintiffs don't get to

17    introduce evidence that prior cases ended in settlement or were

18    resolved by settlement but that doesn't preclude witnesses from

19    testifying about what happened to them.

20         As we've talked about in the context of a number of

21    other motions in limine, post-incident witnesses could have

22    some relevance but that time frame is, I think, fairly narrow.

23    As a general proposition, I would say within 12 months of the

24    incident as being the line of demarcation.  If you have

25    something that is more remote in time post-incident, you need

1  to raise it at the time.  The defendants' request that only the

2  adult plaintiffs and not the minors be permitted to testify is

3  denied.

4           And the last point I wanted to discuss was -- because

5  I don't know what -- how much of an issue it is, is the

6  defendants' request that pattern witnesses be limited to one

7  witness as to each additional incident.

8           MR. A. HOFELD:  We agree, Judge.  Yeah.

9           THE COURT:  Okay.  So how many pattern witnesses are

10 we actually anticipating?

11          MR. A. HOFELD:  Sure, Judge.  So there are it looks

12 like -- so based on the one-year post-incident demarcation, we

13 have -- there are about eight that fit within that time period.

14 We may not call all of them.  Some are on our Will Call; some

15 are on our May Call.  And then I think there are -- and then

16 there are another three or so that are like within 15 or 16

17 months.  I'm sorry.  Yeah; that are within 15 or 16 months

18 after the incident.  I think we said in the motion in limine

19 response that we would -- that we anticipated calling about

20 nine.  It may actually be a little bit less than that.

21          THE COURT:  Okay.  I just -- I heard a range of

22 numbers --

23          MR. A. HOFELD:  Right.

24          THE COURT:  -- including ones that go significantly

25 higher than nine so that's my source of concern.

1          MR. A. HOFELD:  And if I could address one more thing,

2     Judge, on that.  I think we -- I think this has already been

3     ruled on.  I just can't remember all the rulings from last

4     time; but we had asked in this motion in limine response that

5     if the number of witnesses, pattern witnesses that can testify

6     are limited by the one-year demarcation --

7          THE COURT:  They're not going to argue they only

8     called eight witnesses.

9          MR. A. HOFELD:  Right.  In other words, we're not

10    going to argue that, you know, there's an insufficient number

11    of incidents for a pattern.

12         THE COURT:  No.  They can -- they can argue you have

13    not presented sufficient evidence to establish a pattern.  What

14    they can't argue is they only called eight witnesses out of,

15    you know, the hundreds or thousands of people that might have

16    interactions with the police --

17         MR. A. HOFELD:  Okay.

18         THE COURT:  -- and therefore you should -- they have

19    not proved their case.  The distinction being the reference to,

20    you know, the number of witnesses being called.

21         MR. A. HOFELD:  Okay.

22         THE COURT:  All right.  34.

23         MS. MOORE:  Your Honor, there was one additional

24    argument that we had made relating to the pattern witnesses and

25    that is that certain -- some number of them the gun pointing

1  was alleged against SWAT officers and then some number is not

2  SWAT officers.  It's different, a warrant, warrant teams, gang

3  teams -- whatever you want to call them -- gun teams.  And we

4  made the additional argument that alleged gun pointing by

5  non-SWAT officers is not -- is such -- it's not as relevant as

6  gun pointing against SWAT officers and thus the -- the 403

7  analysis is even stronger there because here we have SWAT

8  officers who obtained different training from regular officers

9  in terms of entering a house to clear it for a search warrant

10  so they don't receive the same training that the other officers

11  do.  They receive more and different training.  So the

12  prejudice there is higher and the relevance is lower when it

13  pertains to incidents that don't involve SWAT.  Some of them

14  do.  Some of these pattern witness do and so we understand it

15  there but some of them don't and we think that that relevance

16  is too far removed and then the prejudice is higher so the 403

17  argument is a little -- is different there.

18         THE COURT:  You may be able to make that as an

19  argument in closing but I'm not going to grant that as a motion

20  in limine.

21         MS. MOORE:  Thank you, your Honor.

22         THE COURT:  34, to include sufficient limiting

23  instructions with each Monell witness.  Because I haven't dived

24  into your jury -- your proposed jury instructions yet, did

25  you -- did the defendants proposed a limiting instruction?

1           MS. MOORE:  We did not propose one.

2           THE COURT:  All right.  You should give that some

3     attention.  I'm not -- I'll go ahead and grant defendants' 34

4     because I think it's quite unlikely that I would refuse some

5     limiting instruction with the Monell testimony but that's

6     something we'll need to hash out, the particulars of what those

7     limiting instructions would be.

8           Defendant 35, bar the independent monitor.  Bar

9     evidence related to the consent decree including that the

10    reforms were not going far enough.  I think we've addressed at

11    the outset of today what is permissible with respect to the

12    consent decree.

13          Defendant 36, bar department directives and training

14    that went into effect after August 2018 as evidence of

15    allegedly faulty policy.  Haven't we already addressed this?

16          MR. A. HOFELD:  Yep.

17          MS. MOORE:  I believe so.

18          MR. A. HOFELD:  Yep.

19          THE COURT:  All right.  So I'm going to deny 36 as

20    redundant.

21          Defendants' 37, bar evidence from former

22    Superintendent Johnson, former Superintendent Brown, former

23    Mayors Emanuel and Lightfoot.  I'm going to deny this as a

24    motion in limine.  If the plaintiffs are seeking to introduce

25    statements by the former mayors or former superintendents, you

1  need to identify specifically what you're seeking to admit and

2  I will address that in the context -- in the specific context

3  that that evidence is being offered.

4        MR. A. HOFELD:  Okay.

5        MS. MOORE:  To provide some clarification, your Honor,

6  each of these people is listed as witnesses in plaintiffs'

7  pretrial order and additionally newspaper articles and the like

8  so that is what this is targeted at.  So I understand the other

9  rulings your Honor has made related to this is an objection to

10  be made at trial kind of a thing as it's happening with the

11  witness on the stand but obviously this is more of a motion to

12  preclude these witnesses from coming in to testify and so I'm

13  not sure that we --

14        THE COURT:  Well, so then the question is on what

15  grounds did I bar them?

16        MS. MOORE:  For the grounds mentioned in the -- in the

17  motion.  These statements were made, you know, in newspaper

18  articles so they're made after the fact.  There's relevance

19  issues in regard to timing, what is actually said, what is

20  actually meant.  They're largely political statements.  In

21  addition to apex arguments and arguments that these, you know,

22  are very busy public officials, former public officials,

23  there's ways to get the evidence that plaintiffs seek maybe

24  through other witnesses and the like.

25        THE COURT:  Well, Mr. Hofeld?

1      MR. A. HOFELD:  Yeah.  I mean, your Honor, we -- I

2  mean, we addressed each of these arguments in our response.  I

3  don't -- I don't know that you want us to -- you've read the

4  response.  I think the Court has ruled.  I would say that -- I

5  mean, certainly the burden is going to be on us to demonstrate

6  that any testimony that they come in and give is admissible

7  so -- and defendants will be able to object on multiple

8  grounds.  I mean, apex doesn't apply to former public

9  officials.  It doesn't apply to trial testimony.

10      THE COURT:  Yeah, this is -- this is --

11      MR. A. HOFELD:  Right.

12      THE COURT:  -- not the similar situation to, you know,

13  trying to get discovery from these officeholders.  They offered

14  these statements on their own at a time when they represented

15  the City and, you know, they put themselves in play.  Quite

16  honestly, thinking back to that time period, one might have to

17  scratch your head as to wonder why those officials were making

18  the comments that they were making and whether those were going

19  to -- they were going to rule the day that they had made those

20  comments.  That day may be fast approaching but I -- I don't

21  think just because they're -- you know, these are people who

22  were quite knowledgeable about the practices of the police

23  department and responsible for the practices of the police

24  department and per se I don't see any basis to say just

25  categorically they have nothing to offer that's admissible

1    evidence.

2          To the extent they have admissible evidence and that's

3    why I, you know, say, you know, what are the specific

4    statements that you're objecting to -- and I'll -- I'll do

5    this.  I'll require the defendant -- or the plaintiffs to

6    identify the specific statements that you're seeking to offer

7    from these former officeholders to the defendants by the 21st

8    so you'll know exactly what they plan to introduce and you can

9    object if there's a basis to argue that those statements are

10   not admissible, they're not offered for the truth -- whatever

11   the case may be -- but just the fact that they happen to be

12   these former high-ranking officials isn't a reason not to allow

13   the plaintiffs to call them.

14         MS. MOORE:  Thank you, your Honor.  We'll address the

15   specific relevancy arguments as to the statements then when we

16   get them as a supplement.

17         THE COURT:  Right.

18         MS. MOORE:  And just additionally, we'll likely -- you

19   know, as to former Mayor Emanuel, I believe one of the

20   statements is the statement he made at City Council in 2015 in

21   addition to the specific objections we'll make as to each

22   statement.  For that in particular, you know, Mayor Emanuel has

23   answered interrogatory answers specifically regarding that

24   statement so we will additionally be requesting that those be

25   used in lieu of making him come in here to testify.

1    MR. A. HOFELD:  And, Judge, if I may just in five

2 seconds.  Those interrogatory answers were not produced in

3 discovery in this case.  We didn't have an opportunity to -- to

4 test any of those answers.  They didn't even disclose that

5 document until a few months ago when we were putting together

6 the pretrial order and we would certainly argue that that

7 disclosure violation is not harmless because we didn't have an

8 opportunity to attest those interrogatory answers.  So I know

9 this issue is not before the Court yet but that would be -- we

10 just want it to be on record as well.

11    THE COURT:  All right.  Give him the statements, you

12 can make your objections, and I'll be much better informed

13 about the issue.

14    MS. MOORE:  Thank you.

15    THE COURT:  That was 37.

16    38 is bar use of verdicts or settlements including

17 evidence of plaintiffs' Monell claims.  We've already addressed

18 that.  That's duplicative of defendants' 21, I believe.

19    Defendant 39, bar plaintiffs from eliciting 30(b)(6)

20 testimony on topics for which they were not designated, and

21 from eliciting 30(b)(1) testimony.  I think -- does this one go

22 to Ms. Warren?

23    MR. A. HOFELD:  No.  No, your Honor.

24    THE COURT:  I might have the name wrong.

25    Are you seeking to bar a witness that the --

 1            MR. MOWATT:  No, sir.  If I may, your Honor, basically

 2    what happened in discovery in this case where there are a

 3    number of 30(b)(6) witnesses presented for that purpose.  They

 4    were also asked a number of 30(b)(1) questions about their

 5    background.  We want to try to avoid the argument that what

 6    they testified to as 30(b)(1) witnesses is the testimony of the

 7    City.

 8            THE COURT:  All right.  That's what I understood this

 9    to be doing.  I mean, I'll grant that motion.  There is a

10    distinction obviously between a 30(b)(1) fact witness and a

11    30(b)(6) entity representative.  And just because someone has

12    offered testimony in one capacity or in any capacity as a

13    30(b)(6) witness does not mean that testimony on topics that

14    they were not designated as a 30(b)(6) witness can't come in or

15    that it has to come in as 30(b)(6) testimony.  It can come in

16    as their personal testimony.

17            We'll probably need a limiting instruction

18    distinguishing the two types of testimony and we may need --

19    so, in other words, to tell the jury -- and it probably makes

20    sense to structure the examination of the witness in a way that

21    says this witness is now testifying as a representative of the

22    City, not as in their personal capacity, and delineating when

23    you're moving on to questions about their personal capacity.

24    Or you could call them at different times in your case to

25    address the 30(b)(6) topics versus personal knowledge that they

1     might have but -- so I'll grant that distinction -- or I'll

2     grant that motion in limine based on that distinction.

3             Defendants' 40, the motion to bar the DOJ report, the

4     PATF, and the OIG reports and the witnesses associated with

5     them.  I'm going to deny that motion without prejudice as a

6     motion in limine.  I agree with the defendants that the

7     plaintiffs as the proponent of the evidence need to identify

8     the specific statements for which the report is offered.

9     Otherwise, we don't know what the relevancy is or the

10    admissibility of those statements.  I mean, the fact that the

11    reports themselves might satisfy, you know, official report

12    hearsay exception, there could be multiple layers of hearsay so

13    I just can't make an evidentiary call without knowing the

14    specific statements that are at issue.  My notes reflect the

15    plaintiffs agree that three -- the three OIG reports regarding

16    CPD search warrant practices will not be offered.

17             MR. A. HOFELD:  Yes, your Honor.

18             THE COURT:  Okay.  So 40 is granted.  41, bar --

19             MR. A. HOFELD:  40 is denied without prejudice, right,

20    Judge?  You said denied without prejudice.  The motion to bar

21    the DOJ and the PATF and the one --

22             THE COURT:  I'm sorry.

23             MR. A. HOFELD:  Yeah.

24             THE COURT:  It's denied.

25             MR. MOWATT:  Your Honor, may we have a timetable by

1  which plaintiffs would identify whichever statements they might

2  use for -- or purport to use from these reports?

3       MR. A. HOFELD:  We'd be happy to do that, Judge.  As

4  they know, they were identified on summary judgment.  This

5  Court relied on those reports when denying the City's motion

6  for summary judgment.  They were identified then.  They're

7  identified here in this motion in limine response in specific

8  terms but we'd be happy to do it for, you know, a fifth or a

9  sixth time, no problem.

10       THE COURT:  Well, realizing that I wasn't along for

11  the entirety of that ride, identify those statements by the

12  21st.

13       MR. A. HOFELD:  Will do, your Honor.

14       THE COURT:  Defendants' 41, bar exhibits about

15  alternative policies and trauma-informed policing.  We'll get

16  to that when we get to the Daubert motions.

17       MR. A. HOFELD:  Okay.

18       THE COURT:  Defendant 42, bar news accounts or other

19  media to support plaintiffs' Monell claims, including comments

20  made by City personnel.  Well, a media report in and of itself

21  is unlikely to be admissible.

22       MR. A. HOFELD:  I believe this was already ruled on,

23  Judge.  I think it's a duplicate of defendants' motions in

24  limine 6 and 37.

25       THE COURT:  Well, 37 -- are we talking about anybody

1       other than the former superintendents and the former mayors?

2               MS. MOORE:  There's one media account from a former

3       deputy chief, I think, by the time he left, Matt Cline.

4               THE COURT:  The deputy chief of police?

5               MS. MOORE:  Yes.

6               THE COURT:  All right.  Well, we'll include that in

7       the identification of the statements that we just talked about

8       in Defendants' 37.

9               43, bar argument that IPRA's replacement by COPA

10      should be considered evidence in support of plaintiffs' Monell

11      claim.  That will be granted.  The fact that COPA replaced IPRA

12      does not make the allegation that the defendant -- that the

13      City failed to investigate and discipline the officer

14      misconduct more probable.  Actually, plaintiffs seem to be

15      arguing that both IPRA and COPA failed to investigate

16      complaints so the switch is difficult to see it is evidence of

17      much of anything so I'm going to grant that motion.

18              Defendants' 44, bar argument about the parties'

19      conduct during discovery or in response to FOIA requests or

20      failure to produce documents.  No such arguments will be made

21      before the jury.  If something comes up, we'll address it

22      outside the -- outside the presence of the jury.

23              MR. A. HOFELD:  Your Honor, I apologize.  I wasn't

24      clear on the ruling on 42.  I just -- I may have missed it.  I

25      may have --

1          THE COURT:  Was that to include Deputy Chief Cline

2    along with the former superintendents and the former mayors in

3    terms of if you're seeking to admit public comment by him

4    reported by the media.

5          MR. A. HOFELD:  Okay.  Thank you.  Thank you, your

6    Honor.

7          THE COURT:  All right.  So we just did defendants' 44.

8          Defendant 45, bar evidence or argument relating to

9    Jack Ryan or Lisa Thurau worked for the City of Chicago.  We'll

10   get to that in the Daubert motion.

11         I'm a little unclear, defendants, what you're getting

12   at here.

13         MR. A. HOFELD:  In 46, I think?

14         THE COURT:  Defendants' 46.

15         MR. MOWATT:  Basically, your Honor, we are trying to

16   say that plaintiffs should not be able to conflate who the

17   final policymaker is by saying, well, it's any number of these

18   people or that -- that it's anybody but the City Council for

19   certain things or -- or the superintendent for other things.

20   Who the final policymaker is, is a matter of law and depending

21   on the policy that they're arguing, they need to address the

22   actual final policymaker.

23         MS. MOORE:  Just -- this is partially addressed via

24   the jury instructions.  I think we have a jury instruction

25   relating -- outlining who the final policymakers are.  At least

1   that's -- that's what we had proposed.  Moreover, there were

2   30(b)(6) witnesses who were specifically designated as to final

3   policymaking topics so there has been, you know, specific

4   testimony relating to it so I believe this motion is -- is

5   largely to say, you know, we provided the universe here and

6   we're asking to stick with it.

7          THE COURT:  Well, all right.  Sounds I think more like

8   a legal issue --

9          MR. A. HOFELD:  Right.

10         THE COURT:  -- than a motion in limine so I'll deny it

11  in that regard.  We can take it up in context of jury

12  instructions or a further motion.  At this juncture, I have not

13  looked at those jury instructions so we'll deny that one for

14  the record.  But to the extent there's an issue or dispute or

15  disagreement as to the legal definition of the official

16  policymaker or a final policymaker, we can discuss that

17  further.

18         Defendants' 47, to structure the trial to require

19  plaintiffs' underlying claims to go first.  That will be

20  denied.  The plaintiffs -- the Monell claim is in the case and

21  the plaintiffs can present their case as they see fit with the

22  one exception that we've identified being on cross of someone

23  called by the plaintiff, the defendants can go beyond the scope

24  of the direct so you have some ability to put evidence for more

25  earlier in the process than you might otherwise.  So for the

1    record, defendant 47 will be denied.

2         Defendant 48 provides sufficient advance notice of

3    when they intend to call City witnesses.  We've talked about

4    that and I will rely on the parties to confer further on those

5    issues.

6         Defendant 49, require plaintiffs to provide sufficient

7    advance notice of demonstratives and video evidence.  Same

8    process here; that likely is going to depend on who is

9    testifying when in terms of demonstratives.  When we refer to

10   video evidence, what are we talking about, this phone footage?

11   Is it -- is there any other video evidence?

12        MS. MOORE:  Not that we're aware of.  There's the --

13   the cell phone and then the body worn camera.  That's about it.

14        MR. A. HOFELD:  Well, there's also -- I mean, there's

15   not a lot more, Judge.  There's -- there's video of the

16   outtakes of the interviews of the -- some of the plaintiffs,

17   not all the plaintiffs, shortly after the incident that

18   defendants -- that the defendants plan to use that we could

19   also potentially use some of them for rehabilitation so that

20   comes to mind.  So that's -- I mean, demonstratives with

21   experts but I can't think of any other video evidence.

22        THE COURT:  All right.  Well, I'm going to deny that

23   motion.  It doesn't sound like there's -- well, I guess

24   demonstratives would be -- not necessarily have even been

25   created at this point.

1        As a general proposition, provide anticipated

2 demonstrative exhibits at the same time you disclose when that

3 witness that you intend to use the demonstrative with to the

4 other side so hopefully we're able to do that at least two days

5 ahead of time. So if you're indicating that someone should --

6 is going to -- you anticipate calling them -- if it's Monday,

7 you anticipate calling them on Wednesday, you should

8 provide -- disclose any demonstratives on Monday as well that

9 you anticipate using.

10        Defendants' 50, to limit the testimony relating to

11 procuring the search warrants in questions. I think we've

12 pretty much beat this to death. I'm going to grant that motion

13 in limine. The plaintiffs can introduce evidence and testimony

14 that they had no connection to Mr. Bell or that no connection

15 to Mr. Bell was found during the search but they can't argue

16 that the search was invalid or that the wrong house was

17 searched or that the search was otherwise infirm.

18        Defendants 51, to limit counsel from speaking to the

19 press during the pendency of the trial. That will be denied.

20 At this juncture, I have no basis for concern about the

21 compromise of fairness of this proceeding. Obviously if some

22 issues arise in that regard during the course of the trial,

23 I'll endeavor to address that.

24        Here's the one that was raised earlier. Defendants'

25 52, to allow defense counsel to point out that plaintiffs'

1    pattern witnesses are all clients of plaintiffs' counsel.  I'm

2    going to -- I'm going to grant the motion to the extent that

3    the defendants can question on bias arising from the

4    relationship of the pattern witnesses with plaintiffs' counsel

5    in this case to the extent there is a relationship but I think

6    that would open the door to evidence that there is no such bias

7    including evidence that suggest that there is no financial bias

8    because the case was resolved with a substantial settlement

9    which means probably, defendants, you don't want to go there;

10   but if you choose to go there, you're going to open that door.

11          Defendants' 53, bar evidence unrelated to the claims

12   at issue here.  That will be denied as a motion in limine.

13   It's far too broad.  And that does it for the defendants'

14   motions.

15          All right.  It's twenty after 12:00.  Let's take ten

16   minutes.  I'm going to be able to give you another 45 minutes

17   to an hour.  We'll try to get through the *Daubert* motions to

18   get as far as we can.  Any other *Daubert* motions that we don't

19   address today, I will get a brief order out that at least tells

20   you what the rulings are going to be with -- in fact, we'll get

21   through the *Daubert* motion.  We might not have as much

22   discussion as you would like with respect to the *Daubert*

23   motions but I'll give you my rulings on them today.  So let's

24   take ten minutes and then we'll dive into that *Daubert*.

25          (Recess at 12:21 p.m., until 12:31 p.m.)

1          THE COURT:  Okay.  Back on the record.

2          All right.  I'm going to -- I'm going to go through

3     these essentially without interruption; and then to the extent

4     we have time to circle back to discuss particular issues, we'll

5     do that.  But I want to make sure I give you the rulings so

6     that you've got the -- you know where I'm coming from on those.

7          All right.  Again, starting with the plaintiffs'

8     *Daubert* motions, plaintiffs' 25 is to exclude certain opinions

9     of Mr. Kester.  Mr. Kester states -- the objections are that

10    Mr. Kester states the comments that the, quote/unquote, SWAT

11    team displayed discipline and restraint when referencing the

12    actions of only two officers; not the team as a whole.  Second,

13    that the plaintiffs maintain that suggestions that the team

14    knew safety priorities and was disciplined and professional is

15    also a comment that is challenged.

16         I think the report makes clear that characterizations

17    regarding professionalism apply to the specific conduct within

18    the context of accepted police practices concluding that

19    officers knew safety priorities is not speculation because it's

20    based on Kester's review of the specific actions of the

21    officers so I'm going to deny the challenge to Mr. Kester's --

22    to those comments by Mr. Kester.

23         The plaintiffs maintain that -- also maintain with

24    respect to these comments that they're speculative and

25    constitute character evidence.  I disagree.  It's not -- this

1    is not character evidence.  It's evidence of training or

2    professionalism.  Nor is understanding life safety priorities

3    character evidence.  It's evidence of professional knowledge.

4        The plaintiffs appear to be arguing that evidence

5    isn't relevant if it doesn't apply to all the officers who were

6    involved in the search but the fact that it only relates to a

7    subset of all the officers involved in the search isn't a

8    reason to exclude it just because that that conduct can't be

9    attributed to every officer.

10        The plaintiffs also challenge the statement by Mr.

11   Kester that an evaluation of firearm safety occurs almost every

12   day and most -- that most teams certainly have an awareness and

13   a desire to minimize any negative impact on children.  I'm

14   going to deny that motion as to the firearm safety comment.  In

15   context, that appears to be a comment about the CPD SWAT team

16   and again it's not character evidence.  Plaintiffs can cross

17   examine obviously to clarify any ambiguity in those statements.

18   I'm going to grant the motion as to the "most teams" comment,

19   however, because that -- the context of that statement does not

20   appear to be limited to CPD.

21        The plaintiffs also object to the comments that the

22   general plan called for the teams to arrive at their respective

23   properties, leave the delivery vehicles -- leave the delivery

24   vehicles, approach the apartment on foot, and conduct a knock

25   and announce, breach the doors if necessary, dynamically enter,

1    and detain and remove from the apartment any occupants.  The

2    gist of this complaint is the statement that the plan called

3    for dynamic entry only if necessary.  I'm going to deny that

4    motion.

5         The plaintiffs can certainly cross examine Mr. Kester

6    about his understanding of the plan and highlight any problems

7    with that understanding based on the text of the plan.

8         The plaintiffs also object to the statement by

9    Mr. Kester that "the SWAT team's medical plan and response met

10   generally accepted police practices."  The -- most of the

11   plaintiffs -- I think the foundation for this objection is that

12   Ms. Eason was taken out of the house in her underclothes and

13   was kept outside for an extended period.  The parties argue

14   about the fact that Ms. Eason never required medical care.  It

15   was Ms. Tate who at some point required medical care.

16        I think there's perhaps some confusion here because

17   the defendants put facts about what happened to Ms. Eason in

18   the -- or the defendants, Mr. Kester, put information about

19   what happened to Ms. Eason in the Medical Care section of the

20   report when she didn't receive medical care.  That's certainly

21   something that can be clarified on cross.  I don't see it as a

22   basis to exclude that Mr. -- or bar Mr. Kester from making --

23   offering his opinion about the adequacy of the -- let me strike

24   the use of the word adequacy -- his statement whether the SWAT

25   team medical plan met generally accepted police practices.

1          The plaintiffs also object to various comments by

2     Mr. Kester that read literally take -- you know, read as

3     findings of fact as to what happened in the residence.  Both

4     sides make these arguments about their respective witnesses so

5     I'll take this opportunity to say yes, it's fine for a -- an

6     expert to say my opinions -- I'm basing my opinions on the

7     plaintiffs' testimony or the defendants' testimony or I can't

8     resolve this credibility issue, that's all fine.  Both --

9     experts on both sides, however, I think transgress that line

10    and their testimony and reports read as if -- you know, they're

11    offered without caveats as to the truth of the underlying

12    facts.

13         I'm going to be sympathetic to objections that are

14    made on those grounds if you don't structure your examinations

15    to make clear that they are basing their opinion on -- that

16    they are not there to offer fact findings as to what happened

17    and that their opinions are a predicate what the foundation of

18    their opinions, in fact, are as opposed to offering finding

19    that -- being clear that they're not offering findings of fact

20    themselves.

21         Further, with respect to Mr. Kester, the plaintiffs

22    argue that his opinion that the combination of methods utilized

23    to clear the structure of occupants was acceptable under the

24    circumstances and met generally accepted police practices and

25    that the defendant officers' actions were not in an

1    unreasonable -- were not unreasonable based on the

2    circumstances.

3          You know, case law tries to draw the line between

4    what's a legal conclusion and what's not.  I think this falls

5    on the side of being a legal conclusion and I have tried to be

6    consistent in going through all of these *Daubert* motions as to

7    that line and I think the line lies on one side with testimony

8    that conduct comported with or did not comport with

9    professional standards, departed from generally accepted

10    standards or national standards or widely accepted standards,

11    that's fine.  Crossing the line into their response was

12    inadequate, improper, wrongful, however -- whatever adjectives

13    are used -- goes to the legal conclusion.

14          All right.  The plaintiffs point out that Mr. Kester

15    indicates that it's against practice for SWAT teams to wear

16    face coverings but that based on the videos taken by the

17    neighbor and by testimony, the equipment and uniforms worn by

18    the SWAT team met generally accepted police practices.  That's

19    a -- that's a subject for cross-examination and I'll -- I'm not

20    going to preclude Mr. Kester's opinion testimony in that

21    regard.

22          Last, with respect to Mr. Kester, the plaintiffs

23    object to his conclusion that "the planning and preparation

24    accomplished by the SWAT teams to serve the high-risk search

25    warrants met generally accepted police practices."  The

1    combination of methods utilized was acceptable.  So again, the

2    "met generally accepted police practices" is okay.  The

3    "combination of methods utilized to clear the structure was

4    acceptable" is not.  All right.  That's Mr. Kester.

5            Plaintiffs' 26 is to exclude certain opinions of

6    Jeffrey Noble.  The first objection is that Mr. Noble evaluates

7    the investigation with a reasonableness standard, not a

8    thorough and complete standard, which is what the plaintiffs

9    argue should be the standard.

10           The -- frankly, the defendants don't articulate it

11   or -- excuse me.  The plaintiffs don't articulate it but I

12   think the fundamental -- there's no thorough and complete

13   standard.  I agree with that.  But Mr. Noble's opinions are

14   couched in reasonableness which I think is crossing the line

15   into legal conclusion given that objective reasonableness is

16   part of what we're dealing with in this case substantively.

17           So I think the defendants need to address that with

18   Mr. Noble and I'm not going to permit him to testify about the

19   reasonableness of the actions.  What he can testify about is

20   whether the actions comported with generally accepted policing

21   standards in the context that are presented in this case.

22           The plaintiffs also object to Mr. Noble's reliance on

23   over 2,000 police investigations by the City of Chicago, the

24   vast majority of which are not part of the record in this case.

25   I'm going to deny that motion.  You don't have to disclose

1   every file, article, text you've encountered and reviewed

2   during the course of your career.  This statement goes I think

3   more -- is more of a statement about his experience and general

4   knowledge of the subject matter of his testimony as opposed to

5   substantive testimony about what happened here so I'm going to

6   deny that objection.

7          Plaintiffs object to Mr. Noble's statements that there

8   is, quote/unquote, no evidence that CPD turned a blind eye, no

9   evidence of a code of silence.  I'm going to deny that motion.

10  I think that plaintiffs' argument takes these statements by Mr.

11  Noble, the "no evidence" statements, out of context.  He

12  generally cites the record and explains how he reaches that "no

13  evidence" conclusion and he is certainly subject to

14  cross-examination about any evidence that he doesn't address in

15  the context of those statements.  Plaintiffs can obviously

16  cross examine about, you know, why isn't this evidence or why

17  isn't that evidence.

18         The plaintiffs also object to Mr. Noble's statement

19  that gives the City some credit for having independent civilian

20  oversight after IPRA -- or COPA takes over from IPRA.

21         And also, that Mr. Kester states that "no reasonable

22  CPD officer could believe they could act inappropriately with

23  impunity and that nothing would happen."  I'm going to deny

24  that motion.

25         With respect to Mr. Noble's statements crediting the

1    City for adopting civilian oversight agency, he doesn't

2    expressly say that that's better, though there is some tension

3    with his prior statement on that subject and that's fodder for

4    cross-examination.

5         With respect to the "no reasonable CPD officer"

6    statement, that is again his opinion based on review of the

7    record and the -- including the Monell evidence and therefore

8    won't be excluded; obviously grounds for cross-examination.

9         Plaintiffs' 30 is to exclude reference to John Ryan's

10   potential role in the Providence hiring scandal.  That motion

11   will be granted.  There's no basis to say that the possible

12   incrimination that would follow from -- or that would be caused

13   by answering questions truthfully and honestly, there's no

14   basis to say that that possible incrimination would be

15   probative of honesty or truthfulness.  It's also, I think,

16   unduly -- this evidence would be unduly prejudicial given the

17   likelihood of jury confusion and the pejorative understanding

18   that most people have about taking the Fifth.  So that motion

19   in limine is granted.  That again was plaintiffs' 30.

20        MR. LISY:  I believe that's 29, your Honor.

21        MR. A. HOFELD:  Yeah.  It's 29.  That's -- that's

22   right.  The motion to bar reference to the Providence hiring

23   scandal is number -- plaintiffs' number 29.

24        MR. MOWATT:  And, your Honor, 28 is Dr. Kraus, the

25   *Daubert* motion for that.

1      THE COURT:  All right.  I don't know why I got this

2  misnumbered.  So what we were just talking about was

3  plaintiffs' 29.  Plaintiffs' 28 is to exclude certain opinions

4  of Dr. Kraus.  The general basis of that -- those objections is

5  that Mr. Kraus did not evaluate plaintiffs -- did not evaluate

6  the plaintiffs because the standards for diagnosing PTSD

7  require clinical evaluation.  The plaintiffs maintain that

8  because Kraus did not evaluate the plaintiffs, his conclusions

9  necessarily fall short of this standard.  I'm going to deny

10  this motion.

11      Putting aside the fact that it's not completely clear

12  that a personal examination is required, Dr. Kraus isn't

13  offering a PTSD evaluation.  He is commenting on the evaluation

14  of Dr. Berkowitz and, in doing so, he draws on various medical

15  records and other documents that pertain to Dr. Berkowitz's

16  opinions so that motion is denied.

17      To the extent the plaintiffs argue that -- the

18  plaintiffs also object that Kraus makes various conclusions

19  relating to the impact of E'monie's father's incarceration.

20  Did we -- where did we leave off with that?  Did we find --

21      MR. KOWALCZYK:  Yes.  Your Honor, I had -- and I

22  shared it with plaintiffs' counsel the -- there's three pages

23  of Lakasha Warren's deposition testimony that covers

24  the document that -- the visit that Mr. Hofeld had pulled the

25  record of and has her testimony regarding -- it was actually

1    Legend confirming that it did come from him.  It bothered him.

2    And I have that testimony available if your Honor wanted to

3    take a look at it.

4              THE COURT:  Mr. Hofeld?

5              MR. A. HOFELD:  Just -- I believe I read the three

6    pages on Mr. Kowalczyk's computer and we also checked.  There's

7    no opinion from Ms. Warren that it bothered Legend.

8              THE COURT:  No.  That's -- they're saying that Legend

9    told Warren that that was the case.

10             MR. KOWALCZYK:  And that's why she documented it.

11   That's what she says in --

12             MR. A. HOFELD:  I don't think that's what it says,

13   your Honor.

14             THE COURT:  All right.  Get me those pages of the

15   deposition.

16             MR. KOWALCZYK:  Sure.  I have it on my screen.  I

17   could actually bring it up if your Honor wanted to review it.

18   It's Pages 43 to 45 of Lakasha Warren's deposition.

19             THE COURT:  It will take me longer to find it on my

20   computer than looking at yours.

21             MR. KOWALCZYK:  I have it on full page.

22        (Pause.)

23             MR. KOWALCZYK:  It's a few lines down where it starts

24   the "January 10th visit."

25        (Pause.)

1        THE COURT:  Okay.  All right.  I think the deposition

2    testimony supports the defendants' characterization of the

3    information about -- that the source of the expressed concern

4    about the -- Mr. Booth's incarceration was Legend so I'm going

5    to deny the plaintiffs' motions in limine that seek to bar

6    altogether evidence relating to Mr. Booth's incarceration but I

7    will limit it very much to the -- to the context of, you know,

8    was this part of -- you know, basically a preexisting stressor

9    that bothered him that, you know, enough to raise with the

10   social worker.

11       I will also -- if the plaintiffs want a limiting

12   instruction, you can propose a limiting instruction that makes

13   clear that the fact that Mr. Booth was in custody has no

14   relevance other than in assessing any damages that the

15   plaintiff claims.

16       MR. A. HOFELD:  Understood, Judge.  The only question

17   I would have is -- I mean, as the deposition testimony as I

18   read it, it doesn't tie -- it doesn't seem to be an

19   incarceration per se that's causing the stressor.  I think

20   again the issue in the deposition testimony seems to be

21   absence.  There's nothing indicating that it's incarceration.

22       You know, I would just say respectfully and again that

23   that is so prejudicial, so unfairly prejudicial to introduce

24   "incarceration, conviction, felony."  If the only issue is

25   absence, we understand that absence could be relevant.

1            THE COURT:  All right.  We've made these arguments.

2            MR. A. HOFELD:  Yes.

3            THE COURT:  Your record is secure but --

4            MR. JOHNSON:  Your Honor, if I could just --

5            THE COURT:  -- I made my ruling.

6            MR. JOHNSON:  If I could just make one point -- and

7    I'll keep it brief.  Under 30 seconds, your Honor.  Because I

8    actually thought about this the last time we were here and we

9    did talk about -- I believe I made the point that the child

10   does not know what incarceration is.  If you put it in the

11   context of let's say your Honor has a sentencing and the

12   3553(a) factors come up and someone says it is aggravating that

13   you've been incarcerated before sir, yeah, because you know

14   what incarceration is.  That's not a mitigating factor for you.

15   The child has no understanding of what incarceration is here.

16           THE COURT:  Well, I don't think that's a fair

17   inference from the report.  Whether we use the term

18   incarcerated or in jail or in custody, I think Legend has

19   reported here -- assuming the truth of what's been reported --

20   understood and was bothered by, in some fashion, the fact that

21   his father had been in jail for an extended period.

22           And again, I'll repeat myself to this degree and then

23   we'll move on.  While I appreciate Mr. Hofeld's concerns about

24   undue prejudice, I will do a limiting instruction and, you

25   know, this is not a reflection on the plaintiffs.  This is an

1    explanation for -- or a part of rebuttal evidence relating to

2    the -- one of the plaintiff's mental health issues.  And as

3    such, I don't see this as being terribly prejudicial at all to

4    Legend.  It obviously does not reflect on him that his father

5    was incarcerated so that's the basis for my ruling.

6            All right.  Additional statements the plaintiffs

7    object to with respect to Mr. Kraus, those include that

8    the -- his statement that "if the plaintiffs had PTSD, there

9    would be documented decline in their ability to function at

10   home, at work, and school."  I'm going to deny that motion.

11   The opinion that PTSD manifests itself through symptoms such as

12   described by Kraus based on his experience and training is an

13   adequate basis to support that statement.

14           The plaintiffs object to the -- Mr. Kraus's statements

15   about the fact that Warren diagnosed plaintiffs with Acute

16   Stress Reaction; not PTSD.  I'm going to deny that motion.  How

17   Acute Stress Reaction diagnoses relate to or interact with PTSD

18   diagnoses seems to me like expert fodder.  And again, Kraus is

19   not offering an opinion about PTSD.  All he's doing with

20   respect to this objection is noting that the Acute Stress

21   Reaction is a diagnosis that is only given within the first 30

22   days after exposure and that in -- therefore not offering a

23   PTSD opinion but offering an Acute Stress Reaction diagnosis

24   that undermined the legitimacy and accuracy of Berkowitz's

25   diagnosis of PTSD.

1    We've already talked about I think the plaintiffs are

2    seeking to bar -- bar statements by Kraus about several factors

3    that could have contributed to the plaintiffs' mental state in

4    his report and it's fair game for Mr. Kraus to criticize the

5    Berkowitz opinions and report for failing to take those factors

6    into account.  To the extent that those criticisms are not

7    justified or accurate as to what Berkowitz has said, obviously

8    that can be covered with Berkowitz on direct and with Kraus on

9    cross.

10    The plaintiffs also object -- and we just talked about

11    this -- that Kraus at various points recites the -- what

12    happened in the residence in a manner that suggest that he's

13    making findings of fact.  There were no guns being pointed at

14    anyone.  Plaintiffs are distorting the truth in regards to what

15    happened in the house.  I'm going to grant that motion.  Again,

16    Mr. Kraus can't describe and tell us the truth of what happened

17    in the house.  That's for the jury to determine so that -- that

18    motion is granted.

19    Plaintiffs' 27, if my numbering is correct, is the

20    motion to exclude Mr. Noble's discussion about the statutory

21    affidavit, quote/unquote, requirement.  The plaintiffs seek to

22    bar testimony whether it's from Mr. Noble or some other source

23    about the affidavit requirement.  The plaintiffs argue that

24    that evidence should not be offered because it's a misleading

25    interpretation of the law.  I'm going to deny that motion.

1         I don't think that in this regard the defendants are

2  offering a legal opinion.  How the affidavit requirement was

3  understood is a question of fact and as such the plaintiffs can

4  present contrary evidence of the effect that the statute had.

5  I'll note that in the *First Midwest Bank* case, the issue of the

6  affidavit's effect was treated by Judge Leinenweber as a

7  question of fact citing testimony of several trial witnesses on

8  this subject to -- in support of the conclusion that the

9  affidavit bar was not, in fact, a bar and that there were

10  workarounds available.  I think that that is an appropriate

11  resolution of that issue.  So plaintiffs' 27 to exclude

12  Noble's -- Noble or, I'll add, any other witness's discussion

13  of the statutory affidavit requirement is denied.  That issue

14  can be the subject of evidentiary presentation.

15         Plaintiffs' 30, I hope, is to bar suggestion that any

16  plaintiff experienced or PTSD or re-traumatization by talking

17  about the incident.  I'm going to deny that motion with the

18  limitation that Kraus cannot offer opinions on

19  re-traumatization of the plaintiffs themselves as he did not

20  examine them and is not offering diagnoses of them.  He can --

21  he's not offering a diagnosis or opinion that they had PTSD in

22  the first place.  He can offer his opinion on the effects of

23  discussing traumatic events in general based on his experience

24  so I'm denying that motion.

25         MR. A. HOFELD:  Denied in part and granted in part,

1  Judge, with -- granted with respect to Kraus not being able to

2  offer opinions about the plaintiffs being re-traumatized or --

3       THE COURT:  Oh, yeah.  It's definitely a mixed boat

4  here.  So Kraus can talk about re-traumatization generally and

5  can offer the criticism that if -- if he has made the --

6  offered the opinion that Dr. Berkowitz didn't appropriately

7  address that question but he cannot offer opinions that -- as

8  to re-traumatization.

9       Plaintiffs' 34 is to bar the defendants from eliciting

10  any testimony that Berkowitz evaluated E'monie and LaKai'ya in

11  a consulting capacity arguing via Dr. Kraus the fact that Dr.

12  Berkowitz did not disclose any report on those two plaintiffs

13  means that they were not harmed by the incident.  If the Court

14  denies this motion in limine, plaintiffs are alternatively

15  requesting to elicit testimony from Dr. Berkowitz on his

16  findings as to the two plaintiffs.

17       I'm going to grant that motion.  That's purely

18  speculative as to why Dr. Berkowitz did not write reports as to

19  the two youngest kids.  It doesn't mean that the defendants

20  cannot argue that the plaintiffs did not present opinion

21  testimony that the -- that those two children suffered from

22  PTSD.  It's fair game for the defendants to point out there is

23  no diagnosis of PTSD as to those plaintiffs.

24       All right.  So that's plaintiffs' *Daubert* motions.

25       Defendants' *Daubert* motions, to bar certain opinions

1   of Dr. Berkowitz because he's not a neurologist and he's not

2   qualified to offer opinions on the impact of trauma on the

3   brain.  He's a board certified psychiatrist who specializes in

4   trauma.  He -- the difference between psychiatry and neurology

5   is often a gray area.  I think his testimony is within his

6   realm of experience and training.  This ruling does not,

7   however, bar cross-examination about any failure to conduct any

8   neurological examination to assess whether there is, in fact,

9   any observable brain damage.

10          The defendants object to statements by Berkowitz that

11  plaintiffs are at, quote, increased risk, closed quote, for

12  negative outcomes as a result of the incident.  I'm going to

13  deny that motion.  Increased risk is a current fact.  That's

14  not speculation.  I mean, I'm not making the factual finding

15  but it's offered as a fact that "may face increased risk" so

16  that is not speculative.  Whether the risk will result in

17  adverse outcomes in the future is what is speculative and

18  Berkowitz cannot say with certainty that something will happen

19  but what he can say is that a risk was increased or incurred as

20  a result of the incident.

21          The defendants object to the Berkowitz opinion that

22  La'Niya found thinking about traumatic raid and her feelings

23  about it too hard to manage so she avoided therapy for those

24  reasons.  I will deny that motion because it's objected to as

25  speculative but I don't think it's speculative because it's

1    based on interviews with La'Niya.

2           The defendants object to the statement -- to Berkowitz

3    statement that Ebony Tate was suffering from some abdominal

4    pain and noted gastrointestinal discomfort.  That will be

5    denied.

6           The objection by the defendants that Dr. Berkowitz

7    rebuttal report cannot include new opinions isn't the basis for

8    barring anything at this point in time.  The plaintiffs

9    maintain that Berkowitz's rebuttal is pure rebuttal.  I'm going

10   to deny it because the defendants haven't identified any

11   specific opinions in the rebuttal report that they maintain are

12   inappropriate.

13          The defendants also take issue with Berkowitz's

14   statements that the police raid was, quote, unacceptable,

15   completely irresponsible, and other statements about the police

16   procedures used during the procurement and execution of the

17   search warrant.  He's not a police practices expert.  The

18   opinions that -- that the police raid was unacceptable and

19   completely irresponsible cross the line into legal conclusions

20   so that objection is granted.

21          The defendants' objections to John Ryan's report on

22   police practices.  The procurement of the warrant is no longer

23   an issue so the discussion of the warrant investigation will be

24   precluded.

25          The defendants argue that Mr. Ryan's opinions are

1   based on reliable methodology because Ryan imposes a greater

2   duty on officers than the law requires.  Again, testimony about

3   what are generally accepted standards, widely accepted

4   standards, national standards is permitted and as well as

5   opinion testimony about when those standards -- when the

6   defendants departed from those standards, that's all

7   permissible.  So to the extent that the defendants are trying

8   to preclude Ryan's testimony about such generally accepted

9   police practices and policies and training, it will be denied.

10          The defendants object to Ryan's opinion that the City

11  is under -- the fact that the City is under a consent decree

12  suggest that the City practices were deficient.  I'm going to

13  deny that motion -- or I'm sorry.  Defendants' motion.  I'm

14  going to grant that motion.

15          The extent of the consent decree evidence we've talked

16  about at the outset of today.  As well, the consent decree

17  specifically states it may not be used to support a claim of

18  liability.  Ryan's opinion would go directly contrary to that

19  provision.

20          Ryan's opinions that SWAT team members being

21  unequipped with body worn cameras depart from generally

22  accepted practices is permissible so the challenge to that is

23  denied.

24          The defendants object to Ryan's opinion that the City

25  would have had the data that would have revealed the allegedly

1    improper policies because they have all the IPRA and COPA

2    materials.  I'm going to grant that objection to that opinion

3    testimony.

4           MR. A. HOFELD:  Judge, can I ask just the basis for

5    that ruling because Mr. Ryan supports that opinion with lots of

6    data and CR files and the DOJ report, et cetera?

7           THE COURT:  Yeah.  I guess my question here,

8    Mr. Hofeld, is how Mr. Ryan infers a pattern or practice of

9    specific conduct based on unsustained charges.

10          MR. A. HOFELD:  Okay.

11          THE COURT:  I just started to go through -- there's a

12   list of examples provided.  I didn't make notes of them, every

13   one, but the examples seem universally to be not sustained

14   allegations or allegations reported by nonwitnesses so --

15          MR. A. HOFELD:  Yeah, but I -- I mean, I would just

16   say that it's still -- I would just make the point that --

17   there's -- you know, still they may not be sustained, you know,

18   but if a half to a third of all of those allegations were

19   closed from affidavits so they were never -- they were never

20   investigated, we don't know how much merit there is there.

21   And, you know -- you know, there was certainly some degree of

22   notice that would occur if you got, you know,

23   three-hundred-and-some complaints of excessive force against

24   children.

25          THE COURT:  Yeah, but --

1          MR. A. HOFELD:  I mean --

2          THE COURT:  -- I wouldn't disagree with you about

3    notice.

4          MR. A. HOFELD:  All right.

5          THE COURT:  My question goes to offering a conclusion.

6          MR. A. HOFELD:  I think Mr. Ryan is the -- the opinion

7    is geared towards notice, that the data and their possession

8    would have put them on notice.

9          THE COURT:  Well, I see notice as a different subject.

10   Certainly the complaints that are received put them on notice

11   of a potential issue, a potential training problem, a potential

12   policy that is problematic.

13         MR. A. HOFELD:  Okay.

14         THE COURT:  That's all fair game.

15         MR. A. HOFELD:  Okay.

16         THE COURT:  But the opinion that's identified by the

17   defendants is that the City -- that the data would have

18   revealed the alleged improper policies.

19         MR. A. HOFELD:  Yeah.  I mean, I think that's -- I

20   think it's also based on the DOJ report.  He talks about the

21   DOJ report and that is what the DOJ report -- you know, the DOJ

22   investigation got all of its data from the City and that's what

23   the report says and it concluded that, you know, there's a

24   pattern of excessive force against children, including gun

25   pointing.  So I think -- and Ryan specifically references the

1    fact that the DOJ got its data from the City and, you know,

2    that's the basis. That's one basis for that opinion so --

3    here.

4           THE COURT: Well, I think as it's offered, the opinion

5    is a bit too broad --

6           MR. A. HOFELD: Okay.

7           THE COURT: -- so we'll put a marker on this.

8           MR. A. HOFELD: Okay.

9           THE COURT: We can revisit it next week.

10           MR. A. HOFELD: Okay.

11           THE COURT: But again, I think the basic problem is

12    it's too broad to say that you can -- you would have -- that

13    data would have confirmed -- you know, standing alone, would

14    have confirmed the problems when the data for the most part,

15    you know, consists of unsustained allegations. That's --

16    that's what's concerning to me.

17           MR. A. HOFELD: Okay.

18           THE COURT: All right. Ryan's report includes

19    discussion of the previous affidavit requirement. I've

20    discussed that. That will be denied. That's fair game for

21    discussion and evidence presentation.

22           Defendants object to the City that negotiates away its

23    ability to investigate officer misconduct is indicative of a

24    City that does not care about such misconduct. I'll grant

25    that objection. That's -- that's argument that if -- Mr. Ryan

1    can't reasonably infer on the basis of the CBA that the City

2    was deliberately indifferent to the alleged misconduct.

3         All right.  And this may bear on the one we were just

4    talking about, Mr. Hofeld.  The defendants challenge -- or

5    object to Mr. Ryan's discussion of findings and reports like

6    the OIG -- well, you've said you're not offering those reports,

7    the Police Accountability Task Force, the DOJ report.  I'm

8    going to deny that challenge.  I think that Mr. Ryan does more

9    than restate the conclusions in those reports.  He does tie

10   them to the evidence and professional standards so I don't

11   think the challenge to bar him from talking about those reports

12   should be granted so that will be denied.

13        The earlier thing we were talking about I think just

14   goes a little further than that to the extent that he's

15   offering an opinion that the data alone would have revealed the

16   allegedly improper policies.  That I think goes beyond what was

17   challenged about his discussion of the DOJ and PATF reports.

18        Defendants object to references about legal mandates.

19   those challenges are accepted.  Mr. Ryan should not discuss

20   legal mandates.

21        The challenge to Mr. Ryan's opinions relating to gun

22   pointing at complying individuals, that challenge is denied.

23   The opinions are relevant and helpful because they bear on the

24   core of conduct at issue in this case.  The standards are not

25   self-evident and are subject of expert testimony as well as

1  departures from the accepted standards and those are predicates

2  that the jury needs to understand in order to assess whether

3  the officers were acting reasonably when they entered the home.

4       The defendants object to Ryan's summation of complaint

5  register files against certain officers.  I think there's

6  significant agreement here between the parties if I'm

7  understanding correctly.  The CRs that are summarized at

8  Paragraphs 139 to 141 are relevant to Monell because they

9  involve alleged unjustified gun pointing or the other excessive

10  use of force in the presence of minors so I think they're

11  within the scope of what Mr. Ryan can testify about.  That

12  excludes then CRs against non-SWAT defendants.

13       MR. A. HOFELD:  What?  I'm sorry.  You just -- I want

14  to ask for clarification.  When you say excludes CRs

15  against -- oh, non-SWAT defendants.  Oh, the relevance is not

16  as to the non-SWAT defendants.  I understand.

17       THE COURT:  Okay.

18       MR. A. HOFELD:  Thank you.

19       THE COURT:  All right.  The Ryan summaries of

20  statements made by public officials, that will have to comport

21  with what is ultimately deemed admissible so we'll have to make

22  a determination about that.

23       The defendants also object to the discussion of the

24  firearm pointing bulletin.  When was that bulletin issued?

25       MS. MOORE:  It's 2019.  I'd have to take a look.  I'm

1    not sure of the exact month.

2         MR. A. HOFELD:  Well, let's see.  Which bulletin are

3    we -- because there were a couple.  I guess the one -- yeah.  I

4    think -- I think Ms. Moore is correct about if we're referring

5    to the 2019 firearm pointing incidents education and training

6    bulletin.

7         MS. MOORE:  We think September but we -- that's --

8    September 2019.

9        (Counsel conferring.)

10        MS. MOORE:  I'm sorry.  We are going to have to double

11   check but there's a special order and a bulletin so we'll have

12   to get confirmation on the specific dates for each.

13        THE COURT:  All right.  We'll put a marker on that one

14   as well.

15        The defendants also object to the use of the phrase

16   "force multiplier" by Mr. Ryan.  I'm not sure what Mr. Ryan

17   means by that phrase, Mr. Hofeld.

18        MR. A. HOFELD:  I mean, I think he's -- as I

19   understand it, it's a term -- it's a -- it's a -- sort of a

20   technical phrase, I mean, that's used in -- you know, that's

21   used in the use of force training and policy context.  And

22   he's -- I mean, he's referring to the SWAT team, the nature of

23   the SWAT team, the nature generally of SWAT missions.  SWAT

24   officers are prepared and equipped to use greater force than

25   patrol officers and other non-SWAT officers.

1    THE COURT:  Well, let me go at it this way.  What's

2 the defendants' concern here?

3    MS. MOORE:  The concern is that even if it is a term

4 of art, it's -- it has a connotation to it, force multiplier,

5 that we think makes it unduly prejudicial because there are

6 other -- Mr. Hofeld just said, other ways you could -- other

7 things you could say to describe what that means without saying

8 "force multiplier."

9    THE COURT:  All right.  I'm going to deny the

10 challenge.  If Mr. Ryan uses that phrase, you can seek

11 clarification from him as to what the phrase means.  It's -- I

12 don't see anything terribly prejudicial about it.  It sounds

13 like jargon that many people won't necessarily understand

14 without some amplification but you can seek that clarification

15 on cross.

16    Next, with respect to Mr. Ryan, he discusses

17 statements relating to the code of silence made by Emanuel and

18 Johnson.  Again, those will -- that will be determined by our

19 further discussion as to which of those statements, if any, can

20 be admitted.

21    Defendants challenge Ryan's opinion that there is a

22 code of silence in this case based on the actions of the

23 defendant officers.  I'm going to deny that challenge.  I think

24 Mr. Ryan lays an adequate foundation for his opinion based on

25 his review of the records and his experience.

1      The defendants object to Mr. Ryan's opinions related

2  to the training involving the vulnerabilities of youth.  The

3  defendants seek to exclude these opinions of Mr. Ryan which are

4  similar to the opinions of Ms. -- I don't know how to pronounce

5  that -- Thurau.

6      MR. A. HOFELD:  Yes, your Honor.

7      THE COURT:  The defendants challenge those because

8  doctor -- or Mr. Ryan has not provided support that they are,

9  in fact, nationally recognized standards.  I'm going to grant

10 that challenge and as I will discuss in a minute, it's a

11 concern that I have with respect to Ms. Thurau's opinions as

12 well.  I don't think the plaintiff experts have established

13 that there is a generally accepted practice, national

14 standard -- whatever description you want to use -- for a

15 widely accepted standard of the exercise of professional police

16 forcing with respect to the trauma-induced or

17 vulnerabilities -- youth vulnerability issue to allow either

18 expert to testify about deficiencies in the defendants'

19 policies and procedures and training.

20     You got to have -- you don't -- the plaintiffs argue

21 that you don't have -- the policies don't have to be

22 universally accepted, that's true, but they have to -- you have

23 to establish a foundation of general acceptance, wide

24 acceptance, some basis to say that organizations that are

25 looked to for setting nationwide general standards have done so

1    in this area and neither of the experts appears to me to have

2    done that adequately.  So I'm going to sustain the challenge to

3    doctor -- or Mr. Ryan's opinions as to that subject and we'll

4    get to Ms. Thurau in a moment.

5            With respect to Mr. Schanzenbach, the defendants

6    challenge him as not being qualified to provide a qualitative

7    analysis of CPD policies; I agree.  He admits that he is not

8    qualified to offer a qualitative assessment of the defendants'

9    policies, yet he does so.  And to the extent he talks about,

10   you know, agreeing with the findings of -- the qualitative

11   findings in the PATF report and the DOJ report, he's doing

12   seems to me exactly what he says he's not qualified to do,

13   which is offering a qualitative opinion.

14           What he is qualified to do is offer some statistical

15   analysis; and to the extent he offers statistical analysis

16   about the number of complaints, the percentages, things like

17   that, that's fine.  He's certainly qualified to have put

18   together those tables.  I will add, however, that in referring

19   to what he's done as calculating the probabilities that a

20   complaint will be sustained I think is not proper.  He hasn't

21   laid the foundation -- taking the numbers that actually

22   happened and inferring from those numbers the probability that

23   something will happen requires a lot more analysis than

24   Mr. Schanzenbach has made.

25           What he's done is provided the raw -- you know,

1    aggregated the raw data as to how many complaints were made,

2    how many were sustained, how many were reversed, things like

3    that, all of which is relevant and useful information but it

4    doesn't establish qualitatively that the Chicago Police

5    Department didn't take their obligations seriously, didn't, you

6    know -- that the assessment of DOJ or the PATF are accurate, he

7    can't make those -- he can't offer those opinions.  He has --

8    he does not have the experience, the training, and didn't

9    review the records to enable him to make any qualitative

10   assessment of the adequacy or reasonableness of the City's

11   policies.

12           To cite -- another problem with his analysis is while

13   he -- he confines his analysis to complaints that were made, we

14   have no -- he provides no information about the number of

15   search warrant responses, the number of other situations in

16   which no complaints were made.  So there's no -- there's not

17   even a predicate for saying that the 355, or whatever the

18   precise number was, of complaints that were received about use

19   of force against minors over the six-year period, we don't

20   have any basis to know how rare or frequent those kinds of

21   reports were in the context of responses by the police

22   department to execute search warrants where children were

23   present or engage in other police services where children were

24   present so I think there are any number of shortcomings to

25   doctor -- or -- yeah, he does have a Ph.D. -- Dr.

1   Schanzenbach's qualitative assessments.  What he's limited to

2   is talking about the data that he aggregated in the table

3   explaining what that data is but not -- he's not qualified to

4   draw inferences from that data.

5          Finally, with respect to Ms. Thurau, as I indicated, I

6   don't believe that she has established a foundation for

7   offering an opinion as to the adequacy or -- of the CPD's

8   policies with respect to, you know, the lack of procedures and

9   training relating to and designed to mitigate trauma inflicted

10  on children who are the subject of the use of force or

11  witnesses to the use of force.  The methodology that's required

12  to do that requires one to be able to identify national

13  standards and departures from those standards.

14          I do not see in her report anything that establishes

15  that there is a widely accepted consensus among police agencies

16  in this country about what training is required on that

17  subject.  She certainly advocates that in her view the best

18  practices are to do -- are to include a variety of measures

19  that she identifies but saying I think these are the best

20  practices is not the same and it's not as saying not only I

21  believe these are the best practices but these have been

22  endorsed and are wildly used by police agencies across the

23  country because it has been generally accepted that these are

24  necessary and effective means of reducing trauma to youths who

25  are subjected to use of force.  She just doesn't do that.  In

1  fact, she -- I don't mean to be pejorative about it, but she

2  really dodges the question of what -- which is one of the

3  questions or -- one or two, I think she addressed them both

4  together, the plaintiffs posed to her was what are the national

5  standards for this kind of thing.  The response to that

6  question doesn't identify national standards.  It identifies

7  things that she thinks are best practices, it identifies

8  training programs that are available but she just doesn't

9  provide the foundation to conclude that there is a generally

10 accepted standard about what police policies and training

11 should cover with regard to this area.  She talks many times

12 about making the case for the implementation of such standards.

13 That's almost a concession that the case hasn't been made yet

14 and needs to be made.  That may be right.  One may quarrel with

15 that or not.  But it's -- it doesn't supply the necessary

16 foundation to opine that the Chicago Police Department by not

17 incorporating those kinds of policies and training that she

18 advocates was departing from accepted professional standards.

19 She just hasn't made that case.  Given that, I don't believe

20 that her testimony can be admitted.  I'm excluding her as a

21 witness.

22         All right.  I am late for a 2:00 o'clock sentencing

23 already.  We have our next and final pretrial conference next

24 week -- or not next week; the week after next.  I will not be

25 available essentially next week.  So if you have issues, I

1   encourage you to talk to each other and try to work them out

2   without my intervention.  Anything that absolutely has to be

3   addressed today?

4           MR. KOWALCZYK:  No, your Honor.  Thank you.

5           MS. MOORE:  No.

6           THE COURT:  All right.  I do intend to issue an order

7   which will not go into great detail at all but an order just

8   documenting what the rulings are -- were on all the motions in

9   limine so you'll have that probably by the end of the day

10  tomorrow.  I will also send you tomorrow the proposed voir dire

11  questions, the amalgamation of those so you could be looking at

12  those and thinking of those.

13          All right.  Thanks for your patience today.  I know

14  it's a long slug but --

15          MR. A. HOFELD:  Thank you.

16          THE COURT:  -- that's what you get for filing 120

17  motions in limine.

18          MS. MOORE:  Thank you.

19      (Concluded at 2:01 p.m.)

20                          *   *   *   *   *

21      I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23  /s/Laura LaCien_____        January 18, 2026
24  Laura LaCien, CSR, RMR, CRR                  Date
    Official Court Reporter
25