# Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    EBONY TATE, et al.,            )  Case No. 18 C 7439
 4                                 )
                 Plaintiffs,       )
 5                                 )
       v.                          )
 6                                 )
    CITY OF CHICAGO, et al.,       )  Chicago, Illinois
 7                                 )  January 9, 2026
                 Defendants.       )  9:55 a.m.
 8

 9          TRANSCRIPT OF PROCEEDING - PRETRIAL CONFERENCE
              BEFORE THE HONORABLE JOHN J. THARP, JR.
10

11  APPEARANCES:

12  For the Plaintiffs:    THE LAW OFFICES OF AL HOFELD, JR., LLC
                           BY:  MR. AL HOFELD, JR.
13                              MR. ZACHARY J. HOFELD
                           53 W. Jackson Boulevard, Suite 204
14                         Chicago, Illinois 60604

15                         CHAKA PATTERSON LAW, PLLC
                           BY:  MR. CHAKA M. PATTERSON
16                         220 Green Street, Suite 225
                           Chicago, Illinois 60607
17
                           ACTION INJURY LAW GROUP, LLC
18                         BY:  MR. ANDREW M. STROTH
                           1 S. Dearborn Street, Suite 1400
19                         Chicago, Illinois 60603

20                         THE LAW OFFICE OF JULIAN JOHNSON, LLC
                           BY:  MR. JULIAN M. JOHNSON
21                         125 S. Wacker Drive, Suite 300
                           Chicago, Illinois 60606
22

23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For Defendant
     City of Chicago:        CITY OF CHICAGO, DEPARTMENT OF LAW
 3                           BY:  MS. MARION C. MOORE
                                  MR. RAOUL V. MOWATT
 4                                MS. SIMERDEEP KAUR
                                  MR. MAXWELL E. LISY
 5                           2 N. LaSalle Street, Suite 420
                             Chicago, Illinois 60602
 6
     For Defendant
 7   Officers:               MOHAN GROBLE SCOLARO, P.C.
                             BY:  MR. LAWRENCE S. KOWALCZYK
 8                                MS. MEGAN K. MONAGHAN
                             55 W. Monroe Street, Suite 1600
 9                           Chicago, Illinois 60603

10

11

12

13

14

15

16

17

18

19

20   Court Reporter:         Laura LaCien, CSR, RMR, CRR
                             Official Court Reporter
21                           219 S. Dearborn Street, Room 2304A
                             Chicago, Illinois 60604
22                           Telephone:  (312) 408-5032
                             laura_lacien@ilnd.uscourts.gov
23
                                 *   *   *   *   *
24
                       PROCEEDINGS REPORTED BY STENOTYPE
25        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

```
 1            (Proceedings heard in open court:)

 2            THE COURT:  We'll get started.  Let's have everybody

 3      put your appearances on the record.  We'll start with the

 4      plaintiffs.

 5            MR. A. HOFELD:  Good morning, your Honor.  Al Hofeld,

 6      Junior, for the plaintiffs; and each of the attorneys on our

 7      team will introduce themselves.

 8            MR. Z. HOFELD:  Good morning, your Honor.  Zach Hofeld

 9      for the plaintiffs.

10            MR. STROTH:  Good morning, your Honor.  Andrew Stroth

11      on behalf of the plaintiffs.

12            MR. PATTERSON:  Good morning, your Honor.  Chaka,

13      C-h-a-k-a, Patterson for the plaintiffs.

14            MR. JOHNSON:  Good morning, your Honor.  Julian

15      Johnson for the plaintiffs.

16            THE COURT:  All right.  Good morning.

17            Defendants?

18            MS. MOORE:  Good morning, your Honor.  Marion Moore on

19      behalf of the City.

20            MS. KAUR:  Good morning, your Honor.  Simerdeep Kaur,

21      K-a-u-r, on behalf of the City.

22            MR. LISY:  Good morning, your Honor.  Maxwell Lisy,

23      L-i-s-y, on behalf of defendant City of Chicago.

24            MR. MOWATT:  Good morning, your Honor.  Raoul Mowatt,

25      M-o-w-a-t-t, on behalf of the City.
```

4

1          MR. KOWALCZYK:  Good morning, your Honor.  Larry

2     Kowalczyk for the individual defendant officers.

3          MS. MONAGHAN:  Good morning, your Honor.  Megan

4     Monaghan also for the individual defendant officers.

5          THE COURT:  All right.  A couple things preliminarily.

6     This isn't going to be our final pretrial conference.  If we

7     get through the motions in limine today, that will be an

8     accomplishment.  That's my basic objective.  I've not completed

9     my review of the -- and when I say "motions in limine," I mean

10    the non-*Daubert* motions in limine.  I have not completed my

11    review of the *Daubert* materials so we're not -- and I'm not

12    going to launch into *Daubert* until I've been through all those

13    materials.

14          In terms of jury instructions, we'll defer discussion

15    of those for the time being.  We've obviously got time to

16    address those as both before the trial and during the trial.

17    Developments may affect the decisions on the jury instructions.

18          What I -- before launching into the substantive

19    motions in limine, though, I wanted to also address the

20    scheduling issue.  Several of the motions in limine suggest or

21    maybe the plaintiffs' motion and the defendants' response -- I

22    don't recall specifically, it doesn't matter -- the issue of

23    the length of the trial has been called to my attention.  When

24    we set the trial date, the best estimate that the parties could

25    provide was three weeks and so that's what we blocked out.  I

5

1  don't consider that to be a -- necessarily a hard stop at three

2  weeks if we're not done.  What I consider it is to be is an

3  objective that reflects everyone's considered judgment about

4  how long the trial was realistically supposed to take and we're

5  certainly going to be trying to conduct matters in a way that

6  will achieve that objective but I don't think that the burdens

7  and problems with clocking people and allocating time and

8  arbitrarily saying you've got four days or five days or six

9  days makes a lot of sense.  And from my perspective, if we have

10  to go into the next week, that's not a problem from the

11  schedule.

12       If it's a problem for any of the parties, I'll hear

13  you, but you have to have a very compelling case to say, you

14  know, we can't go forward with this trial at this point even if

15  it spills over -- or if it spills over into a fourth week.  But

16  if you have such a concern, speak now or forever hold your

17  peace.

18     (Pause.)

19       THE COURT:  Okay.  So that will be the first motion in

20  limine we address.  That will be denied.  We're not going to

21  put everybody on the clock.  But, again, that said, we're going

22  to try to conduct this trial as efficiently and expeditiously

23  as possible.  I expect cooperation between counsel in achieving

24  that objective, meaning timely disclosure of witnesses, timely

25  disclosure of demonstratives that haven't been previously

6

1   shared, things like that.  It means managing your witnesses.

2   When we finish a witness and the witness leaves the stand,

3   somebody on your team ought to be retrieving your next witness.

4           Since we're talking about the schedule as well -- I'll

5   probably repeat this subsequently, but the trial day will be

6   essentially 9:00 o'clock to 5:00 o'clock.  I try to avoid to

7   the greatest extent possible setting cases before trial on, you

8   know, when I have a trial going.  Occasionally, you can't avoid

9   that but it's not -- I'm not going to be having extensive case

10  calls before trial days.  So the night before, I'll let you

11  know what time we're going to get started.  I'll let the jury

12  know what time we're going to get started but it's going to be

13  as close to 9:00 o'clock as we can get.

14          At the end of that spectrum at 5:00 o'clock, we won't

15  go past 5:00 o'clock more than a few seconds.  I tell the jury

16  we're done at 5:00.  They're not going to stay past 5:00.  They

17  can count on that, arranging their transportation and whatnot,

18  so I will -- if you've got a witness on and they're not done at

19  5:00 o'clock, they're going to have to come back the next

20  morning, you know, unless it's two questions.

21          The daily schedule will essentially be whatever time

22  we get started as close to 9:00 o'clock as possible.  We'll

23  take a mid-morning break of about 15 minutes and that will --

24  the timing of that will be dictated by the ebb and flow of

25  trial day.  It won't necessarily be at 10:30 everyday if we're

1    in the middle of a witness.  We'll try to work around those

2    kinds of things.  But obviously there will be a break mid

3    morning.  Lunch will be an hour to an hour and 15 minutes and

4    then the afternoon session will resume.  There will be

5    obviously a mid-afternoon break of about 15 minutes as well and

6    then a hard stop at 5:00 o'clock each day.

7         We're going every day that court is in session.  I

8    think we've got the President's Day holiday on the 19th.  We

9    won't have court on that day, but every other day we will have

10    court five days a week so that we can get this done again as

11    quickly as possible.

12         Any questions on that?

13      (Pause.)

14         THE COURT:  Okay.  Well, I guess what I'd like to do

15    is just dive into the motions in limine.  Unless anybody has

16    any issues that you think makes sense to take up before we

17    launch into the substance, I'll hear you.  But otherwise, my

18    intent is to dive in and start marching.  Okay?

19         MR. A. HOFELD:  Sounds good, Judge.

20         THE COURT:  All right.  We'll start with the

21    plaintiffs' motions in limine.  Plaintiffs' 1 is to admit

22    evidence that there was no connection between the plaintiff --

23    excuse me just a minute.

24      (Pause.)

25         THE COURT:  Plaintiffs' 1 is to admit evidence that

1    there was no connection between the plaintiffs and their

2    apartment on the search warrant target Javale Bell, on the

3    other.

4            And what I'm going to do with respect to these motions

5    in limine is most of them I'm going to give you my ruling

6    without a lot of explanation.  If you ultimately need

7    clarification on something, we'll have an opportunity to circle

8    back.  But given the 110 or 115 motions in limine that we've

9    got here, I can't go through and spell out the basis for

10   deciding each one in very much detail.

11           So Plaintiffs' 1 is going to be granted in part.  The

12   plaintiffs can't make the argument or present evidence

13   suggesting that there was not probable cause for the warrant.

14   I don't think they're seeking to do that.  But to be clear,

15   they can't do that but they certainly can present testimony and

16   evidence that the plaintiffs did not know Mr. Bell.

17           Plaintiffs' 2 is to bar irrelevant, cumulative, and

18   prejudicial photos, records, information and other evidence

19   regarding the search warrant target Javale Bell.  That's going

20   to be denied.  The information that the defendants had about

21   the target of the search warrant is obviously highly relevant

22   to the planning and preparation and conduct of the execution of

23   the search warrant.

24           With respect to photos, I think there was some

25   reference to the 58 photos of Mr. Bell.  We obviously don't

1   need 58 photos of Mr. Bell.  One probably suffices, maybe

2   there's two that might be necessary, but that should be

3   dramatically reduced.

4           Plaintiffs' 3 is to bar all testimony, argument and

5   innuendo that any plaintiff had any relationship with the

6   target of defendants' search warrant Javale Bell.

7           I'm sorry.  I have to get my head back in some of

8   these before I can --

9       (Pause.)

10          THE COURT:  Plaintiffs' 3 is going to be denied.

11  Evidence of a relationship between the plaintiffs and Mr. Bell,

12  if there is such evidence, is relevant to again the planning

13  and preparation and execution ultimately of the warrant if

14  there was information known to the defendants about such a

15  relationship.  That includes photos depicting Mr. Bell standing

16  next to the plaintiffs' front door and testimony that relates

17  to the group of individuals who were present immediately in

18  front of the plaintiffs' front door on a daily basis.  That

19  evidence is relevant to explain what the defendants believed

20  and understood they were encountering when they were planning

21  and executing the warrant.  At this stage, I can't conclude

22  that any risk of unfair prejudice substantially outweighs the

23  probative value of this evidence under 403 so Plaintiffs' 3 is

24  denied.

25          Plaintiffs' 4 is to bar all arguments, suggestion and

1    innuendo that the plaintiffs' father or partner -- depending on

2    which plaintiff we're talking about -- Lonell Booth or any

3    relative of any plaintiff was in any way connected with the

4    search warrant target Javale Bell or to any alleged criminal

5    activity in plaintiffs' apartment or neighborhood that led

6    police to obtain the search warrants for 5033 and 5039 South

7    Hermitage.  This motion I understand to be unopposed and so it

8    will be granted.

9         MS. MOORE:  Isn't it -- I believe it's only in part --

10   unopposed in part, your Honor.  I believe the relief -- oh,

11   sorry.  We're on number 4.  I'm sorry.  I jumped ahead.  I

12   apologize.

13        THE COURT:  Nope.  Okay.  So 4 is granted without

14   opposition.

15        Plaintiffs' 5 is to bar any evidence of or reference

16   to any plaintiffs or plaintiff's family member's criminal

17   history, including any arrest, charge, or conviction.

18        All right.  That motion will be granted in part.  It's

19   granted as to any reference to whether or not the plaintiffs

20   themselves or the plaintiffs' family members, including

21   Terrance Hayes and Autumn Adams, have ever been arrested and to

22   bar any details about any arrest and alleged crimes.  But it

23   will be denied as to permit -- in other words, it will permit

24   the defendants to introduce evidence regarding the criminal

25   conviction and imprisonment of Lonell Booth.  That evidence is

1   relevant in potentially cross-examining Dr. Berkowitz regarding

2   the impact of Mr. Booth's incarceration on the children's

3   mental and emotional health in relation to the plaintiffs'

4   damages claims.

5           Plaintiffs' 6 is to bar all reference to whether or

6   not plaintiffs' family members -- Hayes, Adams, Booth and

7   others -- have ever been arrested and to bar any details about

8   any arrests and alleged crimes.

9           All right.  That will be granted as to Hayes and --

10  Autumn Hayes or Terrance Hayes.  It's denied as to Mr. Booth

11  for the same reason we just identified in Plaintiffs' 5.  The

12  evidence of Mr. Booth's conviction and incarceration could be

13  relevant to the cross-examination of Dr. Berkowitz.

14          Plaintiffs' 7 is to bar all evidence of and reference

15  to the fact that the children's father was ever arrested and

16  convicted.  This is substantially similar; and for the reasons

17  I've already identified, it will be denied.  The incarceration

18  of Mr. Booth could be relevant to the cross-examination of Dr.

19  Berkowitz.

20          Plaintiffs' 8, bar all reference to who was living in

21  plaintiffs' public housing apartment from 2014 on, who was on

22  the lease, whether Ebony Tate violated the terms of her lease

23  or was untruthful with the CHA regarding who was living in the

24  apartment.

25          I'm going to deny that motion in limine.  The evidence

1   that -- the testimony about that issue could be probative of

2   Ms. Tate's character for truthfulness and therefore could be

3   admissible under Federal Rule of 6 -- Federal Rule of Evidence

4   608.  I'll note, however, that extrinsic evidence is not

5   permitted to prove up impeachment of such a -- on such an issue

6   so the defendants would be stuck with the answer that is

7   provided if they proceed with that line of questioning.  But it

8   is relevant -- potentially relevant to impeach Ms. Tate's

9   credibility.  I think it does -- it is probative of honesty if

10  she misreported the reality of who was living in her apartment.

11          Plaintiffs' 9 is to bar all reference to plaintiffs'

12  driver's licenses and other forms of identification.  This is

13  unopposed and will be granted.

14          Similarly, Plaintiffs' 10 is unopposed which is to bar

15  all reference to plaintiff Ebony Tate's vehicle, when she

16  purchased it, what kind of vehicle she has, and on what

17  occasion she used it and things like that.  No objection to

18  that motion so that will be granted.

19          Plaintiffs' 11 is to exclude all reference to Ebony's

20  children who are not plaintiffs in this action and to the total

21  number of her children.  I'm going to grant that motion.  The

22  fact that Ms. Tate had children after is --

23          What is -- do we know what's making that noise?

24      (Pause.)

25          THE COURT:  All right.  So we were on Plaintiffs' 11

1    seeking to bar information about other children that are --

2    that were not plaintiffs in this case or are not plaintiffs in

3    this case.  I'm going to grant that motion.

4           MR. KOWALCZYK:  Your Honor, just one point on the

5    children if I could.

6           THE COURT:  Uh-huh.

7           MR. KOWALCZYK:  There was some testimony, I believe --

8    and if I'm wrong, I apologize, but I believe Dr. Berkowitz was

9    questioned regarding postpartum impact on Ms. Tate as opposed

10   to just -- it was more of a mental health related question that

11   was asked of her so I just wanted to make sure that would

12   be -- it's in his report, I believe, so he was asked about it.

13   And if I'm mistaken on that, I obviously will withdraw that.

14   But I do believe that that was the topic of inquiry on him so I

15   just wanted to set that contour, make sure we were acting

16   appropriately.

17          MR. A. HOFELD:  And, your Honor, may I respond

18   briefly?

19          THE COURT:  Yep.

20          MR. A. HOFELD:  I also am not a hundred percent sure

21   of my memory but what I recall is it's not relevant to any of

22   Dr. Berkowitz' opinions but he was asked about it at his

23   deposition by Mr. Kowalczyk so I don't --

24          THE COURT:  Yeah.  I mean, just because you asked the

25   question in a deposition doesn't make it relevant necessarily.

1    MR. KOWALCZYK:  And -- and that's all I -- it's in his

2 report when he was asked about it in terms of impact and that

3 so I just wanted to make sure if we steer clear of that or --

4 Dr. Kraus, I believe, also mentions in his report, our defense

5 medical expert.

6    THE COURT:  Mentions what exactly?

7    MR. KOWALCZYK:  It's -- is it background or is it

8 opinion?

9    MS. MOORE:  It's more background.

10    MR. KOWALCZYK:  It's in more background --

11    THE COURT:  Okay.

12    MR. KOWALCZYK:  -- so if it's just background and he's

13 not saying an opinion about it, we'll stay away from it, of

14 course.

15    THE COURT:  So I'll grant the motion.  If you think

16 they've opened the door somehow --

17    MR. KOWALCZYK:  Okay.

18    THE COURT:  -- to that, you can front that with me at

19 that time.

20    MR. KOWALCZYK:  Absolutely, Judge.  Would absolutely

21 do that first.  Thank you.

22    THE COURT:  All right.  Plaintiffs' 12 is to exclude

23 all evidence related to a single incident between E'Monie Booth

24 and another neighborhood boy.  There was an incident in which

25 he had a fight with another boy.  Defendants have indicated

1    they don't oppose this because they don't intend to introduce

2    this incident so I'm going to grant the motion in limine.  If

3    that changes, you can front it and raise the issue with the

4    Court.

5          Plaintiffs' 13 is to bar evidence from asking the

6    children if they are dating.  I'm going to deny the motion in

7    limine but the questions on this topic are going to have to be

8    very narrow, very brief and must be phrased in terms of dating

9    or romantic relationship, something that is -- does not overtly

10   refer to sexual conduct.

11         Plaintiffs' 14 is to exclude all evidence and

12   reference to any other occasions when any plaintiff or

13   plaintiff's family member contacted the police or when police

14   were present at the plaintiffs' building or apartment,

15   regardless of the reason.  This is unopposed and so it will be

16   granted.

17         Plaintiffs' 15 is to bar defendants' undisclosed

18   pattern witnesses.  All right.  This will be granted in part

19   and denied in part.  It's going to be granted to -- it's going

20   to be granted to pattern and practice witnesses that have not

21   been deposed and not disclosed.  It will be denied as to

22   pattern witnesses who have been deposed even though they were

23   not disclosed.

24         This is -- that's also, for the record, I think the

25   resolution of this issue that Judge Valderrama adopted in the

1    *Mendez* case and I think it makes sense so I'm going to rule the

2    same way that Judge Valderrama did on that issue.

3         Page 16, limit the scope and testimony of pattern

4    Monell witnesses and exclude specific questions, testimony, and

5    evidence related to the other pattern incidents.

6         What evidence are we talking about here?

7         MR. A. HOFELD:  Your Honor, so it's --

8         THE COURT:  Is there something concrete that we're

9    expecting or is this --

10        MR. A. HOFELD:  Yes.  We -- I believe we give at least

11   three examples in the motion itself.  For example, in the

12   *Mendez* incident, after officers entered and were well into

13   their search, Mr. Mendez volunteered that he had some

14   personal-use marijuana on top of the refrigerator in the

15   kitchen.  We -- we maintained that the only reason we're

16   calling the pattern witness from the *Mendez* incident is to ask

17   whether guns were pointed and we would ask -- the cross of the

18   officers would simply be, you know, whether there was any

19   threat posed by the family members, you know, when they entered

20   and made a decision about whether to point guns or not.

21        So anything beyond the scope of, you know, the *Graham*

22   factors, whether there was a justification present for the --

23   for gun pointing and then whether actually -- whether guns were

24   actually pointed or not we believe is -- I mean, not only

25   irrelevant but, in many of these instances, prejudicial.

1          In the *Blassingame* incident, there were -- apparently,

2    there were narcotics and firearms found at the end of the

3    search.  Again, the child witness they will call from there is

4    only going to talk about, you know, whether or not guns were

5    pointed at him or her at the -- when the officers first entered

6    the residence.

7          And we also discussed the *Smith* incident which is

8    similar to *Blassingame*.  We believe the only relevant testimony

9    is whether force was used in the beginning and whether there

10   was a justification for that force.  And critically, I should

11   mention that in the instances where --

12         THE COURT:  When you say "a justification for that

13   force," a justification that was preexisting the search?

14         MR. A. HOFELD:  Well, I mean -- yes.  Correct.  When

15   the officers entered and they saw a child, was that child doing

16   anything that presented a safety threat to the officer or with

17   anyone -- with anyone who they encountered when they -- when

18   they entered, did they present a safety threat and all of

19   the -- all of the officers are already on record, the ones

20   we've deposed, as saying there was no safety threat posed by

21   any child or any -- any adult when they first entered.

22         And in many instances, your Honor, if -- you know, if

23   narcotics were found or weapons were found or ammunition was

24   found -- there's only a couple of instances where it occurred,

25   but where it occurred, these were not things that the officers

1    knew about in advance, you know, if --

2              THE COURT:  They couldn't have influenced the conduct.

3              MR. A. HOFELD:  That is what -- yes.

4              THE COURT:  That's your --

5              MR. A. HOFELD:  That is our -- yes.

6              THE COURT:  Okay.

7              MR. A. HOFELD:  Yes.

8              THE COURT:  So what is the defendants' -- what are you

9    seeking to do here?  Because that makes sense to me; but if

10   they discovered something in the search in one of these other

11   pattern incidents after the fact of the search, that doesn't

12   have anything to do with --

13             MR. KOWALCZYK:  And, your Honor, I'm attorney for the

14   defendant officers in the *Blassingame* case and I can speak to

15   that one relative to there was a TEC-9 high-capacity weapon

16   found by SWAT during clearing so it's a slightly different fact

17   pattern as opposed to I get it where they cleared, it's --

18   they're done and they're searching and then they find

19   narcotics; completely understand that.  But in that scenario in

20   *Blassingame*, I know for a fact that -- and there's testimony

21   that the TEC-9 was found as SWAT was clearing the residence.

22             MR. Z. HOFELD:  May I respond, your Honor?

23             THE COURT:  Yeah.

24             MR. Z. HOFELD:  I took the depositions in the

25   *Blassingame* case.  This issue came up in *Mendez* and Judge

1   Valderrama, we believe, properly excluded that.  The reason is

2   the officers testified that there's two phases to clearing a

3   residence, the first phase being the initial clearing where you

4   go throughout every room and make sure nobody is there, gather

5   the occupants and bring them somewhere safe.  The second phase

6   being the back-clear phase where you then go into each room and

7   do a more thorough detailed examination.

8          The plaintiffs essentially testify that, you know, the

9   gun pointing occurs during the initial clearing phase when

10  they're found in the bedroom where they're all hiding for

11  safety and brought out of that bedroom, down a hallway and into

12  the kitchen.  It's -- it's in the back-clearing phase -- not

13  the clearing phase -- when this TEC-9 is purportedly found

14  under a bed in a back corner of a room and for that reason can

15  have no justification for the gun point --

16         THE COURT:  The residents are already out?

17         MR. Z. HOFELD:  Correct.  They're already in the

18  kitchen, you know, in -- on the floor in a corner and their

19  allegation is that they -- guns were pointed in the back

20  bedroom where they were initially found, when they're coming

21  down the hallway to the kitchen, and when they get to the

22  kitchen but nothing having to do with the bedroom.

23         THE COURT:  Okay.  So I'm going to grant in part --

24  what's relevant here is what the officers knew before they had

25  cleared the individuals -- whether they're residents or

1    visitors or -- non-police who were in the residence.  That

2    seems to me to be the -- where we draw the line in terms of

3    relevance or not.  If you've got some other reason you think

4    something that comes up on the post side of that line, you

5    should come in and be fronted.  But for the motion in limine, I

6    think it makes sense and I will grant that on that basis.

7          Plaintiffs' 17 is to bar defendants from using

8    plaintiff Cynthia Eason's testimony before Judge Pallmeyer in a

9    consent decree proceeding in another case, 17 CV 6260.  I'm

10   going to deny that as a motion in limine as the defendants

11   argue there is no need to disclose statements that are going to

12   be used solely for impeachment which is what they represent

13   this would be used for.  So on that understanding, I'm going to

14   deny the motion in limine.  If defendants for whatever reason

15   believe that they have a basis to go beyond that and use that

16   testimony for something other than impeachment on

17   cross-examination, that needs to be fronted.

18         Plaintiffs' 18 is to bar the defendants from

19   misrepresenting the minor plaintiffs' Monell claim.  I'll grant

20   that as phrased but it begs the question of whether they're

21   misrepresenting.  So to clarify, the issue as I understand it

22   raised in this motion is whether the Monell claim goes to the

23   execution -- to the use of force in connection with the

24   execution of -- use of force against children in the execution

25   of a search warrant or more broadly in other encounters with

1     children.  Do I have that right?

2          MR. A. HOFELD:  Yes, your Honor.  The face of the

3     complaint is crystal clear that it's the use of excessive or

4     unnecessary force against children in all law enforcement

5     context; not just search warrant executions.

6          THE COURT:  All right.  I agree.  I went back to the

7     third amended complaint to verify that and I think it's clear

8     that that is the scope of the Monell claim.

9          Plaintiffs' 19 is to bar any attack on plaintiffs'

10    widespread practice Monell theory predicated on the number of

11    pattern witnesses permitted to testify at trial.  The

12    defendants don't oppose the motion to the extent it is meant to

13    prohibit the specific argument that plaintiffs' Monell claim is

14    invalid because they only called a dozen witnesses or whatever.

15    Defendants agree they're not going to make such an argument but

16    that they maintain that they should have the ability to make

17    arguments attacking the plaintiffs' failure to meet their

18    burden.

19         Certainly you have -- you can make such arguments and

20    present such testimony.  We wouldn't be going through this

21    exercise if I grant -- if you were precluded from doing that.

22    But the motion, of course, is -- just wants to prevent the

23    defendants on closing argument from saying you only heard it

24    from a dozen pattern witnesses out of, you know, tens of

25    thousands of police cases.  That can't be widespread.  That

1    will not be permitted.

2          Plaintiffs' 20 is to bar certain Monell evidence

3    unrelated to the claims or outside of the relevant time period.

4        (Pause.)

5          THE COURT:  I have some problem with my computer here.

6        (Pause.)

7          THE COURT:  All right.  The plaintiffs' motion seeks

8    to bar certain Monell evidence that either falls outside of the

9    Monell period as it's been defined by the parties or is not

10   related to the plaintiffs' Monell theory in this particular

11   case.  There's five illustrative examples of the type of

12   evidence they seek to bar.

13         The first is to bar Ms. Conway's -- the City's

14   30(b)(6) witness, to bar her testimony about the City's

15   research about trauma-informed policing in June of 2020.  The

16   argument is that coming two-plus years after this incident that

17   that's not relevant to determining whether there was a

18   widespread pattern and practice in 2018.  The defendants don't

19   object to that request so it will be granted as to Ms. Conway's

20   testimony.  And to the extent there is testimony that

21   defendants seek to admit from other witnesses about

22   post-incident practices of that degree of two years, those

23   would fall under that ruling as well.

24         The second example is the plaintiffs asked the Court

25   to exclude testimony by various witnesses that officers are

1    allowed to draw their weapons and maintain their weapons at the

2    low-ready position while entering a residence at the outset of

3    a search warrant execution.  That was -- there's I guess

4    evidence and testimony to be offered on that subject that

5    training in 2020 related to that practice and again that's

6    substantially outside the Monell period so that will be granted

7    as well.  The City doesn't contend that they're going to elicit

8    evidence of training that occurred after the Monell period.

9         MS. MOORE:  Your Honor, if I may just briefly discuss

10   a caveat to that.

11        THE COURT:  Uh-huh.

12        MS. MOORE:  As we said in the response, that is

13   absolutely correct.  We will not be bringing up the training

14   from 2020.  We agree that it's irrelevant.  It's frankly our

15   perspective that basically anything that happened after August

16   of 2018 is irrelevant.  However, there is testimony from the

17   witnesses that leading up to -- post-DOJ report, all of that,

18   talks did start happening, planning started happening about

19   certain trainings.  So we don't intend on -- so we don't object

20   to obviously any training that occurred afterwards but we would

21   request that our witnesses be able to discuss what -- our

22   30(b)(6) witnesses what training was being developed, what

23   discussions were being had relating to all this -- everything

24   that was going on in 2017 and 2018 up until the incident, the

25   August incident.

1      THE COURT:  Okay.  I agree.  Testimony about training

2  that was under development or being developed or inquired into

3  or investigated by the City during the Monell period is not

4  included in the grant of that motion in limine so it's --

5  that's available to the defendant.

6      MR. A. HOFELD:  Your Honor, may I make one brief note

7  before we move on?

8      THE COURT:  Uh-huh.

9      MR. A. HOFELD:  Thank you.  So I just would say -- and

10  I don't know what specific evidence the City is referring to

11  now and we don't need to get into it but I would just note that

12  to the extent the City intends to point to training or point to

13  other evidence about its intentions during the Monell period,

14  plaintiff would at least reserve or request the opportunity --

15  if they're using that evidence to defeat plaintiffs' claim of

16  deliberate indifference, then it would be important for

17  plaintiff to be able to show that the training that was in

18  development, let's say, in 2017 and that came online in 2019 or

19  2020 didn't actually address the problem of excessive force

20  against children about which plaintiffs are saying the City was

21  deliberately indifferent.

22      So if they're allowed to use that evidence to rebut

23  deliberate indifference, then we should be able to -- or to

24  oppose deliberate indifference, we should be able to use, you

25  know, whatever the result of that training that was in

25

1   development or that policy that was in development, we should

2   be able to point to the result to say no, it doesn't defeat

3   plaintiffs' claim of deliberate indifference because it didn't

4   address the fundamental problem.  And we don't have to have all

5   that discussion now but I just wanted to note that that's

6   the -- that's the argument that's going back and forth in

7   several of these policy and training and consent decree

8   oriented motions in limine, so.

9        MS. MOORE:  I agree with Mr. Hofeld that this is an

10   underlying logical argument made in many of the motions and is

11   probably going to come up again and again.  And so the City's

12   perspective on this is what the -- and this will -- the

13   argument is slightly different depending on what we're talking

14   about, but what the ultimate training was obviously could not

15   have caused the August 2018 incident.  So it -- even if it

16   doesn't address the particular nuances that plaintiffs think it

17   should, whatever training finally was developed in 2020, it

18   doesn't really address the actual core issue here which is

19   whatever was happening right before this incident, whether it

20   caused the defendant SWAT officers to allegedly point their

21   guns at the children so -- so there's that kind of disconnect

22   there in terms of causation.

23        And secondly, I think as we all should know, all of

24   this training, at least a large majority of it -- and this is

25   related to -- we'll get into the consent decree stuff but it

1    wasn't just the City making the decisions on what was going

2    into this training that was coming out in 2019, 2020, all of

3    that.  This involved -- once the consent decree was entered

4    into, the training on use of force was reviewed by the Attorney

5    General's Office, approved by the Attorney General's Office and

6    monitored and then ultimately approved by either Judge Dow but

7    probably Judge Pallmeyer.  So if we're getting into whether or

8    not this 2020 training meets whatever plaintiffs want it to

9    meet, that's a whole -- whole nother issue.

10           So we're not -- the City doesn't intend on saying we

11   started developing a training that was going to exactly address

12   this and fix everything they're alleging here.  The witnesses

13   are just going to say well, this is what we were doing.  This

14   is -- the DOJ report came out, the PATF report came out that

15   talks about the consent decree started -- because, again, the

16   consent decree wasn't even finalized until after this incident

17   either.  But the -- so the testimony will just be limited to

18   this is what we were starting to do to respond to these reports

19   that came out in April 2016, January 2017, here's the process

20   that was started to respond to them, here's what came out

21   before 2018 and leave it at that which is, you know, something

22   I think we say defeats deliberate indifference.  I think

23   plaintiffs could argue well that's not enough, you got these

24   reports and all you did was start talking, it's April -- August

25   of 2018 and you haven't updated the training and that would be

1    the argument to say -- to prove deliberate indifference on

2    their end, not that two years later after multiple entities

3    reviewing this training that it still doesn't do what the

4    plaintiffs want it to do.

5         MR. A. HOFELD:  Judge, I would just underscore that

6    we're -- I'm not talking about Monell causation.  I'm

7    talking -- we're referring to -- and Ms. Moore is correct that

8    the City intends to use, you know, the development of training

9    and policy in, whatever, 2017, 2018 as evidence to defeat our

10   claim of deliberate indifference.  I mean, if that's -- and so

11   in light of that, I mean, we -- it seems like plaintiffs, you

12   know, must be able to rebut the City's claim that it was not

13   deliberately indifferent because we were developing this policy

14   or that training and the only way we can do that is to show

15   that the policy and training under development didn't actually

16   address the problem that DOJ said the City had of using

17   excessive force against kids.

18        THE COURT:  Well, the problem you've got, though, is

19   you've got conduct occurring over a course of a couple of

20   years.

21        MR. A. HOFELD:  Right.

22        THE COURT:  Just because they're developed -- looking

23   at a question but ultimately the final product doesn't resolve

24   that issue or even address that issue at all doesn't

25   necessarily reflect that it wasn't being genuinely considered

1    at the time of this incident.

2           MR. A. HOFELD:  Your Honor, I would -- I would -- I

3    would disagree just based on the case law which says that, you

4    know, a municipality's post-incident referring to -- our

5    incident was August 2018.  I think the case law is pretty clear

6    that post-incident conduct by the municipality, you know, for

7    up to a year or two after the underlying incident of the date

8    can be relevant to deliberate indifference.  It can reveal what

9    the real policy was on the incident date.  And we cite those

10   cases in multiple places, I guess mainly in our responses to

11   their motions in limine because a lot of -- a lot of this

12   evidence post 2018 is evidence that the City is trying to bar

13   so -- but anyway, yeah.

14          THE COURT:  Well, we'll -- I mean, I think the

15   fundamental point is if the City was engaging in this issue

16   paying some attention to it, that -- that provides relevant

17   evidence of a -- that they were not being deliberately

18   indifferent to the issue.  You could have a battle about the

19   evidence in what was actually being done during the period of

20   the incident or before the incident to suggest that, you know,

21   that -- that was a drop in the bucket of what needed to be done

22   and you could challenge it that way but I think -- I think it's

23   a much tougher thing for you to -- well, "tougher" isn't the

24   right word.  I think it's much more tangential and less

25   relevant for you to argue because they ultimately didn't adopt

1  a policy that addressed the specifics of the incident in 2018,

2  that that is indicative that they were, in fact, deliberately

3  indifferent back in 2018.

4         MR. A. HOFELD:  I -- I understand.

5         THE COURT:  I mean, it could well be that they were

6  not deliberately indifferent in 2018, just as a logical

7  exercise, but were deliberately indifferent several years

8  later.  I don't believe that to be the case given all the

9  attention these issues have had over the past few years, but I

10 think -- I think the post-conduct results don't necessarily

11 demonstrate that the efforts to pay attention to that issue

12 back in 2018 were sham, you know, weren't legitimate and don't

13 have no probative value in rebutting reckless indifference.

14        We'll see what the City presents and if you -- on

15 rebuttal you think that they've given you an argument that the

16 absence of that in the 2020 time frame work product reflects

17 that they weren't, in fact, being genuine back in 2018, I'll

18 hear you in the context of that specific question.  But as a

19 general proposition, I agree that the post-training -- the

20 post-incident policies that were adopted aren't themselves

21 evidence of lack of -- or of reckless indifference by the City

22 to those issues to the extent the City can produce evidence

23 that they were, in fact, paying attention in some fashion to

24 those issues so I think that's the dividing line.  All right.

25 I think that's actually adequate explanation for the ruling on

1     plaintiffs' 19.

2              MS. MOORE:  Plaintiffs' 20, I believe.

3              THE COURT:  Oh, yeah.  Sorry.  Plaintiffs' 20.

4              All right.  So plaintiffs' 21, bar any evidence,

5     examination, testimony, argument, reference, or allusion to

6     COPA's investigation in this case.

7              No objection?

8              MS. MOORE:  Correct, your Honor.

9              THE COURT:  All right.  That will be granted.

10              MR. A. HOFELD:  Your Honor, I apologize, but on -- in

11     20, you were ruling -- going through each piece of evidence,

12     you just -- you have made a ruling on one and two, the first

13     and second pieces of evidence.  I thought you were going to

14     rule on --

15              THE COURT:  Well, I was but I think -- well, I think

16     we probably addressed those issues as a logical matter but let

17     me go back and --

18              MR. A. HOFELD:  Okay.

19          (Pause.)

20              THE COURT:  All right.  The third, fourth, and fifth

21     categories of evidence relate to testimony about training

22     policies and practices, allowing officers to handcuff parents

23     or use force on an adult in the presence of children as well as

24     whether a search warrant can be executed in the presence of the

25     child.

1    Plaintiffs, as I understand it, are arguing that those
2  questions are not -- they're not pursuing the claim on those
3  bases so there should not be testimony about those practices
4  because they are not relevant.  I think there's no objection to
5  that as long as that evidence is not pursued by the plaintiffs.
6    MS. MOORE:  That's correct, your Honor.
7    THE COURT:  Okay.  And sixth, the plaintiffs seek to
8  bar testimony from Mr. Noble about the legislative history of
9  50 ILCS 725/3.8 which I believe is the affidavit requirement.
10    MR. A. HOFELD:  Correct.
11    MS. MOORE:  Yes.
12    THE COURT:  All right.  With respect to that, I'm
13  going to address that in connection with the *Daubert* motions so
14  I won't definitively rule on that portion of plaintiffs' 20
15  until I take up Mr. Noble's -- the challenges, the motions in
16  limine to his testimony.  All right.  So that's 20.
17    MR. A. HOFELD:  Thank you, your Honor.
18    THE COURT:  All right.  With respect to COPA
19  investigation, defendants don't oppose that motion so that will
20  be granted.  That's plaintiffs' 21.
21    Plaintiffs' 22 is to bar the defendants from equating
22  and conflating having a firearm drawn with a pointing -- with
23  pointing a firearm directly at a person who poses no danger.
24  I'm going to deny that motion in limine.  Whether the
25  defendants were pointing guns at minors, whether anyone they

1   pointed guns to presented a risk to them, those are the

2   critical fact issues that have to be resolved by the jury.

3   That will be denied.

4         Plaintiffs' 23 is to bar defendants from affirmatively

5   arguing that an officer pointing a gun at someone is not a use

6   of force.  All right.  I'm going to grant the motion to the

7   extent the plaintiffs are seeking to bar the defendants from

8   affirmatively arguing that an officer pointing a gun at a

9   compliant individual is not a use of force.  But, again, this

10  is a heavily fact-attendant question as to whether the guns

11  were being pointed to someone, whether someone was being

12  compliant, et cetera, so the motion will be denied to the

13  extent it would purport to limit the defendants from making

14  those arguments that this type of use of the gun is not

15  pointing the gun or would not constitute a use of force because

16  it's not being pointed at someone or because the individual was

17  not being compliant or those kinds of things.

18        So the bare proposition that pointing a gun at a

19  compliant individual is a use of force I agree with and you can

20  make that argument but that doesn't preclude the defendants

21  from distinguishing what was going on and characterizing it

22  differently.

23        Plaintiffs' 24 is to present the -- present the

24  testimony of seven non-party minors by videotaped deposition.

25  That will be denied.  These are -- as I understand it, some of

1   the minors are actually not minors anymore or in their --

2   certainly in their teens.  This was a -- I'm sure -- I'm trying

3   not to use any pejorative or unsympathetic terms.  I'm sure

4   this was a memorable and upsetting incident for the children at

5   the time.  It's now seven years past, seven-plus years past.

6           Part of the arguments being made is that plaintiffs

7   shouldn't be permitted to use the age of the victims as both a

8   sword and a shield.  I think that has some merit in this

9   context.  And there is, of course, a tremendous -- great

10   preference for live testimony that allows the jurors to assess

11   the credibility of witnesses much more effectively than they

12   can do when those witnesses are presented by videotape or

13   remote video.  There's also the near constant issue of glitches

14   and problems with the presentation of video evidence.  So for

15   all of those reasons, I'm going to deny the motion that would

16   have the minor plaintiffs testifying by video rather than in

17   person.

18           MR. A. HOFELD:  Your Honor, can I address one

19   exception?  We didn't note it in the motion but there are at

20   least three minors who -- whose videos we hope to present as

21   designations because they live out of state beyond the reach of

22   the Court's subpoena power so we didn't mention those

23   expressly.

24           THE COURT:  They're plaintiffs?

25           MR. A. HOFELD:  No.  They're pattern witnesses,

1   not -- they were plaintiffs in other suits.  They're pattern

2   witnesses in this for purposes of trial and they now -- they

3   now reside out of state, so.

4           THE COURT:  Okay.  I'm talking about the plaintiffs.

5           MR. A. HOFELD:  Right.  Oh --

6           THE COURT:  If there's otherwise -- if the rules --

7           MR. A. HOFELD:  Yeah.

8           THE COURT:  -- would permit the introduction of

9   deposition testimony, you can also -- it could be video

10  deposition as well as -- or written deposition --

11          MR. A. HOFELD:  Okay.

12          THE COURT:  -- but the plaintiffs have to testify.

13          MR. A. HOFELD:  Okay.

14          THE COURT:  I mean, they don't have to testify.  But

15  if they're going to testify, it has to be in person.

16          MR. A. HOFELD:  Okay.

17          MR. Z. HOFELD:  Your Honor, if I may.  To seek

18  clarification on one aspect, going back to MIL 23 -- and

19  apologies to go backwards here -- we just wanted to check the

20  record and make sure we were correct about one thing.

21          THE COURT:  Okay.

22          MR. Z. HOFELD:  Thank you.  Our discussion centered on

23  gun pointing against a complying individual.  I just wanted to

24  flag that the MIL I believe was broader, just seeking to

25  prevent defendants from arguing that as a definitional matter,

1  gun pointing is not a use of force.  And we weren't in no way

2  trying to limit the defendants' ability to suggest -- you know,

3  argue about whether the gun was pointed or argue whether an

4  individual was or was not complying.  We totally understand

5  that that's fair game.  We're -- we're just simply seeking as a

6  definitional matter to bar the notion that gun pointing is not

7  using force.

8          MR. A. HOFELD:  I think we're good.

9          MR. Z. HOFELD:  Okay.

10         THE COURT:  Well, it kind of begs the question about

11 what gun pointing is but what's your --

12         MS. MOORE:  Well, I think --

13         MR. KOWALCZYK:  I think your Honor hit the nail on the

14 head on that.  They need to describe how they hold their

15 weapons just even walking into a residence or going in.  And I

16 think their motion was confusing on beyond how your Honor

17 indicated pointing at a compliant individual, the use of force

18 beyond that, there needs to be explanation and that's -- that's

19 the heart of this case, the facts that are at issue.

20         THE COURT:  Well --

21         MS. MOORE:  I -- that's correct but I think there's

22 this -- there's another issue which is that the motion talks

23 gun pointing being a use of force as a matter of law or, you

24 know, under the various case law addressing what is excessive

25 force, what is not in terms of pointing a gun.  That's --

1   that's largely what the motion talks about and it's what your

2   Honor was talking about and Mr. Kowalczyk.

3          Now that is the -- the main issue here, of course, is

4   what constituted a use of excessive force under the law, but

5   there is discussion in one of the depositions -- and this is I

6   think what plaintiffs might be getting at -- the City's policy

7   witness was talking about reportable uses of forces under the

8   policies.  So she was talking about the different general --

9   special and general orders, the department directives and what

10  goes into those; and until post-incident, an officer pointing a

11  weapon at someone was not a reportable use of force.

12         So to expand on it a little more to maybe make it less

13  confusing, if an officer uses force in the course of an arrest,

14  they have to fill out something called a Tactical Response

15  Report explaining the use of force.  Officers did not have to

16  fill out any reports if the sole use of force was the pointing

17  of a weapon.  So there's a little bit of back and forth about

18  what constituted use of force under the City's policies and

19  then -- which is different from use of excessive force or use

20  of force under the law.

21         So there's that kind of back and forth in this

22  witness's dep and that is mentioned in the motion in limine and

23  I think that there's -- this is a witness who is no longer

24  available.  We are just going to have to take her deposition

25  for what it is.  But I think if there's argument or innuendo

1    that here the City's use of -- or the City's director of policy

2    is saying pointing a weapon is not a use of force and thus the

3    City itself was violating the case law or whatever it may be,

4    you know, the training witnesses obviously are going to be

5    testifying and saying well, you know, we train on gun pointing,

6    we train on *Graham*, we train on all of these cases.  And so I

7    think that's kind of what we're talking about here with the

8    just general use of force and I -- I think this is one that

9    might be hard to make a call at right now until we see what

10   actually this testimony and argument even is.

11         So I guess I would like to reserve the ability to --

12   to be able to argue well what -- Karen Conway is her name --

13   what Director Conway said regarding gun pointing not being use

14   of force, she's testifying about the policy; and that's true.

15   I mean, there's no way around it.  Until 2019, it was not a

16   reportable use of force, pointing a firearm.  But that is not

17   the same thing as the City saying we're disregarding all case

18   law on whether or not officers can be pointing weapons at

19   compliant individuals.  So that's -- I think that's kind of

20   what we're getting at here in the City's response to this

21   motion in limine at least.

22         MR. A. HOFELD:  And just to round out, Judge, I think

23   what the motion in limine -- I think the thrust of the motion

24   in limine is -- is to request an order that the defendants not

25   argue something that's contrary to clear Seventh Circuit

1    precedent that we cite in the motion which is exactly what your

2    Honor has already said, that pointing at a fully compliant,

3    non-threatening individual is excessive.  That's the only scope

4    of the motion.  It's to ask defendants not to make a

5    mischaracterization of the law in argument.  The motion

6    specifically accepts the testimony of Conway.  From our point

7    of view, that's a very different -- from our point of view, you

8    know, the City is understandably putting its spin on

9    Ms. Conway's testimony.  But my understanding of her testimony

10   from taking her deposition is that the Chicago Police

11   Department did not consider pointing a gun at a civilian to be

12   a use of force, period, during the Monell period in this case.

13   And from our point of view, that testimony is relevant evidence

14   of deliberate indifference to what, in fact, was a whole

15   pattern and practice of officers pointing guns at people,

16   including children, without justification.

17           So I think these are two different -- so the

18   only -- the scope of the motion in limine is simply to ask for

19   misrepresentations of the law to be -- to be barred and it

20   expressly asks that Conway be allowed to give the testimony

21   that she gave.  We're not -- we're not including Conway's

22   testimony within the scope of this motion in limine.  I hope

23   that's clear.

24           THE COURT:  Well, so I appreciate the extra context

25   but I think we're still where we were --

39

1      MR. A. HOFELD:  Right.

2      THE COURT:  -- which is the City or the defendants

3  aren't going to be arguing that pointing a gun at a compliant

4  individual is not a use of force.  There may be lots of

5  disagreements and testimony about what is pointing a gun, what

6  is a compliant individual, what were the City's policies with

7  respect to reporting the pointing of a gun at a compliant

8  individual.  And as to all -- the motion does not preclude the

9  City from presenting evidence, making argument about those

10  kinds of issues.

11      What granting it does is essentially say you

12  can't -- you can't, however, argue that pointing a gun at a

13  compliant individual is not a use of force under the law.

14  That's, I think, as clear as we can make it right now.  Again,

15  if somebody thinks there's some other aspect of this that is

16  implicated by testimony or evidence that's presented, you can

17  of course raise it.

18      MR. A. HOFELD:  Thank you, your Honor.

19      THE COURT:  That's where we're going to leave it for

20  now.

21      Okay.  All right.  So we're going to skip from 24 to

22  31.  25 through 30 are *Daubert* motions in limine which, as I

23  said, I'm not going to get to today.

24      Plaintiffs' 31 is to bar the defendants from

25  arguing --

1          And just FYI, it's my intent to take a break in about

2     ten minutes if anybody is getting desperate.

3          MS. MOORE:  Good to know.  Thank you.

4          THE COURT:  -- bar defendants from arguing that any

5     plaintiff was harmed by Mr. Booth's absence or return and from

6     soliciting testimony about the relationship between plaintiff

7     Ebony Tate and the children's father Mr. Booth.  This is

8     substantially similar to some of the earlier motions in limine

9     5 through 7 and I'm ruling the same way.

10         Whether Mr. Booth's absence or return from custody --

11    well, whether Mr. Booth's absence was a factor in the

12    children's mental health is relevant given the damage claim so

13    that motion is denied.

14         MR. A. HOFELD:  Your Honor, can I ask for one point of

15    clarification on that ruling?  So is it -- is it the -- I

16    understand that the absence of the father may be relevant to

17    plaintiffs' claims for damages as your Honor has ruled but the

18    fact of where he was, the fact that he was incarcerated and

19    what for doesn't seem to be relevant.  I mean, if the argument

20    is -- I mean, and, by the way, there's -- there's no expert

21    testimony -- there's no testimony by the defense expert that

22    the father's absence was a cause of anything.  The defense

23    expert didn't even examine the children.  There's no -- there's

24    no -- that doesn't support any defense expert opinion.

25         But, in any event, if it -- if it -- the absence of

1     the father does come in, it doesn't seem relevant whether he

2     was, you know, working for the Peace Corps in India or, you

3     know, had an out-of-state job or was incarcerated.  I don't

4     know that -- and especially in light of, you know, the

5     prejudice that the plaintiffs can suffer if evidence about the

6     incarceration is admitted.

7              THE COURT:  Well, if it -- I'm going to go on to note

8     that I don't think there is substantial prejudice to the

9     children from allowing evidence of Mr. Booth's situation.  That

10    doesn't logically follow to my sense of understanding.  And I'm

11    not -- I'm not sure -- I mean, Mr. Hofeld, be careful what you

12    wish for.  I'm not sure it's not more problematic, to the

13    extent it's problematic at all, that Mr. Booth -- if Mr. Booth

14    voluntarily absented himself from his children's lives as

15    opposed to, you know, being incarcerated and prevented from

16    being part of his children's lives.  There could -- I think

17    it's also foreseeable that there could be argument and evidence

18    that -- well, I'm going to strike that.

19             So I don't see the potential prejudice here to be

20    particularly great.  I mean, we're not talking about the

21    children and their own, you know, misconduct by children.

22    We're talking about the fact that their father was in custody

23    for -- was it a year?

24             MS. MONAGHAN:  It was about three years, I believe.

25             THE COURT:  Three years.

 1          MR. A. HOFELD:  And, your Honor -- yeah.  I would

 2    just -- the only other thing I would point out, Judge, is it

 3    again introduces this specter of criminality over the whole

 4    family so the jury -- we're already going to start out with the

 5    jury hearing, you know, there's a search warrant for an

 6    individual and firearms for the plaintiffs' apartment.  And,

 7    you know, for the jury to also hear -- and there's zero

 8    evidence of record to even suggest that Mr. Booth who wasn't

 9    even around at this time was involved in anything.  But, you

10    know, for the defense to be able to say -- for the jury to hear

11    that Mr. Booth was incarcerated, it just adds to this specter

12    of criminality and it just doesn't seem to be relevant to --

13    the reason why he was absent from his children just doesn't

14    seem to be relevant to the damages claim.  And I think the only

15    argument defense want to make with respect to damages is that

16    the father's absence was another cause or, you know, perhaps

17    the sole cause of the children's traumatic distress, not, you

18    know, the August 9th, 2018, gun pointing and that argument --

19          THE COURT:  Okay.  I get -- I get your argument.

20          MR. A. HOFELD:  Yeah.

21          THE COURT:  What's the argument that it's relevant why

22    Mr. Booth was absent?

23          MR. KOWALCZYK:  Judge, it's all over the medical

24    records.  There was a stressor that was actually discussed in

25    the records of Legend Booth, for example, of his father being

1    incarcerated.  It was a specific thing that bothered him that

2    we were asking Dr. Berkowitz about -- Dr. Kraus does in his

3    report -- but it's literally the facts of what was going on in

4    his mental health life in terms of the incarceration of his

5    father.  It bothered him, it had -- it was a stressor, it had

6    an impact on his mental health so it's relevant and that's why

7    we went into it with Dr. Berkowitz.

8           MR. A. HOFELD:  Well, just -- just respectfully to my

9    colleagues over there, it's just -- I think that's a

10   mischaracterization of the medical records.  There's one brief

11   note I think on one date and to me it's clear that it's a

12   reference to the father's absence.  It's the absence that's

13   the -- that, you know, suggests a concern or a source of

14   stress; not the fact of where he is.

15          And Dr. Kraus has no opinion.  Their medical expert

16   does not give an opinion that supports causation on this and

17   for that reason, I mean, we -- you know, there was a ruling on

18   a very similar issue in *Mendez* and the court there barred Dr.

19   Kraus's opinion because he -- he can't offer an opinion like

20   that because he never examined the children and he doesn't know

21   so it's just speculation, so.

22          MR. JOHNSON:  And, your Honor, if I can add one more

23   point to my colleague --

24          THE COURT REPORTER:  Can you please be by the mic?

25          MR. JOHNSON:  Sorry, Madam Court Reporter.

1    One more point to what Mr. Hofeld is saying, one of

2   the issues is that it -- is that it presupposes that the child

3   has an understanding of the incarcerable conditions of their

4   father, that they understand the conditions of confinement,

5   they understand what he's going through during incarceration.

6   The child is not -- the science is clear, absentee fathers

7   matter.  You know, the DSM-V states this in all the diagnoses,

8   we all know that, but to somehow impute the incarceration onto

9   the child's understanding just would not be fair.  We as adults

10  understand it but you're asking the -- the jury to take on that

11  when the child did not and it does create a specter of

12  criminality over the family that is just unfair.

13       THE COURT:  All right.

14       MR. KOWALCZYK:  It was the reason for the absence and

15  that's what was discussed in the medical records and it's

16  throughout both experts' reports it was questioned about so I

17  think your Honor's point of it being a relevant fact to the

18  damages is -- our argument remains the same.

19       THE COURT:  All right.  I'll -- I'll put this one on

20  TBD and I'll take a look at the specific references as to

21  whether there is discussion with -- about Mr. Booth's

22  incarceration versus his absence and we'll hold that one in

23  abeyance.

24       MR. A. HOFELD:  That's 31 and 32, right, your Honor?

25       THE COURT:  Well, let's --

1          (Pause.)

2          THE COURT:  Yeah.  I think those are peas in the same

3     pod.

4          MR. A. HOFELD:  Okay.

5          THE COURT:  All right.  Plaintiffs' 33 is to exclude

6     all evidence and reference to plaintiffs playing video games

7     that depict guns, watching scary movies, and the like.

8          (Pause.)

9          THE COURT:  What exactly is the defendants' argument

10    in response to this motion?  Why is it relevant to be

11    presenting evidence that the plaintiff -- some of the

12    plaintiffs' children play video games that involve shooting?

13         MR. KOWALCZYK:  It's actually two-part, Judge.  I

14    think -- like getting away from medical evidence, it's what

15    kids normally do and then their normal activities of daily

16    living and them doing things that kids do.  That's number one.

17    This is what they do.  This is how they're -- you know, how

18    they are.  They're not trapped in their room all day long.

19    They go -- they do things and it goes in hand in hand with the

20    activities that they do and things -- activities of daily

21    living, things that they enjoy, acting like, shall we say,

22    normal kids would act.  It goes in hand in hand with that.

23         On the expert medical level, Dr. Kraus does reference

24    it in his report relative to -- specifically I think Legend

25    plays video games and he has mentioned that, you know, it -- he

1    doesn't seem uncomfortable with violent behavior is literally

2    the types of games that he plays where they're shoot-em-up

3    games, that sort of thing.  Fortnite is such a game.  Call of

4    Duty is that kind of game.

5           We're not going to spend a lot of time on it but it's

6    background, I think, when they're asking for significant

7    damages with respect to the impact in terms of how they go

8    about their daily lives is more along the lines of how I

9    envision that topic.  But it does have two different --

10          THE COURT:  So they don't recoil in horror when they

11   see a gun on the television or in the movies or --

12          MR. KOWALCZYK:  It could be.  I mean, that -- I don't

13   think I'm going to ask that specific question but it goes to

14   what they do and kids being kids.

15          MR. A. HOFELD:  Well --

16          MS. MOORE:  Right.  And I think to the extent

17   they're -- there's some kind of argument that it's a negative

18   thing to play these games, if plaintiffs are trying to imply

19   that we're trying to argue that this means that they don't care

20   about violence or whatever, that's actually -- that's not the

21   case.  It's exactly what Mr. Kowalczyk is saying, it's that

22   kids play these games.  I think there will be people on the

23   jury who play these games and/or who have kids who play these

24   games or brothers or maybe sisters, I don't know, and -- but

25   they're common games.  They're games that a lot of people play.

1   They're games that a lot of teens especially are playing and

2   the point of it is to say they're able to do these things.

3   They're able to do these things that a lot of people are doing,

4   a lot of teenagers are doing despite the fact that they do

5   involve weapons and things like that.

6              MR. A. HOFELD:  Your Honor, may we respond?

7              THE COURT:  Yeah.

8              MR. A. HOFELD:  Thank you.  I mean, I guess I would

9   just say that first there's a -- I think it's -- they elicited

10  that, you know, the boys play video games with guns, they

11  elicit that the kids, or at least one of the kids, likes scary

12  movies.  To us, it's clear that this was asked in a way that --

13  to suggest that there was some kind of equivalency between

14  doing those things and having guns pointed at them in August of

15  2018 and that because they're playing video games with guns and

16  watching scary movies afterwards, you know, they were

17  comfortable with guns and they weren't really affected by

18  having assault rifles pointed at them.

19              And there is, however, zero medical evidence on their

20  side to support that kind of argument.  Dr. Kraus does not give

21  an opinion that -- he does not give an opinion along those

22  lines.  That's an argument that the defense is making.  This

23  exact opinion was barred in *Mendez* when the defendants tried to

24  elicit testimony that the child plaintiffs in that case played

25  some of the same video games, Fortnite and others, where there

1   are some guns involved.  There's no -- there's no opinion

2   that -- you know, there's no medical opinion that supports this

3   kind of argument in Dr. Kraus's report.  There's a brief --

4   there's a mention here or there but there's no medical opinion

5   and he didn't examine the children.

6          And finally, I mean, even if you grant defendants'

7   argument that, you know, we just want to show what a normal kid

8   does, the kinds of things that normal kids does, well, I mean,

9   focusing on scary movies and gun pointing, you know, is

10  potentially prejudicial, more prejudicial than probative to the

11  plaintiffs, you know, to the extent that the defendants are

12  going to suggest some kind of false equivalency between having

13  guns pointed at them and then later on playing video games,

14  playing -- you know, watching scary movies and playing video

15  games with guns to suggest that, you know, they weren't really

16  harmed by having the guns pointed at them.

17         THE COURT:  Yeah.  I mean, there's literally an

18  infinite number of ways one could make the point pointing to,

19  you know, any activity that the child did that, you know, is

20  normal.  I think the probative weight of that could vary

21  depending on the specific activity that is being issued but

22  when we're down at the -- I mean, presumably there's no

23  evidence that's going to be presented to say that any of the

24  kids like to jump rope but kids like to jump rope or ride bikes

25  or play baseball or basketball or what have you.  The fact that

1    they did or pursued particular activities, you know, I think

2    has, for those reasons, fairly limited probative value.  We're

3    already letting some of that in or -- you know, evidence that

4    they had romantic relationships, normal activity.

5         I think this particular motion relating to the use of

6    firearms, understanding the City saying no, we're not saying

7    there's an equivalency, we're saying they weren't affected by

8    it and they're doing normal things, in the context of a case

9    where we're talking about pointing guns and traumatic

10   experiences relating to guns, it's going to be confusing to the

11   jury to separate out the appropriate inferences to be drawn --

12   that can be drawn about the use of or the playing of those

13   games.  I think it's confusing.  I think it's got little

14   probative value compared to the confusion that it could

15   engender so I'm going to grant the motion in limine.

16        MR. KOWALCZYK:  And, your Honor, just a clarification

17   because these things -- and co-counsel is correct, we're not

18   using this as any sort of nefarious cast.  The question -- the

19   answer came about is "what do you like to do" and that's how

20   the video games came about.  "What type of things do you like

21   to do?  I like to watch movies.  What kind of movies do you

22   like to watch?"  That's where the types of movies were elicited

23   by their responses.

24        So I -- in terms of cross-examining any of the

25   children, being allowed to ask generally activities that they

1   are involved in, for example, video games is not nefarious.

2   You know, going into the specific type of video game -- I

3   completely understand your Honor's ruling on the

4   firearm-related stuff but just -- just so we know some of our

5   contours of what we should stick to or forget.

6           THE COURT:  All right.  I think it's fair game to ask

7   them what they like to do.

8           MR. KOWALCZYK:  Okay.

9           THE COURT:  If they answer, you know, they like to

10  watch a particular video game or just video -- video games

11  generally, I think that's okay.  We're not going to delve into

12  what video games do you want to watch, you know --

13          MR. KOWALCZYK:  Understood.

14          THE COURT:  -- do you like Fortnite or -- I don't even

15  know the names of these games.

16          MR. A. HOFELD:  I don't either.  I barely do.  Hanging

17  on with the fingernails.

18          THE COURT:  All right.  So that's -- that was 33.  33

19  will be granted understanding it doesn't preclude general

20  questions about what the children like to do.

21          All right.  Let's take a break.  Try to keep it to

22  less than ten minutes and we'll pick up.

23          MR. A. HOFELD:  Sounds good.

24      (Recess at 11:42 a.m. until 11:51p.m.)

25          THE COURT:  Are we ready?

1     MR. Z. HOFELD:  Yes.

2     THE COURT:  All right.  And again, just as an FYI,

3  pointing to 1:00 o'clock or maybe a few minutes after,

4  depending on where we are, is where I need to stop.  So it's

5  looking less likely we'll get through all the motions in limine

6  but there's some duplication between the plaintiffs and the

7  defendants that will hopefully streamline things, but.

8     Plaintiffs' 35, to bar Commander Cline's testimony

9  that during his career, five CPD officers had been shot and

10  killed while executing search warrants.

11     MR. A. HOFELD:  I think we skipped 34, your Honor,

12  unless that was intentional.

13     MR. KOWALCZYK:  That would be a *Daubert*.

14     THE COURT:  Yeah.  I think that's a *Daubert* motion.

15     MR. A. HOFELD:  I don't think it's a *Daubert* at all;

16  but if you consider it a *Daubert,* that's fine.

17     THE COURT:  I'll just remind -- I don't have it in my

18  spreadsheet here --

19     MR. A. HOFELD:  Okay.

20     THE COURT:  -- of the non-*Daubert* motions in limine.

21     MR. A. HOFELD:  Okay.

22     THE COURT:  I'm not sure what it is, but I'll address

23  it in connection with the *Daubert* motions or --

24     MR. A. HOFELD:  Thank you, your Honor.

25     THE COURT:  -- separately.

1    Okay.  So plaintiffs' 35 is to bar Commander Cline's

2    testimony in that regard.  That's going to be denied.  For the

3    most part, the evidence is relevant to explain training

4    policies and procedures.  That said, it will be granted to the

5    extent that there's -- the effort to offer any testimony that

6    someone had been murdered during search warrant executions, I

7    think that's more pejorative than we need.

8         Plaintiffs' 36 is to bar argument, generalization,

9    speculation, innuendo that where there's drugs there's guns.  I

10   think that's unopposed so that will be granted.

11        Plaintiffs' 37 is to bar the defense from using prior

12   pleadings.  That motion will be denied.  Prior pleadings can be

13   used for impeachment purposes and that will be permitted here.

14   If the plaintiffs want any limiting instruction, you can

15   propose one.  What you've offered at this point is too broad.

16        Plaintiffs' 38, bar questioning regarding all

17   reference to whether plaintiffs lived in a bad, dangerous, or

18   high crime neighborhood or area.  That will be granted.  I

19   think it's unopposed if I'm understanding the defense argument.

20   So defendants cannot ask questions referencing whether the

21   plaintiff lived in a bad, dangerous, or high crime neighborhood

22   or area.

23        Plaintiffs' 39 is to bar evidence that the former

24   defendants were part of a "gun" team.

25        MR. A. HOFELD:  Your Honor, I should clarify.  I think

1    there's a bit of a misnomer.  I think we meant this to apply

2    to -- also to the remaining defendants who were on the search

3    team which was called the Area South Gun Team.  I'm not sure

4    why it's titled this way but I believe the body of the

5    motion --

6            THE COURT:  Okay.

7            MR. A. HOFELD:  -- is clear about this.  We were --

8            THE COURT:  Okay.  Yeah.  I -- I get the point.  So

9    bar evidence that defendants -- whether currently or formerly

10    defendants in this case -- was part of the gun team.  That will

11    be denied.  It really, I think, reasonably falls into the

12    permissible background evidence that can be provided as to the

13    parties and I don't think there's any real prejudice that is

14    caused by allowing that identification.

15          It also suggests has some relevance and probative

16    value to suggest that there is -- there are specific officers

17    whose duties involve firearms and, you know, serving on a gun

18    team which could suggest additional training and I think that's

19    also of potential relevance here.

20          Plaintiffs' 40 is to bar reference to commendations,

21    awards, things like that.  That's unopposed.  That will be, I

22    think, largely unopposed.  It will be granted.

23            MR. A. HOFELD:  I'm sorry.  41 or 40 -- 40 was the --

24            THE COURT:  40.

25            MR. A. HOFELD:  Okay.

1          THE COURT:  I'm sorry.

2          MR. A. HOFELD:  All right.  Thank you.

3          THE COURT:  All right.  So that's granted in large

4    part.  If the defendants think the door has been opened because

5    of evidence introduced by the plaintiff with respect to

6    misconduct, you can raise that with the Court.

7          Plaintiffs' 41 is to bar defendant officers from

8    wearing their police uniforms, bullet-proof vests, medals, or

9    the like at trial.  It's unopposed and will be granted.

10          Plaintiffs' 42, to bar mention of dismissed defendants

11   and claims and to bar any mention certain claims were dismissed

12   against or decided in favor of certain existing defendants.

13   That will be granted in part; denied in part.  Defendants don't

14   oppose the motion as a general matter but clearly the fact that

15   they're former defendants doesn't mean that the former

16   defendants can't be referred to by witnesses in explaining what

17   happened at various points in time if those witnesses were

18   involved.

19          With respect to claims that were dismissed, those

20   should not be referred to.  And again, the plaintiffs cannot

21   argue that the search warrant was not valid or was not

22   supportable by probable cause.  And to the extent this

23   addresses the property damage issue, we'll get to that in

24   defendants' motion in limine number 2.

25          Plaintiffs' 43 is to bar reference to the individual

1    defendants' financial inability to pay a judgment for

2    compensatory damages.  That will be granted.  Defendants'

3    financial status is not relevant unless defendants make it an

4    issue by pleading poverty.

5         Plaintiffs' 44 is to bar arguments that appeal to the

6    jurors' pecuniary interest as taxpayers.  That's unopposed and

7    will be granted.

8         Plaintiffs' 45 will be to exclude all non-party

9    witnesses from the courtroom during trial except for expert

10   witnesses.  That will be granted.  Expert witnesses are

11   routinely permitted to observe the court proceedings.

12        Plaintiffs' 46, to bar question, argument, et cetera,

13   that damages award to LaKai'ya Booth and Legend Booth would or

14   could be exploited by their parents or some other adult.

15   That's not opposed and defendants represent that they don't

16   intend to make such arguments or introduce such evidence so

17   that's granted.

18        Plaintiffs' 47, bar witnesses, exhibits, factual or

19   legal defenses that were not disclosed in defendants'

20   pleadings, Rule 26(a)(1) disclosures, or answers to discovery.

21   I'm going to deny that as a motion in limine if -- meaning if

22   you have an objection to something on that basis, you need to

23   raise it at the time.  That said, it should also be raised --

24   it should not be raised -- well, it could be raised in a

25   non-pejorative manner but it won't be discussed substantively

1   in front of the jury.

2           Plaintiffs' 48, limit the parties and the attorneys'

3   examinations of the minor plaintiffs at trial.  That will be

4   basically denied.  If minors are called to testify, we've

5   already indicated that plaintiffs' minors must testify in the

6   courtroom.  Other minors testified pursuant to and consistent

7   with the rules for use of deposition testimony.  There will not

8   be a time limit imposed ex ante on such examinations.  Leading

9   questions will be permitted.  And I see no reason to clear the

10  courtroom during the testimony of minor witnesses, but

11  cross-examination of any minor witnesses will be limited to one

12  attorney.

13          Plaintiffs' 49, bar evidence of the consent decree

14  issued in 17-6260.  This will be granted in part and denied in

15  part.  The evidence of negotiations of the consent decree are

16  relevant.  As we've discussed already, it's certainly open to

17  the plaintiffs to question the sufficiency or genuineness of

18  the participation in those negotiations by the defendants.

19  That goes to the -- whether the defendants were deliberately

20  indifferent to these issues as we've discussed already.

21          All right.  If I'm understanding things correctly, the

22  parties don't disagree that the consent decree itself will not

23  be admitted into evidence.

24          MS. MOORE:  Correct.

25          MR. A. HOFELD:  Well, we do have some disagreement,

1    Judge.  I -- it's -- I think -- I think we do -- we do

2    have -- in our response to a couple of those City's motions in

3    limine, I mean, our baseline position is that everything about

4    the consent decree should be excluded and that's what

5    we -- that's what we presented here in motion in limine 49.

6              But we -- and we also argue in the alternative that if

7    the City is allowed to introduce evidence of entering into the

8    consent decree or negotiating the consent decree, then

9    plaintiffs should be allowed to introduce -- to show that

10   nothing in the consent decree addressed the fundamental, the

11   pattern of excessive force against children.  I don't know that

12   we are able to -- I don't know that we're able to offer -- I

13   don't know that there -- that we have evidence to rebut, you

14   know, the City's alleged good faith negotiations.  All of our

15   evidence rebutting -- all of our evidence that the entry into

16   the consent decree was lip service at least when it came to the

17   pattern of excessive force against children is based on the

18   content of the consent decree, the City's -- the extent of

19   the -- the extent of the City's noncompliance with implementing

20   provisions of the consent decree so -- so we -- we do argue to

21   be able to admit some of that and we have consent decree

22   witnesses listed in our -- on our witness lists.

23             THE COURT:  Well, my question was specifically related

24   to introduction of the consent decree itself.

25             MR. A. HOFELD:  Right.

1    THE COURT:  And I don't -- I don't -- what you're

2    saying is, you know, you might want to introduce the consent

3    decree as a whole to prove the negative that it doesn't address

4    a particular issue.  I wouldn't bar you from seeking testimony

5    on that point but --

6            MR. A. HOFELD:  Right.

7            THE COURT:  -- I don't think we appropriately put the

8    entire consent decree in front of the jury.

9            MR. A. HOFELD:  And we're fine with that as long as

10   there's not a claim -- if there's a -- you know, if there's

11   a -- super briefly, if the witness says, you know, there's no

12   provision in the consent decree -- if the witness testifies no

13   provision in the consent decree prohibiting officers from

14   pointing guns at civilians or children, witness agrees yes, as

15   long as the City doesn't make an argument that this is a -- you

16   know, that some other part of the consent decree -- I think

17   we'll be able to work it out.  I think -- yes.  I think in

18   general, we do not seek to admit the entire consent decree,

19   your Honor.  And the importance of having a witness about the

20   consent decree is so that they can testify efficiently and

21   briefly about what it contains and what it doesn't.

22           THE COURT:  Okay.

23           MS. MOORE:  If I may, your Honor.

24           THE COURT:  Yep.

25           MS. MOORE:  The issue with getting into what the

1    consent decree contains and what it doesn't is that that is the

2    result of a months if not a years-long essentially settlement

3    negotiation between the Attorney General's Office and the City.

4    It involved hearings with various stakeholders.  It

5    involved all of this stuff getting into the final product.  I

6    mean, a lot of it is outside of the City's hands.  Judge Dow

7    approved it as addressing that the final product of what --

8    addressing what the lawsuit brought by the Attorney General was

9    seeking to redress.

10          And so if we're getting in -- that's like a trial

11   within a trial about whether the consent decree is sufficient

12   and there's -- there's a lot of issues with that because, I

13   mean, certain -- I mean, there's not a provision in it that you

14   can't point guns at children; there's not.  We're not going to

15   say that there is.  But I think that if we're going to be

16   attacking the consent decree, we're attacking that whole

17   process that is still actively going on and being monitored by

18   another court in this building.

19          So getting into the nuances of the consent decree

20   presents a lot of issues that are not actually relevant to the

21   claim here which is what was happening in 20 -- beginning of

22   2018, 2017, 2016, 2015, whether all of that caused these

23   defendant officers to think that they -- well, first of all, to

24   point guns directly at children and then, secondly, to think

25   that they could get away with it.

1          And what this ultimate final product that involved

2    multiple entities, not just the City, should not be used -- it

3    would be incredibly problematic for that to be used to show

4    that the City was being deliberately indifferent about what it

5    was aware of in August of 2018 in the months and years leading

6    up to that.

7          MR. A. HOFELD:  So briefly, Judge, if I may.

8          The City can't use the consent decree as both a sword

9    and a shield.  They can't -- they can't use the consent degree

10   as a sword and say, ha, we decided to enter this consent decree

11   so we're not deliberately indifferent.  If they can use it as a

12   sword and also as a shield and prevent us from showing, you

13   know, what the -- showing that the consent decree did not

14   actually address what was a problem in 2018, namely the pattern

15   of gun pointing at kids, it's just -- it's fundamentally unfair

16   for them to be able to use it as a sword to defeat deliberate

17   indifference and as a shield to prevent us from rebutting their

18   evidence that they weren't deliberately indifferent.  It's a

19   public document.  We're not going to get into the negotiations.

20   That's not -- that's -- you know, that's 408 and that's --

21   nobody wants to get in that morass.

22          We would -- as I said, we would briefly and

23   efficiently call one witness who would, you know, be -- say in

24   response to a few specific questions, you know, is there a

25   provision about this in the consent decree, yes, no, and it

1      would be very, very quick and very efficient and done.

2              And again, it's not causation -- it's not causation

3      that makes the consent decree relevant.  It's -- it's the

4      issue -- it's the Monell element of deliberate indifference.

5      And if they're going to be able to use it as a sword and say we

6      weren't deliberately indifferent, then, you know, we -- I think

7      we have to be able to rebut that claim and show that --

8              THE COURT:  Well, we --

9              MR. A. HOFELD:  Yeah.

10             THE COURT:  -- discussed this already from the

11     standpoint of, you know, you -- you don't have to rely on what

12     happened in 2020.  You can point to what was happening in 2018

13     to argue the City's participation and the process isn't

14     indicative that it wasn't deliberately indifferent.  You know,

15     it -- while they were not -- I mean, I'm making things up but,

16     you know, if they never showed up for meetings, if they -- you

17     know, anything inconsistent with suggesting that their

18     participation in the process was genuine, you can point that

19     out and try to diminish the probative value and to establish

20     that they really didn't care about this issue.  They weren't --

21     they were indifferent about it and weren't really -- they were

22     going through the motions, they were paying lip service to the

23     process but were not there.

24             But the outcome of that process ultimately two years

25     later or -- I forget -- more than two years later doesn't tell

1   us that the City was not recklessly indifferent or deliberately

2   indifferent.  You -- they could have genuinely been interested

3   in resolving this issue but for whatever reason could not reach

4   agreement with the other parties involved in the process or,

5   you know, they might have come to a different conclusion.  I

6   just don't see the -- ultimately the relevance of whether --

7   you know, I mean, frankly, also -- I mean, it's your case and

8   your arguments to make, but the fact that there's a consent

9   decree process that involves all these different actors and

10  it's -- the final product comes out without a written policy

11  about pointing guns at children, I'm not sure that doesn't work

12  against you.

13          But in any event, I don't think we can infer from the

14  absence of that provision in whatever year the consent decree

15  came out that the absence of such a provision is probative of

16  whether the City was genuinely involved in participating in the

17  process of trying to address this particular policy.

18          MR. A. HOFELD:  Judge, can I make -- there's -- the

19  chronology is -- there's critical chronology here that we're

20  not -- that we haven't discussed.  There was a public draft of

21  the consent decree within one month of the incident in this

22  case so August -- so the incident was in August 2018.  The next

23  month, September of 2018, there was a public draft of the

24  consent decree and so it -- and then there was a -- then the

25  final was signed and entered by Judge Dow in January of 2019,

1   whatever, four months later.  I mean, I think that that

2   contemp -- you know, that contemporaneousness is important here

3   because it shows that the content decree was basically already

4   negotiated, the contents were already negotiated as of the

5   incident date in this case.  And so, I mean, I think that does

6   make more probative the absence in the consent decree of

7   anything that, you know, that was -- that was intended to

8   address the pattern of gun pointing at children which the City

9   was on notice of from the DOJ and the PATF.

10          And it's also not only the contents or the lack of

11  contents in the consent decree.  It's also the City's -- the

12  large extent of noncompliance with the consent decree and being

13  far, far behind on implementation of provisions of the consent

14  decree.  So all of that together I think is -- is evidence that

15  tends to undermine the City's attempt to use the consent decree

16  as a sword and to prevent us from using it as a shield, so.

17          THE COURT:  Well, I certainly don't think that the

18  fact that there -- the consent decree relates to things other

19  than pointing to -- guns at children even coming in, you know,

20  a draft that's more contemporaneously connected to the

21  negotiation tells us anything about the legitimacy of the

22  City's concern about that issue and whether the City's

23  deliberately indifferent about it because we've got so many

24  actors.

25          I mean, if -- if this was a document proffered by the

1   City alone as its suggestion of what was appropriate, maybe

2   you'd have a stronger argument that it's probative.  But I

3   guess this also leads me to question if -- if what's in the

4   consent decree is the product of this multi-faceted process,

5   why do you -- why do you get to use it and not them?

6          MS. MOORE:  So we're not trying to use the consent

7   decree.  The City -- it's fairly limited evidence and testimony

8   related to it.  It's, you know, the city council -- and again,

9   as your Honor pointed out, there's -- there are arguments to be

10  made from the plaintiffs' side about how good of evidence this

11  is for us.  There's resolutions issued by city council saying

12  we order the City to engage in this process and that's --

13  that's what it is.  I mean, that's the evidence, engage in the

14  process.  So plaintiffs can say, okay, engage in the process,

15  you've been told that there's a problem right now, do something

16  right now and that's how they can attack it.

17         So there's city council issuing resolutions, ordering

18  the various City departments to engage in the consent decree

19  process which the City then does.  There's testimony from

20  30(b)(6) witnesses saying, well, after these reports were

21  issued, this is what we started doing, we started developing

22  this training, things like that.  That's what the evidence is.

23  It -- nobody is going to get up there and say well we entered

24  into a consent decree and that shows that we were not

25  deliberately indifferent.  It's going to basically be this

1   timeline of events, the reports were issued.  Okay.  After

2   that, here's what we did, we started developing these

3   trainings.  Here's what city council did.  They issued

4   resolution saying engage in this process.  Nobody is going to

5   hold out the consent decree itself as the end all be all of

6   solving the problems that plaintiffs allege were here.

7          And I -- your Honor kind of picked up on what I was

8   saying about the trial within a trial in the sense that since

9   this is not contained in the consent decree, that is -- kind of

10  goes to an underlying theme of our defense which is that -- and

11  we disagree, the parties disagree on this, but it's the City's

12  contention that the pointing of guns at children was not an

13  issue that was brought up in the DOJ report and that's part of

14  the reason why it's not in the consent decree.

15         And so we're not even trying to get in to the consent

16  decree itself.  We're just all -- plaintiffs' main evidence

17  here is that these two reports were issued and the City, you

18  know, didn't do anything to address it and we're saying well,

19  here are the things that we had started to do after the reports

20  were issued, starting developing training, city counsel is

21  issuing resolution say hey, you've got to respond to this

22  stuff.  That's -- that's basically what it is.  No witness is

23  going to get up there and say that this final product or what

24  we were doing in 2020 or anything like that is the exact

25  solution to the problems that plaintiffs are alleging here.

1      THE COURT:  So why do we need the consent decree at

2  all?

3      MR. A. HOFELD:  Because, your Honor, they're saying --

4  they're not using the consent decree but they are using the

5  consent decree.  They are going to refer to the consent decree.

6  They're going to say we weren't deliberately indifferent

7  because we agreed to enter into negotiations for a consent

8  decree, agreed to a consent decree, and then they're not going

9  to -- and then they're going to oppose any effort for us to say

10  okay, well, what did the City agree to.

11      And the City -- you know, the City wasn't -- I mean,

12  it was a settlement so there was -- there was a negotiation.

13  The City was the main party --

14      THE COURT:  Well, let me just interrupt you for a

15  second --

16      MR. A. HOFELD:  Yes.

17      THE COURT:  -- so I don't lose my train of thought --

18      MR. A. HOFELD:  Sure.

19      THE COURT:  -- at the expense of you losing your train

20  of thought.

21      If the consent decree or the draft consent decree or

22  the DOJ report on which the consent decree ultimately evolves

23  from doesn't talk about the problem of pointing guns at

24  children --

25      MR. A. HOFELD:  Right.

1          THE COURT:  -- why is it relevant to you or to

2     plaintiff?

3          MR. A. HOFELD:  It's -- your Honor, if I may.  There's

4     Seventh Circuit case law on this very point that we've cited;

5     and I know it's -- it's cited in different places.  It's in our

6     jury instructions, it's in our -- but.  So even if the City

7     can -- if we can show -- the City can still be deliberately

8     indifferent where their approach that they implemented to

9     address a problem was ineffective --

10         THE COURT:  But the -- the problem here --

11         MR. A. HOFELD:  -- and so --

12         THE COURT:  -- is not apparently any of the problems

13    that are actually addressed by the consent decree.  The problem

14    here is something that was not addressed by the consent decree.

15         MR. A. HOFELD:  Right.  And there's also case law on

16    that.  I mean -- I mean, we are allowed to show under the -- as

17    I understand the case law that we've cited, we are allowed to

18    show that what they did or didn't do -- whether it was because

19    it was ineffective or it was because they didn't address the

20    problem at all, we are allowed to show -- you know, we are

21    allowed to show the -- the end product, the result of their

22    supposed effort.  We are allowed to use that as evidence to

23    show that their original effort was -- you know, was lip

24    service or was lip service in -- with respect to, you know, the

25    specific pattern of misconduct that's at issue here.  I just

1    think the case law is just very clear on that and I think

2    that's where we're standing.

3           And again, it's not trials within trials.  I've said

4    several times we're not seeking to enter the whole consent

5    decree.  We have one witness, you know, very briefly, does it

6    include this, does it include that.  It's a very -- it's a

7    very -- it's a very quick witness.  No trial within a trial.

8           But I think the case law -- the case law allows

9    us -- if they're claiming -- they're using the consent decree

10    as a sword to claim they were not deliberately indifferent --

11           THE COURT:  Well, let's --

12           MR. A. HOFELD:  Yeah.

13           THE COURT:  -- stop right there.

14           MR. A. HOFELD:  Sure.

15           THE COURT:  If the City does not present evidence that

16    says we -- you can -- you jurors can infer reasonably that we

17    were not deliberately indifferent because we engaged in the

18    consent decree process, if they don't say that -- if they say

19    that, they've raised the issue of the consent decree and what's

20    in it --

21           MR. Z. HOFELD:  Correct.

22           THE COURT:  -- but I'm not understanding you to be --

23    that you're going to say that.

24           MS. MOORE:  Well, no.  We are going to say that in

25    this time frame up to August of 20 -- August 8th, or whatever,

1   of 2018, these are the things the City did.

2          And I have to back up a little bit, though, because we

3   do have a motion in limine to exclude the DOJ report because we

4   don't think it's relevant because we don't think it finds what

5   they say it finds and so there's that kind of disconnect here.

6          We agree with any idea that none of this is actually

7   relevant to the policy at issue here.  But since we're

8   anticipating plaintiffs being able to get into the DOJ report

9   and the DOJ's findings, this evidence is our response to that,

10  okay, the City was provided this -- the DOJ report, this is

11  what was done in response to the DOJ report.

12         THE COURT:  But the DOJ report -- correct me if I'm

13  wrong -- does not address pointing guns at children.

14         MS. MOORE:  Correct.  In our opinion, yes.

15         MR. A. HOFELD:  Well, it's not correct, your Honor,

16  and just give me two sentences because they've addressed it

17  twice now --

18         THE COURT:  No; go ahead.

19         MR. A. HOFELD:  -- and we haven't had a chance.

20         There's a separate section in the DOJ report with the

21  find -- under the heading CPD has a pattern and practice of

22  using excessive force against minors, against children; and it

23  goes on for a couple of pages.  It's a subset of the overall

24  finding that CPD has a pattern and practice of excessive force

25  against everyone.  It's a specific section in the report.

1     In that section and in a couple of other places in the

2  report, there are anecdotes -- the DOJ relies on anecdotes of

3  officers pointing guns at an 8 year old and at 12 year olds

4  when there was apparently no justification for it.  So we

5  believe it is -- it is abundantly clear the DOJ was addressing

6  a pattern of excessive force against children that included

7  unjustified gun pointing.  And we -- you know, we cited

8  those -- we've cited to the page numbers in the DOJ report, you

9  know, where those findings are, where that evidence is

10 discussed.  So -- so I think it is very clear that the DOJ

11 did -- did address -- did say this was a problem and the -- and

12 the Police Accountability Task Force also said something very

13 similar, namely that CPD officers are not trained to interact

14 with youth of color without traumatizing them, so.  Anyway,

15 thank you.  Thanks for hearing us on that, Judge.

16     THE COURT:  All right.  I'm going to take this under

17 advisement and I'll look further at your motions and response.

18 It's obviously a significant issue.  I don't want to do

19 anything overhasty so I will look back at it and we'll circle

20 back to this.  Okay.  That was plaintiffs' 49.

21     Plaintiffs' 50 is to bar all evidence and argument

22 regarding the confidential informant.  Unopposed?

23     MR. KOWALCZYK:  Yes, as long as it's not raised in

24 terms of the quality of the investigation.  If they don't open

25 the door.

1      THE COURT:  All right.  Well, as we covered several

2  times, the validity, legitimacy of the search warrant is not

3  going to be at issue and so the evidence and argument about the

4  confidential informant who supplied the information on which

5  the legitimate valid search warrant was based seems to have no

6  relevance so I will grant that motion.

7      Plaintiffs' 51, bar evidence and argument regarding

8  the search warrant target's criminal history.  That will be

9  denied.  This is akin to the earlier motions in limine seeking

10  to bar information about Mr. Bell.  That information is highly

11  relevant to the planning and execution of the search warrant.

12      Plaintiffs' 52 is to bar defendants from gaining an

13  unfair advantage by using law enforcement databases to

14  investigate potential jurors and witnesses.  There won't be any

15  use of any information outside the court -- that's developed

16  outside the courtroom with respect to the selection of the jury

17  in this case.  I don't anticipate jury selection will take more

18  than the first day but -- so to the extent anybody has the

19  ability to connect to the internet or law enforcement databases

20  or anything else during jury selection, that is forbidden.

21      What I did not pick up on the first time I went

22  through this was the second part relating to the use of law

23  enforcement databases to investigate the background of any

24  prospective or -- yeah, any witnesses.

25      Mr. Hofeld, are you seeking to bar the defendants from

1    accessing those kinds of databases?

2            MR. A. HOFELD:  Yes, your Honor.

3            THE COURT:  As to witnesses?

4            MR. A. HOFELD:  As to witnesses, yes, your Honor.

5            THE COURT:  All right.  On what basis?

6            MR. A. HOFELD:  I mean, it's certainly -- it's unfair

7    because plaintiffs --

8            THE COURT:  Anything -- anything they come up with I

9    think -- well --

10           MR. A. HOFELD:  I mean, there's just an inherent

11   disadvantage because since we're not a police department, we

12   don't have access to these enormous databases with, you know,

13   lots of information about people.

14       (Counsel conferring.)

15           THE COURT:  I suspect -- a couple of observations.  At

16   this juncture in a 2018 case, I think it's a fair inference to

17   draw that law enforcement databases have been used to

18   investigate and develop defenses in this lawsuit for quite some

19   time.  The information obtained in -- through those processes

20   would have been disclosable under discovery requests presumably

21   so I'm not sure why that process is unfair to the plaintiffs at

22   this juncture.  You've had full discovery.

23           MR. JOHNSON:  So, your Honor, on that point I think

24   your Honor is correct.  This case has been going on since 2018.

25   If there are -- if there had been things that had been

1    disclosed, obviously plaintiff is on notice of it.  However,

2    given just the vast advantage that the City has to connect to

3    these databases both state and national, there is no way for

4    plaintiffs to cure any -- any prejudice that may be thrust upon

5    us because the City decides at the -- before a witness

6    testifies to have the police department or one of their

7    investigators who sits in their office at the law department to

8    run someone's name.

9            MR. A. HOFELD:  Your Honor, this motion is entirely

10   unopposed is my understanding from defendants' response to

11   number 52.

12           THE COURT:  Well, I read it as opposed --

13           MR. A. HOFELD:  There's just a --

14           THE COURT:  -- to the jurors.

15           MR. A. HOFELD:  I think it just says "defendants

16   unoppose plaintiffs' motion in limine number 52," period.

17           MS. MOORE:  Your Honor, to be completely honest, we

18   don't frankly have the time to even run all of the witnesses

19   through any of these databases so it's -- I don't think that

20   that's even going to happen.

21           THE COURT:  Right.  And --

22           MS. MOORE:  And as you alluded to, anyone we would

23   have been interested in doing, we already did and we've already

24   agreed, you know, like the plaintiffs and all that.  You know,

25   I think it's a non-issue.

1          THE COURT:  Okay.  All right.  To keep it a non-issue,

2     if you do that and you obtain any information, it must be

3     promptly disclosed to the plaintiff.

4          Plaintiffs' 53, bar "why I wanted to be a police

5     officer" testimony.  That will be granted.  That's, I think,

6     unnecessary and not really encompassed by what would be

7     appropriate background information so that will be granted.

8          Plaintiffs' 54, bar evidence, testimony, et cetera, by

9     defense counsel or defense witnesses that vouches for the

10    credibility of the defendant officers or other police

11    witnesses.

12         (Pause.)

13         THE COURT:  Well, I think the case law is clear you

14    can't make the argument that the officers wouldn't risk their

15    careers by testifying falsely, but certainly the defendants are

16    permitted to present evidence that police officers generally

17    and the defendants in the context of this case face risk to

18    their personal safety.  That's obviously foundational to the

19    reasonableness of their actions and planning for execution of

20    the search warrant so that will be granted in part and denied

21    in part on those lines.

22         Plaintiff 55 is to bar all reference to plaintiff's

23    financial condition, government benefit, loans, and/or greed.

24    That will be denied in part.  It's denied to the extent that it

25    would purport to prevent the defendants from presenting

1    evidence that -- through presumably cross-examination of

2    witnesses that they have a financial stake in the outcome of

3    the trial.  That's fundamental impeachment, bias information

4    that is not problematic.

5           What could be problematic would be the information

6    about the -- other information about the plaintiff's financial

7    condition, you know, what government benefits they obtain,

8    arguments that this is a -- and this, we'll address plaintiffs'

9    56 at the same time -- you know, that this is a lawsuit

10   lottery, a get-rich-quick scheme, an effort to get a big

11   payday, things like that I won't permit.  But the basic issue

12   that if the plaintiffs' claim prevail that they have a

13   financial interest in winning the case, that is fair game.

14          Plaintiffs' 57, last but not -- allow jurors to submit

15   written questions following each examination of each witness.

16   Denied.  We're not doing that.  Lots of reasons, but I'm pretty

17   firm in that view.

18          All right.  Where are we?  We'll press forward for

19   another 15 minutes or so.

20          Defendants' motion in limine number 1, bar argument or

21   testimony that officers were searching -- only searching for

22   one gun given that two different guns were subject of two

23   different search warrants.  Let me -- I have a question with

24   regard to this motion.  Was the gun described in the 5039

25   warrant the same gun that was found during the 5039 search?

1      MR. KOWALCZYK:  No.  Two different guns.  Two

2  different residences.  5033 was the black gun.  That's the

3  plaintiff's residence was not recovered.  In 5039, the two-tone

4  weapon which was the subject of that search warrant was, in

5  fact, found.

6      THE COURT:  No.  That's my question.

7      MR. KOWALCZYK:  Okay.

8      THE COURT:  The search warrant for 5039 describes a

9  two-tone gun --

10      MR. KOWALCZYK:  Yes, sir.

11      THE COURT:  -- and a -- the two-tone gun was found at

12  the 5039 residence?

13      MR. KOWALCZYK:  Correct.

14      THE COURT:  Okay.  All right.  I'm going to grant

15  defendants' motion number 1.  Each search warrant described a

16  different gun.  The fact that one gun matching the description

17  of the gun in the 5039 warrant was found in the 5039 residence

18  doesn't invalidate in any way the warrant for the 5033 house

19  because there was still a gun that had not been located in that

20  house.

21      Defendants' 2, bar evidence, arguments regarding

22  claimed property damage given the summary judgment ruling.  I'm

23  going to grant this motion.  I don't think it's disputed as to

24  property damages.  The plaintiffs argue that the manner of

25  entry is relevant to other claims such as the unlawful manner

1    of search and the intentional infliction of emotional distress.

2    But in dismissing their claim for property damage, Judge

3    Kocoras determined that the plaintiffs failed to supply

4    evidence that the defendants' manner of searching the property

5    was excessive or unnecessary or was anything more than

6    negligent.  In order words, Judge Kocoras determined that the

7    manner of search was neither unreasonable nor intentional so

8    these alternative theories for the -- for the introduction of

9    the property damage evidence fail.

10            Defendants' 3 is to bar evidence, argument on lack of

11   body worn camera footage and failure to wear or activate body

12   worn cameras and to bar certain body worn camera footage.  The,

13   motion is granted with respect to the defendants' search team

14   officers and -- because the plaintiffs don't oppose that part

15   of the motion, but the motion is denied with respect to the

16   SWAT officers.

17            The plaintiffs, as I understand it, argue that the

18   exemption of SWAT officers from the body worn camera

19   requirement is core Monell evidence.  The individual SWAT

20   officers may not have been at that time required to wear body

21   worn cameras but that's as a result of the defendant City's

22   policy choice not to equip and require SWAT team officers to

23   have body worn cameras and activate those cameras during their

24   activities and particularly despite having information that

25   they would be executing warrants in homes where children might

1    be present.

2          So, in other words, the fact that the City didn't

3    require the SWAT team to have body worn cameras isn't a reason

4    to exclude the evidence that they didn't have body worn cameras

5    because it is evidence of the practices that were in place at

6    the time of the search that were practices implemented by the

7    City.

8          Defendant 4 is to bar evidence and argument

9    criticizing the search warrant investigations, the validity of

10   the underlying warrant, arguments that -- or statements that

11   warrant for -- or that the 5033 house was the, quote, wrong

12   house, closed quote, or a, quote, wrong raid, closed quote, and

13   as well as barring any argument that the target needed to

14   reside at the target residence.  That motion will be granted.

15         Plaintiffs cannot present evidence or argument that

16   the warrant process was unlawful or invalid -- we've talked

17   about that repeatedly -- or that the warrant was based on

18   inaccurate information about the target's location.  Plainly,

19   the target couldn't be present in both houses at the same time.

20   So the fact -- if he was found at one, he obviously couldn't be

21   at the other but that doesn't invalidate the warrant or mean

22   that the warrant for the 5033 house was issued for the wrong

23   house.

24         Defendants' 5 is to request that the Court keep track

25   of trial hours.  We've already discussed that.

1          Defendant 6 is to bar any use of media reports

2   or -- media reports regarding the search warrant for

3   plaintiffs' residence with the exception of any relevant

4   statements made on video by the plaintiff or by a plaintiff.

5   I'm going to deny this as a motion in limine.  The defendants

6   haven't identified specific statements that they're concerned

7   about and I'm not going to make a categorical ruling.  It does

8   seem likely that many such statements might include hearsay.

9   That would be a problem should those statements be sought to be

10  admitted but defendants will have to raise a timely objection

11  at trial if they want to raise those issues.

12          MR. KOWALCZYK:  Your Honor, just -- I didn't mean to

13  interrupt but in the interest of time, we just had a couple

14  housekeeping matters today.  We felt today might be the time

15  just to flag these items.

16          THE COURT:  Sure.  Let me -- we'll get to it in just a

17  minute.

18          MR. KOWALCZYK:  Sure.  Thank you.

19          THE COURT:  All right.  That's a good place to stop.

20  Your housekeeping matters?

21          MR. KOWALCZYK:  Yes, sir.  And co-counsel is free to

22  jump if I misstate.  But we have 12 SWAT officers and the

23  specifics in regards to those types of officers is they are on

24  call many times with respect to incidents around the City.

25  It's not a huge group of individuals in the department to begin

1    with so it was just an item I wanted to flag for the Court just

2    to be aware of that -- that from time to time -- we're not

3    going to make any reference to it but there may be times where

4    a SWAT officer may not be able to be here because of that or

5    because -- you know, because of the -- something that occurs

6    that requires their attention to it.  We're going to work with

7    the command structure to avoid those instances but I wanted to

8    flag that in general.

9            MS. MOORE:  Just to --

10           THE COURT:  All right.

11           MS. MOORE:  If I could provide the Court a little bit

12   more information about it on behalf of the City.  So the SWAT

13   team is approximately 60 officers only and the way it works is

14   they have different teams on shift at different times.  So I

15   think right now, what, two of them aren't SWAT anymore so it's

16   10 -- well, yeah.  So 10 approximately -- so that's one-sixth

17   of the team that is going to have to be here for at least three

18   weeks which presents some pretty big logistical issues for the

19   police department especially if there's a major event.  And so

20   they are working so that the officers can be -- the shifts can

21   be worked out to be -- for them to be here I think every day of

22   trial which we all obviously prefer, but there is a possibility

23   that if there's a major event, they will have to be called out.

24           But the bigger concern from our perspective is -- and

25   this is somewhat in relation to the motion in limine about

1  notice of witnesses is that even though they are making

2  arrangements for the officers to be able to be here during the

3  trial day, that doesn't preclude them from being called out to

4  an incident overnight.  So we have some concern that if we

5  don't know when they are going to be testifying, they could be

6  called out overnight and be showing up here at a trial with no

7  sleep having been sitting in the courtroom all day and then

8  going to an incident at night and then having to basically come

9  straight here again and testify.  So obviously that's a totally

10 hypothetical situation but we did want to make sure the Court

11 was aware that if something like that happens, we would be

12 requesting some leeway there -- perhaps to move the officer to

13 testify to a different day or something like that -- so they

14 can at least get a little bit of sleep before they're put on

15 the stand.

16        THE COURT:  All right.  We'll certainly try to avoid

17 that kind of situation.  Defendants should, as you represented

18 you're doing, try to coordinate with the City in terms of those

19 kinds of scheduling issues and trying to have predictable

20 progress in the case but emergencies do happen.  I will

21 certainly endeavor to be reasonable in responding to them and

22 adjusting our proceedings as necessary and I'm sure the

23 plaintiffs would be cooperative in that process as well.

24        MR. KOWALCZYK:  And I wasn't sure, your Honor, if

25 you -- your practice would be notice of who are -- who the next

1   day's witnesses are in advance of like 48 hours even or

2   something that gives us the ability to then know -- and we can

3   provide the command structure of that information as well that

4   these are individuals who will be on in the next day or next

5   two days?

6           MS. MOORE:  Because with -- 24-hour notice, that might

7   not be enough time for us to get them off the schedule for the

8   night.  So 48 hours, yes, and then we could avoid a situation I

9   guess is what I'm saying.  So if we're given enough notice of

10  when these guys might be testifying, then we could schedule it

11  so that they don't have a nighttime shift the night before

12  they're testifying.  The problem will arise if we're told

13  midday on Tuesday that they're testifying Wednesday, then we

14  don't have the ability to take them off the nighttime shift.

15          THE COURT:  Okay.

16          MR. PATTERSON:  Your Honor, we're prepared to work

17  with them to make -- sorry.  Your Honor, we will work with the

18  defendants to accommodate those logistics.

19          THE COURT:  Okay.  All right.

20          MR. A. HOFELD:  And partly because we have a similar

21  issue, Judge, that I just want to flag.

22          THE COURT:  Okay.

23          MR. A. HOFELD:  Ten seconds.  We -- our hope is that

24  we won't have to keep the minors or the young adults here in

25  the courtroom for the entire three weeks because they would

1  have to miss a whole -- like all of that time in school.  One

2  of them is in college, et cetera.

3         Our plan if it -- you know, we talked about it with

4  the defense some and if it pleases the Court, our plan was to

5  have all of the plaintiffs including the kids here certainly

6  for openings -- for jury selection, for openings, certainly

7  when they testify as well as for closings but there may be some

8  days in the middle when it would be better to have the kids in

9  school, you know.  But I wanted to raise it to, you know, give

10 your Honor -- have your Honor's -- have your Honor's thoughts

11 on the matter.  I don't think there's an objection from the

12 defense if all of the kids are not here for every day of the

13 trial but it will be up to your Honor.

14         THE COURT:  I'm certainly not going to require any

15 party to be present.  They're represented by counsel.  They

16 don't have to be present understanding they, you know, may want

17 to be present for particular periods is -- they're -- they have

18 a right to be present for the entire proceedings.

19         In terms of working these things out, I -- this is

20 exactly what I was talking about at the outset of our meeting

21 today.  I expect counsel on both sides to be cooperative in

22 this process and minimize the burden on folks who are

23 testifying while also ensuring that we can continue to make

24 progress in light of changes that have to be made so definitely

25 think about in advance the problems that are unique to these

1   witnesses but if -- you also need to be contemplating if this

2   does become a problem, what -- how are we going to fill the gap

3   so I do want you to be paying attention to that prospect as

4   well.  I don't want people testifying who haven't been to sleep

5   in 24 hours and have been dealing with a crisis situation

6   during the nighttime hours to have to come back and testify at

7   9:00 a.m. the next morning.  I don't want to lose an entire

8   morning until we get, you know, the next witness who was

9   contemplated.  So when you're dealing with witnesses who don't

10  present these kinds of troubles, you need to start -- you need

11  to also advert to the possibility we'll give, you know, the

12  best notice we can.  But you may -- because of the identities

13  of, you know, the parties and some of the witnesses, you know,

14  you may have to spend the better part of the day sitting in

15  court waiting to see if you're going to be needed to call or

16  whatever.  That's part of what you need to be prepping your

17  witnesses about as well.

18          MR. KOWALCZYK:  Absolutely.  Thank you, your Honor.

19  And this is more minor but just logistically speaking, a table

20  and chairs for -- we have -- for our defendants as well as an

21  extra witness room I think we were going to ask if that's an

22  availability.

23          THE COURT:  Yeah.  We can certainly get another

24  witness room on this floor.  I don't anticipate having

25  counsel -- six counsel for the parties at counsel table.  You

1    can be present but, for instance, nobody is going to sit where

2    you're sitting, Mr. Hofeld, in that row.  We've got computers

3    there.  You're right on top of the jury.  And to be fair with

4    that, I'm not going to have six lawyers at counsel table for

5    the defendants either.  You can all -- you're all welcome to be

6    present.  Some of you are going to have to sit on the benches.

7    We can probably get another table over here if somebody wants

8    to do that.  I don't know if anybody is planning on having a

9    paralegal or somebody who is, you know, putting your exhibits

10   on the screens and doing that kind of stuff.  Typically, we put

11   them over on the side so that they're not taking up space on

12   counsel table so think about that as well.

13         I'm not dictating anything other than we can't have

14   this many lawyers at counsel table.  We'll have to have some --

15   you know, we can block off a couple of the benches for parties

16   or other counsel as necessary.  But again, we can't -- we can't

17   have this many lawyers at counsel table so think about that,

18   think about how you might want to tackle that issue and we can

19   talk more about that.  We don't have to resolve it today

20   obviously.  What else?

21         MR. KOWALCZYK:  When would you like us back?

22         MR. A. HOFELD:  Yeah.  And, Judge, we're -- you know,

23   we're to the point where we've got to start issuing subpoenas

24   but we're also -- whether we do so is dependent on some of the

25   rulings on, you know, motions in limine that haven't been ruled

1    on yet.  I mean, we have some issues we want to discuss with

2    you so I don't know.  I just was hoping we can come back soon.

3              THE COURT:  We will come back this coming week.

4              MR. A. HOFELD:  Okay.

5              THE COURT:  10:00 o'clock on next Thursday the 15th.

6              MR. A. HOFELD:  That works for plaintiffs' side, your

7    Honor.

8              THE COURT:  All right.  And let's -- I want to

9    schedule a time the week of the 26th as well.  As I think I

10   have mentioned at some point along the way but, regardless, I

11   will be out of the office the week of the 19th of January so I

12   will be essentially inaccessible that week.

13             So we'll have 10:00 o'clock on the 15th as the next

14   status hearing and then I want to set something on the week of

15   the 26th in advance of our start date on February 2nd.  And it

16   may be -- hopefully there won't be that much that we need to

17   talk about in that third meeting.  But in case we have issues

18   to talk about, I want to have something scheduled.  So let's

19   also book Wednesday, January 28th at 1:30.

20             All right.  And I will also -- hopefully before the

21   next status hearing but it's not the highest priority --

22   getting through the motions in limine is the highest priority,

23   but at some point I will send you the proposed voir dire that

24   takes what you have suggested and merges that into a single

25   document.  Just for your general information, we will do a

1   written questionnaire that the potential jurors will fill out,

2   we'll copy, get those to you with a very brief opportunity to

3   begin reviewing them before we bring the venire in and start

4   doing follow-up questions with them based on their responses to

5   the jury questionnaires.

6         To the extent your clients intend to be here for jury

7   selection, we're basically going to be limited to half the

8   courtroom in terms of -- because potential jurors will be over

9   here so anybody else is going to have to be over here during

10  jury selection.  Okay.

11        Anything else we need to address right now?

12        MR. A. HOFELD:  Just --

13        MR. KOWALCZYK:  Thank you very much, your Honor.

14        MR. A. HOFELD:  Does your Honor need -- should we plan

15  on having a set of our exhibits ready for the Court either

16  electronically or paper, whatever --

17        THE COURT:  Yes.  I want you to have paper documents

18  in the courtroom because stuff happens and we don't want to

19  delay the trial because we don't have --

20        MR. A. HOFELD:  Right.

21        THE COURT:  -- the electronic stuff isn't working

22  properly.

23        MR. A. HOFELD:  So we should have a set for the Court

24  as well, a paper set?

25        THE COURT:  Yes.

1      MR. A. HOFELD:  Okay.  And then, Judge, in terms of

2   the length of openings and closings, I'm not sure what your

3   Honor's practice is or -- would you like the parties to confer

4   and come up with a proposal?

5      THE COURT:  Yes.  Talk to each other, see what you

6   think you genuinely need, and you can make your proposal and

7   we'll see what I think of it.

8      MR. A. HOFELD:  Okay.

9      MR. Z. HOFELD:  Thank you, your Honor.

10     MR. KOWALCZYK:  Thank you, your Honor.

11     THE COURT:  I will say at whatever time we finish jury

12  selection, it is my intention -- though plans don't always turn

13  out to complete -- my expectation is we'll complete jury

14  selection on the first day and I would -- with enough time that

15  I would hope that we could do opening arguments.  That may be

16  overly optimistic.  But again, in the interest of moving things

17  forward expeditiously, we're going to try to use all available

18  time to be productive and move forward.  Okay.

19     MR. KOWALCZYK:  The last thing that just dawned on me,

20  I think counsel for -- I don't know what prompted it, in terms

21  of witnesses on the stand, for example, parties, does your

22  Honor have a preference of they're on once, then there's no

23  scope objection?

24     THE COURT:  Good question.  I'm all for calling

25  someone and giving leeway to the cross-examining side to go

89

1    beyond the scope of the direct examination so that we don't

2    have to recall those witnesses.

3              MR. KOWALCZYK:  Thank you.

4              THE COURT:  Okay.  Oh, number of jurors, we're going

5    to have eight jurors.

6              Okay.  Anything else?

7              MR. KOWALCZYK:  Thank you, your Honor.

8              THE COURT:  All right.  We will see you on next

9    Thursday.

10             MR. A. HOFELD:  Very good.  Thank you very much, your

11   Honor.

12             MR. KOWALCZYK:  Thank you, your Honor.

13        (Concluded at 1:15 p.m.)

14

15                         *   *   *   *   *

16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18
     _/s/Laura LaCien_____        _January 12, 2026_
19   Laura LaCien, CSR, RMR, CRR                Date
     Official Court Reporter
20

21

22

23

24

25